## Case No. 5,126.

Case of FRIES.

[Whart. St. Tr. 458; 3 Dall. 515.]

Circuit Court, D. Pennsylvania. April Term, 1799.

IREDELL, Circuit Justice (charging jury).[1]
Gentlemen of the Grand Jury: The im-

[1] By the act of July 9, 1798 [1 Stat. 580], provision was made for the registering of the number and the measurement of the windows in each house, for the purpose, however, not of laying a tax upon the windows themselves, but of obtaining an approximate valuation of the house, which was the real subject of taxation. Understood in the cities, the progress of the excise officers, charged as they were with this somewhat inquisitorial duty, was regarded with indifference; but in the interior, and particularly in the north-eastern corner of Pennsylvania, the treatment which they received was far different. At first the matter appears to have been given up to the women, who treated the invaders of their fire-sides with every species of indignity, resisting, as the trial will show, the measurement of their windows by all the domestic artillery; but in a short time the discontent spread itself throughout the whole population, and the result was that the execution not only of this particular law, but of the process of the United States in general, was entirely frustrated. A proclamation was forthwith issued by the president, which is subjoined; and then, either finding himself, on the spur of the moment, unable to muster sufficient force to compel submission, or yielding to the suggestions that to dispel a state disturbance, state militia would be most serviceable, he directed a demand to be made on the governor of Pennsylvania.

By the President of the United States of America: Proclamation. Whereas, combinations to defeat the execution of the laws for the valuation of lands and dwelling-houses within the United States, have existed in the counties of Northampton, Montgomery and Bucks, in the state of Pennsylvania, and have proceeded in a manner subversive of the just authority of the government, by misrepresenta-

portance of the duties you are now called upon to fulfil, naturally increases with the increasing difficulties of our country. But however great those difficulties may be, I am persuaded you will meet them with a firm and intrepid step, resolved, so far as you are concerned, that no dishonor or calamity (if any should await us) shall be ascribable to a weak or partial administration of justice.

If ever any people had reason to be thankful for a long and happy enjoyment of peace. liberty and safety, the people of these states surely have. While every other country almost has been convulsed with foreign or domestic war, and some of the finest countries on the globe have been the scene of every species of vice and disorder, where no life was safe, no property was secure, no innocence had protection, and nothing but the basest crimes gave any chance for momentary preservation; no citizen of the United States could truly say that in his own country any oppression had been permitted with impunity, or that he had any grievance to complain of, but that he was required to obey those laws which his own representatives had made, and under a government which the people themselves had chosen. But in the midst of this envied situation, we have heard the government as grossly abused as if it had been guilty of the vilest tyranny; as if common sense or common virtue had

tions to render the laws odious, by deterring the officers of the United States to forbear the execution of their functions, and by openly threatening their lives. And whereas, the endeavours of the well-affected citizens, as well as of the executive officers, to conciliate a compliance with those laws, have failed of success, and certain persons in the county of Northampton, aforesaid, have been hardy enough to perpetrate certain acts, which, I am advised, amount to treason, being overt acts of levying war against the United States, the said persons, exceeding one hundred in number, and armed and arrayed in a warlike manner, having on the seventh day of the present month of March, proceeded to the house of Abraham Lovering, in the town of Bethlehem, and there compelled William Nicholas, marshal of the United States, and for the district of Pennsylvania, to desist from the execution of certain legal processes in his hands to be executed, and having compelled to discharge and set at liberty, certain persons whom he had arrested by virtue of a criminal process, duly issued for offences against the United States, and having impeded and prevented the commissioners and assessors in conformity with the laws aforesaid, in the county of Northampton aforesaid, by threats of personal injury, from executing the said laws, avowing as the motive of these illegal and treasonable proceedings, an intention to prevent, by force of arms, the execution of the said laws, and to withstand by open violence the lawful authority of the government of the United States. And whereas, by the constitution and laws of the United States, I am authorized, whenever the laws of. the United States shall be opposed, or the execution thereof obstructed in any state, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by powers vested in the marshal, to call forth military force to suppress such combinations, and to cause the laws to be duly executed; and I have accordingly determined so to do, under the solemn conviction that the essential

fied from our country; and those pure principles of republicanism, which have so strongly characterized its councils, could only be found in the happy soil of France, where the sacred fire is preserved by five directors on ordinary occasions, and three on extraordinary ones—who, with the aid of a republican army, secure its purity from violation by the legislative representatives of the people. The external conduct of that government is upon a par with its internal. Liberty, like the religion of Mahomet, is propagated by the sword. Nations are not only compelled to be free, but to be free on the French model, and placed under French guardianship.

French arsenals are the repository of their arms, French treasuries of their money, the city of Paris of their curiosities; and they are honoured with the constant support of French enterprises in any other part of the world. Such is the progress of a power which began by declarations that it abhorred all conquests for itself, and sought no other felicity but to emancipate the world from tyrants, and leave each nation free to choose a government of its own. Those who take no warning by such an awful example, may have deeply to lament the consequences of neglecting it. The situation in which we now stand with that country is peculiarly

---

interests of the United States demand it. Wherefore I, John Adams, president of the United States, do hereby command all persons being insurgents as aforesaid, and all others whom it may concern, on or before Monday next, being the eighteenth day of this present month, to disperse and retire peaceably to their respective abodes: and I do, moreover, warn all persons whomsoever, against aiding, abetting or comforting the perpetrators of the aforesaid treasonable acts, and I do require all officers and others, good and faithful citizens according to their respective duties and the laws of the land, to exert their utmost endeavours to prevent and suppress such dangerous and unlawful proceedings. In testimony whereof, I have caused the seal of the United States of America to be affixed to these presents, and signed the same with my hand. Done at the city of Philadelphia, the twelfth day of March, in the year of our Lord one thousand, seven hundred and ninety-nine, and of the Independence of the said United States of America the twenty-third. By the President, John Adams. Timothy Pickering, Secretary of State. Philadelphia, Friday, March 22, 1799.

War Department, March 20th, 1799. Sir:—To suppress the insurrection now existing in the counties of Northampton, Bucks and Montgomery, in the state of Pennsylvania, in opposition to the laws of the United States, the president has thought it necessary to employ a military force, to be composed in part of such of the militia of Pennsylvania, whose situation and state of preparation will enable them to march with promptitude. The corps of militia first desired on this occasion are the troops of cavalry, belonging to this city, and one troop from each of the counties of Philadelphia, Bucks, Chester, Montgomery and Lancaster. These troops, I have the honour to request your excellency will order to hold themselves in readiness to march on or before the 28th instant, under the command of Brigadier General Macpherson. I have the honour to be, with the greatest respect, your excellency's most obedient and humble servant, James McHenry.

His Excellency, Gov. Thomas Mifflin.

The response was as follows:

Sir:—The secretary of war has this moment communicated to me the president's intention to employ a military force, in suppressing the insurrection now existing in the counties of Northampton, Bucks and Montgomery, with a request, that the troops of cavalry belonging to this city, and a troop from each of the counties of Philadelphia, Bucks, Chester, Montgomery and Lancaster, may be ordered to hold themselves in readiness to march, on or before the 28th inst., under the command of Brigadier General Macpherson. You will, therefore, immediately issue general orders for complying with the president's request; and communicate by express, with the commanding officers of the several corps. As soon as the troops are ready

to march, you will make your report to me; sending the returns of the officers, from time to time, as you receive them. I am. sir, your most obedient servant. Tho. Mifflin. Philadelphia, March 20th, 1799. 3 o'clock P. M. To Peter Baynton, Esq. Adjt. General of the Militia of Pennsylvania.

The legislature of the state being then in session, and having received the president's proclamation, under cover of a message from the governor, put it in charge of a committee, who reported as follows:

The committee to whom was referred a message from the governor respecting a proclamation of the president of the United States, announcing the combination to defeat the laws for the valuation of lands and dwelling-houses, which has existed in the counties of Northampton, Montgomery and Bucks report, that they have had the said message under their serious consideration, and find cause of deep regret, that combinations to defeat the laws of the United States, have a second time made their appearance in the state of Pennsylvania; that such combinations are repugnant not only to the pure principles of republicanism and the spirit of our constitution, but also highly dishonourable to the character of a portion of the citizens of our state. That laws tending to lay the heaviest burthen on the most opulent part of the community, should be opposed by those on whom it operates lightest; proves that the opposition has arisen from ignorance, or the most dark and malignant designs. Your committee cannot hesitate to express, with the most lively sensibility, their entire disapprobation of such unwarrantable conduct, tending to the dissolution of our government, and subversive of the principles of tranquility and good order, and it is the duty of every good citizen to discountenance such treasonable combinations, yet, as the general government has sufficient power to compel obedience to the laws, and the president has, in his proclamation, determined so to do in this instance, and has not thought the aid of the state necessary. The committee offer resolutions: Resolved, that this house will, when required, co-operate with the general government, with alacrity and promptitude, to suppress unlawful and treasonable combinations to defeat the execution of the laws of the United States, but as no such co-operation is now required, this house consider their interference at present as wholly unnecessary.

A motion was made by Dr. Logan, and seconded by Mr. Eyre, to add the following resolution to the report of the committee.

Aurora (Friday), March 25th, 1799. Resolved, that the governor be, and is hereby requested to cause full and due inquiry into the causes of the said riots, and to make special report to this house, thereupon, and particularly of any circumstance which may be alleged or discovered, tending to show the origin of the same in the agency of foreign incendiaries, or

critical. Conscious of giving no real cause of offence, but irritated with injuries, and full of resentment for insults; desirous of peace, if it can be preserved with honour and safety, but disdaining a security equally fallacious and ignominious at the expense of either; still holding the rejected olive branch in one hand, but a sword in the other—we now remain in a sort of middle path between peace and war, where one false step may lead to the most ruinous consequences, and nothing can be safely relied on but unceasing vigilance, and persevering firmness in what we think right, leaving the event to Heaven, which seldom suffers the destruc-

tion of nations, without some capital fault of their own.

Among other measures of defence and precaution which the exigency of the crisis, and the magnitude of the danger suggested to those to whom the people have entrusted all authority in such cases, were certain acts of the legislature of the United States, not only highly important in themselves, but deserving of the most particular attention, on account of the great discontent which has been excited against them, and especially as some of the state legislatures have publicly pronounced them to be in violation of the constitution of the United States. I

---

the seditious views of domestic traitors. On the question, will the house agree to the said resolution? The yeas and nays were as follows: Yeas, 27. Nays, 45.

The following is a translation of a manifesto in the German language, issued to the inhabitants of the counties of Northampton, &c., by General Macpherson, the officer in command—which gives a general view of the object with which he was charged.

William Macpherson, Brigadier General of the Armies of the United States, Commander of the Troops Ordered to Act against the Insurgents of the Counties of Northampton, Montgomery, and Bucks, in the State of Pennsylvania:—To the People of the Aforesaid Counties. Fellow Citizens:—Being ordered, by the president of the United States, to employ the troops under my command, or, according to circumstances, further military force, to procure submission to the laws of the United States, and to suppress and disperse all unlawful combinations which have there been made to obstruct the execution of the laws, or any of them, by main force or power; I, therefore, have thought it proper to inform the people of the said counties, and all others whom it may concern, of the danger to which they expose themselves by combining in unlawful proceedings, or giving any assistance or encouragement to those who are concerned therein; and likewise to represent to them, how just it is to submit to the laws in general, but, particularly to those against which they have opposed themselves in the most violent manner. It cannot be unknown to you, my fellow citizens, nor to any part of the people of the United States, that submission to the laws, constitutionally made, is absolutely necessary for the support of the government; and that in a republic, where laws are made by general consent, this consent must be manifested by the majority of such persons as have been appointed for that purpose by the people in general, according to the constitution. The whole mass of the people cannot meet together to make laws, as it is clear, in places where a debate takes place, there will always be a difference of opinion, and that, therefore, no decision can ever take place unless the voice of the majority prevails. The people of the United States were so well convinced of this truth at all times, that, since their first settlement in this country, they suffered themselves to become governed by assemblies, which they chose themselves to represent their persons; and, whenever it was necessary, they compelled by force of arms everybody to submit to the laws made by a majority in such assemblies. The federal government is as well a government of the people, as freely chosen by them to represent them, and to make laws for their benefit, as the governments of the respective states. It was established and ordained by the people themselves, as is expressly declared by the constitution, "To form a more perfect union,

establish justice, ensure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity." In order to obtain these great and desirable ends, for which the first articles of confederation were found to be altogether insufficient, they gave congress several powers specified in the constitution.

From the nature of the government, sometimes doubts may arise, and have already arisen, whether some of these powers authorize congress to make certain laws; nevertheless, there is a regular and lawful manner to decide such questions when they occur, to which all good citizens should resort, and submit to them without reserve. But, in the present case, no such doubt has ever been entertained, nor can it take place; because, in the constitution, it is expressly declared (article 1, § 8) "that congress" shall have power "to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defence and general welfare of the United States." The constitution giving this power to congress, that body has to decide when and in what manner it shall be exercised, and this decision must be expressed by a majority; and when this is once expressed, it must be obeyed, or else the constitution must fall, and with it, all good government, law and order, must be annihilated, and discord, civil war and anarchy must follow thereupon, where, without government, all things would be overturned and plunged into confusion. The act against which the present treasonable opposition is made, is that for laying and collecting a tax for the common defence and general welfare of the United States, therefore an act which congress is expressly authorized by the people to make; yea, on the least consideration, it is plain, that it is as necessary and equitable in itself, as agreeable to the constitution, and even favourable to those people who now oppose the execution thereof. Nobody has denied, nor can anybody deny, that the United States, at the time the act was passed, was threatened with the resentment of a very powerful, very ambitious, and very revengeful nation, and are so yet. From what this resentment originated, or whether it might have been obviated by a different course of conduct, are only accidental questions. The main question is, whether we should submit to those humiliations which that nation has heaped upon us, and subscribe to the scandalous conditions demanded of us, or prepare ourselves for resistance and the defence of our rights, as it becomes a free, independent nation. With respect to this question, which congress was obliged to decide upon, according to its duty "To provide for the common defence and general welfare of the United States," there was no difference of opinion, or, at least, there was none declared. All agreed that we should not submit to what France proposed, but prepare for our defence in case she should attempt to carry them by force. The only question was,

deem it my duty, therefore, on this occasion, to state to you the nature of those laws which have been so grossly misrepresented, and to deliver my deliberate opinion as a judge, in regard to the objections arising from the constitution. The acts to which I refer, you will readily suppose to be what are commonly called the alien and sedition acts. I shall speak of each separately, so far as no common circumstances belonging to them may make a joint discussion proper.

I. The alien laws, there being two. To these laws, in particular, it has been objected: 1. That an alien ought not to be removed on suspicion, but on proof of some crime. 2. That an alien coming into the country, on the faith of an act stipulating that in a certain time, and on certain conditions, he may become a citizen, to remove him in an arbitrary manner before that time, would be a breach of public faith. 3. That it is inconsistent with the following clause in the constitution (article 1, § 9): "The migration or importation of such persons as any of the states now existing shall think proper to admit, shall not be prohibited by the congress prior to the year one thousand eight hundred and eight, but a tax or duty may be imposed on such importation, not exceeding ten dollars for each person."

With regard to the first objection, viz.,

---

in what manner we should prepare, and how far these preparations were to go. Who were to decide this question? the majority or the minority? A majority, and a large majority of the people's representatives, chosen by themselves according to the constitution, made the decision, and resolved upon the manner of proceeding which has been observed. This manner of proceeding required money, and in order to obtain that a tax became necessary. If a different manner of proceeding had been adopted, money and the tax would nevertheless have been necessary; because it is impossible to defend the country in any way, or to make preparations for the defence thereof, without money. Even if there had been any base enough to propose a submission to the conditions of France, and the proposal had been agreed to, nevertheless, money and taxes would have been necessary; because France demanded of us before all things, the loan of many millions of dollars, and gave us to know that their further demands would be in proportion to our ability to pay. In order to raise this unlimited tribute, we should have been obliged to submit to much heavier taxes than congress has now laid for our defence. They certainly afterwards pretended to give up this demand; but, after all, so doing was only the consequence of our resistance and our preparations, and these preparations had already rendered the tax necessary. In laying this tax, congress paid the greatest attention to the situation and wants of the people, and distributed it in such a manner, that the burthen almost totally falls on the richer part, and the poorer class are greatly screened from the effects thereof. It is laid on lands, dwelling houses, and slaves; but as there are no slaves in this state, the whole tax falls upon the lands and dwelling houses. The lands are to be taxed exactly to their value, be the owner who he may, but the dwelling houses are appraised at a different rate. The poor man, whose house, out-houses, and lot, not exceeding two acres, are worth less than an hundred dollars, has nothing to pay; and if it were worth one hundred, the tax would be only twenty cents. According to the same rule, other houses of a higher value pay as follows:—

If $200 ...... ............... 40 cents
   300 ..................... 60
   400 ..................... 80
   500 ..................... 100

From which you will perceive, my fellow citizens, that the house-tax is according to the value of the house, at 20 cents to $100; but for houses from $500 to $1000 value, the tax rises for each $100, 30 cents; so that a house of the value of $600 will have to pay six times 30 cents, or $1 80 cents.

If worth $700 pays............$2 10 cents
        800 ................. 2 40
        900 ................. 2 70
       1000 ................. 3 00

At this rate, the rich man, with a house rated at $1000, has to pay three times as much of the tax as the poor man whose house is rated at one half that sum, viz., $500; and thus the tax operates progressively to the most costly houses and opulent people, until the value of their houses is taxed in proportion five times as high as those of their poorer fellow citizens, whose houses are worth only from $100 to $500. A house worth $100 pays 20 cents, which is only the one fifth part of one per cent. of its value; a house worth $30,000 pays $300, which is one whole per cent. of its value, and consequently five times as much in proportion as the other.

Hereby, my fellow citizens, you must be convinced that an opposition to this tax in our counties is not only contrary to the constitution, the laws, and every principle of good government, but in itself is inconsistent and ridiculous, as the tax which is opposed is the most easy on the poorer citizens, whom they irritate to opposition. Many of their houses, however, would have no tax to pay, and very few more than one dollar each, for very few of their houses will be rated at more than $500. It is true they will be subject to a land tax, but the tax on houses must first be deducted from the whole quota of the state, and what is then deficient will be laid upon the land. The houses in this state will probably pay the greatest part of the tax, perhaps the whole, and in that case no tax will be laid upon the land; and those whose houses are rated at less than $100, will be exempted from the tax. As a further proof of the attention of congress to the wishes and accommodation of the people, they have, during the last session, repealed that part which required a statement of the windows of each dwelling-house, and which, as it afterwards appeared, was more disagreeable than necessary and useful. Therefore, no further account of the windows has been demanded. To ascertain the value of the lands and houses was a difficult matter, and connected with a great deal of expense: but when once done, need not be repeated. Great pains were taken, and the most effective measures employed, to select people of good character, who understood the business well, and whose interests were equally involved with their fellow-citizens, to have the business accurately executed.

Besides, this act is not perpetual, being only for one year, and will not be continued, unless the public good demands it, and not otherwise than with the consent of the people through their representatives; as for those who have in so treasonable a manner opposed the execution of such lawful, necessary, and, for that part of the citizens who were the least able to pay taxes, indulgent law, there can therefore be no excuse; the bad consequences which they draw upon themselves by their criminal conduct, they cannot impute but to their own blindness, obstinacy and malice. On the contrary, every necessary step will and must be taken to bring them, and all others who have aided and abetted them, to submission, and trial by due

"That an alien ought not to be removed on suspicion, but on proof of some crime." It is believed that it never was suggested in any other country, that aliens had a right to go into a foreign country, and stay at their will and pleasure without any leave from the government. The law of nations undoubtedly is, that when an alien goes into a foreign country, he goes under either an express or implied safe conduct. In most countries in Europe, I believe, an express passport is necessary for strangers. Where greater liberality is observed, yet it is always understood that the government may order away any alien whose stay is deemed incompatible with the safety of the country. Nothing is more common than to order away, on the eve of a war, all aliens or subjects of the nation with whom the war is to take place. Why is that done, but that it is deemed unsafe to retain in the country, men whose prepossessions are naturally so strong in favour of the enemy, that it may be apprehended they will either join in arms, or do mischief by intrigue, in his favour? How many such instances took place at the beginning of the war with Great Britain, no body then objecting to the authority of the measure, and the expediency of it being alone in contemplation! In cases like this, it is ridiculous to talk of a crime; because perhaps the only crime that a man can then be

---

course of law, in order that their punishment may serve as an example to others, and prevent the like crimes in future. The necessity of employing arms against a number of our fellow-citizens is painful, but the consequences must be imputed to those whose traitorous conduct has produced the present disturbances, and not to government, who, according to their most sacred duties, are obliged to maintain order and enforce obedience to the laws. But all those who return quietly to their homes, and abstain from any participation in these unlawful acts, either through open aid or secret abetting, counsel, or information, shall obtain the utmost protection to their persons and property. Every precaution shall be taken that the march of the troops shall not be troublesome to the citizens; all subsistence shall be punctually paid for, and the strictest discipline observed. Let me, therefore, my fellow-citizens, warn and entreat you, as you love your country, and estimate the happiness concomitant of liberty, order and peace; as you wish to avoid the necessity of human bloodshed, which is as much repugnant to my wishes, as to those of the president; as you abhor the horrors of a civil war, and the crimes and punishments of traitors, let me conjure you to shut your ears against the counsels of those malicious persons who would lead you to destruction, in order to satisfy their ambition, while they screen themselves from the punishment due to their crimes; who try to seduce you to take up arms against the laws and government of your country, and to involve yourselves in a contest as hopeless as it is criminal, against the whole power of the United States; who speak to you of peace and liberty, while they are kindling civil war; who complain of expenses, while they are forcing the government to augment them, in order to suppress sedition and revolt; and who plume themselves upon being republicans, while transgressing the most essential principles of republican government: to wit, obedience to the laws made by the decision of the majority. Therefore I forewarn you not to aid or abet those violators of the law in any manner, so that you may avoid a participation of their crimes, and the consequent punishment.

Given under my hand and seal, at head quarters, April 6th, 1799. Wm. Macpherson. By order of the Governor. Jonathan Williams, Aid de Camp.

This manifest was accompanied with a letter from the Rev. Mr. Helmuth, a Lutheran minister of Philadelphia, conspicuous for his piety and zeal.

To the people of Northampton County: Friends and Brethren in the Faith: Excuse my addressing these lines to you; where there is fire, everybody is bound to extinguish it, and the clergyman is no more to be blamed for lending his aid than any other citizen. I am depressed with anxiety on your account. I know the consequences of conduct like yours; many of you will doubtless be apprehended and confined, some perhaps will pay the forfeit with their lives. You know it is the duty of the clergy of the city to warn such miserable persons, and prepare them as much as in their power for the awful change; my heart was much oppressed. I thought, alas! perhaps the same circumstances as those of 1794 will again occur; perhaps other thoughtless people will fall into the same wretched situation, because they were ignorant, and were deluded, and what would be your feelings if you had to witness their sorrow and anguish, their agonies of death? You should have warned the miserable creature; he would then perhaps have been saved; but you neglected to warn him, and are, therefore, responsible for the destruction of him and his. Such were the melancholy reflections that induced me to write you these few lines. I trust that you will think, when you read this, as you may in all truth: This man is sincere in his wishes for our welfare—why then should we think it improper in him to send us this advice? If he even should now and then say some things that are not perfectly agreeable to us, we will still take it in good part, for perhaps he is in the right, perhaps we have been deluded, we may have been deceived: If such be your thoughts, you will soon find them perfectly correct. You have hitherto entitled yourselves to the character of industrious and religious citizens of the Union, and most of the Germans still deserve that praise; but, sorrowful to relate, you have suffered yourselves to be spurred on to the most abominable injustice, to actual rebellion against the government you yourselves have chosen. How happy it is that your number is but small amongst the serious, and that the far greater part of them view your inconsiderate conduct with detestation! You all know that government cannot exist without taxes; at least your Bible would so instruct you; read Romans, xiii. 1–7; read it attentively. Do but reflect seasonably on your conduct. Even the holy passion week have you profaned with the works of actual rebellion. You have undertaken to oppose a tax which is as favourable to the country people as any tax can possibly be; for the rich inhabitants of the cities pay by far the greatest proportion of it; you have undertaken to oppose a tax which never would have been made had not the government been necessitated to make defensive preparations against the attacks of the French; a nation that aims at the overthrow and destruction of all religion, against a people that would scarcely have dared to attack and plunder us, if they had not been certain that they had their advocates amongst us. You do not consider the dreadful consequences of such opposition as you have made; I will therefore inform you of some of them. In the first place, an army of several thousand men will be marched into your neighbourhood; you well know that, in spite of every possible attention of commanding officers,

charged with. is his being born in another country. and having a strong attachment to it. He is not punished for a crime that he has committed, but deprived of the power of committing one hereafter to which even a sense of patriotism may tempt a warm and misguided mind. Nobody who has ever heard of Major Andrè, that possesses any liberality of mind, but must believe that he did what he thought right at the time, though in my opinion it was a conduct in no manner justifiable. Yet how fatal might his success have proved! If men, therefore, of good character, and held in universal estimation for integrity, can be tempted when a great object is in view, to violate the strict duties of morality, what may be expected from others who have neither character nor virtue, but stand ready to yield to temptations of any kind? The opportunities during a war of making use of men of such a description are so numerous and so dangerous, that no prudent nation would ever trust to the possible good behaviour of many of them. Indeed, most of those who oppose this law seem to admit that as to alien enemies the interposition may be proper, but. they contend it is improper, before a war actually takes place, to exercise such an authority, and that as to neutral aliens, it is to—

---

excesses will be committed by an army. You will be more or less prevented from following your usual occupations, and yourselves and families will be put in the greatest terror and apprehension. 2dly. The army will cost money, and this money the government will have to raise by new taxes, for which you must thank your own opposition. The Western Expedition in 1794, cost a million of dollars; from this you may judge what expense you will bring on yourselves and fellow-citizens by your scandalous insurrection. 3dly. If you make any farther opposition, you will necessarily be treated as rebels, and before a month has passed, many of you will be in prison. They will be torn from their wives and children, and some will probably suffer an ignominious death. Alas! my heart bleeds for you. You have been told a thousand falsehoods. You have been told that the militia approved of your violence, and would not march against you. But you have been wrongfully deceived. For my own part, I have heard many speak of your conduct, but I have not heard one approve of it; your best friends, (if those are your best friends who agree with you in political opinion,) say, the occurrences in Northampton are very unjustifiable; the insurgents must be subdued; what would become of us if everybody was to create an insurrection? This is the substance of what is thought and said of your conduct—and you may depend upon it, that the government could, at a very short notice, muster upwards of twenty thousand men, if such a number were necessary, who would willingly march against you. Every one cries, shame! shame! upon you. I beseech you to mark well the character of those men who have enticed you to this insurrection. Are there not many of them who spend more money at the taverns in the course of a few evenings, than their whole tax amounts to? Honest Christian men will never advise to rebellion. but more especially against a government which has scarcely its equal under the sun. No. they are wicked, restless men, who have deceived themselves and you. It is your misfortune that you have suffered the habit to grow upon you, of scandalizing government; of cursing, instead of blessing it; and then indeed there are enough to be found. who, having particular ends in view, will scheme with you; persons who wish for your friendship on election days, in order that they may get a lucrative office under the very government that they blaspheme. When matters come to extremities, these deluders know perfectly well how to slip their necks out of the halter. and let the deluded suffer; these, who in comparison with the former, are innocent, will be left to bake, as their deceivers have brewed. Think of me, when you experience this sorrowful truth. Alas! you have been most scandalously deceived: from my soul I pity you. But what is now to be done? Listen, and take my advice. It is possible. that the marshal will be sent with an armed force to seize the wretches who opposed him in arms. For God's sake, do not let yourselves be prevailed upon to abet those rebels; for, should you be found in their company, you will certainly be punished with them. Rather endeavour to persuade them to deliver themselves up to the proper authority, (and this would be the wisest course they could pursue;) but if they will not do so, give the marshal every assistance he may require, for it is your duty. Take my advice. Affection for you, and the impulse of conscience, have compelled me to write you this letter. If you follow my counsels, you will do well; if not, I have done my duty. Be assured that I remain your friend. J. Henry Ch. Helmuth. Philadelphia, March 28th, 1799.

The view taken by the opposition generally of the "insurrection," may be gathered by the following notices in the Aurora.

(Tuesday) March 12, 1799. The public attention has been engaged for two or three days by some occurrences that have taken place in Northampton county. in this state. Efforts are making to magnify these occurrences into a terrible and bloody conspiracy against the government, &c. We shall, therefore, briefly state such facts as have been communicated to us on this subject. It is a well known circumstance, that in the schedule made out for the appreciation of the house tax, passed at the session of congress before the last, there was a column set apart for registering the number and measurement of the windows in every house, although no tax had been laid on windows. This circumstance caused a considerable degree of discontent throughout all parts of the Union; in some places the assessors were induced to desist from the admeasurement, and a member of congress in the last session, suggested the omission entirely of that measure, which was generally supposed by the people to be intended as the basis of a future tax. In Northampton county, while a person was in the act of measuring the windows of a house, a woman poured a shower of hot water over his head; in other places they were hooted at. and every expression of odium made use of, but no other violence done than the hot water war carried on by the female. Several of the assessors were intimidated from pursuing the duties for which they were appointed. and complaints were laid against several persons, who had uttered their dislike for what they called the window tax. The matter was taken up by the executive committee of the Union. and the marshal of this state district was directed to arrest several persons for a violation of the law. The marshal proceeded to the different places where the people reside, arrested them, and took bonds for their appearance at an inn in Bethlehem: all the accused appeared agreeably to appointment, except three out of seventy persons. The order of the marshal was to bring them to this city, and they were preparing to set out for Philadelphia. when a body of the people, some on horseback and others on foot. several of them belonging to the volunteer uniform corps, ap-

tally inadmissible. To be sure the two latter instances are not quite so plain; the objection I am considering belongs equally to them all; for if an alien cannot be removed but on conviction of a crime, then an alien enemy ought not to be removed but on conviction of treason, or some other crime showing the necessity of it. If, however, we are not blind to what is evident to all the rest of the world, equal danger may be apprehended from the citizens of a hostile power, before war is actually declared as after, perhaps more, because less suspicion is entertained; and some citizens of a neutral power are equally dangerous with the others. What has given France possession of the Netherlands, Geneva, Switzerland and almost all Italy, and enables her to domineer over so many other countries, lately powerful and completely independent, but that her arts have preceded her arms; the smooth words of amity, peace, and universal love, by seducing weak minds, have led to an unbounded confidence, which has ended in their destruction, and they have now to deplore the infatuation which led them to court a fraternal embrace from a bosom in which a dagger was concealed.

In how many countries, alien friends as to us, dependent upon them, are there warm

---

peared, and demanded the liberation of the prisoners. The prisoners remonstrated in vain, and insisted on proceeding to Philadelphia, relying upon the laws, but the people that were collected, were not to be diverted from their purpose; the persons were set at large, and the marshal has returned to Philadelphia. It is but justice to the marshal to say, that he has conducted himself with propriety in the whole of this business, and the persons that were first arrested behaved with the utmost propriety and deference for the constitutional authorities. We are informed that a body of volunteers are to be called out and marched into Northampton county, but we cannot believe that such a measure can be deemed either necessary or wise. The discontents in Northampton county were directed against the window admeasurement; the same discontents have prevailed elsewhere. No tumult has arisen, or violence has been done to any person but what was done with the hot water, and as to the rescue of the persons arrested, there are means more effectual to bring them to justice, than by the odious means of an armed military force, which can answer no other purpose than to stir up new jealousies and harass the public mind. The offence of such a measure is among the least considerations on this occasion, and possibly there may be found some unfledged Alexander, desirous of burning up some of the flourishing towns, in the course of such an expedition, in order to give spirit and energy to the military movements.

(Friday) March 22, 1799. On Wednesday Herman Hartman, Adam Stephan and Henry Skanweiller, of Millerstown, Northampton county, arrived in town and delivered themselves up to the marshal, who conducted them to Judge Peters; before whom they entered into recognizances for their appearance at the next circuit court of the United States. These men were amongst the most violent opposers of the law in Northampton county, and we are informed that others of the principal rioters are on their way to this city for the purpose of making the like submission. Messrs. Hartzen, Horn, and Kern, members of the legislature, arrived in town from Northampton. The report of these gentlemen we gave in yesterday's Aurora. Whence is this precipitation on the part of the government of the United States, to march a body of troops against the people of Northampton and Bucks? Are those people in arms against the government? No one will dare to say they are. Whence, then, it may be again asked, such precipitation? When the disturbance took place in Western Counties, what was the conduct of the late President Washington? He first conferred with the governor of the state on that subject, then sent commissioners to expostulate with the deluded citizens, and to endeavour to bring them to their duty, and not till all failed did he resort to military force. He was not of the opinion that men like himself were first to be tossed upon the bayonet, and afterwards instructed in their duty. He was not of the opinion that our laws, like those of Draco, ought to be written in blood, and that disobedience to them should subject the offender to immediate military punishment. He was not of the opinion that the lives of his fellow citizens were of such little consequence, that they were to be taken away when their only crime might be ignorance or misinformation. He was not of the opinion that the state government should be treated with contempt, and that no consultation with its executive should be had. It is true that in a despotic government, where there are no citizens, but all are slaves, and where force and not reason is the alphabet of instruction, in such a government, indeed, it would be incongruous to argue the people into obedience, The logic of the bayonet is there the only one employed, and it is applied with promptitude. Is there any analogy between such a government and ours? If not, why such a similarity of measures? No republican can justify the conduct of those people who resisted the marshal in the execution of his duty; it was highly reprehensible, and ought to be punished. But has any endeavour yet been made by the administration to arrest the transgressors? Has the civil power proved inadequate to the object? Has the language of reason been addressed to the offenders? No, not by the administration. It has been employed, and with effect too, by private citizens; but it was a private and not a public voice that proclaimed it. Tranquility and submission are the consequences. Even Fries has declared his readiness to submit, and to take his trial whenever summoned thereto; and yet we hear of nothing but military movements. And for what purpose let Timothy Pickering declare.

Mr. Wolcott, then secretary of the treasury, in a letter to Frederick Wolcott (2 Gibbs' Life of Wolcott, 230), however judicious may be his views as to the tumult itself, certainly does not want as to raciness of sentiment as to the materials upon which the tumult was to act.

"There is a paltry insurrection here, which I am inclined to think will be subdued without difficulty. It may, however, be nursed into something formidable. Pennsylvania is the most villainous compound of heterogeneous matter conceivable. Though there are many good men and good things, yet as a state it is bad in the extreme. The governor is an habitual drunkard. Every day, and not unfrequently in the forenoon, he is unable to articulate distinctly. The efficient powers of the government are exercised by Judge McKean and Dallas. Of these men I can sincerely say that I believe them to be as vile as Porcupine represents them. What lies in their power towards promoting rebellion against the government, they will effect. McKean pretty openly supports the United Irishmen. One or two rascals who assaulted Brown and were committed by the mayor, were immediately released by the judge."

partisans not nominally French citizens, but completely illuminated with French principles, electrified with French enthusiasm, and ready for any sort of revolutionary mischief! Are we to be guarded against the former and exposed to the latter? No, gentlemen. If with such examples before their eyes, congress had either confined their precaution to a war in form, or to citizens of France only, losing all sense of danger to their country in a regard to nominal distinctions, they would probably justly have deserved the charge of neglecting their country's safety in one of its most essential points, and hereafter the very men who are now clamorous against them for exercising a judicious foresight, might too late have had reason to charge them, (as many former infatuated governments in Europe may now fairly be charged by their miserable deluded fellow-citizens), as the authors of their country's ruin. But those who object to this law seem to pay little regard to considerations of this kind, and to entertain no other fear but that the president may exercise this authority for the mere purpose of abusing it. There is no end to arguments or suspicions of this kind. If this power is proper, it must be exercised by somebody. If from the nature of it, it could be exercised by so numerous a body as congress, yet as congress are not constantly sitting, it ought not to be exercised by them alone. If they are not to exercise it, who so fit as the president? What interest can he have in abusing such an authority? But on this occasion, as on others of the like kind, gentlemen think it sufficient to show, not that a power is likely to be abused (which is all that can be prudently guarded against), but that it possibly may, and therefore to guard against the possibility of an abuse of power, the power is not at all to be exercised. The argument would be just as good against his acknowledged powers, as any others, that the legislature may occasionally confide to him. Suppose he should refuse to nominate to any office, or to command the army or navy, or should assign frivolous reasons against every law, so that no law could be passed but with the concurrence of two-thirds of both houses! Suppose congress should raise an army without necessity, lay taxes where there was no occasion for money, declare war from mere caprice, lay wanton and oppressive restraints on commerce, or in a time of imminent danger trifle with the safety of their country, to gain a momentary breath of popularity at the hazard of their country's ruin! All this they may do. Does any man of candour, who does not believe everything they do, wrong, apprehend that any of these things will be done? They have the power to do them because the authority to pass very important and necessary acts of legislation on all those subjects, and in regard to which discretion must be left, unavoidably implies that, as it may be exercised in

a right manner, it may, if no principle prevent it, be exercised in a wrong one. If the state legislatures should combine to choose no more senators, they may abolish the constitution without the danger of committing treason. If to prevent a house of representatives being in existence, they should keep no law in being for a similar branch of their own, deeming the abolition of the government of the United States cheaply purchased by such a sacrifice, they may do this. They have the same power over the election of a president and vice president. What is the security against abuse in any of these cases? None, but the precautions taken to procure a proper choice, which, if well exercised, will at least secure the public against a wanton abuse of power, though nothing can secure them absolutely against the common frailty of men, or the possibility of bad men, if accidentally invested with power, carrying it into a dangerous extreme. We must trust some persons, and as well as we can, submit to any collateral evil which may arise from a provision for a great and indispensable good that can only be obtained through the medium of human imperfection. At the same time it may be observed, that in the case of the president, or any executive or judicial officer wantonly abusing his trust, he is liable to impeachment, and there are frequent opportunities of changing the members of the legislature, if their conduct is not acceptable to their constituents.

The clause in the constitution, declaring that the trial of all crimes, except by impeachment, shall be by jury, can never in reason be extended to amount to a permission of perpetual residence of all sorts of foreigners, unless convicted of some crime, but is evidently calculated for the security of any citizen, a party to the instrument, or even of a foreigner if resident in the country, who, when charged with the commission of a crime against the municipal laws for which he is liable to punishment, can be tried for it in no other manner.

The second objection is, "that an alien coming into the country, on the faith of an act stipulating that in a certain time and on certain conditions, he may become a citizen, to remove him in an arbitrary manner before that time, would be a breach of public faith." With regard to this, it may be observed, that undoubtedly the faith of government ought, under all circumstances, and in all possible situations, to be preserved sacred. If, therefore, in virtue of this law, all aliens from any part of the world had a right to come here, stay the probationary time, and become citizens, the act in question could not be justified, unless it could be shown that a real (not a pretended) overruling public necessity to which all inchoate acts of legislation must forever be subject, occasioned a partial repeal of it. But there are certain conditions, without which no alien can ever be admitted, if he stay ever

so long; and one is, that during a limited time (two years in the case of aliens then resident; five in the case of aliens arriving after), he has behaved as a man of a good moral character, attached to the principles of the constitution of the United States, and well disposed to the good order and happiness of the same. If his conduct be different, he is no object of the naturalization law at all, and consequently no implied compact was made with him. If his conduct be conformable to that description, he is no object of the alien law to which the objection is applied, because he is not a person whom the president is empowered to remove, for such a person could not be deemed dangerous to the peace and safety of the United States, nor could there be reasonable grounds to suspect such a man of being concerned in any treasonable or secret machinations against the government, in which cases alone the removal of any alien friend is authorized. Besides, any alien coming to this country must, or ought to know, that this being an independent nation, it has all the rights concerning the removal of aliens which belong by the law of nations to any other; that while he remains in the country in the character of an alien, he can claim no other privilege than such as an alien is entitled to; and consequently, whatever risk he may incur in that capacity, is incurred voluntarily, with the hope that in due time, by his unexceptionable conduct, he may become a citizen of the United States. As there is no end to the ingenuity of man, it has been suggested that such a person, if not a citizen, is a denizen, and therefore cannot be removed as an alien. A denizen in those laws from which we derive our own, means a person who has received letters of denization from the king, and under the royal government such a power might undoubtedly have been exercised. This power of denization is a kind of partial naturalization, giving some, but not all of the privileges of a natural born subject. He may take lands by purchase or devise, but cannot inherit. The issue of a denizen born before denization cannot inherit; but if born after may, the ancestor having been able to communicate to him inheritable blood. But this power of the crown was thought so formidable that it is expressly provided by act of parliament, that no denizen can be a member of the privy council, or of either house of parliament, or have any office of trust, civil or military, or be capable of any grant of lands from the crown. Upon the dissolution of the royal government, the whole authority of naturalization, either whole or partial, belonged to the several states, and this power the people of the states have since devolved on the congress of the United States. Denization, therefore, (in the sense here used,) is a term unknown in our law, since the right was not derived from any general legislative authority, but from a special prerogative of the crown, to which parliamentary restrictions afterwards were applied. So much so, that if an act of parliament had passed, giving certain rights to an alien with restrictions exactly similar to those of a denizen, I imagine he would not have been called a denizen; because the royal authority was not the source from which his rights were derived. As to acts of naturalization themselves, they are liable in England, by an express law to certain limitations, one of which is, that the person naturalized is incapable of being a member of the privy council, or either house of parliament, or of holding offices or grants from the crown. Yet I never heard, nor do I believe that such a person was ever called a denizen; for which, as there is no foundation in precedent, or in the constitution of the United States, I presume it is a distinction without solidity. Fixed principles of law cannot be grounded on the airy imagination of man.

The third objection is, "That it is inconsistent with the following clause in the constitution, viz.: 'The migration or importation of such persons as any of the states now existing shall think proper to admit, shall not be prohibited by the congress prior to the year one thousand eight hundred and eight, but a tax or duty may be imposed on said importation not exceeding ten dollars for each person.'" I am not satisfied, as to this objection, that it is sufficient to overrule it, to say the words do not express the real meaning, either of those who formed the constitution, or those who established it, although I do verily believe in my own mind, that the article was intended only for slaves, and the clause was expressed in its present manner to accommodate different gentlemen, some of whom could not bear the name slaves, and others had objections to it. But though this probably is the real truth, yet, if in attempting to compromise, they have unguardedly used expressions that go beyond their meaning, and there is nothing but private history to elucidate it, I shall deem it absolutely necessary to confine myself to the written instrument. Other reasons may make the point doubtful, but at present I am inclined to think it must be admitted, that congress, prior to the year 1808, cannot prohibit the migration of free persons to a particular state, existing at the time of the constitution, which such state shall, by law, agree to receive. The states then existing, therefore, till 1808, may (we will say) admit the migration of persons to their own states, without any prohibitory act of congress.— This they may do upon principles of general policy, and in consistence with all their other duties. The states are expressly prohibited from entering into an engagement or contract with another state, or engaging in war, unless actually invaded, or in such imminent danger, as will not admit of delay. The avenues to foreign connection being thus carefully closed, it will scarcely be contend-

ed, that in case of war, a state could, either directly. or indirectly, permit the migration of enemies. If they did, the United States could certainly, without any impeachment of the general right of allowing migration, in virtue of their authority to repel invasion, prevent the arrival of such. And as such invasion may be attempted without a formal war, and congress have an express right to protect against invasion, as well as repel it, I presume congress would also have authority to prevent the arrival of any enemies, coming in the disguise of friends, to invade their country. But, admitting the right to permit migration in its full force, the persons migrating on their authority must be subject to the laws of the country, which consist not only of those of the particular state, but of the United States. While aliens, therefore, they must remain in the character of aliens; and, of course, upon the principles I have mentioned, be subject to a power of removal, in certain cases recognized in the law of nations; nor can they cease to be in this situation, until they become citizens of the United States; in which case they must obey the laws of the Union as well as of the particular state they reside in. But, gentlemen argue as if because the states had a right to permit migration, the migrants were under a sort of special protection of the state admitting it, lest the United States, merely to disappoint the purpose of migration, should exercise an arbitrary authority of removal without any cause at all. It would be just as consistent to say, that if such migrant was charged with a murder on the high seas, or in any fort or arsenal of the United States, he should not be tried for it in a court of the United States, lest the court and juries, out of ill will to the state, should combine to procure his conviction and punishment, in all events, to defeat the state law. The two powers may undoubtedly be made compatible, if the legislatures of the particular states, and the government of the United States, do their duty, without which presumption, not an authority given by the constitution can exist. They surely are more compatible than the collateral powers of taxation, which, under each government, go to an unlimited extent, but the very nature of which forbids any other limitation than a sense of moral right and justice. If we skepticize in the manner of some gentlemen on this subject, suppose each legislature should tax to the amount of 19s. in the pound; each has the power; but is such an exercise of it more apprehended than we apprehend an earthquake to swallow us all up at this very moment? All systems of government suppose they are to be administered by men of common sense and common honesty. In our country, as all ultimately depends on the voice of the people, they have it in their power, and it is to be presumed they generally will choose men of this description; but if

they will not, the case, to be sure, is without remedy. If they choose fools, they will have foolish laws. If they choose knaves, they will have knavish ones. But this can never be the case until they are generally fools or knaves themselves, which, thank God, is not likely ever to become the character of the American people.

Having said what I thought material as to the alien laws, upon the particular objections to them, I now proceed to discuss the objections which have been made to what is called the "Sedition Act," one of which equally applies to the alien laws as well as to this. But I think it proper previously to read the law itself.

The objections (so far as I have heard them) to this act, are as follows: 1. (And this applies to the alien law also.) That there is no specific power given to pass an act of this description, though in the particular specific powers given, there is authority conveyed as to other offences specially named. 2. That this law is not warranted by a clause in the constitution, conveying legislative authority, which, after designating particular objects, adds: "And to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other power vested by this constitution in the government of the United States, or in any department or officer thereof."—Because it is not necessary and proper to pass any such law in order to carry into execution any of those powers. 3. That, admitting the former positions are not maintainable, yet the exercise of this authority is incompatible with the following amendment to the constitution, viz.: "Congress shall make no law respecting an establishment of religion, or prohibiting the full exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

With regard to the first objection, I readily acknowledge, that soon after the constitution was proposed, and when I had taken a much more superficial view of it than I was sensible of at the time, I did think congress could not provide for the punishment of any crimes but such as are specifically designated in the particular powers enumerated. I delivered that opinion in the convention at North Carolina, in the year 1788, with a perfect conviction, at the time, that it was well founded. But I have since been convinced it was an erroneous opinion, and my reasons for changing it I shall state to you as clearly as I am able.

It is in vain to make any law unless some sanction be annexed to it, to prevent or punish its violation. A law without it might be equivalent to a good moral sermon; but bad members of society would be as little influenced by one as the other. It is, therefore, necessary and proper, for instance, under the constitution of the United States, to

secure the effect of all laws which impose a duty on some particular persons, by providing some penalty or punishment if they disobey. The authority to provide such is conveyed by the following general words in the constitution, at the end of the objects of legislation particularly specified: "To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof." A penalty alone would not in every case be sufficient, for the offender might be rich and disregard it, or poor, though a wilful offender, and unable to pay it. A fine, therefore, will not always answer the purpose, but imprisonment must be in many cases added, though a wise and humane legislature, will always dispense with this, where the importance of the case does not require it. But if it does, from the very nature of the punishment, it becomes a criminal, and not a civil offence; the grand jury must indict, before the offender can be convicted. This general position may be illustrated by a variety of instances under the Penal Code of the United States, which have, I believe, never been objected to as unconstitutional, though there have never been wanting penetrating and discerning members who were ready enough to take exceptions where they found any plausible ground for them. I shall enumerate a few. In the act entitled, "An act for the punishment of certain crimes against the United States" (1 Swift's Ed., p. 100 [1 Stat. 112]), among other crimes specified, are the following: Murder or larceny in a fort belonging to the United States. Misprision of felony committed in any place under the sole and exclusive jurisdiction of the United States. Stealing or falsifying a record of any court of the United States. Perjury in any court of the United States. Bribing a judge of the United States. Obstructing the execution of any kind of a process issuing from a court of the United States. In the collection act (volume 1, p. 237 [1 Stat. 175]) it is provided, that in all cases where an oath is by that act required from a master or other person having command of a ship or vessel, or from an owner or assignee of goods, wares, and merchandize, his or her factor or agent, if the person so swearing shall swear falsely, such person shall, on indictment and conviction thereof, be punished by fine or imprisonment, or both, in the discretion of the court, before whom such conviction shall be had, so as the fine shall not exceed one thousand dollars, and the term of imprisonment shall not exceed twelve months. In the act laying duties on distilled spirits (volume 1, p. 324 [1 Stat. 208]), in the 39th section, it is provided as follows: "If any supervisor, or other officer of inspection, in any criminal prosecution against them, shall be convicted of oppression or extortion in the execution

of his office, he shall be fined not exceeding five hundred dollars, or imprisoned not exceeding six months, or both, at the discretion of the court; and shall also forfeit his office." These instances deserve great consideration; because I believe no candid man will deny that these provisions were constitutional exercises of authority, within the scope of the general authority conveyed, though not specially named as objects which it should be competent for congress to provide for. And they certainly derive weight from the consideration, that the principle of them (which I believe was the case) was never objected to, though the expediency of some of the provisions may have been.

In further illustration of this subject, I shall state a case which was determined in this court, — U. S. v. Worrall [Case No. 16,766], — where there was an indictment against the defendant for attempting to bribe Mr. Coxe, the commissioner of the revenue. The defendant was found guilty, and afterwards a motion was made in arrest of judgment, assigning, together with some technical objections, this general one, that the court had no cognizance of the offence, because no act of congress had passed creating the offence and prescribing the punishment, but it was solely on the foot of the common law. The very able and ingenious gentleman who is the reporter of that case, and was the defendant's counsel in it, in the course of his argument, makes the following observations, part of which are remarkably striking and pertinent to my present subject: "In relation to crimes and punishments, the objects of the delegated power of the United States are enumerated and fixed. Congress may provide for the punishment of counterfeiting the securities and current coin of the United States; and may define and punish piracies and felonies committed on the high seas, and offences against the law of nations. Art. 1, § 8. And so, likewise, congress may make all laws which shall be necessary and proper for carrying into execution the powers of the general government. But here is no reference to a common law authority. Every power is matter of definite and positive grant; and the very powers that are granted cannot take effect until they are exercised through the medium of a law. Congress had undoubtedly a power to make a law, which should render it criminal to offer a bribe to the commissioner of the revenue; but not having made the law, the crime is not recognized by the Federal Code, constitutional or legislative; and consequently, it is not a subject on which the judicial authority of the Union can operate." So far the observations of the defendant's counsel. Judge Chase, who on that occasion differed from Judge Peters as to the common law jurisdiction of the court, held, that under the 8th section of the first article, which I am now considering, although bribery is not among the crimes and offences specially mentioned, it is

certainly included in that general provision; and congress might have passed a law on the subject which would have given the court cognizance of the offence. Judge Peters was of opinion, that the defendant was punishable at common law; but that it was competent for congress to pass a legislative act on the subject.

I conclude, therefore, that the first objection is not maintainable.

With regard to the second objection, which is, that this law is not warranted by that clause of the constitution authorizing congress to pass all laws which shall be necessary and proper for carrying into execution the powers specially enumerated, and all other powers vested by the constitution in the government of the United States, or in any department or officer thereof; because, it is not necessary and proper to pass any such law, in order to carry into execution any of those powers—it is to be observed, that, from the very nature of the power, it is, and must be, discretionary. What is necessary and proper, in regard to any particular subject, cannot, before an occasion arises, be logically defined; but must depend upon various extensive views of a case, which no human foresight can reach. What is necessary and proper in a time of confusion and general disorder, would not, perhaps, be necessary and proper in a time of tranquillity and order. These are considerations of policy. not questions of law, and upon which the legislature is bound to decide according to its real opinion of the necessity and propriety of any act particularly in contemplation. It is, however, alleged, that the necessity and propriety of passing collateral laws for the support of others, are confined to cases where the powers are delegated, and do not extend to cases which have a reference to general danger only. The words are general, "for carrying into execution the special powers previously enumerated, and all other powers vested by the constitution in the government of the United States, or any department or officer thereof." If, therefore, there be anything necessary and proper for carrying into execution any or all of those powers, I presume that may be constitutionally enacted. Two objects are aimed at by every rational government, more especially by free ones: 1. That the people may understand the laws, and voluntarily obey them. 2. That if this be not done by any individual, he shall be compelled to obey them, or punished for disobedience. The first object is undoubtedly the most momentous; for, as the legitimate object of every government is the happiness of the people committed to its care, nothing can tend more to promote this than that, by a voluntary obedience to the laws of the country, they should render punishments unnecessary. This can never be the case in any country but a country of slaves, where gross misrepresentation prevails, and

any large body of people can be induced to believe that laws are made either without authority, or for the purpose of oppression. Ask the great body of the people who were deluded into an insurrection in the western parts of Pennsylvania, what gave rise to it? They will not hesitate to say, that the government had been vilely misrepresented, and made to appear to them in a character directly the reverse of what they deserved. In consequence of such misrepresentations, a civil war had nearly desolated our country, and a certain expense of near two millions of dollars was actually incurred, which might be deemed the price of libels, and among other causes made necessary a judicious and moderate land tax, which no man denies to be constitutional, but is now made the pretext of another insurrection. The liberty of the press is, indeed, valuable—long may it preserve its lustre! It has converted barbarous nations into civilized ones—taught science to rear its head—enlarged the capacity—increased the comforts of private life —and, leading the banners of freedom, has extended her sway where her very name was unknown. But, as every human blessing is attended with imperfection, as what produces, by a right use, the greatest good, is productive of the greatest evil in its abuse, so this, one of the greatest blessings ever bestowed by Providence on His creatures, is capable of producing the greatest good or the greatest mischief. A pen, in the hands of an able and virtuous man, may enlighten a whole nation, and by observations of real wisdom, grounded on pure morality, may lead it to the path of honour and happiness. The same pen, in the hands of a man equally able, but with vices as great as the other's virtues, may, by arts of sophistry easily attainable, and inflaming the passions of weak minds, delude many into opinions the most dangerous, and conduct them to actions the most criminal. Men who are at a distance from the source of information must rely almost altogether on the accounts they receive from others. If their accounts are founded in truth, their heads or hearts must be to blame, if they think or act wrongly. But, if their accounts are false, the best head and the best heart cannot be proof against their influence; nor is it possible to calculate the combined effect of innumerable artifices, either by direct falsehood, or invidious insinuations, told day by day, upon minds both able and virtuous. Such being unquestionably the case, can it be tolerated in any civilized society that any should be permitted with impunity to tell falsehoods to the people, with an express intention to deceive them, and lead them into discontent, if not into insurrection, which is so apt to follow? It is believed no government in the world ever was without such a power. It is unquestionably possessed by all the state governments, and probably has been

exercised in all of them: sure I am, it has in some. If necessary and proper for them, why not equally so, at least, for the government of the United States, naturally an object of more jealousy and alarm, because it has greater concerns to provide for? Combinations to defeat a particular law are admitted to be punishable. Falsehoods, in order to produce such combinations, I should presume, would come within the same principle, as being the first step to the mischief intended to be prevented; and if such falsehoods, with regard to one particular law, are dangerous, and therefore ought not to be permitted without punishment—why should such which are intended to destroy confidence in government altogether, and thus induce disobedience to every act of it? It is said, libels may be rightly punishable in monarchies, but there is not the same necessity in a republic. The necessity, in the latter case, I conceive greater, because in a republic more is dependent on the good opinion of the people for its support, as they are, directly or indirectly, the origin of all authority, which of course must receive its bias from them. Take away from a republic the confidence of the people, and the whole fabric crumbles into dust. I have only to add, under this head, that, in order to obviate any probable ill use of this large and discretionary power, the constitution, and certain amendments to it, have prohibited, in express words, the exercise of some particular authorities, which otherwise might be supposed to be comprehended within them. Of this nature is the prohibitory clause relating to the present object, which I am to consider under the next objection.

4. That objection is, that the act is in violation of this amendment of the constitution. 3 Swift's Ed. p. 455, art. 3 [1 Stat. 21]. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

The question then is, whether this law has abridged the freedom of the press? Here is a remarkable difference in expressions as to the different objects in the same clause. They are to make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press. When, as to one object, they entirely prohibit any act whatever, and, as to another object, only limit the exercise of the power, they must, in reason, be supposed to mean different things. I presume, therefore, that congress may make a law respecting the press, provided the law be such as not to abridge its freedom. What might be deemed the free dom of the press, if it had been a new subject, and never before in discussion, might

indeed admit of some controversy. But, so far as precedent, habit, laws, and practices are concerned, there can scarcely be a more definite meaning than that which all these have affixed to the term in question. We derive our principles of law originally from England. There, the press, I believe, is as free as in any country of the world, and so it has been for near a century. The definition of it is, in my opinion, no where more happily or justly expressed than by the great author of the commentaries on the laws of England, which book deserves more particular regard on this occasion, because for near thirty years it has been the manual of almost every student of law in the United States, and its uncommon excellence has also introduced it into the libraries, and often to the favourite reading of private gentlemen; so that his views of the subject could scarcely be unknown to those who framed the amendments to the constitution: and if they were not, unless his explanation had been satisfactory, I presume the amendment would have been more particularly worded, to guard against any possible mistake. His explanation is as follows: "The liberty of the press is indeed essential to the nature of a free state. And this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity. To subject the press to the restrictive power of a licenser, as was formerly done, both before and since the Revolution, is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controversial points in learning, religion, and government. But to punish (as the law does at present) any dangerous or offensive writings, which, when published, shall, on a fair and impartial trial, be adjudged of a pernicious tendency, is necessary for the preservation of peace and good order, of government and religion, the only solid foundations of civil liberty. Thus the will of individuals is still left free: the abuse only of that free will is the object of legal punishment. Neither is any restraint hereby laid upon freedom of thought or inquiry: liberty of private sentiment is still left; the disseminating, or making public, of bad sentiments, destructive of the ends of society, is the crime which society corrects. A man (says a fine writer on this subject) may be allowed to keep poisons in his closet, but not publicly to vend them as cordials. And to this we may add, that the only plausible argument heretofore used for the restraining the just freedom of the press, 'that it was necessary to prevent the daily abuse

of it,' will entirely lose its force when it is shown (by a reasonable exercise of the laws) that the press cannot be abused to any bad purpose, without incurring a suitable punishment: whereas, it never can be used to any good one when under the control of an inspector. So true will it be found, that to censure the licentiousness is to maintain the liberty of the press." 4 Bl. Comm. 151

It is believed that, in every state in the Union, the common law principles concerning libels apply; and in some of the states words similar to the words of the amendment are used in the constitution itself or a contemporary bill of rights, of equal authority, without ever being supposed to exclude any law being passed on the subject. So that there is the strongest proof that can be of a universal concurrence in America on this point, that the freedom of the press does not require that libellers shall be protected from punishment. But, in some respects the act of congress is much more restrictive than the principles of the common law, or than, perhaps, the principles of any state in the Union. For, under the law of the United States, the truth of the matter may be given in evidence, which at common law, in criminal prosecutions, was held not to be admissible; and the punishment of fine and imprisonment, which at common law was discretionary, is limited in point of severity, though not of lenity. It is to be observed, too, that by the express words of the act, both malice and falsehood must combine in the publication, with the seditious intent particularly described. So that if the writing be false, yet not malicious, or malicious and not false, no conviction can take place. This, therefore, fully provides for any publication arising from inadvertency, mistake, false confidence, or anything short of a wilful and atrocious falsehood. And none surely will contend, that the publication of such a falsehood is among the indefeasible rights of men, for that would be to make the freedom of liars greater than that of men of truth and integrity.

I have now said all I thought material on these important subjects. There is another upon which it is painful to speak, but the notoriety as well as the official certainty of the fact, and the importance of the danger, make it indispensable. Such incessant calumnies have been poured against the government for supposed breaches of the constitution, that an insurrection has lately begun for a cause where no breach of the constitution is or can be pretended.[2] The grievance is the land tax act, an act which

---

[2] [This refers to the insurrection in the counties of Northampton, and Bucks, against the execution of the act of July 9, 1798 (1 Stat. 580) providing for registering the number and admeasurement of the windows in each house for the purpose of fixing the value of the house for purposes of taxation.]

the public exigencies rendered unavoidable, and is framed with particular anxiety to avoid its falling oppressively on the poor, and in effect the greatest part of it must fall on rich people only. Yet arms have been taken to oppose its execution; officers have been insulted; the authority of the law resisted; and the government of the United States treated with the utmost defiance and contempt. Not being thoroughly informed of all particulars, I cannot now say within what class of offences these crimes are comprehended. But as some of the offenders are committed for treason, and many certainly have been guilty of combinations to resist the law of the United States, I think it proper to point your attention particularly to those subjects. The provisions in regard to the former, so far as they may at present be deemed material or instructive, are as follow: (Here the passages referred to were read.)

The only species of treason likely to come before you is that of levying war against the United States. There have been various opinions, and different determinations on the import of those words. But I think I am warranted in saying, that if, in the case of the insurgents who may come under your consideration, the intention was to prevent by force of arms the execution of any act of the congress of the United States altogether (as for instance the land tax act, the object of their opposition), any forcible opposition calculated to carry that intention into effect, was a levying of war against the United States, and of course an act of treason. But if the intention was merely to defeat its operation in a particular instance, or through the agency of a particular officer, from some private or personal motive, though a higher offence may have been committed, it did not amount to the crime of treason. The particular motive must, however, be the sole ingredient in the case, for if combined with a general view to obstruct the execution of the act, the offence must be deemed treason. With regard to the number of witnesses in treason, I am of opinion that two are necessary on the indictment as well as upon the trial in court. The provision in the constitution, that the two witnesses must be to the same overt act (or actual deed constituting the treasonable offence), was in consequence of a construction which had prevailed in England, that though two witnesses were required to prove an act of treason, yet if one witness proved one act, and another witness another act of the same species of treason (as for instance that of levying war), it was sufficient; a decision which has always appeared to me contrary to the true intention of the law which made two witnesses necessary—this provision being, as I conceived, intended to guard against fictitious charges of treason, which an unprincipled government might be tempted to

support and encourage, even at the expense of perjury, a thing much more difficult to be effected by two witnesses than one. An act of congress which I have already read to you (that commonly called the sedition act) has specially provided in the manner you have heard, against combinations to defeat the execution of the laws. The combinations punishable under this act must be distinguished from such as in themselves amount to treason, which is unalterably fixed by the constitution itself. Any combinations, therefore, which before the passing of this act, would have amounted to treason, still constitute the same crime. To give the act in question a different construction, would do away altogether the crime of treason as committed by levying war, because no war can be levied without a combination for some of the purposes stated in the act, which must necessarily constitute a part, though not the whole, of the offence.

Long, gentlemen, as I have detained you, for which the great importance of the occasion, I trust, is a just apology, it will be useful to recollect that, ever since the first formation of the present government, every act which any extraordinary difficulty has occasioned, has been uniformly opposed before its adoption, and every art practiced to make the people discontented after it; without any allowance for the necessity which dictated it, some seem to have taken it for granted that credit could be obtained without justice, money without taxes, and the honor and safety of the United States only preserved by a disgraceful foreign dependence. But, notwithstanding all the efforts made to vilify and undermine the government, it has uniformly risen in the esteem and confidence of the people. Time has disproved arrogant predictions; a true knowledge of the principles and conduct of the government has rectified many gross misrepresentations; credit has risen from its ashes; the country has been found full of resources, which have been drawn without oppression, and faithfully applied to the purposes to which they were appropriated; justice is impartially administered; and the only crime which is fairly imputable is, that the minority have not been suffered to govern the majority, to which they had as little pretension upon the ground of superiority of talents, patriotism, or general probity, as upon the principles of republicanism, the perpetual theme of their declamation. If you suffer this government to be destroyed, what chance have you for any other? A scene of the most dreadful confusion must ensue. Anarchy will ride triumphant, and all lovers of order, decency, truth and justice be trampled under foot. May that God, whose peculiar providence seems often to have interposed to save these United States from destruction, preserve us from this worst of all evils! And may the inhabitants of this happy country deserve his care and protec-

tion by a conduct best calculated to obtain them![3]

April 30.—Mr. Lewis preferred the following motion to the court in writing.

And now the prisoner, John Fries, being placed at the bar of this court, at the city of Philadelphia, being the place appointed by law for holding the stated sessions thereof, and it being demanded of him if he is ready for his trial, for the treason in the indictment mentioned, he moves, ore tenus, that his trial for the same offence may not be proceeded on here, and that the same may be had in the county in which the same acts of treason in the said indictment mentioned are laid, and where the offence therein mentioned is alleged to have been committed.

Mr. Lewis stated this motion to be founded on an act of congress entitled the "Judiciary Act," passed 24th September, 1789, § 29 [1 Stat. 88]: "That in cases punishable

[3] The publication of the charge was elicited by the following note.

Philadelphia, May 15, 1799. Sir:—The grand jury of the circuit court of the district of Pennsylvania have heard with great satisfaction, the charge delivered to them, on the opening of the court. At a time like the present, when false philosophy and the most dangerous and wicked principles are spreading with rapidity, under the imposing garb of Liberty, over the fairest countries of the Old World—they are convinced, that the publication of a charge, fraught with such clear and just observations on the nature and operation of the constitution and laws of the United States, will be highly beneficial to the citizens thereof. With these sentiments strongly impressed on their min's, they unanimously request, that a copy of tne said charge may be delivered to them for publication; especially for the information of those, who are too easily led by the misrepresentations of evil disposed persons, into the commission of crimes, ruinous to themselves, and against the peace and dignity of the United States. Isaac Wharton, Foreman, J. Ross, Edward Pennington, Philip Nicklin, Joseph Parker Norris, Benjamin W. Morris, Thomas M. Willing, Robert Ralston, John Craig, Samuel Coates, David H. Conyngham, John Perot, James C. Fisher, Daniel Smith, Gideon Hill Wells, William Montgomery, W. Bulkley. Honourable Judge Iredell.

To the Gentlemen of the Grand Jury of the United States, for the District of Pennsylvania. Gentlemen: I receive with great sensibility the honour of this address, from gentlemen whom I personally respect so much. Believing, as I have long done, that the constitution and laws of the United States afford the highest degree of rational liberty which the world ever saw, or of which perhaps mankind are capable, I have seen with astonishment and regret, attempts made in the pursuit of visionary chimeras, to subvert or undermine so glorious a fabric, equally constructed for public and private security. It cannot but be extremely pleasing to me that the sentiments on this subject I delivered in my charge, should meet with your entire approbation; and as you are pleased to suppose the publication of them may be of some service in correcting erroneous opinions, I readily consent to it, considering your sanction of them as giving them an additional value, which will increase the hope of their producing a good effect. James Iredell. Philadelphia, May 15, 1799.

with death, the trial shall be had in the county where the offence was committed; or where that cannot be done without great inconvenience, twelve petit jurors at least shall be summoned from thence." He stated the advantages resulting from this section to the accused to be, that a man might be tried by his peers, where he is known, and where there can be no difficulties to procure witnesses in his behalf. This inestimable right, he said, was one of the grounds of complaint to the United States, which promoted their separation from the mother country, and this was one cause of her taking up arms. This advantage, congress had held in just estimation, and upon this, no innovation was to be admitted; on which account, the most pointed and positive terms were used, and the divisions of vicinage reduced to counties. But nevertheless, he observed, this rule had an exception, which was where "manifest inconvenience" occurred, twelve jurymen were to be summoned from that county, and therefore before the court could consider themselves authorized to proceed to the trial in that place, their honours must be well satisfied that trial could not take place in the county of Northampton without "manifest inconvenience." These words did not refer to the inconvenience the judges might feel in travelling, or the time spent; but an inconvenience arising from some cause which congress did not foresee at the time of the passing of the act. The trouble and inconvenience to the judges could be no greater than to the prisoners, whom the government had brought to this city.

Mr. Lewis said he was aware of an objection which would be raised to the force of the section above quoted, founded on a subsequent law passed March 2, 1793, § 3 [1 Stat. 333], which directs that a judge of the supreme court, with a district judge, "may direct special sessions of the circuit courts to be holden for the trial of criminal causes, at any convenient place within the district, nearer to the place where offences may be said to be committed, than the place or places appointed by law for the ordinary sessions." The places appointed by law for the state of Pennsylvania are, York Town and Philadelphia. This, he presumed, must refer to causes of a civil nature, or to criminal acts of a less grade than what is peremptorily required in the act first quoted from, to govern "cases punishable with death." The same act says, that trials in capital cases should be elsewhere, and not at the stated places, unless manifest inconvenience attend it. And what, he asked, was the great inconvenience in the present case? Was there any objection of a nature to render it improper or impossible to try the prisoner in that county? It was true that a considerable number of persons in that county had been misguided, but was it to be inferred thence that all were? or that a fair trial could not be had there? No

doubt an able and impartial jury might be obtained in that place, and therefore an impartial trial could be had. In bad times, with corrupt judges, if ever such a time and such judges should unhappily be in this country, the section of 1789 would form a protection to the citizen against any innovation of his privilege, and prevent their dragging him from his family and friends to a distant part, where he might be unknown, to be tried. Surely it could not be urged that the safety of the United States, or the protection of the court, made it necessary to try this cause in Philadelphia. The prisoners might have been confined in the jails of that county; the troops of the United States were even now remaining there, to protect the law. The vicinity of that spot to the witnesses who beheld the transactions was an additional argument for the plea. Some, to be sure, had come to the city; others perhaps might come forward; sickness or age might operate to prevent some coming. It was also inconvenient to the prisoner in preventing his neighbours or relatives affording him that comfort which they might wish. But all this, he said, was immaterial; the law was definite, and nothing could supersede its mandate. Here was a list of ninety-eight witnesses, furnished the prisoner by Mr. Attorney, who were to appear against him, and hence the necessity of time and opportunity being allowed the prisoner to examine that numerous train of evidence, and to prepare to controvert them.

Mr. Lewis then referred to a similar motion which he made before the court, respecting a person tried for high treason in the Western Insurrection, in 1795, for which he referred to [U. S. v. Hamilton] 3 Dall. [3 U. S.] 18. The motion was then rejected, but upon different grounds than could possibly be now urged. Judge Wilson stated it as the opinion of the court, the plea being made at a previous court, that the circuit court, at which the prisoner was to be tried, was so near, that there was not time to send to the witnesses and bail, on account of the great distance of the county from the city, as they were subpoenaed to attend at the next session. The reason was, that the supreme court could not order a special session to over-rule the stated session, and therefore the inconvenience was great and manifest; but no such excuse could hold good in the present case: the mandatory language of the former clause must be obeyed. Further, he observed that a man might be charged with the crime of treason, and committed for that crime, or bound over, if the case would allow it; yet it was impossible to know that he would be indicted for treason by a grand jury; and no court held previous to the indictment could say whether it was a case punishable with death, or a misdemeanour, and therefore the time to move the plea was the present time, after the indictment was returned, and when the defendant was ar-

raigned for trial, and till then the motion would be inapplicable. He observed that he considered this motion of considerable importance to the prisoner, and not to him only, but to every citizen of the United States: this was the security of his rights, and those of every man in the court, and therefore he hoped the justice of the court would grant the plea.

Mr. Sitgreaves said he had not been able to distinguish whether this motion had been preferred to the court as a matter of unqualified right, or whether it was merely an application, as a matter of favour in this particular instance; but he would attempt an answer to both. With respect to the 29th section of the judiciary act, if the first part of the paragraph was to stand alone, without a qualification, it would be a positive direction, and would not bear an objection, yet there would be a difficulty arise how it could be executed: But it was not so. At the time that law was passed, there were stated places, as well as stated times, for holding the federal courts; there was no provision whatever for holding them elsewhere than the appointed place, although the judges had special powers to alter the time of holding them: whether that reason, or some other, excited the legislature to put the discretion as to place in the judges also, he could not tell, but although the first direction is positive, an alternative is immediately introduced: twelve jurors summoned from the county where the crime was committed, may suffice, at the discretion of the court, and this second branch of the rule is to avoid what the court may judge a great inconvenience, against which no general rule of common law can provide. In order to prevent any misinterpretation, and remove the embarrassments which a wrong use of the law of 1789 might produce, the provision of March, 1793, still more defines that discretion, without making any material alteration: that says, "the court might be held at any convenient place within the district, nearer to the place where the crime was committed than the place for holding the stated session." Certain it is that this provision does not require it to be held in the same county; indeed it is extremely questionable, whether the court have authority to remove it there; they may nearer the place, but the word "nearer" excludes the place itself; if the place was intended, the phraseology would be more accurately inserted. He would now remark that no place nearer the scene of insurrection than this city could have been selected, and here the discretion of the court had fixed it. The law must have been made for one of two reasons: either for the facility of public justice, or to favour the prisoner. Respecting the first, the crime was committed, not in one county only, but in three adjoining counties, and, therefore, agreeably to the arguments of the gentleman, the trial must be held in three counties, by three juries, and the witnesses be harassed to appear three times; but even if the court should determine upon one of those counties for the trial, which was to be selected?

Mr. Lewis questioned the propriety of this argument, since it appeared all the cases of treason except one (in Bucks) happened in Northampton county, and no inconvenience could accrue from holding the trials at one place.

Mr. Rawle said that he should produce evidence to prove the crime of treason committed in the three counties.

Mr. Sitgreaves proceeded to state, that, as the act of 1793, as well as 1798, left a discretion for the court to determine according to existing circumstances, and not according to any known definite principles of law, it would be impolitic, if not illegal, to hold the court 'in the county, this city being, agreeably to one argument, next to one of the counties, and on the other view, the stated place for holding the courts, the arguments must fall, and the motion be rejected. Philadelphia, he said, was as near to the place where the crime was committed as the court-house of that county, and here, it was probable, the purposes of public justice could be most completely answered. If, then, the argument was not supported on public convenience, it must be the convenience of the prisoner which the gentleman aimed at; but he had failed to show any such thing, and therefore had precluded any answer. He had argued for the comfort of the prisoner; having his neighbours about him, &c.; but it must be observed that the residence of the prisoner was in Bucks, whereas the crime was committed in Northampton, and there he must have been tried, if the decision should turn in favour of his arguments. Now, Philadelphia was as much an adjoining county to Bucks as Northampton, and therefore as much his vicinage, and each place of holding the courts at about equal points of distance from his residence. Even if it was held in Northampton county, it would neither facilitate the trial nor be of advantage to the person. Another question he would suggest was, whether this application was made soon enough? It was nearly, or quite a week, since the indictment was given to the prisoner, and it was a much longer time since he was committed: if it was proper that any application should be made to the court, either as a matter of right or of favour, it ought to have been made in due time, so as not to delay or defeat the question of public justice. It would be unnecessary to say that the question was fully determined in the year 1795, and if it was a matter of law, and as such mandatory, every case which was then decided on was a case of mis-trial, and the whole court and counsel must have been guilty of a great dereliction. But he believed it was asked of the court at that time, not as a

matter of right, but of favour, and it appeared by the report quoted, that if the favour could have been granted, it would, but the decision was against the possibility of it, and certainly stronger reason would have weighed for it then than now, on which account there is now, at least, equal grounds for refusing it.

Mr. Rawle observed, that while he professed as much humanity as any gentleman in court, yet as counsel for the prosecution he felt as much desire for the just execution of public justice. He could scarcely persuade himself that the gentleman who moved the court could be serious, at this late period of the business; after seven days had elapsed since the indictment was found, after all the inconveniences of a preparation for trial had been incurred, this new, this additional inconvenience of summoning the witnesses and jurors to another place, could not be either to the advantage of the prisoner, or agreeable to a just construction of the law adverted to. The law of March, 1793, does not apply to a case which the offence first charged would make capital so as to affect life. The question seriously was, Mr. Rawle said, whether granting the motion would not deprive the country of the power of prosecuting the trial at all, or even after full proof of the guilt of the prisoner, it would not prevent the court from passing sentence. The act read by Mr. Sitgreaves gave the judge the power to hold courts throughout his whole district,—2 Laws U. S. 226 [1 Stat. 333],—but the act of 1789, which fixed the place, only gave the court power as to times of holding special sessions,—volume 1, p. 51 [1 Stat. 75]. The 29th section of that act was very ambiguously worded, because the fifth section of the same act had put it out of the power of the court to remove as to place. Whatever, then, was the intention of the legislature, the courts had not power to effect a change, and as when an act failed in explaining the intention, the intention could not be carried into execution, to remedy the inconvenience of the court being bound in all cases as to place, the clause of 1793, p. 226 [supra], was passed.

Mr. Rawle contended that a special court was more than an adjourned circuit court: it was a substantive court of itself, held for special purposes, and could not issue certiorari for any other court; if, therefore, a special court was to be held for this trial, it must begin de novo: a new grand jury, a new petit jury, must be called; the witnesses must be summoned anew, which would be a bad precedent, besides a great delay. The impropriety was evident: after a bill had been found, and the prisoner had seen a list of the jury and witnesses; after having had time to calculate its chances, at the seventh day of the proceeding, he came forward to remove the trial! If the prisoner had not had time to inquire into the character of the jurors or witnesses, some other reason would

have been given; but as nothing of that kind had been attempted, and as the inconveniences of delay and removal were so manifest, he trusted the court would not accede to the motion.

Mr. Dallas declared that it was not the design of the counsel for the prisoner to try experiments by the present motion; they conceived that he had a right to be tried in the county where the crime was charged: the act of congress was mandatory, unless "manifest inconveniences" should appear. He conceived that distance could not be an inconvenience, because the act contemplated the possibility of crimes being committed in Alleghany as well as in Chester county. Nor could time. The importance of a capital trial was not to be so played with. Congress designed that an impartial trial should be had in all cases, without regard to such trivial objections. He was sure the honourable court would not consider their personal inconveniences as meant, and therefore should not mention it. Mr. Dallas wished it to be observed, that the crimes were recently committed, and public justice had not been long suspended; and, even if the present motion was acceded to, the hand of public justice might shortly give the blow, by appointing an early special session. It was not certain, before the court sat, that a bill would be found for high treason, merely because the parties were bound over for high treason; and therefore the prisoner might not be able to meet that charge. Again, the time since the bill was found and the party informed, and served with the enormous list of ninety eight witnesses, has been very short. It was Wednesday last, seven days only, two of which must be left out, Thursday having been the fast-day, and Sunday intervening. Many of these witnesses and jurors he had never seen nor heard of, and it was necessary he should have time to inquire who they were. There had been no catches on the part of the prisoners. It would be an easy thing for the court, at this time, since all the parties were upon the spot, to bind them over to appear again. In the case read by Mr. Lewis, Judge Wilson expressly declared, that there was a desire in the court to comply, but the difficulties were insurmountable. With respect to the other cases, the mandatory language of congress imposed a necessity on the officers of justice, where it was possible. The clashing of courts, he presumed, could not be held up for excuse at this time. He did not know how much time the present circuit might consume; but as the supreme court would not meet until August, no doubt there could be a period for the business of a special court spared during the recess; but if the period should be filled up, in the August session arrangements might be made to hold one. With respect to the holding of district courts, Mr. Dallas observed, that the law—volume 1, pp. 49, 50 [1 Stat. 74]—allowed a discretion as to the places of

holding them; page 51 gives discretion, as to the circuit court, to the judges of supreme court with respect to time. These provisions respected all cases alike within the jurisdiction of those courts; but the subsequent act referred to made an exception with regard to cases of a nature highly criminal, or capital. Certainly, then, if ever the congress meant there should be a trial at all in the proper county, one like the present must come under that intention. The language of the two acts—volume 2, p. 67 [1 Stat. 88], and volume 2, p. 226 [1 Stat. 334],—Mr. Dallas observed, was different. The first declared that cases punishable with death should be tried in the county, &c. The second, that special circuit courts may be holden nearer the place where the offences may be said to be committed than the place of the ordinary sessions. But, one thing was worthy of notice. The first relates only to offences punishable with death, while the other is worded as crimes only, of whatever nature. Cases of insurrection and rebellion must have been in view of the legislature; and in them it would be very probable that part of more than one county would combine, and they could have excepted such cases if it had been meant so to do. It was farther said, that part of the crimes were committed in two counties, and therefore the prisoner had deprived himself of the common law vicinage. This was not clear. The vicinage where the offence was committed would, at any rate, have it in their power to declare what they had seen of the conduct of the prisoner. As to the stage at which the application was made, no loss of time had been felt; and if it had, it would be extremely severe, if it was in the power of the court to order it otherwise, so that the prisoner in so important a case should be injured thereby. On the whole, he trusted, unless manifest inconvenience should appear, that the court would grant the motion.

Mr. Lewis said, it was strange, mischievous, and unfounded doctrine that this application had not been made in time. Three clear days from the notice of the indictment being allowed by law to the prisoner, he was not bound to answer the indictment until yesterday. The trial did not then proceed, and he appeared this day; but, in his sincere opinion, from mature reflection, two, three, nor four days, should have weight with the court, because the act of congress was binding upon them, whatever the learned gentleman had advanced to the contrary. He had a right to demand it; and if their honours, the judges, proceeded to hold the trial in any but the right place, they, and not the prisoner, would offend. Mr. Attorney had supposed, if this was granted, all which had been done would be null and void. Grant this for a moment. Did Mr. Attorney or John Fries direct the proceedings of the grand jury, &c.? Certainly the attorney. In this Mr. Lewis believed he had done strictly right; here was the proper place for the issue to be joined; but Northampton is the proper place for the trial of that issue. It was objected, because it was said the crime was committed in three counties. But, suppose it were in three or thirty counties, the overt act in the bill is laid in one county only, and there only does the law support the claim for trial. The two laws referred to are unnecessary in capital cases, if they do extend to them at all, because the first law makes ample provision not only as to time,—page 51 [1 Stat. 75],—but as to place,—page 67 [1 Stat. 88],—and is not superseded by the other. With reference to the law of 1793, p. 227 [1 Stat. 335], which says, that criminal causes may be tried nearer to the place where the offences were said to be committed, the argument was taken up by Mr. Sitgreaves to mean "nearer to the county"; hence he says that Philadelphia county is the adjoining one of the insurgent counties. In the indictment, Bethlehem is mentioned as the "place." Now, the law directs a special session to be held nearer to Bethlehem than is Philadelphia; that act does not say whether it shall be held in or out of the county, but near the place. The gentleman appeared to have thought he was in another place, and not at the bar, in his view of the discretionary power of the court, which would leave it to be regulated according to the ebbs and flows of the passions of the judges, or the temper of the times; but he should recollect this discretion was of a legal, and not of a political nature, which the necessity of the case called for. All that must be considered to operate on the question is, whether justice cannot be done between the United States and the prisoners, if the trial is held in the county of Northampton; if it can, we rise to claim this as the right of John Fries, and nearly allied to the interests of every citizen.

Judge IREDELL said it was held by Judge Hale, that an indictment was part of the trial; if so, he should be glad to be told what they were to do with the present indictment, if the trial was to be removed? If so, the prisoner must be indicted as well as tried in the county. Foster, 235, 236. Another question would be, could the court order the dismissal of the indictment?

Judge PETERS could not see how part of the proceedings of this court could be transferred to a special court, and therefore how it could be removed to the county, and while a doubt remained, it would never do to renovate a criminal case of so much importance. He could not see the force of the reasoning in favour of the removal. He thought that, however humanity ought to lean towards the prisoner, still the proceedings of the court ought to ensure justice to the United States, and to the prosecution, and therefore that public justice ought to be as well guarded as the prisoner's convenience; a fair and impartial trial ought to be had, which he was certain could not be held in the county of

Northampton, and if he were now applied to, in his official capacity, to take the necessary steps for that event, he would refuse. .

Mr. Rawle said there were opportunities enough for a motion like this to be made before a bill was found, after the parties were bound over. The accused ought to be preparing for trial from his first commitment, to remove all the inconveniences which delay, until after the proceedings were going on, would occasion; it appeared to him to amount to a technical trap, laid to involve difficulties. It was well known that the prisoner could not wait till it was too late to obtain many privileges to which he was entitled by an earlier attention to his interests, of which the present was one. With respect to the difficulties his honor, Judge IREDELL, had mentioned on the indictment, they were too serious and important to be dispensed with.

Judge IREDELL delivered his opinion in effect as follows:—With regard to the lateness of the application, as it does not relate to the merits of the defence, I think the arguments in favor of the motion preponderate, and that no advantage should be taken from the prisoner without full ground. It is evident that, in this case, a number of circumstances might be mentioned which would render a trial inconvenient in the county of Northampton. I am inclined to think with the counsel for the prisoner, that the court have the power to order a special court to be held there if they should think proper, and therefore I should not scruple to admit it, if all concurrent circumstances admitted its prudence. The question then is, whether, according to the legal discretionary power of the court, this court think it their duty to admit the force of the motion. When these offences were first known to have been committed, and when the gentleman with whom I have the honor to sit was in that country, it was possible for a court to have been ordered there for the trials, but it appeared to those with whom the power rested, to be improper. And why?—The president in his proclamation had publicly declared that the lawful authority of that county could not be carried into execution without the aid of a military force. Would it not therefore have been improper for us to order a special court to be held at that place? If a special court could not have been held there, the only thing to be done was to bind the parties over to this court. There are two very important difficulties in the way of this motion; I say important, because they are such as no gentleman of the law can be perfectly clear upon. First, whether, if we order a special court, we can order, by any process known to the law, this indictment to be transferred to that court. This is a doubt stated by Judge Wilson, of the supreme court, at the time of a former motion alluded to; and I am inclined to think this was a great reason which guided the decision; otherwise a

doubt would not have been intimated. If this cannot be done, what would be the consequences of the removal of the case? If this indictment were to be taken there, with a doubt in point of law on it, a motion might be made after trial for a new trial; that not being regular, part having been held in another place. Whether this would be moved or not, I cannot say, but I know at best it is doubtful. The court therefore ought to proceed in the clearest manner not to run the risk of defeating the prosecution of a cause so important. It is the great desire of this court to do the most impartial justice between the public and the prisoner, and not from private humanity on the one hand, or resentment on the other, to lean either way. As to the common law principles of vicinage, there are advantages and there are disadvantages attending it. The advantages are, that the parties are known by, and know their jurors and witnesses, that their characters may be viewed, and the most impartial justice done. But if nearly one whole county has been in a state of insurrection, can it be said that a fair trial can be had there? We may at least presume it could not, because the President of the United States ordered a military force there, to enforce the execution of the laws. It was by this military force that the prisoners are now convened in this city, and I have reason to believe, from the opinion and knowledge of the judge with whom I now act, that it would be exceedingly improper to hold the trials there. It was hinted that troops are still there, and they could promote the execution of justice; but what sort of justice is that of the sword? If they would operate at all, it would be by intimidation, and this would be to the prejudice of the prisoner, and in no respect in his favor. This consideration alone, in my opinion, would make it "manifestly inconvenient" for a trial to be held there. With respect to the principles of common law, the gentlemen well know that the venire may be changed, that is, that parts of the jury may be summoned from other counties. I do not know whether there is a power in the courts to change the venire in England in a criminal case, but I know that in some difficult cases, where partiality was to be apprehended, an act of parliament has been passed to remove the trial. This was done respecting the rebellion in Scotland, for the manifest reason of partiality. This proves that we ought not to look to one side only, but to both, and then form our determination.

Upon the whole, I am clearly of opinion that, as the motion could not be granted without running the risk of these uncertainties, but certain inconveniences, it would not be expedient to allow it, and therefore the trial must go forward.

Indictment in the Circuit Court of the United States of America, in and for the Pennsyl-

vania District of the Middle Circuit. The grand inquest of the United States of America, for the Pennsylvania district, upon their respective oaths and affirmations, do present that John Fries, late of the county of Bucks, in the district of Pennsylvania, he being an inhabitant of, and residing within the said United States, to wit, in the district aforesaid, and under the protection of the laws of the said United States, and owing allegiance and fidelity to the same United States, not having the fear of God before his eyes, nor weighing the duty of his said allegiance and fidelity, but being moved and seduced by the instigation of the devil, wickedly devising and intending the peace and tranquillity of the said United States to disturb, on the seventh day of ___arch, in the year of our Lord one thousand seven hundred and ninety-nine at Bethlehem, in the county of Northampton, in the district aforesaid, unlawfully, maliciously and traitorously did compass, imagine and intend to raise and levy war, insurrection and rebellion against the said United States; and to fulfil and bring to effect the said traitorous compassings, imaginations and intentions of him the said John Fries, he, the said John Fries, afterwards, that is to say, on the said seventh day of March in the said year of our Lord one thousand seven hundred and ninety-nine, at the said county of Northampton in the district aforesaid, with a great multitude of persons, whose names at present are unknown to the grand inquest aforesaid, to a great number, to wit, to the number of one hundred persons and upwards, armed and arrayed in a warlike manner, that is to say, with guns, swords, clubs, staves and other warlike weapons, as well offensive as defensive, being then and there unlawfully, maliciously and traitorously assembled and gathered together, did falsely and traitorously assemble and join themselves together against the said United States, and then and there, with force and arms, did falsely and traitorously, and in a warlike and hostile manner, array and dispose themselves against the said United States, and then and there, with force and arms, in pursuance of such their traitorous intentions and purposes aforesaid, he, the said John Fries, with the said persons so as aforesaid traitorously assembled, and armed and arrayed in manner aforesaid, most wickedly, maliciously and traitorously did ordain, prepare and levy public war against the said United States, contrary to the duty of his said allegiance and fidelity, against the constitution, peace and dignity of the said United States, and also against the form of the act of the congress of the said United States, in such case made and provided. William Rawle, Attorney of the United States for the Pennsylvania District.

The prisoner having been set to the bar, pleaded not guilty.

The petit jury impanneled, consisted of the following gentlemen: William Jolly, City. Samuel Mitchell, Bucks. Richard Leedom, do. Anthony Cuthbert, City. Alexander Fullerton, City. John Singer, City. William Ramsay, Bucks. Samuel Richards, City. Gerardus Wynkoop, Bucks. Joseph Thornton, City. Philip Walter, Northampton. John Rhoad, Northampton. Some difficulties arose as to the two latter gentlemen being qualified, they being Germans, and not sufficiently understanding the English language: however, it was agreed that any difficulties of that nature might be explained to them, and it was urged that they would understand many of the witnesses better than others, several of those being Germans also, and could not speak English, on which account Mr. Erdman was sworn for interpreter.

Mr. Sitgreaves opened the trial as follows:

Gentlemen of the jury:—By the indictment which has been just read to you, you perceive that John Fries, the prisoner at the bar, has put himself on trial before you, on an accusation of having committed the greatest offence which can be perpetrated in this, or any other country, and it will devolve on you to determine, according to the evidence which will be produced to you on the important question of life or death. It is the duty of those that prosecute, to open to you, as clearly as they are able, those principles of law which apply to the offender, and then to state to you the testimony with which the accusation is supported. This duty has devolved upon me, and I hope, while I regard my duty as accuser, I shall do it in such a way as shall do no injustice to the prisoner. However, if I should be incorrect, there are sufficient opportunities for me to be corrected by the vigilance which the counsel engaged on behalf of the prisoner will use, and the order which the court will observe. These are sufficient to correct any mis-statements, but I will use my utmost endeavours to be guilty of none.

The prisoner is indicted of the crime of treason. Treason is defined in the constitution of the United States (section 3, art. 3) in the words following: "Treason against the United States, shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort." This crime appears to be limited to two descriptions: the one, levying war against the United States, and the other adhering to its enemies. With respect to the latter branch of the description, there will be no occasion for any explanation, or to call your attention in the least to it, because it is not charged upon the prisoner; he is charged with having committed treason in levying war. This expression, phraseology, or description as adopted by our constitution, is borrowed from a statute of Great Britain, passed in the reign of Edward III., which has, ever since it passed, commanded the veneration and respect of that nation, almost equal with

their great charter: it is considered as a great security to their liberties. Indeed the uniform and unanimous consent given to this statute, through a great lapse of time, by the most able writers on law; its never having undergone the least alteration amidst the most severe scrutinies, and its adoption into the constitution of the United States, without the least amendment, are sufficient encomiums to prove its worth. I shall state to you, as far as is necessary to the present application of that statute, the most able and judicious expositions, but without recurring to a variety of authorities which might be quoted.

The crime of treason, as it has been laid down by those writers, generally allowed to be the most able on law, whose accuracy is unquestionable, is the highest crime that can possibly be committed against the good government of a nation, and a considerable inroad into the liberties of a subject. In discussing this crime, I shall only recur to the notes which I have taken, and my own knowledge of the law; if that statement should be inaccurate, there are sufficient opportunities for amendment in the course of this trial. Treason consists in levying war against the government of the United States: it may confidently be said not only to consist in joining or aiding the hostile intentions of a foreign enemy; nor is it confined to rebellion in the broad sense in which that word is generally understood; or in the utter subversion of the government and its fundamental institutions: but it also consists in the raising a military force from among the people for the purpose of attaining any object with a design of opposing the lawful authority of the government by dint of arms, in some matter of public concern in which the insurgents have no particular interest distinct from the rest of the community. This is the best description of the crime of treason, as it relates to the matter before you, which I am able to give. A tumultuously raising the people with force, for the purpose of subverting, or opposing the lawful authority of the government, in which those insurgents have no particular interest distinct from the people at large. Agreeably to the division made in the definition of treason by Lord Hale, it must consist both in levying war, and in levying war against the government of the United States. Respecting levying of war, it is to be understood, agreeably to the most approved authorities, that there must be an actual military array. I mention this because I think it proper to be particular in so essential and important an inquiry, and because I think we shall prove to you that this was actually done by the prisoner. Another thing I wish you to bear in mind is, that war may be sufficiently levied against the United States, although no violence be used, and although no battle be fought. It is not necessary that actual violence should take place, to prove the actual waging of war. If the arrangements are made, and the numbers of armed men actually appear, so as to procure the object which they have in view by intimidation, as well as by actual force, that will constitute the offence. It must be war waged against the United States. This is an important distinction. A large assemblage of people may come together; in whatever numbers; however they may be armed or arrayed, or whatever degree of violence they may commit, yet that alone would not constitute treason; the treason must be known; it must be for a public and not a private revenge: it must be avowedly levying war against the United States; if people assemble in this hostile manner only to gratify revenge, or any other purpose independent of war against the United States, it will only amount to a riot; but if it is an object in which the person has no particular interest, this constitutes the offence of treason. There are a variety of instances which might be produced in order to illustrate this definition of the law, but it is not necessary to turn to them. Suffice it to say that it is the intention or end for which an insurrection is raised, which constitutes the crime. This of course you will have in mind when the testimony is gone into. I will just observe, as applicable to this case, that one instance which is defined, of the crime of treason, is, to defeat the operation of the laws of the government; any insurrection, I will be bold to say, to defeat the execution of the public laws, amounts to treason. Having given you this explanation of treason, so far as I suppose it is connected with the present awful occasion, I shall now proceed to state the amount of evidence we mean to produce, in order to prove that the unhappy prisoner was guilty of that high crime.

It will appear, gentlemen, from the testimony which will be presented to you, that, during the latter months of the year 1798, discords prevailed to an enormous extent throughout a large portion of the counties of Bucks, Northampton, and Montgomery, and that considerable difficulties attended the assessors for the direct tax in the execution of the duties of their assessment. It is not in the nature of this inquiry to explain for what purpose, or by what means, the opposition was made: it is not necessary to say whether the complaints urged were well or ill founded, because it is a settled point that any insurrection for removing public grievances, whether the complaints be real or pretended, amounts to treason, because it is not the mode pointed out by law for obtaining redress. It will then be sufficient to show you that discontents did exist, and that in various townships of those counties: that in several townships, associations of the people were actually formed, in order to prevent the persons charged with the execution of those laws of the United States from performing their duty upon them, and more particularly to prevent the assessors from measuring

their houses: this opposition was made at many public township meetings called for the purpose; in many instances resolutions were entered into, and reduced to writing, solemnly forewarning the officers whose duty it was to execute the laws, and these, many times accompanied with threats if they should perform that duty. Not only so, but discontents prevailed to such an height, that even the friends of the government in that part were completely suppressed by menaces against any who should assist those officers in their duty. Repeated declarations were made, both at public as well as at private meetings, that if any person should be arrested by the civil authority, such arrests would be followed by the rising of the people, in opposition to that authority, for the purpose of rescuing such arrested prisoners. It will appear to you farther, gentlemen, in the course of evidence, that, during those discontents, indefatigable pains were taken by those who were charged with the execution of the laws, to calm the fears, and to remove the misapprehensions of the infatuated people; for this purpose, they read and explained the law to them, and informed them that they were misled into the idea that the law was not in force, for that it actually was; at the same time warning them of the consequences which would flow from opposition; and this was accompanied with promises that even their most capricious wishes would be gratified on their obedience. The favour was in many instances granted, that where any opposition was made to any certain person executing the office of assessor, in some townships proposals were made for the people to choose for themselves, but notwithstanding this accommodating offer, the opposition continued. After having shown to you the general extent of this combination and dangerous conspiracy, which existed in all the latitude I have opened to your view, we shall next give in evidence full proof that the consequences were actual opposition and resistance: in some parts, violence was actually used, and the assessors were taken and imprisoned by armed parties; and in others, mobs assembled to compel them, either to deliver up their papers, or to resign their commissions; that in some instances they were threatened with bodily harm, so that in those parts, the obnoxious law did remain unexecuted in consequence of this alarm. Seeing that the state of insurrection and rebellion had arisen to such a height, it became necessary, in order to support the dignity, and indeed the very existence of the government, that some means should be adopted to compel the execution of those laws; and warrants were in consequence issued against certain persons who had so opposed the laws: these processes being put into the hands of the marshal of the district, were served upon some of them: in some instances, during the execution of that duty, the marshal met with insult, and almost with violence: having,

however, got nearly the whole of the warrants served, he appointed head quarters for these prisoners to rendezvous at Bethlehem, where some of them were to enter bail for their appearance in the city, and others were to come to the city in custody, for trial. It will appear to you, that, on the day thus appointed for the prisoners to meet, and when a number of them had actually assembled agreeably to appointment, a number—parties in arms, both horse and foot, more than an hundred men, accoutred with all their military apparatus, commanded in some instances by their proper officers—marched to Bethlehem, collected before the house in which were the marshal and prisoners, whom they demanded to be delivered up to them, and in consequence of refusal, they proceeded to act very little short of actual hostility, so that the marshal deemed it prudent to accede to their demands, and the prisoners were liberated.

This, gentlemen, is the general history of the insurrection. I shall now state to you the part which the unfortunate prisoner at the bar took in those hostile transactions. It will appear that the prisoner is an inhabitant of the township of Lower Milford, in the county of Bucks; that some time in February last, a public meeting was held at the house of one John Kline in that township, to consider, in relation to this house tax, what was to be done; that at that meeting certain resolutions were entered into, and a paper signed; (we have endeavoured to trace this paper, so as to produce it to the court and jury, but have failed;) this paper was signed by fifty-two persons, and committed to the hands of one of their number: John Fries was present at this meeting, and assisted in drawing up the paper, at which time his expressions against this law were extremely violent, and he threatened to shoot one of the assessors, Mr. Foulke, through the legs, if he did proceed to assess the houses. Again, the prisoner, at a vendue, threatened another of the assessors, Mr. S. Clarke, that, if he attempted to go on with the assessments, he should be committed to an old stable, and there fed on rotten corn: we shall further prove that, upon its being intimated by some of them to Mr. Chapman, principal assessor, that if they might choose their own assessors, things would go on quietly, he directed that they should do so; but still they continued in opposition to the law, and would not choose an officer at all. A general meeting was called to read and explain the law to the people, and thus remove any wrong impressions and misapprehensions: the principal assessor was at that meeting; but the rudeness, opposition and violence, used by the people, prevented him from doing so, which was an evident proof that they did not want to hear the law, and that they understood enough of it to oppose it: thus the benevolent intentions of that meeting were frustrated. We shall farther show you that the assessor of Lower Milford was intimidated so as to de-

cline making the assessments, and that the principal assessor, together with three other assessors, was obliged to go into that township to execute the law; that they proceeded in the execution of their duty during a part of the day of the 5th of March last, without any impediment; that, at eleven o'clock in the morning, Mr. Chapman met, at the house of Jacob Fries in Lower Milford, with the prisoner, when he, the prisoner, declared his determination not to submit, but to oppose the law, and that by the next morning he could raise 700 men in opposition to it: that, upon Mr. Chapman telling him that many houses were assessed, the prisoner flew into a violent passion, absolutely declaring that it should soon be in this country as it was in France. We shall farther show you that, at another time during the same day, the prisoner met with two of the assessors, Mr. Rodrick and Mr. Foulke, whom he warned not to proceed in the execution of their duty, accompanied with threats that if they did, they would be hurt; and left them in a great rage. Farther, he proceeded to collect parties, with whom he went in search of those men, and attacked them in executing their duty; one of them escaped, but the other he took; but not having got Mr. Rodrick, who appeared to be a particular object of resentment, he let Mr. Foulke go, telling him he would have them again the next day. He told Mr. Clarke that if he had met with Rodrick, he would not have let him go so easy, and declared to him solemnly and repeatedly, that it was his determination to oppose the laws. We shall farther show you that, after having discharged Foulke, he proceeded to collect a large party in the township, in order to take the assessors the next day. Accordingly, on the day following, a numerous party—to wit, about fifty or sixty, the greatest part of whom were in arms—collected together, and pursued the assessors, and not finding them in that township, pursued them into another, in order, not only to chase them out of the township, but generally to prevent them executing their duty. This party collected, not only many of them in arms, but in military array, with drum and fife, and commanded by this Captain Fries and one Kuyder: Fries himself was armed wath a large horse pistol. Thus equipped, they went to Quaker Town, in order to accomplish their purpose, where they found the assessors, two of whom they took, but Rodrick fled. Fries ordered his men to fire at the man who fled, and a piece was snapped, but did not go off. Fries did then compel Foulke to deliver up to them his papers, but not finding in them what they expected, they were returned; but at the same time exacting a promise that he, the assessor, should not proceed in the valuation of the houses in Lower Milford. Fries was in many instances extremely violent against this law, and peremptory in his determination not to submit to it, as will appear by the evidence.

When they left Quaker Town, they met with a travelling man who expressed some good will towards the government, and for that expression they maltreated him very much, and expressed their general dislike to all who supported the same principles. During the time they were at Quaker Town, intimation was received that the marshal had taken a number of persons prisoners in consequence of opposing the execution of this law, whereupon a determination was formed among these people to go and effect their rescue; and the people of Milford were generally invited to assist in this business. When they were going, the party halted at the house of John Fries, and then a paper was signed, by which they bound themselves volunteers to go upon the execution of this design. This paper was written by the prisoner at the bar, and signed by him and the rest; therein they engaged to go and rescue the prisoners who had been arrested by the marshal. On the morning of the next day, twenty or more of them met at the house of Conrad Marks, in arms, to go on with their design. John Fries was armed with a sword, and had a feather in his hat. On the road, as they went forward, they were met by young Marks, who told them that they might as well turn about, for that the Northampton people were strong enough to do the business without those from Bucks county. Some were so inclined to do; but at the instance of Fries and some others, they did go forward, and actually proceeded to Bethlehem. Before the arrival of these troops, a party, going on the same business, had stopped at the bridge, a small distance from Bethlehem, where they had been met by a deputation from the marshal, whom he had prevailed on to go and meet them, in order to advise them to return home. They agreed to halt there, and send three of their number to declare to the marshal what was their demand. It was during this period that Fries and his party came up; but it appears that when they came, Fries took the party actually over the bridge, and that he arranged the toll with the man, and ordered them to proceed. With respect to proof of the proceedings at Bethlehem, it cannot be mistaken; he was there the leading man, and he appears to enjoy the command. With the consent of his people, he demanded the prisoners of the marshal; and when that officer told him that he could not surrender them, except they were taken from him by force, and produced his warrant for taking them, the prisoner then harangued his party out of the house, and explained to them the necessity of using force. And that you should not mistake his design, we will prove to you that he declared, "that was the third day which he had been out on this expedition; that he had had a skirmish the day before, and if the prisoners were not released, he should have another that day. Now, you observe," resumed he, "that force is neces-

sary, but you must obey my orders; we will not go without taking the prisoners; but take my orders, you must not fire first; must be first fired upon; and when I am gone, then you must do as well as you can, as I expect to be the first man that falls." He further declared to the marshal, that they "would fire till a cloud of smoke prevented them seeing one another." And, executing the office of commander of the troops, which at that time overawed the marshal and his attendants, he harangued the troops to obey his orders, which they accordingly did, and the marshal was really intimidated to liberate the prisoners; and then the object was accomplished, and the party dispersed, amidst the huzzas of the insurgents. After this affair at Bethlehem, it will be given you in evidence, that the prisoner frequently avowed his opposition to the laws, and justified that outrage; and, when a meeting was afterwards held at Lower Milford to choose assessors, the prisoner refused his assent to the accommodating object of the meeting, and appeared as violent as ever.

These are some of the points we mean to prove before you. I shall, therefore, at present, proceed to introduce our testimony.

William Henry testified substantially as follows:

I arrived at Bethlehem on the evening of the 6th of March, 1799. We had heard that there was a party of men would collect, for the purpose of rescuing the prisoners who were there in custody of the marshal; in consequence of that, I went to assist the marshal, and, if possible, prevail on the people to desist. I was one of the judges of the court of common pleas for the county of Northampton. About ten o'clock on the morning of the 7th, two men, with arms, arrived at the tavern where we were; who, when inquired of by the marshal as to their intention in coming armed, appeared to be diffident about an answer; after first saying that they came upon a shooting frolic, one of them said they were coming in order to see what was best to be done for the country. After that, came in several others, armed and on horseback, two of them in uniform, with swords and pistols. The two first men were placed with the marshal in a separate room, in order to await the issue. At this time a considerable number of people had assembled. The marshal first went and spoke to these men as to their intention; I also walked out for the same purpose, requesting them to withdraw, and not appear in arms in order to obstruct the process of the United States laws. They answered, that they were freemen, and might go where they pleased with their arms. I told them that they ran great risk by appearing in arms for such a purpose as I feared they were come. They came in a number, but I don't know how many particularly, as they mixed among the crowd. We request-

ed them to deliver up their arms; but they refused. I also, at the same time, told one of them that it would be best for him to surrender himself, and not oppose the process; the others gave me answer, that they had come to accompany their friend, and to see that no injury was done to him. After this I returned into the lower back room of the house; by this time there were a number more collected round the house, but mostly armed. I don't recollect whether it was before these three men arrived, or not, that the marshal had sent off four men of his posse in order to meet the men with arms who were coming forward; and after we were up stairs three men arrived as a deputation from the armed body, making inquiry as to the intention of the marshal in taking these prisoners; with these three men, the four deputed by the marshal had returned from the armed body that was on the other side of the bridge, in order to learn the marshal's object. The marshal assured them of the legality of the process, and reasoned with them as to the consequences of opposition, or threats to him, or preventing him from executing his duty; but I believe he liberated the two men that were first put in confinement, and returned them their guns. During the time that these two men were in confinement, we examined their guns, and found them loaded. I was pretty much in the lower part of the house, backwards, and there was much of the proceedings of these people I did not see, in the front of the house; but I endeavoured to converse with as many as I knew, informing them of the badness of their conduct, and the consequence of it; but it appeared to be to no effect. About one o'clock I think I first saw what was called the main body of this armed force, marching up the street. A party of horse, preceding the foot, came riding up two abreast; I am not certain whether they had their swords drawn, but I believe they had; and then followed the foot, marching up in Indian (single) file. When they came up, the foot marched twice round the tavern, and placed themselves in front of the house, where they stood some time drawn up in single rank; I believe they were riflemen; they continued there till the rescue was effected. During this time I frequently heard that the prisoners were demanded by them, and they insisted on their release.

Cross-Examined.—I did not hear this demand made, but I heard in the house that it had been made; I also heard that they intended to force their passage up stairs. I observed a party coming up stairs, particularly one, whom I did not know, pointing a rifle up the stairs, as though levelling it at some particular person. The people appeared very noisy in the lower part of the house, all this time; I frequently heard the cry of "deliver up the prisoners," and it appeared to come from the party at the foot of the stairs. During the affair, I am not certain

whether it was previous to this or not, I looked out and saw six or eight men at the foot of the stairs, and the prisoner on the stairs conversing with the marshal; while I was standing there, an old man came running in from the front door, and called for Captain Fries in German, telling him there was his sword (offering it); I think he called three different times, on which I observed the prisoner wave his hand and tell him to wait, it was not quite time yet; shortly after the prisoners were given up. I was not by to be able to hear the conversation between the marshal and the prisoner. Fries was going backward and forward among the men, as though he had command, and I saw him marching into the town in front of the footmen. After the prisoners were delivered up, the principal part of the men marched off. They did not take the prisoners with them. I heard two or three men in the back room say that they must see the prisoners, and insisted they should be let go before they would leave. These prisoners were arrested for combinations and misdemeanours. There was, among the company in the lower room, a man who declared himself very violently; he said if the damned Stamplers [4] had only fired a shot, we would have showed what we could do. He really expressed a wish that it had been done. The words were spoken in German. There were twelve or fourteen of the horse in a military dress, as well as armed: I believe there were none of the foot, except that about ten or twelve had cockades of blue and white, blue and red, &c. They had shot pouches, particularly the rifle company, and I believe all who had guns. The man who was first disarmed had a powder horn in his pocket: his piece was a common fowling piece, the others were mostly rifles, as far as I could perceive from the window. I did not count the number, but there appeared about an hundred, or rather above that number. The whole crowd assembled, I think, could not have been less than four hundred. I think that the marshal had with him for his posse comitatus to arrest these people fourteen or fifteen persons. I believe there were eighteen or nineteen prisoners. I understood that releasing the prisoners was the object they had in view, both from themselves and from several persons with whom they had conversed on the subject.

William Barnett.—I was summoned to attend the marshal on the seventh of March at Bethlehem, as one of his posse. I came there about eleven o'clock in the forenoon: I was there but a very little time, when I understood there were some men coming with arms: the marshal then appointed four of us to go out and meet them, in order to

[4] A Stampler was explained to be a nick-name given in that country to the friends of government, originating from their support of the stamp act.

prevail upon them not to come into the town. We went on about a mile from Bethlehem, and crossed the Lehigh, and there we met a party of horsemen: they were armed. I did not know any of them, but understood they were from Northampton county, near about Millarstown. When we came up to them, we asked them for their commanding officer. They made answer that they had no officers; they were all commanders. We then told them what our errand was—to try to prevail upon them not to go on any farther; but they did not seem to mind it much. We were with them but a very little time, before a company of riflemen came up, who were armed as well as the others. We told them our errand, but they did not seem to mind us. We then returned, and came on with them to the bridge of the Lehigh, where we halted. There we talked with them a great while, but still they wanted to go on. We told them we came from the marshal, and asked them what they wanted by going into Bethlehem with their arms. They said the marshal had two of their men that had come to Bethlehem under arms, and had put them under guard, and they wanted them, and they would have those two men set at liberty. As I found that they were determined to go, I asked if they would not allow that if any had done wrong, they ought to suffer for it: They agreed that they ought, but they should not be taken to Philadelphia, but have their trial in Northampton county. When we found that they were determined to go on, we agreed that they had better send two or three men over to the marshal, and not to go bodily. This they agreed to, and appointed three men to go, and sent them over. There was some stipulation that I should return the men safe; they were afraid these three men would be confined also; but we promised them that we would see them safely returned. We then all went over together to the tavern at Bethlehem, where the marshal was. They spoke to him, told him what their business was, and he gave the two men up to them. When they were given up, we went back with them, in order to go to where we had left the remainder of the men. Going down through Bethlehem, we met a party of horsemen, and we stopped them: they were armed; part of them were light horsemen; and part were other horsemen: they all had swords or some arms or other. The light horse had their swords drawn. We told them that they had better go back, and not go up into the town; but they seemed very anxious to go up. One of them made answer something like this: "This is the third day that I was out, I had a fight yesterday, and I mean to have another to-day if they do not let the prisoners clear." To the best of my knowledge the prisoner was the man who said so; I never saw the man before, but I took notice of him then. He had a sword. This was a distinct body

from those we had left at the bridge; these were others who had come up during the time we were gone. I let them know that the two persons whom they had demanded were liberated; and the three men who went with us told them this also. The horsemen did not wait one moment, but hurried on: they all then marched up town, and formed right in front of the tavern; I returned with them. After they were formed there, I was among them, and talked with them a great deal, but could not do anything with them: if there were ten or twelve that agreed to be moderate, the others would all insist upon it, that they would have the prisoners, all of them. We were there for nearly or quite two hours. This man, whom they called Captain Fries, came out and mentioned to his men that he would now have the prisoners, if any of them would go into the house with him: he had been in backward and forward several times. He said he should go foremost. He told them that he would ask the favour of them, that they were none of them to fire first, if they went in. He mentioned to them likewise, that there were some armed men on the stairs belonging to the marshal. I did not expect he would go in: I was talking to some men there, when I looked round and saw some of the men at the door: he said he would go foremost: he signified, talking in German, that he should get a blow or a stroke: the nearest translation was, "I shall get it."—I looking round, saw the men going in at the door, and I followed them in: they were armed men. I did not see the prisoner after he had spoken those words. I got in, between the men and the stairs, at the foot of the stairs: they halted there, I got in there, in order to keep them back from going up stairs: I was there but a few minutes, when I saw the prisoners coming down stairs. Captain Fries said, when he told the men to come forward, that if he did get it, they should not be scared; they then must do as well as they could: he said he expected to get some stroke; he told them they must take care of themselves: I do not recollect that he said they should shoot, yet I recollect something he said; I think it was "slay, strike, or do as well as you can." The prisoner at the bar went before, and he rather wished the men to follow him.

Cross-Examined.—When I went out at the request of the marshal, it was to speak to these people, and they told me their object was to obtain the liberation of the two men belonging to their party. The crowd began to disperse immediately on the release of the prisoners.

John Barnett.—On the 7th of March in the morning early, just as I got up, the deputy marshal handed me a summons, to be at Bethlehem at 10 o'clock, to aid and assist the marshal in executing the laws of the United States. About 10 o'clock I arrived at Bethlehem. I was there but a very short time, when somebody came in, and said he had met twenty men at one place, ten at another, &c., walking towards a tavern, on the road, about three or four miles from Bethlehem; I cannot recollect its name. The marshal, and others agreed that they thought it would be best to send three or four men to meet them, and to stop them on the road: it was then to be decided who should go. I mentioned that I thought John Mohollan and William Barnett could do more with them than anybody else. They were agreed upon, as was Christian Roth (or Rote) and another, but Isaac Hatsel went in his place. This was, conformably to agreement, two Federalists and two Anti-Federalists. They went and met them; I remained at the house. They were not gone very long, indeed I think it was just as they were getting upon their horses; there were two men, arrayed, and with arms; one had a rifle, and the other a smooth-bore piece. When they were come into the yard, the marshal went down into the yard to them, and talked to them; what he talked to them, I did not hear. However, he took their arms away from them, and carried them up stairs, and put them by themselves. Directly after that, there were five or six horsemen came. The marshal and Judge Henry went down to meet them; they asked them what they came there for: they said, they only came there to be Shankwyler's bail: and Judge Henry then asked them what they did with their arms? They said they did not mean any harm with them. They then got off their horses, and went into a room with the judge and the marshal; what they said there, I do not know, for I did not hear them. Presently after, there came up a troop of horse, and behind them there were two companies of riflemen. They marched up right into the yard, and formed before the door of the tavern. There were about fifty riflemen, and the light-horse had their swords drawn. On a rough calculation, I suppose there were one hundred and thirty or one hundred and forty armed men, and about sixteen or seventeen of the marshal's posse. After they had formed a line in the yard about fifteen or twenty minutes, Captain Jarrett arrived when they gave three huzzas. He then went into the house and talked with the marshal; the marshal requested him to get the men to withdraw. He professed he would. He had arrived from Philadelphia, whither he had been to give bail. After this, Jarrett staid at the tavern about two hours. The men kept regular order, and never separated. The marshal appointed four of us, me and three others, to keep the guard of the stairs, armed with pistols, two at the bottom and two at the head. I served my time, and the second time I was ordered on guard by Capt. Henry Snyder; I staid on the platform at the turn of the stairs, when Fries, the prisoner, came up to me, and wanted to go up stairs. I

told him that he could not be permitted to go up stairs without the marshal's leave. I then asked him what he wanted? He answered that he wanted to see the marshal. I told him that I expected he could see him, and told some men at the head of the stairs to call the marshal out of the room. He came out, and I then told him these two gentlemen wanted to talk to him. He said I should let them pass. As Fries was the first man, I let him pass on between me and the other guard. The other man wanted to go up, but I told him that one at a time was enough, and that when the other had done, he would be permitted to talk to him too. Fries then went up and told the marshal what he came for; he replied that he was come for the release of the prisoners. I stood close by them when they were talking. The marshal made answer that he could not give them up to him; he then told the marshal that he would have them. Well, then, said the marshal, you must get them as well as you can; for he said it was out of his power to deliver them up; he dared not do it. Fries then told the marshal that he had a skirmish yesterday, and he expected to have another one to-day; he then said to the marshal, "As for you, marshal, I will vouch that none of my men will hurt you, but as for the other company, I will not." With that, both of them marched off. I remained on guard. A little while after this, I saw the men coming in at the door, and they got into the entry, with arms. I did not know one of those who came in except Fries; he returned with those armed men. He had a sword in his hand, but I think it was in its scabbard. When they got into the entry, they were pressed upon by the posse, who soon got them clean out of the door. I then got off guard. The language of the men was, that they would have the prisoners. I could not hear many of their expressions, because I was chiefly up stairs; but I heard them say they would not leave the ground till they had the prisoners. The marshal at this time had gone back into the room. Before the prisoners were released, I was relieved. When they made the second attempt, I was up stairs, looking out of the window. These prisoners were at this time up stairs in a room by themselves. About sixteen or eighteen prisoners were there. I believe there was not any kind of acquaintance or friendship between Fries and any of the prisoners. The prisoners said they did not wish to be rescued by those people; they said that they knew none of those people that were before the door. If they had done anything wrong, they said they were willing to go anywhere to take their trials. The minister, and the Lehigh people were all there.

Cross-Examination.—I saw them point their guns towards the window often enough. No violence offered to any person, besides what was offered to the marshal.

Christian Winters.—I was summoned on the 7th of March to go up to Bethlehem, and I went accordingly; when I came there, which was about 11 or 12 o'clock—about the middle of the day—the first man that I saw come there armed, was one Keiser; another, I think his name was Paul, came with him to the tavern; the marshal went out, and brought them into the house, and took them up stairs: I was on guard at that time, and with another, I was set to stand guard by them. (The rest of the testimony of this witness was similar to that of the preceding.)

Christian Roths.—On the 7th of March, I was summoned to go to Bethlehem, but did not know what it was for. About 11 o'clock I got to Bethlehem; when I came, Mr. Eyerly came to me, and told me some men were coming there to rescue the prisoners; I thought it not possible, but he told me it was certain. When we had been there about three hours, there came two men on horseback, and had their arms, whereupon Mr. Marshal, myself, and Mr. Philip Sheitz went down and asked them what they were about. They told us they were informed that there were a number of men met there to-day, so they said they came there to see how they came on: they did not say what they heard they were to meet for. We took them and put them into the house under guard, and took their arms from them. I then thought there was something in what Mr. Eyerly had mentioned to me. I then made an observation to Mr. Eyerly if he did not think it proper that one or two men should go and prevent these people coming. Mr. Eyerly told the marshal of it, and he thought it would be proper that some men should go. I agreed that if no one else would go, I would go by myself. I do not know who spoke to the others; but I, Judge Mohollan, Major Barnett, and ——, went out. We met them within a mile of Bethlehem. I did not know a single man of them; but Judge Mohollan and Major Barnett spoke to them first; but I did not understand what they said. I went farther back, to the rear: I said to them, "What in the world are you about, men? you will bring yourselves into great trouble." One of them said, "We don't know you;" I mentioned, "If you know me or not, you will thank me for it." I said, "If you do not do as I advise you, you will be sorry for twenty years after this;" so there was one of them that levelled his gun at me: said I, "Little man, consider what you are about; don't be too much in a hurry:" then some of his comrades pushed him back. Then that man hallooed out, "March on; don't mind this, people." I do not know his name. They then marched on to the bridge, and there we stopped them again. They then agreed amongst themselves that they would send three men with us to the marshal, to see if they could get the two prisoners we took at first, liberated, and gave their honor that

none of them should come over the bridge with arms. We then went with these three men to the tavern at Bethlehem. They then went to the marshal, and agreed with him, and the two prisoners were discharged; but he set down their names. I do not recollect their names. When these two men were discharged, we went to go back with them again; but when we came to the lower end of Bethlehem, there was that company and another coming on, and there was no stopping them again. The bridge is about half a mile from Bethlehem. These two men went with us, I think; but I am not sure. I endeavoured to stop them, to reason with them, but they would not: and I then told them if they were determined not to hear, they might do as they pleased. As I came back to Bethlehem, I went up stairs to Mr. Eyerly and the marshal. The men paraded before the tavern, and there I think they were for two hours. I suppose one hundred and twenty men, or upwards, were drawn up. I saw those two men that were first kept prisoners mix along with these people. The light horse were armed, and with their uniforms. They had not their swords drawn till they came near to the tavern; then they drew their swords, a great number of them. Before we started from the bridge, we asked them again what they were about. They told us that they were informed that they had taken a number of prisoners, and that they would take them to Philadelphia, and put them in jail there, and no bail would be taken for them. We asked them what prisoners they meant. They mentioned one name only that I recollect, which was one Shankwyler. They mentioned that they would not suffer Shankwyler to be put to jail in Philadelphia; they mentioned that they would give bail ten double for him, or that they might put him in jail in our own county, and try him in our own county. I saw one Schwartz come up into the room where the marshal was. No one abused, threatened, or insulted Mr. Eyerly that I know of. I heard no threats against any one.

Colonel Nichols, the Marshal.—Some time between the 20th and 26th of February, the warrants I now hold in my hand were given to me by the attorney of the district, with orders for me to go to Northampton county to execute them. I set out on the 26th, and after serving some subpoenas on the road, in order to get some evidence, I got to Nazareth on the 1st of March; next morning, Mr. Eyerly and myself went into Lehigh township to serve some warrants upon some persons who had given their opposition to the house-tax law. I think we got twelve of them that day; the others were not to be found. I think there were five of them, however they came in afterwards. We then returned to Bethlehem, and there met with Col. Balliott. We went then to Macungy township, and there we met with

no difficulty till we went to the house of George Syder; I had a subpoena on him: he and his wife insulted us very much; his wife began abusing us first, and he came out with a club, and would by no means be persuaded to receive it, I suppose not understanding it: I gave it to a Mr. Schwartz, a neighbour, who undertook to deliver it to him. We then proceeded to Millarstown, a few miles farther: on the way we stopped at the house of the Rev. Mr. Buskirk, where we left our horses, and walked into the town, to the house of George Shaeffer, to serve a warrant on him; but were informed that he was not in town. We returned to the tavern, about the centre of the town, and there we saw a considerable number of people assembled. Mr. Eyerly and myself walked over to Shankwyler. As we walked out, many people ran after us, and many ran past us, and getting into the house, filled the long room. There appeared to be about fifty men. Near the house in which Shankwyler lived, we concluded it was bad policy to ask for him, for by that means it was not likely we should find him. And therefore, as Col. Balliott knew him, I got him to point him out to me; but upon observing me, he withdrew into the crowd; I followed him, and laid hold on him, and told him he was my prisoner, in the name of the United States. I told him I was the marshal of the United States for the Pennsylvania district. He retreated towards his barn. He afterwards called out that he would not hurt the marshal, but Eyerly and Balliott were damned rascals: after this the people called out to each other "Schlaget! schlaget!" (strike! strike!) This seemed to be the general voice of the people. David Shaeffer seemed to be a prominent character. I told them the consequence of their attempting to strike: I had a pair of pistols, and finding the danger we were in, I pulled open the buttons of my great coat, that I might, if necessary, get a ready gripe at them: whether they saw them or not, I cannot say, but when they found that I was determined not to suffer these people to be abused, they were then a little quiet: they, however, pulled the cockade out of Mr. Balliott's hat, and I believe would have done more violence to him, had they dared. I called on Shankwyler to go with me to Bethlehem, and thence to Philadelphia; but he swore he would not: I told him the consequence of resisting the authority of the United States, that it would be ruin to him; he declared and swore he would resist; he would not submit, be the consequence what it might. I told him it would ruin his interest and family; he said he would do it, if it was to the destruction of his property, and children. However, he finally agreed to meet me at Bethlehem, but never promised to submit, or surrender himself as prisoner. He spoke a good deal about the stamp act, and the house tax; that seemed to be the bone of

contention, and he said he had fought against it, and would not submit to it now; I told him he appeared to be too young to have fought on either side during the war: he then said his father had; he then added that there were none in favour of those laws but Tories, and officers of government. I told him that, as to Tory, that could not apply to me; that I had had a share in the Revolution; and that I was as fond of liberty as any of them. We came away, and as we came out, Mr. Eyerly and Mr. Balliott came out of the door, they huzzaed for liberty: I told them that I should join them in that, if they would huzza for liberty of the right kind; but this was licentious liberty. We then went with a constable to arrest Adam Stepham, Herman Hartman, and Daniel Everly. When I returned, I was informed that the rescue of the prisoners at Bethlehem was intended. This was on the 6th of March. I could scarcely conceive it possible; I thought it was somebody for their own diversion had raised it merely to alarm us, until we got to Bethlehem, where we got that night. There we were informed that the report was serious, and that it would be attempted by a body of armed men. On which I consulted with Judge Henry, Mr. Balliott, Mr. Eyerly, Mr. Horsefield, and General Brown. I had taken a bond of the Lehigh people, with sureties for their appearance. I sent Mr. Weed over the mountain to arrest Ireman, the minister, and John Fox, which he did. Seeing this matter very serious and important, I requested General Brown to remain at Bethlehem, as he had very great influence in that county: he said he was so near home, that he should go home, as he had been so long from his family. I then asked him to return in the morning, but he seemed to think there was no necessity for it, and did not. I then consulted what steps it would be necessary to take; I had seen an attorney, and told him I was ordered to call a posse comitatus in case of necessity, and also that I was ordered that they should not be an armed force; I then spoke to Judge Henry, expecting that he could call out armed men, but he told me he could not, for he had received similar instructions. We then concluded to call about twenty men. He called this posse from the neighbourhood of Bethlehem and Easton; about eighteen of them came in. About 10 or 11 o'clock two men riding into the yard, dismounted, and placed themselves opposite the door, by the side of each other; one of them had a long smooth bore gun, and the other a rifle. Some people in the house went out to speak to them, and asked them what brought them there: they seemed to be at a loss for an answer; I think one of them said they came out on a shooting frolic. I then asked them what they meant to shoot: they did not know, not could they explain the object of their coming. I asked them what they meant to do: one of them said

they meant to do what was best for the country. I then supposed that they would all come in by straggling parties, and therefore thought it was the best way of making the business easy to lead them into the house, which I did, and put their arms into the garret. Shortly after, three horsemen, armed, and, I think, in uniform, came into the yard with Shankwyler; I went and spoke to them, and some went with me. I asked Shankwyler if he was come to deliver himself up; he answered no. I asked him what he came for, if he did not come to surrender himself; he answered that he came to see his partner: on farther inquiry, I found he meant his accuser. By this time the people were collecting very fast, and some persons mentioned that there was an armed force down by the bridge. On consulting with the gentlemen who were with me, it was agreed that a few men should be sent to speak to them, and warn them of the danger they were in, if they persisted in the measure which we supposed they intended. It was accordingly agreed that four gentlemen should go, which they did, and in a little time returned with three of their force, as a deputation from them to speak to me. I asked them what was meant by this armed force, and what they intended by it: they answered me that they wanted to prevent my taking the prisoners to Philadelphia. I told them that could not be, nor must it be attempted; they had much better go back, and tell the people to go to their respective homes. I think they asked me particularly for the two men who had first been made prisoners; I forget whether I gave them up then, or some short time after; however, they were given up, and their guns were given up to them: they were both loaded, and one of them was putting a new flint into his gun in the yard, before I went out to speak to them. The same gentlemen who went down to speak to them at the bridge, went down to them again, and, a short time afterward, we observed that they were coming up in force, up the street, Mr. Mohollan riding with the foremost of them, and speaking to them: the horsemen, such as had swords, had them drawn: the infantry marched with trailed arms. The prisoner at the bar was at the head of the infantry, with his sword drawn: the horse marched into the yard, and formed in front of the house; the infantry marched round the house, and the captain, with the leading file, came in at the upper gate. I had a great deal of conversation with different persons among them, who seemed to take a lead. They were all strangers to me; I told them the consequences of their attempting to rescue the prisoners; I told them they might rest assured that things of this kind would be severely punished by the government; that it would be considered a high offence, and that every insult offered to me, would be an insult to the United States. I had a good deal of

conversation with the prisoner at the bar, without knowing that he was Captain Fries, till he made himself known to me. I remonstrated strongly against the measures, and told them the consequence, but they seemed regardless of it, and seemed determined that I should give them up. They spoke generally of the prisoners. During this conversation, he was without his sword. The substance of the conversation was, he demanded of me the prisoners; I refused to give them up, and told him the consequences of his demands. On his still insisting, I told him that he and those about him would be severely punished for this conduct, that he would surely be hanged. He said they could not be punished; he said something to the effect that the government were not strong enough to hang him, for that if the troops were brought out, they would join him. His reason was, that he was opposed to those laws—the alien law, the stamp act, and the house-tax law; and said they were unconstitutional. He also spoke of bringing people charged with crimes to Philadelphia to be tried as an oppressive thing; they had no objection, he said, to be tried in their own courts, and by their own people. We parted, and met in the crowd two or three times, for the house was much crowded; he still demanded of me the prisoners; I told him I could not give them up; I told him I was commanded to bring them to Philadelphia; he insisted upon having them, and I that he should not. He then went and talked to his people, and came to me again. He told me that if I did not give them up, he would not answer for the consequences; he told me that he would not hurt me; he was the oldest captain in the rank, but he would not answer for them that were with me; that he took command of the whole by rank. By this time Captain Jarrett came in, and by this time there was much noise and huzzaing. I was told that this noise was on account of the arrival of Captain Jarrett: I wished him pointed out to me in confidence. that, as he had come to submit to the laws, he would be able to persuade others to do the same. He was shown to me; he had a pair of pistols in his hand. He showed me that he had entered into recognizance for his appearance. I then begged him to use his influence in persuading the people to disperse, and go to their respective homes; and told him what would be the consequence if they did not. His answer was that he had no influence; that he could do nothing. After this, I consulted with Judge Henry and others, what was best to be done; it seemed to be their opinion that I had better submit, and give up the prisoners; I told them I would not do it; I would immediately march the prisoners to Philadelphia, and if the armed mob thought proper to take them from me, they might; it would then be their act, and not mine; I went to them and told them to prepare for

march immediately, for that we would set off to Philadelphia. The Lehigh prisoners said they would not do so, they would not expose themselves to so much danger; but if I would suffer them to go to their homes, they would meet me in Philadelphia on the Monday or Tuesday following. I met Mr. Fries about the foot of the stairs, and he still persisted in his demand of the prisoners, that I must give them up.

Cross-Examination.—I do not think he had a sword at that moment. I refused, and went into the back room, and a person whom I did not know, told me, that if I did not give them up, I should not be hurt, but the lives of Balliott, Eyerly, and Henry were in danger. This was not an armed man. I did not like to expose the lives of those men, so I gave up the prisoners. Fries came in directly, and said I had not given up Ireman, the minister. I told him I had; he then went out, and came in again, and said he was without. He then mounted and went off. I did apprehend that the lives of those gentlemen would be in danger if I refused the prisoners.

Philip Schlaugh.—When I was at Bethlehem, which I expect was the 7th of March, the first I saw was that the company was ordered in rank, and when that was done, this Fries was in the entry of the house, where he was speaking loud. I inquired who that was; they said it was Captain Fries. He said they who were the greatest Tories in the last war, were the head leaders now; then I went out of the house, and he went up to the marshal, and when he came out again, he went up to his company, and told them, "Well, brothers, I went up to the marshal, and asked him about the prisoners, and told him I would have the prisoners, but the marshal told me he dare not give them up willingly; I tell you, brothers, we have to pass four or five sentries, but I beg you not to fire first on them, till they first fire upon us; I shall be the foremost man; I shall go on before you, and I expect I shall get the first blow." Then he turned himself round. Mr. Molhollan and others begged him that he would not go on in this matter; they would rather go and speak to the marshal that he should deliver up the prisoners willingly, if they would absolutely have them. The men, when he told them this, followed him. He then said to them, "You must not fire first; but if they do fire upon you, then I will order you to fire too, and help yourselves as well as you can." I did not wait till the prisoners were released, for when I heard this, I thought there was going to be warm work, so I got upon my horse, and rode off to Easton as fast as I could.

Joseph Horsefield, Esq.—I live in Bethlehem; am a justice of the peace there, and was there on the 7th of March. Shortly before the last general election, the spirit of discontent and opposition was sensibly felt

in the county of Northampton; there were different meetings called in different parts of the county; among others I was informed there was one at which the militia officers were particularly to attend, which I understood was intended to prepare a ticket for the election. At that meeting, sundry resolutions were passed, which appeared in public prints; among others, one was that petitions should be formed to obtain a repeal of the alien and sedition laws, and the land-tax act. I was informed that the captains of the militia companies were to be served with a copy of each of these petitions; I was likewise informed that this was done, and a five-penny-bit each paid freely for a copy, though the Germans love their money so well. I think the people were told that the petitions merely contained a request for the repeal of the house and land-tax law. I have seen none of them. On the election day, the people pretty generally collected, and, at least in the district where I had a right to vote, the spirit of opposition against the measures of government was so universal, that a friend of government, by saying one word in favor of it, was ready to be abused; and I understood it was so in every election district in the county; and the county in general gloried that they had gained the day. Nothing material occurred, to my knowledge, from that time till the marshal arrived there. The spirit of opposition which had begun before the election, daily increased before the marshal arrived. The marshal arrived at Bethlehem about the 3d of March. I, having some personal acquaintance with that gentleman, waited on him, when he told me he was sent to the county on business for the United States, and desired me to inform him where several persons resided, against whom he had precepts from the district judge. I acquainted him. He then went to Nazareth, and returned again about the 5th, telling me he had summoned a number of persons in Lehigh township, and that they were to be at Bethlehem on the 7th. On the 6th, I was informed he had returned from Millars town, and on the 7th in the morning I went up to town, when he told me that he expected there would be some disturbance that day, and also told me that he had issued summonses for the posse comitatus. Between 10 and 11 o'clock the posse came; I think they were about fourteen in number. A considerable number of people from the neighborhood of Bethlehem had collected unarmed. Mr. Dixon arrived from Emaus about 11 o'clock, and informed the marshal that, on his way, he met with a number of people collected at a tavern called Reiter's, in arms, both horsemen and footmen, about six miles from Bethlehem, and that he met a number on the road partly armed, partly unarmed. About half past eleven, two men arrived at Bethlehem armed, from that quarter; they were disarmed, and sent up stairs into a room; about the same time a number of persons arrived from Lehigh township, who were also sent up stairs by the marshal in a room by themselves; they were about eleven in number. I was present when Mr. Eyerly spoke to these prisoners, telling them that an armed force was formed with intention to rescue them; the prisoners answered that they by no means wished it; that they would submit to go with the marshal, rather than be rescued. In about an hour, I was looking out of the window up stairs, and saw riding into the yard a number of horsemen, besides some footmen; I said to the marshal I thought it was best for us now to go down and see these people. I went down and asked one of them what was his name; he answered Daniel Shaeffer. He had a sword at his side, and two pistols; next to him on horseback was Henry Shankwyler; next to him was another horseman accoutred in the same manner, whose name was Philip Daesch; there were also John Dillinger and Jacob Cline, not in uniform, but with swords in the scabbard. I asked them what they wanted: we are all civil people, and have no arms, was my observation to them. Dillinger, who seemed to speak for them, said that yesterday the marshal had taken Shankwyler and some other of their neighbours prisoners; that they were come to see Shankwyler's partner (accuser). The marshal told them that the United States was the accuser of Mr. Shankwyler. Dillinger, said he thought it was not right that he should be taken to Philadelphia. The marshal said that the judge had ordered it so. I told him that I thought they were unacquainted with the government of the United States, and I thought they were in a very critical and dangerous situation; that the United States in less than twenty days could muster 10,000 men, which power I thought they could not withstand, and that it was best for them to surrender the prisoners to the marshal, and go home. They said that Shankwyler and the others were their neighbours, and that they would wait and see what should become of them. They did not mention the other names. I asked whether any more armed men would be there; Jacob Cline answered, fifty more. With that we went into the house. After dinner the people collected very fast, and Dillinger began again to speak in behalf of Shankwyler. The marshal told him it could not be otherwise, go he must; Shankwyler answered that he had a family to take care of, and that he would not go. With this, the marshal and myself walked up stairs, and there saw a great number of armed people round the house, I think one hundred and twenty or thirty, and about two hundred and fifty unarmed. I suggested to the marshal that my suspicions were very gloomy; that I doubted whether he would succeed in taking off the prisoners, for I had quietly heard among the people that were in the house, and out of doors, that nothing should satisfy them but the deliv-

ery of the prisoners: in front of the house was drawn up a number of men armed. I went up stairs, and there I perceived several times, guns pointed up to the window of the second story, at which I began to feel very disagreeable. Mr. Eyerly, Mr. Balliott, Mr. Henry and the others were occasionally at the windows, though I do not recollect Eyerly being at the window, but the others were: I walked down stairs, and there saw men armed close before the door, pressing in; I pressed through them, and heard two men say if Henry, and that damned Eyerly, and that damned potgutted Balliott were there, they would tear them to pieces; this man did not attempt to come into the house. I thought this was bad news, and I walked back again, and proceeded my way up stairs, and desired Mr. Levering (the tavern-keeper) to close the bar, thinking there was madness enough without stimulating it, which was immediately done. I desired the marshal not to protract the delivery of the prisoners to the law. Mr. Mohollan and several others there pushed them back, but just then I heard some of the officers say, "Boys, in the ranks! in the ranks!" I looked out of the window again up stairs, and there I saw a second pressure, to come in at the door; some of the men who were in the ranks, thumped their guns upon the ground, and jumped, pronouncing some unintelligible shrieks, savage-like shrieks. I begged the marshal, for God's sake, to deliver up those men up stairs, for the rescue was perfect, in my opinion: the closing of the men would be only butchering, and I had no doubt the government of the United States would not let its dignity be trampled upon in this way. The marshal still continued to hesitate. By this time a number of persons had got into the house, adorned with large three-coloured French cockades. The posse staid up stairs at this time: I then worked my way down stairs again, in order to be ready for a jump. By this time I understood that the prisoners were delivered. After the prisoners were gone about ten minutes, there was not a single armed man in, or about the house: some of the neighbors who had collected were still there, some of whom were approving, and others disapproving of the conduct of the insurgents, but in my opinion, the majority were approving. I never saw the prisoner till I came down to this place, but I frequently heard the name of Captain Fries called. Mr. Balliott looked out of the window, but stepped back again pretty quick, afraid of the muzzles of the guns.

John Mohollan, Esq., after describing the preliminary proceedings to the same effect as the preceding witnesses, proceeded: Having met with those horsemen before we came back to the bridge, we returned with them, and all made a halt in the yard. I spoke all I could to dissuade them from the purpose about which they came, but all to no purpose. I had no answer that I could understand, for they generally spoke in German or broken English, which I could not understand. I always understood, generally, that they wanted the prisoners, and that they wished to give in security, and let them be tried in the county: that if they had done anything that was wrong, it was right they should suffer, but that it was not right to take them to Philadelphia. I heard Major Barnett say this, who interpreted what they said in German. After being a considerable time engaged with people as actively as I could, but it appeared to be but to little purpose, I then went up stairs with a view to take something; as I was returning, the stairs were so crowded I could not easily get down. Coming down, I saw a person whom I understood to be Captain Fries, and the marshal standing talking to him. I believe it was the prisoner at the bar. I heard them talk a few words; the marshal said that they were not doing right, and that they must suffer: but I cannot recollect anything particularly that was said, but I observed that he often made a demand of the prisoners, but that he should not be hurt; that he would be answerable for himself and the company, that none of his men should hurt him that day, but that he would not be answerable for any others that did not belong to his company. I think he repeated this twice. I was there but a few minutes. I made some observations to the men, advising them to consider what they were about, for I considered it dangerous, and very wrong to proceed in this way. At this time there was a noise in the entry: I was afraid something had happened, so I went down, but I do not recollect seeing Fries the whole day afterwards. There was a great deal said, but none of them spoke to me in English.

Jacob Eyerly.—As to what happened on the seventh of March, I am not able to say much. I was out with the marshal the day before, when he served the process. As we heard that the rescue was intended, it was agreed to send express to Easton, in order to obtain the posse to aid him in the execution of his duty: they accordingly arrived between ten and eleven o'clock, to the number of fifteen or sixteen. Mr. Dixon of Emaus told us, that he had seen about twenty armed men at Reiter's tavern, and some at another tavern, besides some on the road, and that he understood from them that they were coming to rescue the prisoners. It was then agreed to take these prisoners, who had surrendered, up stairs. There were a number of people now collected from the neighbourhood, and then it was agreed to send the deputation to meet the armed men. About that time I went down stairs into the back room, and there I saw those two men whose arms had been taken from them: I did not see them come in. I then went up stairs again; this was the last time I went down stairs, till after the prisoners were released. I then saw those three men come with Shank-

wyler. I did not hear what passed, but saw Mr. Horsefield and Judge Henry go to them. Sometime afterwards, I saw an armed force coming in, a great many on horseback, and many footmen with muskets on their shoulders: the horsemen had their swords drawn. The greatest part of those on horseback came from Bucks county. Afterwards, the marshal came up stairs and said that they were determined to have the prisoners, and he believed that Mr. Balliott and myself would be in danger of our lives if we went out of the house, and then desired me to undertake to guard the stairs, and told me to give orders that if anybody would come up with force, they should shoot them. I placed the guard on the stairs; at first there were but two. Some of the posse were at this time below talking to the people. After some time the guard told me that they had got violent, and threatened to come up stairs with violence, and requested of me that I might double the guard, which I did. As I was in the room, I looked out of the window and saw a company of riflemen, all with three-coloured cockades, marching Indian file round the house: I counted them; there were forty-two in that company; another person besides myself was counting them, but I do not recollect who it was, though I rather think it was Mr. Balliott: they marched twice round the house. Another time when I was walking about the room, a person who was along with me, I do not recollect who, told me that they were pointing their guns up to the window, and that he was sure it was dangerous for me to show myself at the window. There is not the least doubt upon my mind, from what I heard, and from what I saw, and from the marshal's testimony, that if I had gone to any place where they could have done it, they would have shot me; because the people in general appeared to be in such a rage that there was no reason in them. I abstained from showing myself at the window, or amongst the people, as much as possible. There was nothing particular that I saw, except at one time when I was in the room, I heard a terrible huzza: this was in the afternoon. On this I went to the window to see what produced this noise, and I saw that Captain Jarrett had arrived: he had just dismounted his horse, and had his pistols in his hand, and was walking up towards the stairs. I did not remain long at the window, but just looked out, and saw him come in, and shortly after he came up into the room where I was; he had not his pistols with him then: I had that moment received a letter from Mr. Rawle, attorney of the district, that Mr. Jarrett had surrendered himself and given bail, and that he declared he was a strong friend to government. I then said to him, "If you are a friend to government, as you profess to be, you ought to go down and tell your people to desist:" to which he made no reply at all. He walked about in

the room for some time, and then went down stairs. I did not see anything more till the prisoners were released. The only time I saw Mr. Fries, the prisoner, was a few minutes before the prisoners were delivered up. I walked out of the room, and saw Mr. Fries upon the head of the stairs, speaking with the marshal: shortly after, the prisoners were requested to go down; but the minister, staying a little while up in the room, there was a call made for him particularly, and therefore I went and requested him to go down. Shortly after, the armed men went off. I looked out of the window, and saw Mr. Jarrett parading his light horse in rank before the door. He then gave orders to march, and they went off. That was the only time I saw the prisoner during the day.

I was one of the commissioners appointed to carry into execution two acts of congress; one for assessing houses, and the other for laying a direct tax. After I had received my commission, which was some time in August, 1798, I had received a letter from the secretary of the treasury, requesting me to take some pains to find out suitable characters to serve as assessors. I did, in consequence of that, write some letters to some of my friends, in the counties of Northampton, Luzerne and Wayne, which constituted my division: in Wayne and Luzerne, I found no difficulties whatever, but received a number of applications sufficient, and accompanied with recommendations. In Northampton county I was not so successful; I had but two recommendations from that county; it was, therefore, necessary for me from the best information which I could obtain, to endeavor to find men of suitable characters in each township; and likewise to get a number of blank commissions, in case some of those appointed should refuse to accept of the office. I received information at Reading, at the time the board of commissioners met, from the commissioner in Bucks, that he had received information from a gentleman in Philadelphia (Mr. Chapman) that he had travelled through a great part of Northampton county, and that in every tavern where he stopped, this tax law was the general topic of conversation, and that great pains were taken to find out who the persons were that were friends of the government so much as to be assessors, in order to persuade them not to accept of the appointment. Although I could not believe it was the case at that time, yet I found it was the case afterwards. Agreeably to my duty, I gave notice to the assessors to meet me at a certain place. I should have first said that I appointed the assessors agreeably to the best information I could collect; I took one man from each township, such as was thought qualified for the business. I sent them their commissions, and with them notices to meet me at a time and place appointed in order to receive from me their instructions. I appointed a meeting of the assess-

ors of the third district of Nazareth, on the 3d Thursday in November; two of them did not attend, and some of the others who did attend begged to be excused from serving. I asked their reason, and told them I could not very well excuse them; they told me that the people in their different townships were very much opposed to the law; that they thought it was dangerous for them to accept of it. I found that they, as well as the people, had a wrong idea about the law; and I was so happy that day as to prevail upon all those that wished to be excused accepting the appointment, upon explaining the law to them, to accept it. The next day I met the assessors of the second district at Allentown, where all attended but one. I had the same difficulty there as at the other place, and it was not without much difficulty that those who did appear, were persuaded to accept of the appointment. I then left the blank commissions with Mr. Balliott, and requested him to appoint some persons in the room of Mr. Horne, who had refused. The Monday following I met the assessors of the other district at Chestnut Hill township. Previous to that, I had seen Mr. Kearne, who was the assessor appointed at Easton; when I mentioned to him that he was appointed an assessor, he told me that it would not suit him to accept of it. I requested of him that he might name some suitable person, and qualified for it, and I would be willing to accept him. He mentioned Jacob Snyder, and told me he would notify Mr. Snyder to meet me with the rest. When I came there, two of the assessors did not appear, and one from Hamilton did not appear willing to accept of it, but after a great deal of explaining and persuading he was prevailed upon. Just as we were going, Snyder came; he told me that he had received his notice, and that he was willing to accept it; that the people were very much opposed to the law, and he did not very well understand it himself; but he thought he would endeavour to get some information; and that when he came there, the information he received was such, that he was determined to go after me, and accept of the appointment, if he were to ride fifty miles in order to accept of it, for that he had been wrong informed about the law. I then went up to Wayne county, where I had no difficulty, except that one assessor told me that he was persuaded with difficulty to accept of the appointment. As I was going to Luzerne county, the assessor from Hamilton township (Nicholas Michael) came after me, and told me that he had been obliged to fly from his house in the night to save his life, and begged of me to accept of his resignation; I told him I could not accept of it, but that I would see perfect justice done. At my request he went with me to Easton, where we went to see Mr. Sitgreaves, attorney of the district; but not finding him at home, we went to Judge Trail, in order to take his deposition. He begged that I would grant the favour for him to consider of it till the next morning; I did, and next morning he came to me and begged me, "Mr. Eyerly, for God's sake, put me to jail, so that I may be secure of my life, for if I inform against these people, I and my family shall ruined." I told him that I would do no such thing, for that I had too much friendship for him; that I would give a few lines to the constable to request him to call a township meeting, and I would meet him in the township. I requested Mr. Henry to go there with me: I had reason to believe that this opposition arose from misrepresentation, which I supposed was given to the people by a few gentlemen, who had travelled through the country a few days since. When we came to Hamilton township, there were about sixty or seventy persons assembled, three or four of them in uniforms; their arms were behind the door at the house of Mr. Hellers. I then told them that I was come as their friend, and without any design of taking the least advantage of their conduct in opposing the assessors; that I had come to read the law to them, and explain it. I did so, and pointed out the impositions practiced on them. Mr. Henry assisted me as much as he could, but all to very little purpose. The assessor, after this, again begged me, for God's sake, to accept of his resignation. As there was a number of them that complained against the assessors, I proposed to them that, though I had no authority to it, yet if I thought it would be a favour to grant them that indulgence, to elect their own assessor themselves, I would grant him the appointment. They told me they would do no such thing, for, said they, "If we do this, we at once acknowledge that we will submit to the laws; and that is what we won't do." I then inquired for a suitable man, and John Hufton was mentioned, who was likewise elected assessor for the county rates. I called him into a room, and requested him to accept the appointment; he told me that it was impossible at the present time, but he should, whenever things appeared more favourable, so that he could go through, be willing to do it.

The last week in December, or the first of January, I received a letter from Mr. Heckavelter, the assessor of Upper Milford; by which, he informed me that he was stopped by a regular deputation from the township meeting, consisting of three men. I sent a line to Mr. Heckavelter, and wished him to give notice to Mr. Schymer, Mr. Moretz, and some of the leading men in the township, that I would meet them at such a time, and explain the business to them. When I came, in consequence, within four miles of the place, I was requested by a friend not to go, for that the people were so violent, that if I did go I should certainly be killed: I replied to them that I would go; I was not afraid of any of them. I took Mr. Henry

along with me; when we came there, I found about sixty or seventy persons collected at the house of John Schymer. I suppose about twenty of them had French cockades in their hats, red, blue, and white. Mr. Schymer then took me into his own room; there were about eight or ten in the room. Mr. Schymer asked me if I had seen the petitions; he gave one of them to me, and requested that I would read it, which I did in the presence of another person; there were but two in the company that understood English. While I was reading, these two men began to shake their heads; they said it was not such a petition as they had been told. I then asked them whether the general opposition was not on account of the stamp tax, and the house tax; they said yes. I then told them there was not a word in this petition against the stamp act; they seemed to be altogether satisfied, and said that they had been made to believe it was. I then went into the next room, where the people collected; some of them appeared to be extremely violent and very abusive. I told them I had not come there to be abused by anybody; that I had come there as a friend, to inform them of the law, which it was important should be understood. There was a report among them that it was no law; I read the law to them, and explained it in the German language, and told them it was their duty to submit to it. One of them of the name of George Shaeffer jumped up before me, and said, "Mr. Eyerly, it is no law;" I told them that if they did not believe me, they might inquire of Squire Schymer whether it was or not. Mr. Schymer told them it was a law; upon which Shaeffer replied, "admitting it is a law, we will not submit to it." He then further said, "Here I am, take me to jail; but you shall see how far you will bring me." Upon which a great many of them jumped up and said, "Yes, by God, if they shall only attempt to take any one to jail, we would soon have him out again." Some of them made use of very abusive language against the assessor, calling him a Tory rascal and the like; and as the assessor had requested me to accept of his resignation because it was not in his power to go through with it, I proposed to them, that if they had any objections against the assessor, they should elect one, and I would give him his appointment: to which some of the most sensible and most moderate replied, "No, if it must be done, Mr. Heckavelter shall do it;" and some of the others said, "We will do no such thing: if we do, we at once acknowledge that we submit to the law, and that is what we will not." I then went over to the tavern close by, with Mr. Schymer, when Mr. Heckavelter came to me and told me that he was in danger; that there were three of the Shaeffers were going to give him a licking; I requested him to stand by me, and I would see him safe. We then went off.

Cross-Examined.—All three of them came up to beat him. Mr. Heckavelter told them he would not have anything to do with them, and they charged him something respecting a liberty pole at Millars town. The liberty pole was erected two weeks before that, but after the dissensions arose, with a few exceptions, poles were erected nowhere but where this opposition prevailed. The law was not executed at Millars town, nor at Upper Milford, till about two or three weeks ago at farthest. I then agreed to go to Millars town, where one of the Shaeffers lived. Mentioning this to an assessor, (John Roming,) he requested I would not do it; he told me that the people were so violent that he would not go upon his duties if anybody would give him £500; if he did, he must run the risk of losing his life. I then desisted.—I then went to Mr. Trexlers, where I saw Mr. Bobst, who gave me information of Heidelberg, Wiessenberg, Lynn, and Low Hill: he told me that at a meeting at one of those places the people had drawn up a paper not to submit to the laws: he then told the people that they were certainly doing wrong, and that they would bring themselves into trouble if they went on that way: upon which they (the people themselves) destroyed the paper. He said the same of Heidelberg. He likewise informed me that in the township where he lives, it was impossible to execute the laws. The laws were executed in those four townships only since the troops have been there. All in the township opposed the execution of the law, except three or four. In Penn township the assessor did not meet us; he refused to accept the appointment, well aware of the difficulties that would occur; and a general rule was admitted to meet those difficulties. I received information from Mr. Balliott that he had found a man in that township who was willing to execute the office. At my request, he sent him a commission, but the man was obliged, before he took the oaths, to return it again, declaring it was impossible to do it. This was some time in January. Some time afterwards he wrote to me of another man who would accept. I requested him to sign his commission. I received information, while the marshal, Mr. Balliott and myself were about the country, that as soon as the people in the township knew that he had received his commission, they raised a mob. Penn township was assessed about ten days ago. Owing to the opposition in that township, the law could not be executed. In Moore township there was some opposition; but when the assessor was opposed, he called a town meeting. That township has been assessed about two months. On the first or second of March last, when the marshal came to Nazareth, and told me that he had process against a number of persons in Northampton county, he requested me to go with him; I went with him first to Lehigh township, where the marshal served process upon those peo-

ple for opposing the assessments, without any difficulty: we then came to Bethlehem, and then to Emaus: the first subpoena the marshal had to serve was in a house upon George Syder, where, after being abused by the house, we were sworn at and abused by him; he had a large club in his hand.—He called us rascals, highway robbers and the like: the marshal told him he only had a subpoena to appear at Philadelphia to give testimony; to which he answered in German, he would be damned if he would go. The marshal, finding he could do nothing with him, requested Daniel Schwartz, sen., to read and explain it to him, and we left it with him to serve. We then went to Millars town to serve a warrant on George Shaeffer, but we were told he was gone to Philadelphia: we went to Seward's tavern. The marshal and myself then went to Shankwyler's, where there were at least fifty assembled in the room. Not knowing Shankwyler, Mr. Balliott pointed him out, and the marshal took him: while the marshal was talking with Shankwyler, the crowd closed upon us, and abused us very much, and in a very menacing manner, accompanied with an almost universal cry of "Strike! strike! strike!" so that for some time we did not know what would be the consequence. The marshal this time was persuading Sankwyler to submit, telling him the consequence of opposition: he at first declared he would not, but at length he said he would do as Jarrett did. Some of the people then said that if Shankwyler was to be taken out of his house, they would fight as long as they had a drop of blood in their bodies. The marshal then turned round to the crowd, when they were so violent, and told them that Mr. Balliott and myself were under his protection. I forgot to mention that, while the marshal was talking to Shankwyler in the bar, one of the persons present tore the cockade from Mr. Balliott's hat, while he was turning round to speak to the marshal: Mr. Balliott did not for the present know but it was a blow some one had given him. They then made back a little. Having found it impossible to do anything farther, Shankwyler promised to meet the marshal at Bethlehem. We then went out of the room, but before we came out of the house, there was a terrible huzza in the room. I then sent for a constable, at the request of the marshal, to go with him and show him the persons and places of those against whom he had process. I remained while he served the process at Mr. Irexler's, and it was there we first received information that an attempt would be made the next day to rescue the prisoners. We arrived at Bethlehem that evening, the 6th of March, and then the occurrences happened of which I have given testimony as far as I know.

Samuel Toon.—(The testimony of this witness being in entire accordance with the two immediately preceding, is here omitted.)

Andrew Shiffert.—I was one of the armed party that went to Bethlehem on the seventh of March, and belonged to Jarrett's company. I was informed by John Hoover that all the light-horse were to meet at Martin Ritter's at ten in the morning: I went to Ritter's the next morning, (on the seventh of March,) and when I came there, I asked what was to be done. Their answer was, that they were going to Bethlehem to release the prisoners from the marshal. I told them that if they were to do this, they would find what would be the consequences. The others said that if they got the prisoners clear that day, there would be noth ing done; it would be all over: that if the soldiers came with arms against them, it would be all at an end. At Ritter's I wanted to go home, but they would not let me, telling me that Fogle would be at Guise's tavern, whereupon I agreed to go so far with them. Coming there, Fogle was not there, and I and Samuel Toon wanted to go home, for there were no officers there. They then agreed to choose an officer, when the choice fell upon me; I told them I would not go with them without they would obey my orders, and not say any more about taking the prisoners from the marshal. They professed to do so, whereupon we proceeded to within half a mile of the bridge, and there we were met by four gentlemen from Bethlehem, and as they repeated again that they would have the prisoners, I said I would have no more to do with them. They then went into Bethlehem, but I did not go with them; but in about two hours I went in to see what they were about: I staid this side of the bridge till then. When I got to Bethlehem, I was informed that they had got the prisoners out. I remained there about half an hour, and then rode home, so that I know not what happened.

The evidence here was closed so far as related to the affair at Bethlehem: and the district attorney then proceeded to introduce the following testimony in regard to preceding and succeeding events to show the state of the country, and the prisoner's intention, the material portion of which is here given.

John Dillingher.—It was rumored in my neighbourhood that the marshal was coming up to arrest some persons; before he came, it was suspected that some persons would be arrested. The report was that they were to be taken to Philadelphia. It was said, that if any person was to be arrested innocently, it would be very hard for such a man, and he ought not to be suffered to suffer. And further, it was said that somebody had sworn against Shankwyler that he had two pistols and a sword on his table, and that he had sworn that if the assessors should come, he would shoot them.

William Thomas.—On the fifth of March we heard that the assessors were going round to assess the houses in Bucks county: they had assessed a few of the houses

about already: my brother was at Jacob Hoover's, and I was there when he told me to tell two of our neighbours to let the assessors go round. On the sixth in the morning, I met Captain Kouder: he told me I must come down to the mill, that his company was assembling there. When we got there, several were met; part of them were armed. There were about fifteen in the whole. We went to Jacob Fries' tavern; then the people said they went to see the assessors, but I don't know what for. There were a great many more people there, I think about thirty. Two horsemen were sent to see if they could find the assessors. Their direction was, that if they could find them, they should bring them to Quaker town, or to Jacob Fries' tavern. After the horsemen were gone, then the order was for the company to go to Quaker town. A great many were armed, and many who were not, had clubs. I cannot tell how many were armed, but the greatest part had either arms or clubs. There was a drum and fife when we were at Quaker town.—We all stood in a rank, and fired off, and hallooed huzza. Soon after we were there, the assessors came along. They were Esquire Foulke, John Rodrick, and Cephas Childs. I was at Zeller's when they came along, and they all began to run out of the tavern. When I came out, they had Foulke by his horse's bridle, and him by one leg, and they told him to get off. It was Captain Kouder that had hold of him; then John Fries came up and told him to get off. Fries told Foulke to get off; he wanted to speak to him. Then another came up, and stood at the back of the others, giving one of them a knock with the butt of his gun, and told them to pull him off; Jacob and John Hoover told them they should not abuse the man, for he would get off without. With that the esquire rode up with them to the shed, and got off. They then went into the tavern together. Then John Fries told him that he had forewarned them yesterday not to assess the houses, and yet they had come to-day again; he then told him that he should show his writings, what he had done in the township. Which he did, and John Fries read them, and gave them to him back again. I then went into another room, and when I came out again, Childs, the other assessor, was sitting on the table, with five or six about him. When I came up to him, I told him that they should not abuse him, for I used to know him: at this time they were abusing him. I do not recollect what they said, but they told him he should not have gone about when they had forewarned him the day before, and they made him promise that he would not come again till farther orders—till they knew how the law was. They told him they thought they had as fit men in their township as what he was. and they wished to choose a man in the same township, if they must have it done. A travel-

ling man named Captain Seaborn was there; he was drunk, and some of them asked him whether he was for liberty or government: he said government; some one said if he said that again, he should be whipped. They were all pretty well drunk, but I was not drunk. I do not recollect ever seeing Fries drunk: Kouder was, and so might Fries, for what I know; but I had known him some time, and knew he was a sober man. They talked of Tories and stamplers: Foulke was one they called a Tory, and so were several others. Next morning I went to Marks' tavern, in consequence of a message they had left for me that night before with my mother. By ten o'clock we were all there. John Fries was there. John Fries had the command; but he did not command till he got to Bethlehem; he gave no orders on the road. The substance of the conversation before we went from the tavern was, that they were going to Millars town: I did not know that they were going to Bethlehem. Should there be prisoners there, Marks said that he wanted us to show ourselves. The Northampton people had a mind to take the prisoners again: I understood that the night before at Fries', and along the road before we got there. About three or four miles from old Marks', we met young Marks; he said it was not worth while to go to Millars town, that the prisoners were up at Bethlehem, and that the Northampton people and the light horse had all gone there. Some were then for going back again: some, as they had come so far, was for going up to Bethlehem, to see what was going on there; so we went on. Old Marks and John Fries said so. Then we went on about a mile, and stopped at Ritter's: there was a liberty pole there. Then we went on to Bethlehem. When we came to the bridge, the people had stopped; there were some riflemen and some light horse. Some asked the reason why they stopped there: they said they could not get over, the bridge was shut: then John Fries rode up, and asked whether they required toll or not; they said—Yes. Then he told them to count his men, and told us to follow him. The words he used were. "Now, boys, follow me." I do not know whether he counted all or only his own men. I do not know who paid the toll; we did not: we were all mixed together. I did not hear of three men being sent forward. I heard of their having taken some prisoners. I believe only the Bucks county people followed Fries over the bridge, without it was some few of Staeler's riflemen, who came pretty soon after over the bridge. From Marks' to Bethlehem, it is about twenty miles. When we got over the bridge, two men met us. and said we should not hurt them: Fries told them that he should hurt nobody without they hurt him first. Then Judge Mohollan came and spoke with him afterwards, but I do not know what either he or Fries said. When we got up to the tavern at

·Bethlehem, the whole of Staeler's rifle-company were there. They marched round the house twice; we did not stand in ranks; we were separate. They wanted one to go up and talk with the marshal, and they from Bucks and Northampton said John Fries was more fit to go up than e'er a man that was there. Then John Fries and one Hoover went up stairs. After a while Hoover came down; Fries staid up; when he came down, he kept dashing and swearing, and said force should do: give him nine or ten of the best riflemen in the company, and he would storm the house; a great many of them told him he should not do it; he said he would. Jacob Hoover, Mitchel and Mr. Mohollan endeavoured to keep him off. Fries, when he came down stairs, fetched some writing down with him, that he got from the marshal, which he read to the company. He said the marshal dared not give up the prisoners, and therefore that they would take them by force of arms. At this time the Bucks county people were separate from the others. He spoke to the whole of them. Then he asked, "What shall we do now—take them by force of arms or how?" Several of them said, since they came so far now, they would have them. Frederick Henry said, since they were come so far, it was a damned shame not to have them. Then Fries went up stairs again, and said he would go and talk to them once more. When he came down again, he said that the marshal dared not give them up, without they took them by force of arms. They then told him that he should go and do something pretty soon, for it was getting late. Some of them said it was better to let Fries have the whole command of all the men. Then it was concluded to go into the house, and he spoke five or six times. Fries, when it was concluded to go into the house said, "For God's sake, don't fire boys, till I am fired upon first:" he said this three or four times over. Then we moved on to go in; he was before us. A good many at last followed him. I could not see who they were, the house was so full. Then Fries went up and talked to the marshal about half way up stairs. Henry told me that Fries was telling the marshal that if he did not give up the prisoners, they would fire on them, so that they should not see each other for smoke. After that, the door was opened, and I saw some of them come down.—Some came down while Fries was talking to the marshal. There was some not down; they called for them, and they came down. Fries said he was glad Hoover did not go in along with him, because he was too much of a fool; he thought this would not have done so well as it did: he did not want him there. We retired from Bethlehem altogether when we had got the prisoners. Fries went to the minister after he was released, in another room: he pulled off his hat to the minister, and told him he must thank him that he had got out; he said he was out, but he could not thank him, for all. The marshal was again called to reconcile some seeming difference in relation to the last conversation Fries held with the marshal, and of the prisoners coming down at once. The marshal said, that the last conversation he held with the prisoners was at the foot of the stairs. Mr. Fries declared that he would force his way up stairs, if I would not give them up; I told him that this would be punished with the utmost severity, but that if he was determined to rescue the prisoners, he should not go up stairs, but that I would, and order them down. Finding myself not in a situation to resist his force, I went up and ordered them down.

Cross-Examined.—At no time when I was in conversation with Fries, did the Lehigh prisoners come down stairs. There might be others that would not submit, but none from the room in actual custody: if they did, it must have been while I was speaking to them in the crowd; it was possible for them to do it at that time. They were 'n the room, and the guard remained there till I went up; it was placed there to prevent any person going up or down. After this conversation with Fries, I went up stairs to order the prisoners down. They were all 'n the room at that time, though I did not count them. Upon my order, they came down, and I came down with them.

George Mitchel.—I keep tavern in Lower Milford township, Bucks county. There was a great disturbance and discontent in my township respecting this house law; a meeting was advertised for the 8th of February, at the house of John Cline, to consult about the house tax law. No names were signed to the advertisement, that I recollect. A number of the inhabitants met; it was pretty late in the day; they all seemed discontented, but they were in doubt whether it had passed into a law or not. There was something in the newspaper of an amendment which made them doubt whether it was in force. They formed an instrument of writing, but I cannot recollect the particulars of it. It was drawn up by John Fries; I assisted him. We passed home after that. I had no particular conversation with anybody after the paper was signed; it was signed by about fifty or fifty-two of the inhabitants. Captain Kuyder was directed by the meeting to give notice to the assessors not to come forward till they had informed themselves farther, whether it was a law or not. I am not sure who put up the notice of this meeting; perhaps it was myself. John Hoover and several had talked about it, and we thought we would call a meeting. This was on Friday. On the Monday following, James Chapman came to my house, and told me I should tell Jacob Hoover that he should give notice over the creek (I live nearly at the end of the township), that if they would

choose an assessor of their own, they should be welcome; and any man that was capable of the business would be admitted into the office. One Valentine Hoover came to my house that same day, he lives over the other side, and I told him what Mr. Chapman had told me; likewise I informed Jacob Hoover that day myself. Who opposed it, I don't know; but it was reported that it was not adopted. Squire Foulke sent me word to advertise a meeting. Israel Roberts and Samuel Clark called on me and told me. They informed me that Mr. Foulke was of opinion that the people were ignorant of the law, and he would read it for them, and explain it to them; this was the purpose of the meeting. So we advertised the meeting to be held at my house some time in February toward the latter end. It was on a Saturday, and there were a great many of the inhabitants at the meeting; Squire Foulke and Mr. Chapman attended it. The people behaved very disorderly; but I cannot recollect any of the conversation that passed. Jacob Kline came in and asked me what the meeting was intended for. I told him that I understood by Squire Foulke, that the Germans were very ignorant of the law, and that he called them together to read and explain it to them; I desired him to try to pacify the people; and I believe he did his endeavour, but it proved in vain: at least they did not read the law. I did not understand that anybody offered to read it; he thought it was in vain, there was such a clamour. After Mr. Chapman was gone, Marks asked me how I came to meddle with the advertisement. John Fries was not at the meeting. I don't recollect anything afterwards till the assessors came, which was the 5th of March. They took the rates of my house and my neighbours. The assessors were Mr. Childs, Mr. Foulke, and Mr. Rodrick.—I went from home the rest of the day, and the next morning when I returned, (6th of March), I heard there had been an uproar about driving away the assessors. It was talked of that they were going to Millars town the next day. Hearing of such an uproar, I concluded to go and hear what was going on; they said they were going to meet the Northamptons who were going for the relief of the prisoners. I do not know the names of any of the prisoners. There was a talk at Marks' house (7th of March) about going to the tavern above Emaus: Marks said his son would bring word. We went on then till we met young Marks, and he beckoned that we should halt or go back; so we did; he said he had been up at Ritter's tavern, and they had started before he came there. I do not know of any in particular who took the command. Some wished to go to see Bethlehem, some to see the bridge; so they concluded to go on. I cannot say who were for going on, and who were not. We were overtaken by several people going to Bethlehem. None were armed, that I can recollect. When we got to the bridge at Bethlehem, there were a great many armed men and light horse, and two rode over the bridge towards us from the other side. I did not hear the conversation that passed at the bridge; but after a while we went over to Bethlehem. A great many of the company was formed before the house, who seem to speak out that they would have the prisoners. Fries went in, I saw him start to go in; but I did not hear who ordered him, or who desired him. A short time after, in the course of five or ten minutes, Henry Hoover came out to us, and said he was sergeant of their company, and he was chosen to demand the prisoners. He said he went up stairs, and somebody gave him a push, and had like to have tumbled him down stairs, and he came out in a great passion. He went on in a great rage; he said if they would only give him ten men, he would storm the house. A short time after that, I observed Fries come out, and he said "Silence!" to the people there. He seemed to be as much among Staeler's company as among ours. He then afterwards said, "Gentlemen, an officer of the United States says he cannot deliver up the prisoners, unless they are rescued by force of arms; so, he said if you are willing, we will; I will go foremost, but if we do, I beg of you, none of you fire till they fire on us first, till I give the word, and if I drop, then you must take your own command." He repeated these words, at least once more. I heard nothing afterwards of the proceedings in, nor out of the house, that I recollect. Some time after this, on the 18th of March, a meeting was held at Marks'. The object of the meeting was to choose a committee of the three counties of Northampton, Bucks and Montgomery. The meeting was to consult what was best to be done, and it was determined to leave it to the committee. John Fries was there. After the meeting, I had some conversation with him: while the committee was sitting, I said to him: "John Fries, you never intended to resist the law, did you?" He made me answer, "Yes, I did." We did not in particular mention any laws. There was a meeting after this at my house, on Easter Monday, March 25th. The object of that meeting was to appoint an assessor. The one that was appointed was to do the business, if he pleased; if not, the person they chose was to do it, or both together. John Fries was at that meeting at the beginning of it, but I do not recollect that he was at the time they gave in their votes. He said it would not suit him to vote now, as he had been against the law throughout.

Cross-Examined.—At the meeting at Marks', it was generally agreed that there should be a submission to the laws. After the business was over, they made mention of it, but I do not know that they made any report of it. I believe the people never knew to the contrary but there would be a return made.

It was recommended to submit, and I believed it was agreeable to the meeting; I heard no opposition to it. The return was made in writing. On the 15th of March, we received the proclamation, and that evening I took it down to Frederick Henny's; I read the proclamation to Frederick Henny, and he agreed to submit; he made no opposition. When Fries said it would not suit him to vote for the assessor, he seemed rather opposed at that time to the laws, than the appointment of an assessor. This proclamation was communicated to the meeting on the 18th of March.

James Chapman.—I was a principal assessor under the act for laying a direct tax; I believe in all but Lower Milford, the assessments were carried into effect without opposition, or in a majority of the townships, except some little threatenings. The assessor of Lower Milford was taken sick, and did not proceed. His name was Samuel Clark; I called upon him afterwards, to know whether he was able to proceed or not: he thought he should be able in a few days: I had occasion to go to Newtown, and was several days from home, but found there was nothing done respecting it; I found the people had had a meeting, and there appeared to be great opposition to the rates being taken. The day after I returned from Newtown, Clark called upon me, and told me he thought it was not safe to go about, from the disposition of the people at that time. I told him that I would meet him the next day at Mitchel's tavern in Milford, and meet the people to know what their complaints were. I met Clark at a house just by, and he told me he would be in at Mitchel's in a few minutes. I examined Mitchel, to know what were their complaints: Mitchel signified that the people were dissatisfied that the assessor was appointed without their having a choice: for they wished to choose for themselves. I told Mitchel if they would choose a man of character, I would use my influence with the commissioner to have him appointed, and I desired him to give notice of it to Jacob Hoover. I wrote to the commissioner, stating the situation we were in, and told him what I had done; but he seemed not to be willing to indulge them with it. Seth Chapman was commissioner for that district.—I told him it would ease the minds of the people if it were done. At length he consented, but seemingly with reluctance. However, they never chose one. I do not recollect that it was made known to the people.—I met him at a meeting of the assessors which was held at the house on John Rodrick. On my return home I was told, I think by Squire Foulke, that the township was advertised to meet at Mitchel's. He said, if I would attend there, he would meet me. I got there between one and two o'clock. Just as I got to the house, before I went in, I saw ten or twelve people coming from towards Hoover's mill; about

half of them were armed, and the others with sticks. I went into the house, and twenty or thirty were there. I sat talking with some of my acquaintance that were well disposed to the law. Conrad Marks talked a great deal in German, how oppressive it was, and much in opposition to it, seeming to be much enraged. His son, and those who came with him, seemed to be very noisy and rude; they talked all in German, which, as I did not know sufficiently, I paid but little attention to them. They were making a great noise; huzzaing for liberty and democracy, damning the Tories, and the like. I let them go on, as I saw no disposition in the people to do anything toward forwarding the business. Between four and five I got up to go out; as I passed through the crowd towards the bar, they pushed one another against me. No offer was made to explain the law to them while I staid; they did not seem disposed to hear it. They did not mention my name the whole time of my being there, but they abused Eyerly and Balliott, and said how they had cheated the public, and what villains they were. I understood it was respecting collecting the revenue, but I did not understand near all they said. I recollect Conrad Marks said that congress had no right to make such a law, and that he never would submit to have his house taxed. They seemed to think that the collectors were all such fellows; the insinuation was that they cheated the public, and made them pay, but never paid into the treasury. After getting through the crowd to the bar, I suppose I was fifteen minutes in conversation with Mitchel: he said perhaps they were wrong, but the people were very much exasperated. Nothing very material happened, and I asked Mr. Foulke if it was not time to be going. So I got into the sleigh, and went off; soon after they set up a dreadful huzza and shout. I stopped at Jacob Fries' tavern, and waited for Mr. Foulke, who soon came: Clark, the assessor, was likewise there. After talking a little more on the subject, Clark still persisted in not having anything to do with it, for he thought it was not safe for him. We thought it was best to give the other assessors notice, as their assessments were nearly finished, to meet us at a certain day to take the rates in that township. I then wrote to the other assessors, requesting them to meet at Quaker town, on the 4th of March. Rodrick, Childs and Foulke met me there: we waited till evening, but no others came; so we agreed to meet at my house next morning at 9 o'clock. We met, and I went with them to Milford, to Samuel Clark's, but he was not at home. It was thought best for me to go to look for Clark, as he was engaged in a moving. I went to Jacob Fries' tavern to wait for him; they went to Mitchel's to take the rates. Clark soon came: he told me he could not undertake to take the rates, for that he might as

well pay his fine, if it cost him all he had, for they were so opposed to it at any rate, that he could not think himself safe, for at least he should receive some private injury. Finding he would not do it, I said no more. John Fries was coming up just then: he told me he was very glad to see me: he told me that he understood I had been insulted in their township, at one of their meetings: he was very sorry for it, he mentioned Squire Foulke as well as myself: had he been there, he said, it should not have been done: I turned it off by this: that there was not a person among them that spoke a word to me. I told him I thought they were very wrong in opposing the law as they did: he signified that he thought they were not, and that the rates should not be taken by the assessors. I told him that the rates certainly would be taken, and that the assessors were then in the township taking the rates. I repeated it to him, and he answered, "My God! if I was only to send that man (pointing to one standing by), to my house to let them know they were taking the rates, there would be five or seven hundred men under arms here to-morrow morning by sunrise." He told me he would not submit to the laws. I told him I thought the people had more sense than to rise in arms to oppose the law in that manner: if they did, government must certainly take notice of it, and send an armed force to enforce the laws. His answer was that "if they do, we will soon try who is strongest." I told him they certainly would find themselves mistaken respecting their force; he signified he thought not: he mentioned to me the troop of horse in Montgomery county, and the people at Upper and Lower Milford, and something about infantry, who were ready to join. He said he was very sorry for the occasion, for if they were to rise, God knew where it would end: the consequences would be dreadful; I told him they would be obliged to comply: he then said huzza, it shall be as it is in France, or will be as it is in France, or something to that effect. He then left me and went off. Fries did not appear to be intoxicated. I scarce ever saw him intoxicated. A short time after he was gone, on the same day, the assessors came to Jacob Fries' tavern. We then ordered our dinners there, and I believe it was Childs undertook to take the rates of Jacob Fries' house. We had not gone out of the room after dinner, till John Fries came in; he addressed himself to Squire Foulke, telling him he was very sorry to see him there; he was a man that he had a great regard for, but that he was opposed to the law himself. "I now warn you," said he, "not to go to another house to take the rates; if you do, you will be hurt." He did not wait for any reply, but turned himself about, and went off out of the room. I do not recollect anything farther was said to him. He seemed much irritated. The assessors concluded to pro-

ceed upon their business. Rodrick and Foulke agreed to go together, and Childs went by himself: this was an agreement between themselves. There had been no meeting of the assessors since Mr. Clark had refused, complaining that he found it inconvenient to proceed with the assessment. This new arrangement was not communicated to the board of assessors at all.

John Rodrick.—I was one of the assessors under the direct tax law, appointed for Lower Milford. I took the oaths the law directed. There were twelve townships in our district, and there were six assessors to serve them. We were all six sworn at a meeting held at my house, by the commissioner, Seth Chapman: Squire Foulke got his warrant afterwards; he was appointed, I think, in addition to Samuel Clark. We met the commissioner on the sixteenth of February, when it appeared all the other townships were nearly done, except Lower Milford; at that meeting all attended but Clark. The principal assessor, James Chapman, was likewise there. We were informed that Lower Milford was not done, for Clark was afraid to go about. The commissioner told the principal assessor that he must inform the other assessors, that if anything could be done in it, we must try to do it. We all agreed that we would. Mr. Foulke was appointed before this meeting, and was present at it. Not long after this, we got orders from the principal assessor to meet him at Quaker town on the fourth of March, and to go the next day to get the rates at Milford. Only three of us attended. We agreed to meet at the principal assessor's house the next morning, which we did, and thence we went to Clark's to have him to go with us: as he was not at home, however, we proceeded on, taking the rates, Mr. Childs, Mr. Foulke and myself. We had taken between fifty and sixty assessments when we came to the house of Jacob Fries. All were at home when we took the rates, I think, except one, and there we left a notice. When we came to Jacob Fries' we met the principal assessor. After dinner, while we were sitting at the fire, John Fries came into the room: we had a room by ourselves. He said he heard we were come to take the rates of the township; we told him yes. He said he would warn us not to proceed, else we should be hurt. He said he was sorry for Squire Foulke, and I believe Mr. Chapman he mentioned, for he always respected them very much. He said he was opposed to the law, and he would not submit to it. He then left the room. He seemed to be a little in a passion. We got on our horses, and proceeded at taking the rates: I and Foulke went together, and Childs by himself to some who, we thought, were quiet people. We proceeded on till about sunset, when we were going to the house of one Singmaster, and as we turned down a lane, out from the road, we heard somebody halloo to us: we stopped, and saw it was John Fries

and five men more. We stopped, and they came walking towards us. John Fries was in the front. Fries said that he had warned us not to proceed and we would not hear, and now they were come to take us prisoners. I believe I asked by what authority: with that he made a grapple at the bridle of my horse; I wheeled my creature round, and he just catched hold of my great coat, but he could not hold. I rode off then: after I had got about two rods, 1 turned my creature round again; and he was a little way from the rest. I told him I was surprised at his conduct, that he had behaved so. He began to damn and curse, and walked back towards the other men: he mentioned that if he had a horse, he would soon catch me. He was about two or three miles from his own house then. I rode up nearer to those other men: they had stopped Squire Foulke: as Fries returned back to his men, he said, "Men, let Foulke go, as we cannot get Rodrick; to-morrow morning we will have him. I will have seven hundred men together to-morrow, and I will come to your house, and will let you know that we are opposed to the law." We then went and took the assessment of Singmaster's house. We had agreed, before we left Jacob Fries', that we would meet the principal assessor the next morning, to see what course we should take. Singmaster was at home, when we met: we said that it was not worth while to attempt anything more; we could not proceed. James Chapman then wrote a letter to the commissioner to state matters. We agreed to quit taking the rate at Lower Milford at that time, as we thought we should not be able to do anything. When we were going home through Quaker town (on the sixth of March) Cephas Childs rode before us. I and Squire Foulke rode together. When we came to Quaker town, Childs turned into Squire Griffith's: we found a great many people armed with guns and with uniforms; so I said to Foulke, "Here is Fries and his company." I said, we won't stop if we can help it: I rode through them, but when I had got half through them, they hallooed to me to stop; a great many hallooed, and came running on both sides the road, some with their clubs and muskets to strike me. They did not strike me. I rode quickly through them. I saw them running to come to strike. I had passed Roberts' tavern, and when I came to Zeller's tavern, there was John Fries at the porch; he hallooed to me to stop, for I was going to pass by, and not to stop and give myself up: there was another man with me. They followed me to stop me: I stopped, and wheeled my creature round, and asked Fries what he wanted. They damned me, and told me I should deliver my self up; I told him as long as he used such language, I would not. There was order then given to fire at me. I cannot tell who gave the order, but there were two men standing close together at Zeller's door; they pointed their guns: as I saw that, I rode off. I did not hear whether it was Fries or not who ordered them to fire. They hallooed to stop me: they hallooed out to get horses to pursue me, but they did not pursue me. I cannot say that Fries had anything in his hand at that time, but the others had clubs. Fries was from me at that time perhaps five or six rods. There was an old man standing with him.

Cephas Child.—I was one of the assessors under the act for the valuation of houses in Bucks county. (Witness showed his warrant, and proved his qualification, dated November 5, 1798.) At the meeting at Rodrick's, when we were qualified, we had our instructions given us by the commissioner; he informed us that there were six assessors to twelve townships, which we were all equally concerned in assessing, and it would be proper for us to point out which townships we would severally take. I think this meeting was about the latter end of December. Clark and myself fixed upon a day when I should come and assist him for two days, and another time was appointed for him to assist me. I had made some beginning in my own district before that day came. Before we separated, the assessor pitched upon an early day to make our returns of what we had done, in order to examine whether we had proceeded right or not. I went up to Clark's, agreeably to appointment, and found he was not able to go on: I therefore attended to my own district.

We met to make our returns at Rodrick's: Everhard Foulke, I think, met with us; I know nothing of his appointment. This was on the 5th day of the Bucks court (6th of February). Not having gone through our business, we were to meet on the 16th again. Foulke, I understood at the former meeting, had been appointed. When we met, Foulke told James Chapman that he dared not go into the township, for he understood that some threats were thrown out against him, and he rather wished that the people would appoint some other person, themselves, to do it. The commissioner did not seem to agree with it; finally, he consented so far as to intimate to James Chapman, that if they should make such an offer, and appoint one, he would recommend him; if not, he said we must go and assist in that township. There were some proposals made who of us should go, excuses were made, and then the commissioner informed us that we were all enjoined as much to assess that township as our own. Upon which he told the principal assessor that if it did not go on, he was to write to us, and we were to attend to the call. I received a letter about the first of March, or the last of February, from the principal assessor, that he had been to Milford, and it did not seem likely the assessments could go on, and I was ordered to meet the rest in Quakertown on the 4th of March. Accordingly, Foulke, the principal assessor, and myself, met there. We had

word from two others that they were not able to come. We concluded to call upon Clark to go with us, and divide the township so as to complete it in a short time. The next morning we met to begin the business; we went to Clark's, but he was not at home. It was agreed, then, that we should go on with the rates, and James Chapman was to go to Jacob Fries' to wait for Clark. The first house we went into was Daniel Weidner's; I went in first, and told him I was come to take down the rates, under the revenue act of the United States: he appeared to be very angry; I reasoned with him, telling him, if he wished to read the law, he might; I told him the consequences of opposition, but he might have ten days to consider of it, and give in his account if he chose to take that time. He, seeing me thus, said, "Take it now, since it must be done." He gave me his account accordingly, and appeared contented. He said further, "We have concluded not to take it, as we expect the act will be repealed." He meant they had concluded not to take it till they knew what congress would do with the law. I made reply to him that I believed that was already done, for I had seen a report of a committee of congress, that it was inexpedient to repeal it, and it was not done. He made some remarks, but I told him it was very wrong. I cannot tell what he said in particular. One thing I think was, that the assessors were to have very extravagant wages. "It does not matter," he said; "you may as well give in my return." I did not get on my horse till I got up to Mitchel's, where the other two assessors were. Weidner went out a little before me, and he was there when I came, walking about, seemingly very angry. I again reasoned with him. Another objection he made was, that the houses of high value were to pay nothing, while smaller ones, and of small value, were to pay high. I forgot to say that, after the rates of Weidner's land were taken, he returned, and said he had forgot, there was another piece of land: he then sat down with a heavy sigh, and said, "They will play the devil with me; what shall we do?" I asked him what he meant; he made no answer. I told him I hoped every one would be as well convinced as he was. I took several houses in my way, and went to Jacob Fries. As I was going in at the door, I met John Fries, who shook hands with me, told me he was glad to see me, and asked me to take a drink. He came in again after we had done dinner, and said, "I forbid you going to any other houses in the township." He then mentioned that Foulke and Chapman, or Rodrick, were men he much esteemed. He said if we did go to any other houses, we should be, or would be, hurt. We then proceeded to assess. Where English people lived, there appeared no objection, except at one place. The people there said, that if they did give in the account, there were some ordinary people in the neighborhood, and they would be set on by them to do them an injury. That afternoon I went to David Roberts'; his wife seemed very anxious, and wished her husband had been there, for she said I should not go home alive. I went afterwards when he was at home, and he said he had no objection, only for his neighbours. After some conversation, he said the people there had agreed not to let the rates be taken yet: he said they had already chosen an assessor in their own township: I told him I wondered they did not let him go on: he signified that he was a person of an obnoxious character, and therefore they did not wish to accept of him. In our return home, I called at Squire Griffith's: as I got off my horse, his wife told me that they were come there to take us, and that there were forty or fifty men there, and she did not know what they were about. A little girl just after came in and said that they had hold of Squire Foulke's horse by the bridle, going to take him: I went to the window, and saw them all around him. I did purpose to go out; but at their persuasion I staid. The little girl came in again, and said they had taken Mr. Foulke into Enoch Roberts' tavern. After a short time Fries came over into the house where I was sitting: he took me by the hand, and I rose up; he said, "Mr. Childs, you must go with me to my men:" as we walked along, he said, "I told you yesterday that you should not go to another house, and if you did you would be hurt, and we are now come to take you prisoner, if we find that you will go on with the assessments." My answer was, we are obliged to fulfil our office, and we cannot do otherwise, unless we are prevented. I was endeavouring to inform him of the manner in which I had obtained the warrant, in hopes that I should prevail upon him to go on with the business, as Roberts had proposed, but he would not hear me. When we went into the house, he addressed himself to his men and me: "Here are my men—here is one of them." He appeared to be angry, but he did not appear to show any revenge to me, or to talk angrily. I do not recollect that I knew any one in the house, except the tavern-keeper. Some of them soon began to use rough language. A person then came behind me, and caught me by the collar over the shoulder, and said, "Damn you, Rodrick, we have got you now; damn you, you shall go to the liberty pole and dance round it;" the house was then crowded as full as it could crowd, and they pushed me up so close, that I could not turn round sometimes for a considerable time: the person who caught me, seemed to wish to keep behind me, but he still kept hold of me: during this time, I had several thumps, which seemed more with the knee than the fist. After some time, he got to see my face: he damned me that I was not Rodrick, but

that I was the other damned son of a bitch that he saw sitting at Rock hill; he had mistaken me. A short time after this, a person came up to me and said, "Keep a good heart, and you will not be hurt." I turned, or endeavored to turn to them and said, "I am not Rodrick, nor did I ever assess in Rock hill;" he said, "You are a damned liar." With that there were still more of them came up, and pressed about me more, and more took hold of me. There was a good deal of talk, some in German, and some in English. I then told them that my name was Cephas Childs; that I was not a man known in the country; but I had no doubt many of them, though they did not know my face, knew my name: and that there were some there who knew me as coroner of the county. A man then said, "If he is Childs, he is no better than the other." He asked me where I assessed: I told him: a number of them asked how they liked it where I had been. I told them some of them had appeared dissatisfied in the first instance, but now, as I believed, every man almost in the townships where I assessed was satisfied; they again said I was a damned liar, for the people had told them that they would join them in the suppression of it, and my own neighbours would fight against me. I told them I thought I knew better than they; that if I was well informed, they would not do so. Then they began again at me. Then they asked me if I had taken the oath of allegiance to the United States of America: I told them I had: they asked me when: I told them I could not recollect the time, but I knew it was as soon as the law required it of me: they asked me if I was a friend to the government of the United States; I told them I was: they then began to damn the government, and the governor, and shoved me about, many of them taking their Maker's name in vain: there then was a person who spoke very good English: they damned the house-tax and the stamp act, and called me a stampler repeatedly: they damned the alien law and sedition law, and finally all the laws: the government and all the laws the present congress had made. They damned the constitution also. They did not mention what constitution, whether of this state or of the United States. They damned the congress, and damned the president and all the friends to government, because they were all Tories, for that none were friends to the present government except Tories. They asked me if I had been out in the last war: first I told them the law did not require me to go, and then I said I was under the tuition of my parents: they said they had fought for liberty, and would fight for it again. They said they would not have the government, nor the president, and they would not live under such a damned government: "We will have Washington;" others said, "No, we will have Jefferson, he is a better man than Adams: huzzah for Jefferson." They then insisted on my taking an oath of allegiance to them, alleging that, if I did so, I should not be hurt. They insisted on it several times, till at length I had no way to waive it, and then I asked them what their government was. One answered Washington: I said I had taken an oath of allegiance to Washington's government already. They then said Jefferson; "We will have none of the damned stamplers, nor the house tax." So they went on. They said they embodied themselves to oppose the government; they meant to do it, and that was their design in coming there. I do not know who said it, but the words were these: "We are determined to oppose the laws, and we have met to do it; the government is laying one thing after another, and if we do not oppose it, they will bring us into bondage and slavery, or make slaves of us: we will have liberty." And then they mentioned the number of men that had joined them, or sent them word that they would join them. They mentioned, some a hundred, some more, some less, than they had there, would do it; besides they said all Northampton county to a man would join them, except some Tories as they called them. Between Quakertown and Delaware river, I recollect they said they could raise ten thousand men, if they should be wanted, to oppose the sedition and alien laws. I cannot be certain, but I think he said (as he spoke in German) and fifty other damned laws. However, I am not certain as to the number. They likewise said that General Washington had sent them account that he had twenty thousand men all ready to assist them in this undertaking to oppose the laws. I begged them not to believe it, for it could not be, and somebody was endeavouring greatly to impose upon them: I thought I knew the situation of things better, and as for General Washington, I was sure he never would undertake such conduct as that. A great many of them spoke in German, but one or two of them spoke very good English, but they were altogether Germans. This passed while I was in custody.

Cross-Examined.—Fries took me in there, and leaving me in custody, went away. They said General Washington had certainly wrote to them so and so. One of them said he would be damned if it was not so, for he had seen the letter from Washington; or something to that effect. During this time, they were constantly pushing me; one would come to my back and get his knee up: they would endeavour to push me on the stove; one or two had hold of my hips, and endeavoured to throw me down; others seemed ready to lick me, and particularly after this conversation about Washington. About that time Captain Fries came toward me, and seemed very much surprised: he said, "Mr. Childs, I understand some of my men have abused and insulted you." He really did ap-

pear to be very serious; he said he would not allow me to be abused; he appeared to be really distressed for the usage I had received, and if I would tell him who it was, he said he would make him behave himself. He then told me to come into the room. He said he respected me, and did not wish me to be abused. I told him I thought it hard that he should leave me amongst a parcel of intoxicated people. I do not particularly recollect what I said, but he told me he hoped I would not impute that conduct to him: I told him I was not much injured, and, therefore, hoped he would not think about it. He said his men were civil men, and seemed to wonder such a thing had happened. I think he then gave me something to drink. He took me into a room, the farthest side of which seemed to be empty. When I got in there, he demanded my papers while I had been an assessor. While he was with me, no person insulted me; indeed, some of them, when he came forward into the room where I was, pushed off out of the way. I then told him all that I had done, and reasoned with him, but notwithstanding that, he insisted on my papers; I then told him I had no papers about me relative to the assessment. I do not recollect anybody particularly, but there were a great many crowded into the room after me. He insisted that I had the papers; I told him I had not got the papers; he said I had, and he would have them. I told him I had no papers about me, but what related to my office of coroner. I was going to deliver up to him my county tax papers; but he said I had other papers; I said I had not. He then looked on those I had given him, and saw Hilltown at the top; then he said, "Hoho! my boys, we have got what we wanted;" and then turned about, and went away. He left the pocket-book, taking the papers with him. There was a considerable huzza made, and they most of them followed him out of the room. They were gone but a few minutes, till they rushed in again as hard as they could rush, without Fries, and some got hold of me. They brought Daniel Weidner along with them: some had pistols, guns, clubs, &c., and some swords. They seemed very angry, and were pushing upon me, while some endeavoured to put them off. Weidner came up to me, and insisted on the return of the rate I took of him yesterday; he said he would have it. I desired him just to acknowledge to the truth—Did not he give it me freely yesterday? This while a person had hold of me. Some of them then stepped up, and said it was fair. I then asked him, Did I not say I would not take the measure of your house by force, but you gave me the rates with a free will? Yes, he said, "but I was not forced, and, therefore, I want it again." Some of them then went out, and directly others came in and shook me very hard: one came in and threatened me, and said I should be shot; some brought in their guns and showed them to me, and

told me if I should be seen in Milford township on the business, I should be shot. Weidner went off. This person with the sword threatened a good deal. He was called Marks, the elder. I believe him to be the same man I have seen here. While I was in this conversation, William Thomas came forward, and said he knew me, and that they should not abuse me. That gave me an opportunity of talking farther, and then I reasoned with them of the bad tendency of such conduct, and told them that I really thought if I had the law with me, I should persuade them to allow of it. One of them who had abused me before, came to me and acknowledged he had abused me, and was sorry for it, and wished me to forgive him. I think his name was Smith, but I am not sure. After passing some time in conversation, Fries came back again with the transcript, and delivered it to me, and told me as near as I can recollect in these words: I must go home, and must never come back again to assess, or I should be shot; and insisted on my promising I would not do it. My reply was, that from the pains I had taken, I had left the township with a view of not returning to it, unless compelled by authority, and from their present treatment, if they ever catched me going back without that authority, I would give them leave to shoot me. He then told me, Foulke and you may inform the government what has been done as soon as you please; we can raise one thousand men in one day, and we will not submit to it. They said there were a number of laws they were opposed to, and one of those laws was now putting in execution, and they appeared to think if that was stopped, the others would be. This was how I understood it. The words were that they were determined to oppose the laws, and not let them be put into execution; there were so many laws coming on, it was time to stop them, and if they were known to oppose them, they expected the others would not be brought forwards. Fries was not present when these words were used.

Judge Peters (one of the bench) sworn.[5]

Ques. Will your honour please to give the jury an account of the circumstances of your issuing warrants in Northampton county, and of circumstances within your knowledge previous to the examination of John Fries on the 6th of April? Ans. The first time I heard officially of this uneasiness in the counties of Bucks, Northampton and Montgomery, was some time in February, I cannot precisely recollect what time. I had heard of it before as a piece of news, but this was the first time I heard it officially: it was by depositions being sent to me by the attorney of the district (Mr. Sitgreaves) relative to a number of persons. After that, I examined some witnesses relative to it, and up-

[5] The questions, as well as the answers in Judge Peters' testimony are given in full.

on the whole I concluded to issue my warrants against the parties charged. Being much engaged in the district court, the attorney of the district drew up the form of the warrants for my signature and approbation. We had concluded, by way of ease to the people, that these warrants should be drawn up in a form of order for the defendants to appear before some justice of the peace, or judge of the county, in order to give bail for their appearance at the circuit court of the United States. Neither of us then knew that those insurgents, as it turned out afterwards, had got to such a head. But I doubted myself of the propriety of the form and substance of the warrants, because I thought that the justice, or judge before whom bail was taken, ought to be acquainted with the whole case, and ought to have the proof of the fact before him, on which the proof of the warrant was found. I had some doubt, too, whether it was legally right for persons taken by my warrants to go before an inferior magistrate. For though a justice of the peace of any state has a right by the laws of the United States to take cognizance in the first instance of crimes against the United States, and bind over the offenders to the proper court, yet I did not think that, as such justice had not had the original cognizance of the matter, there would be a propriety in my ordering him to take secondary notice of it. While I was hesitating on this point, I received information of the length to which, at that time, this opposition to the law had arrived. I doubted very much, and this thought was afterwards clearly confirmed to me, whether the magistrates of those counties, and particularly Northampton, would choose to take cognizance of such offences, or would choose to do any business concerning them. There were two of the magistrates, one of them a justice of the peace, the other a state judge, who had done themselves much honour in persevering so far as they did, in endeavouring to bring those criminals to justice. But finally it turned out that they were obliged to abandon even every endeavour towards executing this business. So that the law and the public authority so far failed as it respected that county, that the judicial authority of the United States became entirely prostrate. I found that some of the very persons who were charged before me were magistrates, and I wish I could say that they were the only magistrates who were engaged in this business. These were the reasons that induced me to alter the form of my warrants. I found that too many magistrates were concerned in flattering the prejudices of the people, and engaging in seditious practices, and encouraging the people in their mistakes, for me to trust them; and I finally found that there were but two magistrates that could be depended upon, and they told me that they were insulted in the performance of their duty to the United States: of this I had good evidence. And further: it arrived to such a pitch that I could not get one of these gentlemen even to issue a subpoena to examine witnesses, and save them the great trouble and expense of coming before me. This was the opinion of those two gentlemen; one of them wrote me, and the other informed me, that they were afraid to perform such an act. They could not only not get persons to serve the process, but they could not get the witnesses to appear before them. This I do not bring as a charge against any particular person, but as a reason why the warrants were thus issued. Another reason was that those people had taken up the fallacious notion that they would not appear before me, and therefore I thought it best, though this should not have been my leading motive, to convince them that every person in this district ought to obey a warrant issued by me, and appear at such time and place as I directed; the whole district being to be considered the same as a county in respect to a state. The witness then produced the warrants, dated February 20, 1799. One of which was read. The marshal wrote to me official statements at sundry times, of the difficulties he met with, and at one time informed me that the prisoners had been rescued, by force of arms, from his possession. The account he gave me it is unnecessary to state, being much similar to what has been given in evidence: He took some engagement from those prisoners, particularly those of Lehigh township, that they would appear before me, which, the prisoners themselves told me, was cheerfully given. I understood from them, and other channels, that they several times attempted to come down before me and deliver themselves up; but they were prevented by persons who interrupted them, and would not let them come.

Ques. Was John Fries brought before you after you got up there? Ans. Yes: I had previously issued my warrant against him.

Ques. Was this the examination he signed in your presence? The witness was then shown Fries' confession, which was as follows:

The Examination of John Fries—6th April, 1799. The examinant confesses that he was on the party which rescued the prisoners from the marshal at Bethlehem: that he was also one of a party that took from the assessors at Quakertown, their papers, and forewarned them against the execution of their duty in making the assessments. The papers were delivered with the consent of the assessors, but without force; perhaps under the awe and terror of the numbers who demanded them, and were by this examined and delivered to the assessors. He confesses that, at the house of Jacob Fries, a paper was written on the evening preceding the rescue of the prisoners at Bethlehem, containing an association or agreement of

the subscribers to march for the purpose of making that rescue; but he is not certain whether he wrote that paper: He knows he did not sign it, but it was subscribed by many persons, and delivered to the examinant:—He does not know where that paper is—The examinant confesses also, that some weeks ago, he wrote (before the assessors came into that township) an agreement which he, with others signed, purporting that, if an assessment must be made, they would not agree to have it done by a person who did not reside in the township, but that they would choose their own assessor within their township—A meeting has been held in the township since the affair at Bethlehem, for the purpose of making such a choice: the examinant went to the place of election, but left it before the election opened.—The examinant further acknowledges that his motive in going to Bethlehem to rescue the prisoners was not from personal attachment, or regard to any of the persons who had been arrested, but proceeded from a general aversion to the law, and an intention to impede and prevent its execution. He thought that the acts for the assessment and collection of a direct tax did not impose the quota equally upon the citizens, and therefore were wrong. He cannot say who originally projected the rescue of the prisoners, or assembled the people for the purpose—The township seemed to be all of one mind. A man unknown to the examinant came to Quakertown, and said the people should meet at Conrad Marks' to go to Millerstown. The examinant says that, on the march of the people to Bethlehem, he was asked to take the lead, and did ride on before the people until they arrived at Bethlehem—The examinant had no arms, and took no command, except that he desired the people not to fire until he should give them orders, for he was afraid, as they were so much enraged, that there would be blood shed.—He begged them, for God's sake, not to fire, unless they had orders from him, or unless he should be shot down, and then they might take their own command.—That he returned the papers of the assessors which had been delivered into his hands, back to the assessors privately, at which the people were much enraged, and suspected him (Fries) of having turned from them, and threatened to shoot him, between the house of Jacob Fries and Quakertown. John Fries. Taken 6th April, 1799, before Richard Peters.

Witness.—It is my constant practice to tell a prisoner that he is not bound to be evidence against himself: I did not make any promise or threats to extort it from him, but he chose to make a voluntary confession, which if they do not choose to do, I commit them without it. I am particularly delicate on this subject of confession, and I do not like to encourage it.

Judge IREDELL.—The gentlemen of the jury will observe that the law requires a judge to examine a prisoner, and it is left quite at the option of the man to confess or not.

The counsel for the prisoner hoped, as it was a case of treason, upon which the law and constitution were extremely cautious how evidence was admitted, the jury would consider that proof of the overt act must be given by two witnesses independent of any confession the prisoner might make.

Witness. The prisoner appeared to me to be not at all disinclined: his manner was that of a man not having done anything wrong, but perfectly collected, and possessed of his faculties. It was read to him afterwards, to which he accorded, and, thinking a part not fully enough explained, added the latter part. I have now brought it to my recollection that there were three magistrates in that county, instead of two, to whom we were peculiarly indebted for assistance.

Question.—Were any others applied to besides those three? Answer.—Some were, but we found much disinclination to do the business, and therefore thought it quite unnecessary to apply farther.

Question by Dist. Attorney to Judge Peters.—Did you not discover manifest signs of terror coming from the districts where the army had not marched? Answer.—Yes, in many instances—some very strong; it was even attempted to raise troops to oppose the army, if they went up. There were one or two instances of testimony given to me that troops were endeavoured to be raised, and nothing, I believe, but the rapidity of the progress of the troops prevented its execution. I did believe that unless the army had gone through the whole country, there would have been the most atrocious instances of violence. Did not some of the witnesses give their testimony under great reluctance, owing to fear? Yes, I had, in some instances, to state the protection of the United States, and their determination to lay hold of persons who should threaten, in order to stimulate them: some said, after they had given their testimony, that they were afraid to go home. I can really say, that, in general, they were the most unwilling witnesses I had ever examined. I got evidence that some of them were forming associations for actually opposing the troops. One man was even afraid because I was in his house, asking for some refreshment, as, he said, he should be suspected for harbouring me; however, after I had expressed my own security, he seemed satisfied.

Judge Henry again called.

I was an associate judge of the common pleas for the state. I issued a number of subpoenas about the 15th of January to make some inquiries respecting the opposition to the tax law: these were issued at the instance of Mr. Eyerly, one of the commissioners, as he and others could not proceed

in the execution of their duty and particularly in Lehigh township. The witnesses generally appeared much afraid at opening themselves: and he could say, that among the people, there were many much opposed to the law. I agreed to meet a number of persons at Trexler's, commonly known as Trexler's town: there Captain Jarrett appeared with a part of his company of light horse. Shortly after the arrival of Mr. Eyerly, Mr. Balliott, and myself, the people seemed to be walking about, and looking in at the window, and seemed to make game at us and mouths; I observed Henry Shiffert in particular;—they were mostly in uniform. It was not muster day. I understood it was the general conversation there that Jarrett meant to display his consequence, and to intimidate. One witness in particular appeared to be in great terror: when he was called up to give his testimony, he cried like a child, and begged, for God's sake, that we would not ask him, for that the people would ruin him when he returned home. Indeed, all the witnesses were much agitated. I discovered a general opposition to the execution of this law, and was apprehensive of danger from the threats which were given.

Cross-Examined.—I sent for the captain, and requested him to keep his men in order, for all I wanted was to examine witnesses. There was nothing beyond insult offered to us. The captain assured me that he would do all that lay in his power.

Mr. Chapman and Mr. Childs were again called, at the suggestion of Mr. Dallas, to be asked how the measurement of a house was taken?

It was always, in every instance, given by the owner; we never measured any houses. Size, length, and breadth were told us, or the proprietor had ten days to send it in: we left a note for those people that were not at home. The people who were at home in Milford mentioned the dimensions of their houses.

Mr. Chapman here proved the letter which was mentioned in his evidence to have been written by him to the commissioner.

Mr. Sitgreaves produced and read the warrants under which those persons at Bethlehem were held; also the commission from the President of the United States, appointing one of the commissioners under that act.

Mr. Eyerly again called.

Question.—How were the principal and assistant assessors appointed? Answer.—At the time I received the notice from the first commissioner that was appointed in the commission, the commissioners were to meet at Reading on the 22d of October. After a board were met, every commissioner was desired to make a plan of his division, and to divide it into such a suitable number of assessment districts, as to have the law executed in a reasonable time; at the same time each commissioner was requested to make out lists of persons qualified for the office of assessors in each division. As soon as this was done, as the law gives a power to the secretary of the treasury to reduce the number of assessors if too large, the clerk made out a list, and sent it to the secretary of the treasury; a list was also entered in the commissioner's book. Some few alterations were made in some districts afterwards, but at the time the board was sitting. After this was done, the form of the warrant was agreed upon by the commissioners, and ordered to be printed. They were then filled up, and every warrant signed by all the commissioners. A rule was then adopted to call all the assessors together in each district, and the commissioners were to meet and qualify them, and give them instructions. The country was not in a pacific state, except where the army marched. After the president had issued his proclamation, I wrote up to the principal assessor in Northampton county, and to Mr. Balliott, to request them to go on, and have their returns made in a certain time, and to give notice to all the other assessors so to do. I received an answer from Mr. Balliott that he had received information that it was impossible to do the business in the execution of the law.

Mr. Dallas here remarked in substance that, though they wished to give as little trouble on the part of the defendant as possible, yet he should produce two or three witnesses, in order to show that this indisposition, which was manifested to permit the assessment, was owing to the uncertainty those people were in, of the real existence of the law; that the prisoner himself was under the idea that it was no law; and that they had no intention of opposing congress by force of arms, but that they wished for time, in order to ascertain its real existence, and if the law was actually in force, that they wished, agreeably to their former custom, to appoint assessors from their own respective townships. It could be shown also that Fries was perfectly quiescent after the proclamation, and that Mitchel was entirely mistaken as to the expressions said to be used by Fries, at the meeting at Conrad Marks'. As the defendant's counsel, however, wished to have time previously to examine the witnesses, he stated that they would not be able to produce them at this stage of the trial.

Mr. Rawle then opened the constitutional definition of treason, as consisting of only two parts: "levying war against the United States, and aiding the enemies of the United States." As it is only the first of these species of treason that the prisoner is charged with, it is only necessary to ascertain what is meant by levying war against the United States. Mr. Sitgreaves has stated that, levying war against the United States consisted, not only in a broad sense of rebellion openly manifested, with an avowed intention of subverting the government and constitution of

the country. but also with force of arms, or by numbers sufficient for that purpose, to cause an impression of terror: either one of these, or altogether, used to prevent the execution of the laws, or of any particular law of the United States, from motives, not of a special but of a general nature—is treason. This position, I believe, is perfectly correct, and has already received the sanction of a court of the United States, respecting the insurrection in the western parts of Pennsylvania. See U. S. v. Mitchell [Case No. 15,788]. This doctrine is laid down in terms short and concise. and is such as is founded on the particular authority of all the writers on English law. "Bradford (Attorney).—The design of the meeting was avowedly to oppose the execution of the excise law; to overawe the government; to involve others in the guilt of the insurrection; to prevent the punishment of the delinquents, &c." "Patterson (Justice).—The first question to be considered is, what was the general object of the insurrection? If its object was to suppress the excise offices, and to prevent the execution of an act of congress, by force and intimidation, the offence, in legal estimation, is high treason; it is a usurpation of the authority of the government; it is high treason by levying war. Taking the testimony in a rational and connected point of view, this was the object. It was of a general nature, and of a national concern."

Let us attend, for a moment, to the evidence. With what view was the attack made on General Neville's house? Was it to gratify a spirit of revenge against him as a private citizen, as an individual? No:—as a private citizen he had been highly esteemed and beloved: it was only by becoming a public officer, that he became obnoxious, and it was on account of his holding the excise office alone, that his house had been assailed, and his person endangered. On the first day of the attack, the insurgents were repulsed; but they rallied, returned with greater force, and fatally succeeded in the second attempt. They were arrayed in a military manner: they affected the military forms of negotiation by a flag; they pretended no personal hostility on General Neville; but they insisted on the surrender of his commission. Can there be a doubt, then, that the object of the insurrection was of a general and public nature?

Patterson (Justice) in the charge against Vigol, says: "With respect to the intention, there is not, unhappily, the slightest possibility of doubt: To suppress the office of excise, in the Fourth survey of this state; and particularly. in the present instance, to compel the resignation of Wells the excise officer, so as to render null and void, in effect, an act of congress, constituted the apparent, the avowed object of the insurrection, and of the outrages which the prisoner assisted to commit. Combining these facts and this design, the crime of high treason is consummately in the contemplation of the constitution and laws of the United States." U. S. v. Vigol [Case No. 16,621].

This, you will perceive, gentlemen of the jury, is not preventing the execution of all the laws, or all the authority of the government, but of "an act of congress." It is a usurpation of the authority of the government, and thus it is levying war, and is high treason. Taking it in this point of view, this was the very object of the insurgents at Northampton, and was of a public, of a general, and not of a private or special nature. In the case I referred to, the prisoner acted different from the prisoner at the bar; he acted in a subordinate station; he does not appear to be a first character in that treasonable enterprise. Gentlemen, the law thus laid down by the court, upon that occasion, was derived from the English authorities to which I shall now refer you. 4 Bl. Comm. p. 81. defines that branch of treason of which we are now treating,—"Levying war against the king (substitute here the U. States for king), is, pulling down all enclosures, meeting-houses, prisons or brothels." [6] Although bawdy-houses are illegal, yet by any individuals not authorized, taking the authority which alone is vested in the government, it is a usurpation of the authority, and the act being of a general, and not of a special nature, is treason. Lord Chief Justice Hale, whose name will ever be endeared by the piety, the humanity, and the sound legal learning which characterized him, has a chapter upon this subject of levying war against the king. Hale, P. C. 105. He says, to march with colours flying, drums beating, &c., if on a matter of a public or general nature, is high treason; but if on a private quarrel or for a private purpose, it is not treason. Treason in levying war, by this definition, consists of two sorts. First, marching expressly, or directly against the king's forces: secondly, interpretatively, or obstructively; doing a thing of a general nature. If to pull down a particular inclosure, it is only a riot; but if to pull down all inclosures, it is levying war against the king, because it is generally against the king's laws. Insurrections, in order to throw down all inclosures, to alter the established law or change religion, to enhance the price of all labour or to open all prisons—all risings, in order to effect these innovations, of a public and general concern by an armed force, are, in construction of law, high treason, within the clause of levying war; for though they are not levelled at the person of the king, they are against his royal maj-

---

[6] The language of Blackstone (4 Comm. 82) is, "To resist the king's forces by defending a castle against them, is a levying of war: and so is an insurrection with an avowed design to pull down all inclosures, all brothels, and the like; the universality of the design making it a rebellion against the state, a usurpation of the powers of government. and an insolent invasion of the king's authority."

esty, and besides, they have a direct tendency to dissolve all the bands of society, and so destroy all property and all government too, by numbers and an armed force. Insurrections, likewise, for redressing national grievances, and for the expulsion of foreigners in general, or indeed of any persons living here under the protection of the king; or for the reformation of real or imaginary evils of a public nature, and in which the insurgents have no special interest—risings to effect these ends by force and numbers, are, by construction of law, within the clause of levying war. Fost. Cr. Law, 211. 1 Hawk. P. C. c. 17, § 23, p. 37, is much to the same effect; and see also Doug. 590, in the case of Lord G. Gordon. The case there on the part of the prosecution was an attempt to force the repeal of an act of parliament, and this was called high treason, although the defendant was not convicted. J. Kel. 70, 75. So in the Case of Messenger, Appletree and others.

It will probably be said by the defendant's counsel that this should be simply considered as a rescuing prisoners from the custody of the marshal, and that is not treason, and that a number of crimes of a less degree must be committed in order to make it treason, as arson, burglary, and murder. But I would observe, that when these crimes are committed, one or more of them, they are not component parts of treason, but they lose their qualities and their name in the absorbing crime—treason. So when General Neville's house was burnt, it was said only to amount to arson: to that it was answered by Judge Patterson, were it not for the treasonable purpose with which this was done, it would be so; but the guilt rose to treason in the intention. Admitting it is a crime, and worthy of a punishment, the question is, whether or not it must be considered as one of the means made use of to obtain the end in view? If a man break open prison, except where a person is convicted for treason, it was ruled to be only a great riot: if several were rescued thereby, it was a riot and rescue, except those persons rescued were convicted for treason; and where it was without any particular view to the persons themselves, and where the prisoners were unknown, then the rescue becomes a part of the treasonable act, and that, with other facts, constitutes the person guilty of treason. 1 Hale, P. C. 133. In 4 Bl. Comm. you will find an answer to what Mr. Dallas said this morning ought to be in favour of the prisoner: to wit, an ignorance of the existence of the law. Suppose every man who would profess himself ignorant of the existence of a law was exculpated from the observance of it, or from the consequences of breaking it, to what would that doctrine lead! It would be for the interest of every man who wished to oppose a law, to keep himself under the shelter of this want of knowledge, in order that he might sin with

impunity—without knowing it. This is a mistaken fact, and an error in point of law. I make these observations, not because I suppose that the defence will be seriously set up, or that, did it exist, you would be in the least guided by it, but under the impression, that when you come to examine all the facts, you will discover that it was not so. Unless these points which I have laid down are controverted, I shall not trouble you with more points of law, and shall leave the observations I am farther to make, to a later period of the case.

Mr. Dallas opened the defendant's case as follows:—It has become so uncommon in the state of Pennsylvania to be employed in a cause, upon the issue of which the life of a fellow-creature depends, that, I am confident, the court and jury, as well as the counsel on both sides, are prepared to give a solemn, candid and patient attention to the present investigation. It is, gentlemen, a question of life or death; and if what we have heard is true, that the prisoner is a husband and a father, it is a question whose importance extends beyond his own life, to the existence and well-being of a miserable family. If I should manifest, therefore, an extraordinary solicitude to secure the attention of the jury, as long as the occasion shall require, these considerations would, I think, furnish a sufficient excuse; yet, permit me to add to my justification another remark. It is not only the life of John Fries, and the well-being of his family, that are at stake on this trial; but, we all know, that the impressions made on your minds, and communicated to the public by your verdict, may reach the lives and families of many more unhappy men now under indictments for a similar crime. I must confess that I feel agitated by the prospect: for, if it appears so awful, so interesting, as it evidently does, to the court and audience, how must it affect us who are the counsel for the prisoner, charged with the development of every principle and of every fact, that can tend to an acquittal? As it relates to the counsel for the prosecution, the difficulties are comparatively small. They have had an opportunity amply to explore all the facts; to calculate the effects to be produced, and to point their testimony precisely to the object of the charge. We, who are counsel for the prisoner, are ignorant of the man and of his connections. Till you were impanelled, we knew nothing of the evidence to support the prosecution; and could, therefore, be little prepared to encounter and repel it. Besides, in all our inquiries for the means of defence, as well as in our examination of the witnesses, we have been embarrassed by the foreign language in which the parties have spoken. That some of you, however, as well as the opposite counsel, understand the German, has been a source of consolation to us; for, it is your province to decide on the facts. But these are not the only obstacles which we have

to encounter. I am sure I shall not be misunderstood when I say, that the prosecution appears to be strongly marked with the authority and influence of government.

It is, I grant, incumbent upon the government to exercise its powers for the punishment of crimes; but it is essential to a fair discussion of every accusation, that the acts of the government should not be estimated as proofs of the prisoner's guilt. Thus, though you find by the proclamation of the president (which, doubtless, he thought, with a wise and upright intention, was required by the extraordinary circumstances of the times), that the disturbances in Northampton were deemed overt acts of treason by his advisers; and though this denunciation was followed by the march of a considerable army for the express purpose of subduing and apprehending the traitors, you will recollect, that you are to decide whether treason has been committed, from the evidence of the witnesses, and not from the opinions of the government. Again: great inconveniences have been experienced by many meritorious citizens, who relinquished the pursuits of business and the pleasures of domestic life, to assist in the suppression of the insurgents; but you will not allow the irritation and resentment proceeding from this source, to transfer from your judgments to your passions, the determination of the cause. Far be it from me to contend that outrages have not been committed, which are disreputable to the state or society at large, and to the character of Pennsylvania in particular; or to endeavour to shelter from the punishment of the law, the instigators and perpetrators of such offences. Every citizen is interested, and is bound to assist in detecting, prosecuting, and punishing the offenders; but every citizen, let it be remembered, is still more interested, that even the greatest criminals should only be punished in the manner and to the degree which the law prescribes. However we may differ on speculative points of politics abroad, however we may be disposed to approve or to disapprove the measures of administration, and however we may controvert or assert the constitutionality or the expediency of particular laws, all party spirit, all personal animosity, must be abandoned when we are called upon to act as ministers of justice; or we shall, in the indulgence of a moment's vengeance, overthrow those barriers which are our own security, and the pledge of safety to posterity. Whatever you may have thought, whatever you may have said, whatever you may have heard, in other scenes, must now be obliterated from your minds. The character of private citizens, with all the privileges of private opinion and feeling, is here exchanged for the character of public functionaries, with all the restraints of law and justice. Your opinions, as private men, will only be regarded according to their intrinsic merit;

but your verdict, as a jury, will be forever obligatory, bearing all the authority of a precedent. Though, then, a proclamation has issued, an army has marched, and popular resentment has been excited, we claim an unbiased attention; and, circumscribing your view of the subject to the evidence, we confidently expect a fortunate result. What has happened in England upon a similar occasion, we think will happen here. The British privy council announced a traitorous conspiracy to the British parliament. The British parliament declared that the party recognized and confirmed the charge of high treason; and thus, the whole weight of public authority in that country, legislative and executive, instituted a prosecution, which was afterwards conducted with the greatest zeal and talents, with such zeal and talents as the present prosecution has displayed. What was the event? A jury (that inestimable palladium) without fear, and without favor, examined and pronounced that no treason had been committed. I allude to the recent cases of Horne Tooke, and Hardy.

I shall, I presume, be excused, if I intimate to you some other disadvantages under which the prisoner's case labours; for, it is not merely necessary to produce evidence, to explain, extenuate, or refute the charge; we must guard your minds against any previous bias, any latent pre-determination to convict. The accused gentleman and his companions, you will recollect, are not upon their trial among persons with whom they have been accustomed to live. This is a disadvantage which every candid man will acknowledge. They are to be tried likewise, by a jury, selected and returned by the marshal, the very officer who has been personally insulted, and whose appointment depends on the will and pleasure of the executive magistrate, that magistrate by whom the offenders have already been described as traitors. I mean not to cast the least reflection upon the laws of congress, nor upon the officers of the government; but to make a general remark on the defective state of our judicial institutions. The conduct of the marshal has, indeed, been highly exemplary throughout the transaction; and when, with such powers, he returned such a jury as I have the honour to address, he manifests an impartiality and independence of character that entitle him to the respect and plaudits of his country. Nor is it here that the prisoner's disadvantages terminate: but I hope, I believe, that never till this day, was the press employed in a base and sanguinary attempt to intimidate the jury and counsel from a faithful execution of their duty in a capital case! Since, however, the jury have been summoned; nay, since the court have been sitting upon this very trial, there have been the grossest, the most insidious practices in a public newspaper, to warp your sentiments, and to deprive the unfortunate prisoner of the benefit of the best tal-

ents which the bar of Pennsylvania can afford. On the other hand, a gentleman, whose abilities we all respect, and whose long residence in the offending counties must greatly facilitate the progress of the prosecution, is associated without censure, and certainly without being answerable, in the duties of the attorney of the district. While our ignorance of characters and circumstances perplexes the defence, his accurate information and experience enable him to probe every witness to the quick, and forcibly to combine and interweave all the incidents of the transaction. But his motives are pure; for, if he does arraign, if he does convict, if he does punish, it is because his patriotism and public spirit enable him to soar far beyond the little affections of a neighbourhood.

Gentlemen, in this situation we appear before you as advocates for the prisoner. I declare, that as far as my mind is capable of being impressed by a sense of duty, I feel a terror lest anything should be left undone or unsaid which is essential to the cause; and, therefore, complicated as the discussion must necessarily be, accept, I pray you, my sentiments under the following heads. First, I will endeavour to establish such points of law, as seem to me to be applicable to the facts which have been given in evidence. Secondly, I will consider the general state of the discontents, and how far the rescue at Bethlehem was connected with the previous disturbances. Thirdly, I will take a review of the conduct of the prisoner in particular.

Mr. Dallas here went into an examination of the law of treason, taking the same general grounds as those opinions maintained by Mr. Lewis, and thus proceeded:—

Now, gentlemen, I challenge the prosecuting counsel to say, in what part of the evidence it has appeared, that these insurgents went further than to declare that the law did not please them; that, though they did not mean to compel congress to repeal it, they had some doubts, and wished to ascertain whether it existed or not; to know whether the country in general had submitted to it; to know whether General Washington was not dissatisfied with it, and to see whether they could not get the assessor appointed by themselves. Under these impressions many irregularities occurred, but I ask the adverse counsel to point out, if they have discovered, through the whole course of the business, any insurrection existing, any traitorous design, till the meeting at Bethlehem; or whether, till that moment, the people of Northampton could be said to have been guilty of any crime? We are told that the Case of the Western Insurgents in 1794, is in point, and that the decisions upon the trials that then took place are precedents on the present occasion; but, with great deference, I declare that it seems impossible to bring cases more dissimilar into view, where violence has been committed in

both. At this stage of the argument, however, I shall only remark, that whatever may have been the language of the judge who then presided, I am sure the attorney of the district will be good enough to recollect, and candid enough to state, that the opposition, though in its origin excited against the excise law, was conducted with the avowed purpose of suppressing all the excise offices, and compelling congress to repeal the act. See U. S. v. Vigol [supra].

Let us for a moment, gentlemen, trace the motives of the people by looking at their conduct, not at large, but in the lawless scene at Bethlehem. What did they do? why they rescued the marshal's prisoners; but the moment they had effected the rescue, did they not disperse? Their whole object then was consummated; for, I must presume that they contemplated nothing farther, as I see them attempt nothing more; and yet the time was very favourable to accomplish a more extensive design, if it had ever been meditated. Men intending to compel, by every hostile means, the repeal of a law, when they had in their hands the obnoxious agents of that law, (Mr. Balliott, Mr. Eyerly, the marshal and others,) would hardly have let the moment pass without some effort to triumph in their advantage. It was, indeed, rumoured to be their intention to dispatch Mr. Eyerly; but where does it appear? Was he not completely in their power? Was he not constantly in their view, though he incorrectly says that he was constantly out of their view? No: I repeat that the rioters, having accomplished the rescue, dispersed; and will you, under such circumstances, in a case of life and death, determine that they came to commit treason—rejecting the plain fact, and adopting a constructive inference? But if they proceeded no farther than I have stated, let us again look to the law of England, to define their crime, as distinguished from treason; and you will not cease to bear in mind that you must establish the distinction. 1 Hale, P. C. pp. 133, 134; 6 Bac. Abr. pp. 513–515.

2. Having thus delivered my sentiments upon the points of law that arise on the evidence, I shall now enter upon the consideration of the second proposition—"The general state of the discontents in the Northern counties; and how far the rescue at Bethlehem was connected with the previous disturbances." And here I find, gentlemen, that the source from which proceeds much, if not all, of our political good, discharges, likewise, much, if not all of our political evil: I mean the business of elections. You will recollect the testimony of Mr. Horsefield. That gentleman, when he wished to give you a description of the origin of all the mischief that we deprecate, pointed his finger emphatically at the election of 1798. Now, I pray that I may not be misunderstood in the progress I shall make through the scene which is thus disclosed: let it not be sup-

posed, that I am depraved enough to justify the misconduct that has been exhibited, because I am firm enough to contend, that it did not proceed from motives directed to treason, nor lead to consequences that amount to treason. At the eve of our election, it is natural for the citizens of a free country to canvass what has been done by the public agents; to applaud the good, and reprobate the bad; and in doing this they exercise a right; nay, they perform a duty. No intelligent and candid man will say that the constitution of a representative republic can be preserved in a vigorous and healthy state, unless the people, from whom it derives its vital principle, are vigilant and virtuous in the exercise of the elective franchise. For this purpose they retain the right of opinion; and though they may use it upon mistaken, or erroneous grounds, if they use it fairly and peaceably, there is no power to control or obstruct them.

I ask, then, what were the ostensible causes of discontent? They will be delineated by the opposite counsel as spectres of the most visionary, yet most horrible aspect: but notwithstanding any sincere abhorrence of the manner in which the discontent has been manifested, I cannot admit that the causes did not afford a legal ground for exercising the right of opinion. For instance, the alien and sedition laws. They are a novelty in this country, and their novelty might alone attract the popular attention and displeasure. But were the inhabitants of the Northern counties of Pennsylvania the only dissatisfied citizens? Peruse the debates examine the files of congress, and you will find the most pointed declarations of the public opinion, the most unequivocal marks of dissatisfaction, throughout the United States. Exercising the right of opinion, the people disapproved the laws, and the law-makers. Exercising the right of election, they endeavoured to promote the success of those candidates who would regularly procure a repeal of the laws. Again: the stamp act was strongly objected to, and produced the nickname of "Stamplers," which was applied generally to the friends of government. Now, in my opinion, there cannot be a more convenient mode of taxation than an imposition on stamps; but that was not the opinion of the people of Northampton and Bucks. They had imbibed a prejudice against a stamp act in the year 1775, and not considering properly the ground of American opposition to the tyranny of taxation without representation, they confounded the name with the principle of the law. I repeat that I do not agree with them, but I contend that they had a right to speak freely on the subject.

Again. The house tax was objected to; not from the real, but from the imaginary burdens which it imposed; for if it had been intended to devise a tax for the relief of the poor, at the cost of the rich, for the benefit of the country at the expense of the city,

there could not, I think, be a more ingenious plan than the present law exhibits. The opposition must evidently, therefore, have arisen from misconception or misinformation. But if their opinion of the law was sincere, however erroneous, it is entitled to indulgence. The fallibility of the human understanding, and the frailty of our passions, must be respected in every wise and benevolent system of politics, or law. A man who honestly acts under a false impression of facts, may be pitied as a weak man, but he ought not to be punished as a wicked one. Then, the rioters were under an evident delusion, as to the principle of the land tax, the purity of the government, and the compensation of public officers. They had not the ordinary access to information, since our laws are published in English, and most of them only understood German: and this being a question of property, they acted upon the first blind impulse of their avarice, proving the truth of Mr. Horsefield's observation, "that the Germans are fond of their money, and do not like to part with it." But still there is a criterion which, in applying a rule of law, ought always to be regarded:—I mean the moral character and mental attainments of the men who are arraigned. If a discontent exists, we cannot fairly expect the same mode of expressing it from illiterate, uncultivated men, the scattered inhabitants of a remote district, that we may reasonably exact from men of education and manners, formed by the luxury and refinements of a metropolis: these will take care, if they do express their discontents, to avoid personal indignity and legal embarrassments; while those without skill to ascertain the limits of the law, as without delicacy to respect the inviolability of the person, rarely act without being riotous, or complain without being abusive. Plain men, then, have but plain ways to manifest what they feel; and they ought not to be tried and condemned by a more perfect and, generally, a more artificial standard. A disturbance similar to the one under consideration is not uncommon in England; but the government, instead of entering prosecutions against the discontented, for treason, has sometimes thought it proper to acquiesce in the wishes of the people. We all remember the popular influence in depriving Lorth North of the reins of government. The attempt of a minister (Mr. Pitt) to involve that nation in a war with Russia, was a very unpopular measure; murmurs and complaints reverberated through the kingdom, and, finally, he was obliged to abandon his project. The shop-tax was sanctioned by all the branches of the parliament; but it generated clamours so loud and so acrimonious, riots so numerous and so outrageous, resistance to lawful authority so daring and so injurious, that the government itself might justly be said to be assailed; and the act of parliament to be repealed by force

and intimidation; yet, not a single indictment for high treason was projected. Hence it is that I think risings of the people, like the present, should be viewed with the determination to punish, on account of delinquency, but, also, with the disposition to mitigate, on account of prejudice or ignorance. In a country where party spirit beats high, there should be peculiar caution on the subject; for, even in the present case, has not the joy testified by the triumphant majority at the late election, been classed with the symptoms of popular discontent and hostility to the government? Nor will it be denied that there actually did arise in the minds of the people a serious doubt, whether the law was in existence or not; and although, I repeat, that ignorance is not a legal excuse, yet you must take into view the state of information, before you can understand the degree of guilt. Under this ignorance, in this state of doubt, can the refusal to permit the assessors to enter a particular township, be construed into a fixed and deliberate intention of levying war against the government? Though the law had been enacted, we find that the subject of the law had been brought anew before congress, and petitions were sent in abundance, praying for a repeal. These discontented people might have supposed that a repeal was effected, or intended; though we, who were at the seat of government, knew the object of the revision was merely to amend, and not to rescind the law. At the meeting at Kline's, (acting, probably, under the mistake that I have suggested,) there was an express declaration that the people did not think the law was in force at that time: And here let me remark, that the prisoner, who is called the great parent of the discontents, was not present at Kline's, which appears to have been the first step in the opposition to the land-tax. Such was the state of information at that period. Mr. Horsefield has said that there were general discontents prevailing throughout the country: but his allegation is too vague, too comprehensive, to be understood or acted upon. The citizens of a free government have a right, if they apprehend that a violation of their constitution is intended, or if they think that any encroachment is made on the bulwarks of liberty, or property, to express their opinion; but is it practicable so to express that opinion as not to encounter from their political opponents the charge of discontent and sedition? How, in the present instance, was the popular discontent expressed? At first, petitions to the government were proposed, framed and subscribed. This was the result of Kline's meeting; and in this, I presume, no hostility, no levying war, can be discovered. At every subsequent meeting, whether convened by the assessors, or by the people themselves, the reliance on legislative redress was never abandoned; though, it is true, there was great intemperance of manner and of language. The assessors were sometimes interrupted in their journeys, and sometimes jostled in the crowd; and the unmeaning epithets of Stamplers and Tories, were rudely applied to the friends of government. But however censurable, where is the treason in such proceedings? A rioter and a traitor are not synonymous characters; and let us say what we please about nicknames and slander, the society that patiently submits to the scurrility of the Philadelphia newspapers, will never be disgusted or enraged at the indecorum or vulgarity of the northern insurgents. But the insurgents went further; they intimidated the assessors: and is that treason? No; it is the very gist of the offence for which the sedition act explicitly provides. Is it not the very phrase of that act, that if any persons shall combine to intimidate an officer from the performance of his duty, he shall be deemed guilty of a high misdemeanour, and be punished with fine and imprisonment? Now let us go step by step through the evidence, and I defy the most inquisitional ingenuity to discover anything beyond the design, and the effect, of a system of intimidation. Is there any actual force resorted to? No! I find the bridle of one assessor seized, and his leg laid hold of; but the man is not pulled off his horse, nor is he the least injured in his person. I find that a witness thinks that he heard the word "fire" given, and that he saw two men from a neighbouring porch present their rifles at another assessor: well, did the riflemen fire? No. They had guns; their guns were, probably, loaded; and if any thing more than intimidation was meditated, how shall we account for their not firing? But we hear a great deal of the personal jeopardy of the commissioners and assessors; and yet who of them sustained an injury? Mr. Chapman, Mr. Foulke, and Mr. Childs, are, generally speaking, treated as men of merit and consideration; and, in particular, wherever the prisoner met them, they were respected and protected; as at Jacob Fries' and Roberts' taverns. To repel the plea for favour founded on such correct deportment towards the officers, we shall be told that the prisoner was an artful man, that he was the leader; and it will be strongly urged against him, that he called on the officers to surrender the public papers. Of his conduct as a leader, I shall speak hereafter; and of his demand of the papers, it is surely sufficient to observe, that, in opposition to the sense of the rioters, and at the risk of his life, he returned the papers, privately, in the same state in which he had received them.

Having spoken of the assessors, I would wish, likewise, to review the evidence with respect to Mr. Eyerly, the commissioner, and Col. Nichols, the marshal. (Here Mr. Dallas entered into an investigation of the evidence, to show, that although the people acted violently at the several meetings which Mr. Eyerly had called to explain the law to them;

that although Mr. Eyerly accompanied the marshal in his whole progress for serving process, and that although he was conspicuously present at Bethlehem, no personal violence was ever offered to him, or to the marshal; and all the ill-treatment they encountered, amounted to no more than an attempt to intimidate them, but which they both declared was without effect. Mr. Dallas then continued as follows.) And are we to be told, sir, that these acts without force, without any apparent object but to intimidate the assessors of a particular district; that distinct acts of inconsiderate riot and folly shall, when connected and combined, constitute a deliberate treason, by levying war against the United States? If no treason was actually perpetrated, if none was intended when the transactions occurred, I insist, that nothing previous to them, nothing ex post facto, can make the prisoner a traitor; the intention at the time must have been treasonable, or the act can never be punished as treason.

Let us now, however, proceed to inquire into the circumstances of the rescue at Bethlehem, and its connection with the previous disturbances. I think the evidence is strong in support of the assertion, that the sole, independent, consummate object of the assembling of the people at that place, was to rescue these prisoners. Is there any satisfactory proof of a combination between the people of Northampton and of Bucks? I know that an expression is said to have escaped the prisoner, that, in this general discontent with respect to the land-tax, certain persons of a part of Northampton would join the inhabitants of Lower Milford; but let the foundation of his opinions be tested by the facts, and it evidently arose, not from negotiation, conspiracy, and compact, as the prosecution supposes, but from a general knowledge, which he possessed in common with thousands, that the land-tax was unpopular throughout the adjacent country. It is enough, however, for the defence, that no combination or correspondence is proved; since the rule declares, that in legal contemplation, what does not appear and what does not exist are the same. You do not find the people of Bucks attending any meetings but in their own county, nor entering into the county of Northampton at all, previously to their appearance at Bethlehem. Gentlemen, it might surely be expected, that a concerted insurrection for treasonable purposes, prevailing throughout the three counties of Bucks, Northampton, and Montgomery, and cemented by common interests and passions, would have been inspired and conducted by one common counsel; but is there the slightest proof of such a co-operation? I am aware of the communication made by Captain Staeler to the son of Conrad Marks; but the communication itself was merely accidental, and amounts to nothing more than the request of one individual of Northampton to an individual of Bucks. I am aware, likewise, that a message was received at Quakertown (as one of the witnesses says), mentioning the arrest of the Northampton prisoners and inviting the people of Bucks to assist in rescuing them. Who brought this message, and to whom it was delivered, I don't recollect; but it seems, that a compliance was resolved on, and a paper expressing the resolution, was prepared and signed by Fries, with a number of other persons. But was the object of the invitation, or of the resolution to comply with it, treason, or rescue?—to commit a riot, or to levy war against the United States? I repeat, that the sole, independent, and exclusive purpose, was to rescue a particular set of prisoners. Now if, in the previous part of this transaction, nothing has struck your minds as traitorous in the acts, or the intention of the people, I beg you to follow me, gentlemen, with strict attention, to a consideration of the object that was actually effected, and the means of effecting it. The object was to obtain a rescue; a rescue was effected, but it was effected with circumstances of military array; will this alter the original character of the riot? No, sir: if the people did not repair to Bethlehem with a traitorous intention, their arms and military equipments will not convert them into traitors. As on the one hand, I grant, that the circumstance of military array is not necessary to an act of treason, if the intention is traitorous, so I insist, on the other hand, that the circumstance of military array will not constitute treason, without such intention. (Here Mr. Dallas entered into an investigation of the evidence in relation to the assembling of the people, their march to Bethlehem, and their conduct there. In the course of the detail, he endeavoured to establish, that the sole object of the rioters was to rescue the prisoners; that no injury was offered, or intended against the marshal, the commissioners, the assessors, or the posse comitatus; and that although the prisoner was forced into a conspicuous station among the rioters, his conduct had been marked with civility towards the public officers, and a solicitude to avoid the effusion of blood. On the last of these points, Mr. Dallas concluded as follows.) And here, permit me to remark, that if the conduct of John Fries was such as to justify his being selected as a subject for capital punishment, I cannot see the policy or justice of the selection, nor forbear from deprecating the consequences of the precedent. A good man may sometimes affect to join a mob, with a view to acquire and to exercise an influence in suppressing it; or an intelligent and temperate man may, for awhile, be associated for an illicit purpose, with a furious and ignorant rabble, who will naturally look up to him as a leader; but, in either case, the power and the disposition to avert or to limit outrage, will be dangerous to the prominent indi-

vidual who displays them, and his only safe-ty is in mingling with the crowd, whatever may be the direction or the devastation of the storm!

Gentlemen of the jury, I have now gone through two of the general propositions into which I divided the consideration of the defence; and, in the course of my observations, I have anticipated much that related to the third proposition, the particular conduct of the prisoner. I should here, therefore, break off, as I feel that my strength, and I fear that your patience, are exhausted, but that the proclamation of the president demands a moment's further attention. By the laws of the United States it is provided, that, under certain circumstances, the president may call out the militia to suppress an insurrection, having previously published a proclamation requiring the insurgents to disperse. This proclamation is obviously in the nature of an admonition; and if the admonition produces the effect, I ask, whether in the present, as in every other case, it ought not to produce impunity? Then I argue, on general principles, that if the rioters did peaceably retire to their homes upon this authoritative warning, they ought to be sheltered from punishment for any offence previously committed. Nor is the argument without a sanction from the positive authorities of the law. 1 Hale, P. C. 138. And the court will recollect, that the principle is incorporated into the statute, which is usually called in England, the riot act. There must surely be some object in requiring the president to issue his proclamation; and the one which I suggest is equally benevolent and politic. On the present occasion, it produced an immediate and decisive obedience to the laws. Besides, when we recollect that the president has the power to pardon offences, to discontinue prosecutions, and to grant a general amnesty, as in the case of the Western insurrection, why may we not consider the proclamation as emanating from that attribute of mercy, since no specific formula is prescribed, by which its exercise shall be expressed or announced? [7]

Mr. Dallas then proceeded to point out the differences in the nature, progress, and turpitude, of the Northampton insurrection, and of the Western insurrection—U. S. v. Mitchell [Case No. 15,788]; and analysing again the Case of Lord George Gordon, he contended that upon that authority alone, the prisoner ought to be acquitted. In the Case of Lord Gordon, the direct, the avowed object, was to obtain the repeal of a law; and as petitions and remonstrances were unavailing, a body of forty thousand men were convened and marshalled to surround, intimidate, and coerce the parliament. Riot, arson, murder, and every species of the most daring outrage and devastation, ensued; and yet, the only prosecution for high treason was instituted against the leader of the association; and that prosecution terminated in an acquittal. View, then, the riots of Lord George Gordon in their origin; estimate their guilt by the avowed object; aggravate the scene with the cotemporaneous insults and violence offered to the persons of peers and commoners; and close the retrospect with the horrors which the British metropolis endured for more than eight days; and then say (exclaimed Mr. Dallas) what was the guilt of John Fries compared with the guilt of Lord George Gordon? What is there in the English doctrine of treason that has justified an acquittal of the latter? What is there in American doctrine of treason, that will justify a conviction of the former?

Gentlemen, I can proceed no longer. The life of the prisoner is left, with great confidence, in your hands. There are attempts to make him responsible, under the notion of a general conspiracy, for all the actions and all the words of meetings, which he never attended, and of persons whom he never saw. But this is too, too harsh in a case of blood. It is inconsistent with the humanity, the tenderness of life, which are characteristics of the American people, and especially of the people of Pennsylvania. Nor is it called for by the policy or practice of those who administer our government. I believe that to the chief magistrate, to every public officer, to every candid citizen, it will be matter of a gratification, if after so fair, so full a scrutiny, you should be of opinion that treason has not been committed. Such an event will by no means ensure impunity to the delinquent; for, though he has not committed treason, though the punishment of death is not to be inflicted, the violation of the laws may be amply avenged upon an indictment of a different nature. The only question, however, now to be decided is, whether the offence proved, is like the offence charged, treason against the United States. The affirmation must be incontestably established as to the fact and the intention, by the testimony of two witnesses to the same overt act; but remember, I pray you, what the venerable Lord Mansfield stated to the jury on Lord Gordon's trial, remember that it is enough for us in defence of the prisoner, to raise a doubt; for, if you doubt (it is the principle of law, as well as of humanity) you must acquit.

The counsel for the prisoner then called the following witnesses.

John Jamieson.—Some time after last February court, John Fries came to my house; I had heard, on my way coming to Newton, that there was to be a meeting at Kline's. I asked him whether there were

---

[7] Judge Iredell, says the reporter, here interrupted Mr. Dallas, observing that he thought it irregular to make any use of the proclamation as a pardon, without pleading it. Mr. Dallas said, that he only meant to infer from the facts that the warning and the dispersion, that the insurgents never meditated treason.

many people there, and what they had done. He told me there were, and they had agreed not to allow the assessments to be made in the township as yet; he said the reason was, because they did not know whether there was a law passed on it or not; I told him I really believed there was, for though I had not seen it myself, I had heard of it. He likewise told me that Mitchel had undertaken to draw up an instrument of writing, but he could not go through with it, and that he called upon him to assist him to do it, which he did. On the sixth of March, I had occasion to go to the township meeting on account of a pauper which was likely to become chargeable, calling at Jacob Fries'. I had been there but a short time, before a parcel of men came there, some with arms, and some without. They called for liquor, freely. They then proceeded to make inquiry whether anybody knew whether the assessors were going about the township or not: I do not know whether they got any information or no, but they agreed to go up to Quakertown; after they were gone a little while, Jacob Fries and I concluded that we would ride up after them: we went to the house of Enoch Roberts. We went into a room, but nothing occurred there; and I then asked Jacob Fries if he would ride down to Daniel Penrose's: after we had been there some short time, one of the family told us that our horses were getting loose, so we went out, and there we saw Mr. Rodrick, who halted: he appeared to be much frightened; so I asked him what was the matter; he told me they had catched Foulke and Childs, and that he was afraid they would kill them, and insisted on my going back to try to prevent them being hurt: I told him I would not, except he would too; he said he would, if I would engage they should not hurt him; I told him I would not do that, for I did not know what they had against him. However, at his desire, I went to town, and when I got there, I think I was told they had Foulke in the stable; so I rode up, and called him by name, and I think he answered me. At my desire, he came into the house; while we were walking along, I told him it was a pity he should assess the township till they were more reconciled: I told him I thought the best way to quiet the people, was to show them the small assessments he had made, and promise not to go about again till they were satisfied. He said he was willing to do that. We then walked into the room, and soon after we were there, Conrad Marks walked towards us with a kind of sword in his hand, though I believe sheathed, and said to Foulke, "What! I hear you are going about this business again! did not I tell you not to do this business? but I cannot tell you in English like as I could in Dutch; but it is for the sake of those few dollars that you go about this business." Foulke answered him that he did not do it for the sake

of the money. Marks answered, "Did I not tell you that if you could not do without, come to my house and I would keep you four or five days? but if you had to do this for half a crown a day, the devil would not send you about the township." I then told Marks what I had advised Foulke: he said if he would do that, he would use him like a gentleman. Then the affair of Captain Seaborne [8] took place, which seemed to draw the attention from Mr. Foulke. I saw John Fries looking over some papers, but I did not know what they were; I went away.

A day or two after the affair at Bethlehem, John Fries came to me and told me the circumstances, much the same as was related by the marshal, to the best of my knowledge: he then said he did not know what to do with these Germans, for that they had got it grafted in them that General Washington was opposed to this law, and that, so poor a man as he was, he would not grudge half the expense of a man to go and get his opinion on purpose to satisfy the Germans. The next knowledge I got about it, was from two gentlemen who came from Philadelphia in order to carry the proclamation about, and they gave me some proclamations, desiring me to do all I could to get submission to the laws. I spoke to many of them, and there was a meeting called at Marks's on the Monday following. There were one hundred and fifty people or more there from the three counties. It was agreed by several people that it would be best to have men chosen to form a committee, from the three counties, to consult what to do for the best. This was agreed to, and four men were chosen from each county. I was one of four chosen from Bucks, with George Kline, David Roberts and Conrad Marks. Dr. Baker, Squire Davis, and I think Squire Jarrett were some. We unanimously agreed to recommend to the people, as near as I can recollect, to desist from opposing any public officer in the execution of his office, and enjoined upon the citizens to use their influence, to prevent any opposition, and to give due submission to the laws of the United States. I did not hear anybody, but did not consent to what was done by the committee. The people of Lower Milford thought it would be necessary to have the assessments taken. David Roberts said, that he believed Mr. Chapman would agree for them to appoint an assessor in their own township. It was then agreed that we should ride to him to know; which we did next day: he said he had once made an offer, but it was now out of his power. He then said Mr. Clark had been first appointed, and that he had not yet given up his commission, and he did not know how another could be appointed now; that if Mr. Clark would go about it, it would answer the end. On returning home, I called at Frederick Henny's, and desired him to draw out some German advertisements, and send them

---

[8] See Thomas's testimony.

over towards Marks's, to desire the people to meet, and consent to let Clark go about. I believe he did it. At the time of appointment, the people met at Mitchel's; perhaps there were about forty there. John Fries and Frederick Henny were there. The people in general agreed to let Clark go about; I believe Fries and Henny did not vote. I went to Fries and asked the reason: he said he had no objection to the people voting for him, and he wished it was done; but as he was first opposed to Clark going about the township, he thought it would not be right in him to vote. I believe Henny said about the same. I saw Fries again a few days before he was taken. He told me he had heard a report which troubled him more than anything in his life: I asked him what it was: he said that a report was in circulation that he was collecting up men to assist the French. He said, "Damn the French; if they were now to come to invade this country, so old a man as I am, I would venture my life against them; but I want nothing to do with them."

Cross-Examined.—I do not recollect any proposition made there about signing a submission paper. I recollect Fries said that if he was called upon, or summoned, he would come forward and deliver himself up. This he said at Marks'.

Jacob Huber.—I was at the meeting at Conrad Marks'. It was after the proclamation, and we were choosing the men to meet in the committee; Fries and I got to talking together. He says, "Now, Jacob, you see the error we got into by going to Bethlehem." I answered to him, that the assessors would have to go about and assess the houses; he said, they should not assess his before he gave them a dinner, then they might take the assessment of his house; and "If I am not at home," said he, "my son will give them a dinner." After this meeting, the general situation of the township was quiet. John Fries was as peaceable and quiet as any man could be; I never afterwards heard of the least opposition.

Cross-Examined.—I saw George Mitchel at Marks', but was not much with him: I had no conversation with him: he was clerk of the meeting.

Israel Roberts.—After the proclamation arrived in our neighbourhood, there was a statement in the next week's newspaper, stating the conduct of John Fries, which I procured, and took to John Fries. After looking over the paper, he seemed pretty submissive, but said nothing: he appeared, I thought, much distressed in his mind. I told him that I wanted to have some conversation with him relative to it. I then asked him whether he had rightly considered this matter, whether he had not run himself into danger inconsiderately, and told him the consequences I thought might attend it. He said he never had considered it so much as he had within a few days before. He said he had not slept half an hour for three or four nights, and

that he would give all he was worth in the world if the matter was all settled, and he clear of it: he likewise said, if the government would send for him, he would go with him, even if a little child was sent. After the proclamation was read, there was still some little opposition to the law in Milford township; but I do not know that there was any made by the prisoner. I recollect that John Fries further expressed himself to me at that time, that he was charged with taking part with the French, which he took very hard, and signified his determination to defend the country against any invasion; if any army should invade our land, he would, at any time, lay all this aside, and turn out against them, and particularly France.[9] There was a meeting at Mitchel's after that, to choose an assessor; Fries was there: he was asked to vote, but he said he would have nothing to do with it. More than once I heard him say that he did not believe it was an established law, and therefore he was determined to oppose it. I think this was the 5th of March, not far from Jacob Fries' tavern, on the road. He said he would oppose it till he had known other counties had agreed to it—then, said he, we must submit; but he would choose Lower Milford should be the last. At the last meeting at Mitchel's, there appeared a disposition to wait till they should have assistance from any other place. It was said that a letter had arrived to George Mitchel from Virginia, stating that there were a number of men, I think ten thousand, on their way to join them: that letter was traced from one to another, through six or eight persons, till at last it came from one who was not there! Some of the company at that time were in arms and uniform. I do not recollect what was said when the letter was mentioned, but they appeared to be more opposed to the law than they were before. At the meeting at George Mitchel's, at which Mr. Foulke and Mr. Chapman were present, which was held for the purpose of explaining the law, there were a number (about twelve) came up in uniform, and armed with a flag and "Liberty" on it. They came into the house and appeared to be very much opposed to the law, and in a very bad humour. I proposed to read the law to them: they asked me how I came to advertise the meeting: I told them I did it with the consent of a few others: one of them asked me what business I had to do it: I told him we did it to explain the law. He looked me in the face and said, "We don't want any of your damned laws, we have laws of our own," and shook the muzzle of his musket in my face, saying, "This is our law, and we will let you know it." There were four or five who wished to hear it, but others forbid it, and

---

[9] Judge Peters said he must do these people the justice to say, that from all he heard, and all he saw, they were generally disposed against the French; he found none at all in favor of them.

said it should not be read, and it was not done. I saw Fries on the evening of the 5th of March. He asked me if they had assessed my house? I told him they had: he then asked me if I had told anybody of it; I said I had not: he then added that he had forbade them to come into the township, as he did not believe it was an established law, and others should be gone through with first. I think he then added that they could not get hold of Rodrick: they had got Foulke, but let him go, and added, if they had got Rodrick, they would have put him under guard for that night. He seemed very much opposed to the law. He did not express his opposition to any other law that I heard, but to the law for assessing houses, that night: in a conversation I had with him before, he appeared to be opposed to the alien and sedition law also. I know that he expressed himself a number of times, that he did not believe it was an established law. I took it that he did not believe the law had ever passed; he seemed to doubt of its being established.

Everhard Foulke.—As I was coming from the house of James Chapman with the other assessors (John Rodrick and Cephas Childs), when I came nearly opposite Enoch Roberts', I saw the prisoner at the bar, and a number of others with their arms, (though I don't know that he had any, but the others had). Some of them held them nearly as high as my horse's side, on a level, with their arms hanging down. I spoke to them as I passed, and rode on till I got nearly to the other tavern, David Zellers'. When I got there, a number run out and cried "Stop!" Some of them addressing me by name, desired me to stop; which I did in a pleasant manner. Before any of them got to me, I think John Fries came over from Roberts'; when he was about a rod from me, he called me by my name, and told me he had told me yesterday that he would take me to-day, and he was now come to do it, or it should now be done, I don't know which he said. Captain Kuyder then ran up, and seized my horse by the bridle, and a number of others came round me; the prisoner did not come himself. Some of the people there (Jacob and John Huber) came and took Kuyder off, and he then seized me by the foot, and endeavoured to dismount me, but he failed. He then again took hold of the bridle, but Huber released me again. Fries came up and said, "Foulke, you shall be taken, if you will get off; there shall no man hurt you." He took hold of the bridle, and ordered Kuyder to hold it; I rode up to the stable, got off, and went into the house. When in the room, which was very thick of people, the prisoner came and demanded my assessment papers. I told him that I did not like to give them up; he told me not to hesitate, but to do it. In that situation I gave them to him, and told him I was in hopes he would not take them away without giving them to me again when

he had looked at them.—I then went into another room with some of them, who exclaimed much against the law. Huber said they were not willing to submit to it yet. Fries then gave me the assessment papers again unhurt, and told me that he had used me better than I deserved, and that if I had a mind I might return him to court, which I had before threatened. He then went with me to the bar, and took me to my horse through the mob, and held the bridle while I got on, and I rode off. I received no injury. The prisoner said he knew, or thought he had transgressed the law in such a manner as to endanger his life, and that I might return him if I would. The day before he spoke of force that was expected to assist him, when he attacked Rodrick and me in the road. He said there would be 700 men there to-morrow morning, pointing to Jacob Fries' house. I was appointed assessor for the whole district; my appointment was on the last day of the court (January 28).

Mr. Ewing.—You are now, gentlemen of the jury, in the discharge of the most important duty which possibly has, or ever can fall to your lot as members of society. This is a cause of the greatest magnitude, of the first impression. Its importance is derived not only from a consideration that the life of the prisoner is now at stake, but also from the precedent that your verdict will establish in similar cases in future. From this view of it, it claims the highest and most serious attention that can be bestowed upon it. When I address you on this occasion, I feel diffident lest my ideas should not be clothed with that perspicuity or clearness that I could wish, or my sentiments delivered with that ease or elegance that might insure success. I shall rely upon your goodness to forgive any inaccuracy of style or sentiment that your penetration may discover in my address to you. When I address you on this occasion, it is with an anxiety of mind which I never before experienced, when I reflect upon the possible issue of this cause with respect to the unfortunate prisoner at the bar. The situation of the public mind, now roused to resentment; the place where this subject is made matter of inquiry; together with the prejudices that may exist against the defendant, all conspire to form strong obstacles to the defence which I shall attempt on this occasion. But when I consider your characters, gentlemen, I am fully persuaded that you will suffer no circumstances of this kind to bias your impartial judgments, to destroy that inflexible integrity which characterizes you, or prevent this defendant from receiving from your hands (which is all he asks) a fair, a candid, and an impartial trial; that you will hear his cause under every presumption of his innocence, until the contrary is proved by the most incontrovertible evidence. That it is essential to the very existence of every

government; that it is essential to the preservation of life, liberty, and property that offences should be punished, and that the crime of treason, the highest that a member of society can commit, is what I will admit; but I contend that it is equally essential to the existence of a government, and to our security as members of it, that every man indicted should have a fair trial; to have the offence defined with certainty, and proved in such a manner as to leave no possibility of doubt on the minds of the jury. That this man has been guilty of a flagrant violation of the law, an offence for which he deserves to suffer, and which the good of society requires should be punished, is what I readily admit; but I do contend, and I assert with confidence, because I think the law will bear me out, that no act the prisoner has committed can be construed treason by the most rigid or strained construction of law. Gentlemen, permit me to observe, that in proportion to the nature and magnitude of an offence, so ought the evidence to be. As the accusation against this man is of the deepest dye, as it is the highest possible offence against the laws and government that he could commit, so should the proof of it come from the purest sources, and be of that nature as to establish the crime beyond the possibility of a doubt. He is indicted for the crime of treason. Happy for us that we are not now left to the construction of judges, to the opinions of men of any kind, or we might be led astray in a variety of instances, and at times introduce accumulative treason. The people of this country, knowing the magnitude of this object, and the propriety of good security against such constructions, ingrafted into the constitution the definition of the crime, and transmitted it to us unimpaired. Congress recognized the constitutional definition, by ingrafting also the very words of the constitution into the act for the punishment of crimes; they have there prescribed the punishment; they have said that the perpetrators of this crime shall suffer death. We are now to consider how far the defendant is guilty of treason, as laid in the indictment. I had meant to have gone more largely and fully into this subject from the authorities of law writers of eminence, but my learned colleague has so ably, in so masterly a manner handled this cause, that less remains for me to do. I shall endeavour to show you what is to be understood by levying war against the government of the United States, and think I can rest on that ground with safety, to prove to your satisfaction that the prisoner has not been guilty of the crime of treason.

The defence rests upon three grounds. First. That he has not been guilty of the crime charged in the indictment. Secondly. If he has been guilty of any crime at all, the act of congress has sufficiently defined it, and prescribed the punishment not to be capital. Thirdly. I contend that the proclamation of the president should operate as a pardon to take off the guilt of actions done previously thereunto, if not continued in.

(Judge IREDELL here interrupted Mr. Ewing respecting the pardon, and said that a plea must be put in if that was insisted on, but the prisoner must plead guilty to plead pardon. The proclamation was read by Mr. Ewing, in which, he observed, there was no pardon promised. Mr. Dallas said he had begun speaking on this point before, but was interrupted from explaining his idea: he thought there was much difference between an assemblage before and after an admonition to disperse: it doubtless would have been treason had they continued in arms, but their future actions put a construction upon their past actions, and proved that they were guilty of riot and not treason.)

Mr. Ewing continued.—This opposition arose from ignorance: they did not know that the law was in force; and the first time they knew that, was by the proclamation, when they actually did disperse and submit to the law. The prisoner at the bar is not guilty of the treason laid in the indictment; for, first, there must be a traitorous intention; and, secondly, that intention must be carried into effect. In order to prove that, we must trace his conduct through Bucks county, and then proceed to Bethlehem, where the act of treason is said to have been committed. In order to discover what is meant by levying war, we are obliged to resort to the authority or decision of English courts on the statute of Edward the III.: but though everything that has been done there is not to be considered as a proper precedent for us here, yet there are some rules and constructions in England that will apply to particular cases here. Wherever a set of men take up arms to oppose themselves to the government generally, to subvert the laws, or to reform them, in that case they are said to levy war against the government. The great criterion to distinguish what amounts to this crime is the quo animo, or the intention with which the act was done. The object must be of a general nature, and not an assembly to do a particular act; this would not be treason. I shall now show, by the conduct of the prisoner, that his views were not of a general nature, and that it was by no means marked with that degree of malignity which the counsel for the prosecution have represented. You will consider that the residence of the prisoner was remote from the seat of government, and from that source of correct information which, as a member of society, he ought to have received, whereby to regulate his conduct. The people with whom he conversed were unacquainted with your language, warmly, and perhaps superstitiously attach-

ed to old established laws and customs of the place where they resided. Having been accustomed to be taxed and assessed by men of their own choice; men whose conduct they had a right to scrutinize, and whom they had used to bring to account, you need not be surprised that these people would at least hesitate at admitting innovations into their customs. The ideas which struck them naturally were, "From what source can this law arise, that should send a stranger into our townships to make assessments—a right which, exclusively, as we think, belongs to us?" They did not feel such prejudice against this law, considered as to its effects, but from the manner of its breaking upon their view. The introduction of this new principle alarmed them, but they assembled, not to oppose the law, but to gain time for information of the real existence of it. Under this delusion they laboured, because they had not the advantage we have of enjoying information, and the illiterate state they were in operated as a great source of their opposition. This ignorance and delusion were peculiarly manifested throughout all their conduct. Their first meeting was held to consider whether it was a law or not. Not being satisfied about it, and disappointed in their information, they met again, in order to tell the assessors not to come about their township to make the assessments until their doubts were removed. The assessors went on, however, and all this while the people were enveloped in darkness. They warn the assessors; they tell them, "We don't want to repeal this law by violence." No; if they had, arresting the assessors would not have done it; they must have gone to a higher source; and if they had gone there with a determination to repeal or oppose it, the act might have received the stamp of treason. I deny that they arrested any of the officers of the government in the execution of their duty. We have repeatedly asked upon what authority these men acted: we have asked, and have not obtained satisfaction, and we therefore presume the authority does not exist; and where there is no law, there is no transgression. But suppose they had produced their authority, to what would their opposition have amounted? To a riot, and no farther. What course did Fries take in this scene? Humanity and tenderness, wherever his interposition was necessary, and he was present, characterized him. So far from subverting the government; so far from preventing the execution of its laws; so far from injuring or punishing these assessors while entirely in his power, he prevented the very people who were with him from doing those acts, and he himself was industrious to release them, and lead them into a place of safety. If conduct like this is to be construed into the crime of treason, what act, I ask, will not by and by? If this is

treason, it is unhappy for us, for thousands in the United States have been guilty of the same thing. Because a law exists, must we acquiesce implicitly? have we not a right, as freemen, to think? have we not a right to object to it? It is impossible that we should be all of one mind with respect to the beneficial consequences of a law; some difference of opinion will necessarily exist. The opposition was manifested in different places, but it was all to the same law. But the opposition did, in no instance, amount to a traitorous intention, nor was it ever manifested in their conduct from the beginning to the end. I ask you, if Fries ever took any active part in it, so as to distinguish him as their leader. It has been declared that he opposed the law, and likewise that he took men to Bethlehem to rescue the prisoners, but we do not find there was any command given. There was a difference of opinion on their way, whether they should go to Bethlehem or not. If he had commanded these men, and had intended to levy war against the government, some of them would not have returned; but he would have led them on to the object without consultation. Trace him towards Bethlehem: there were several who could not pass the bridge because toll was demanded. When he came up, he said "Count my men." No doubt he meant only the men of his own company, because we do not hear that he paid for more than his own. It does not appear that he had any communication whatever, informing him that such a party were to meet there that day, much less can it be imagined there were any treasonable communications. He went up with his men; but we find, while another company formed before the house, his men stood aloof: they did not form there in the ranks, nor did they come there for that purpose. The consideration that some of their country people were taken prisoners, and they thought it was unconstitutional and oppressive for them to be taken to Philadelphia to be imprisoned and tried, induced them to insist upon the rescue. What did they say, "We will bail them: if they are guilty, they ought to suffer." Bail is refused. The marshal could not have granted that request, but they did not know that. When they found this, their proposal was rejected, they determine they will have the men. Then John Fries appeared: a man who had used the assessors respectfully: a man whose character was that of humanity: he was chosen to go in to the marshal to demand the prisoners. One said he should be commander of them; but it does not appear that he did take the command at all; but we hear of two others who commanded on that day. Fries went in and conversed on the release of the prisoners with the marshal, who, with great firmness, said that they must be taken from him. He went out again, and the men be-

ing pretty warm, he checked them: went a second and third time: all his aim was to prevent the shedding of blood. He pledged himself to the marshal that no harm should come to him from him or his company.

If the object of these people had been of a general nature, men so obnoxious in the county as Balliott, Henny, and Eyerly would not have escaped their vengeance or resentment, when they were so much within their power. Had their conduct been stamped with treason, they would not have been satisfied with rescuing the prisoners: the officers would have suffered; but not one, we find, was hurt. One strong trait, worthy your observation, is, that their view in going to Bethlehem was not to prevent the operation of the law, but simply to rescue the prisoners; and in this their conduct cannot amount to more than a riot and rescue: an offence defined, as well as its punishment, in an act of congress. As the overt act must be laid in the county where the offence was committed, and if it is true that treason was not committed at Bethlehem, where shall we look for it? The gentlemen will not attempt to prove, I presume, that the beginning of the treasonable act was in Bucks county, and its completion at Bethlehem. But Bucks has nothing to do with the present indictment at all, and ought not to be brought into view.

Mr. Ewing then referred to Fost. Cr. Law, 210, and 1 Hale, P. C. 143, and Lord George Gordon's Case, each of which, he said, far exceeded the case of the prisoner at the bar. But, he observed, as the time and patience of the jury, to which he felt himself so much indebted, had been so severely tried already in this lengthy trial; and as the defence had been so ably handled by Mr. Dallas, and what remained would be, he had no doubt, well conducted by the justly acknowledged great talents of another learned advocate, he should forbear enlarging. The verdict you give, gentlemen, said he, will not only be of vast moment to the prisoner, but will also establish a precedent for future similar cases, and it will be to your immortal honour if you preserve and decide with impartiality and firmness; while, on the contrary, it will be a source of shame and disgrace if you do otherwise, through the influence of prejudice or the operation of external circumstances. I can safely trust the life of my client in your hands, under a consciousness that those feelings of humanity, and a just estimation of the evidence, will outweight all other considerations, and thus will your righteous verdict gain you the gratitude of your country, the approbation of your own consciences, and the warmest thanks of the defendant.

Mr. Sitgreaves.—I acknowledge the propriety of an observation which dropped from one of the counsel for the prisoner in the course of his address to you: that is, that those who are concerned for the prosecution in criminal cases should not endeavour, by their eloquence or ingenuity, to divert the attention of the jury from the truth, or to stretch that truth so as to give them more unfavourable impressions on the facts than they will bear. This, I must acknowledge, would have been unnecessary advice to me, because the views I shall be able to take of this subject will be but feeble and imperfect. In the course of my limited and short experience, I have been but little conversant with criminal courts, and have paid but little attention to the Criminal Code, and never have been engaged in a case so important as the present, my public duties having, for some years past, drawn me from the bar. It may not be wondered, then, if I have not been able to bring into this court talents equal to meet those called to the assistance of the prisoner. I must therefore say I shall not be able to do justice to the case. I confess I feel a desire that those persons who have been guilty of this second outrage and disgrace brought on the state of Pennsylvania may feel the punishment the law inflicts. I hope you and every one who hears me will join in this sentiment, for on it hangs much of our peace and security. I have no objection to going still farther. My lot is cast in that part of Pennsylvania where this unfortunate circumstance occurred. I feel particularly for the good order, peace, and prosperity of that part of the state; but I have unhappily seen it in such a situation that all the harmony of society was destroyed; and if I were not to feel a strong desire that peace, harmony, and good order should be restored, I should be destitute of humanity; for we all know that crimes can only be prevented by inflicting suitable punishments on the delinquents. I wish, gentlemen, that the law should be executed against those who were criminal; but when I say so, let me not say that I wish the prisoner at the bar to be executed. No: my earnest wish is that the general good of society may be procured. This man must be tried by the evidence that is brought against him, and upon that alone he must stand for his guilt or innocence.

Having said thus much, I begin now to premise one or two things which I think should be altogether set aside, but which have been much insisted upon. You have been told that the prisoner appears here on the charge of treason, under all the disadvantages of denunciation by the president of the United States in his proclamation. Any of the assertions on that proclamation are not to have weight on your minds, nor will it operate against the prisoner. He is to be tried by the evidence only, and you are not to regard anything you have heard out of doors before this trial commenced. Nothing should operate to doom the prisoner to a harder fate than the law, supported by fair testimony, provides. It is also as true, that nothing contained in that proclamation should operate to the benefit of the prisoner: if it should not convict him,

no more should it acquit him. The analogy which has been drawn does not exist between this proclamation and the riot act of England, as you have been told; but even if it did, the inference would not be just. You were told that all who disperse on the reading of that Act are pardoned for crimes previously committed. It is not so. But more of that presently. The proclamation of the president was issued for one purpose, and the riot act of England, is read for another. The president has no authority to call forth a military power but under certain circumstances. Wherever a combination should form which is too strong for the civil power to quell, then the military may be called in to aid the civil, but with a humanity intending to prevent the effusion of human blood, and to call out military force as seldom as possible, the law has provided that a proclamation shall be previously issued, that the offenders may disperse peaceably to their homes; but there is not a syllable about pardon in it. The president has the power to pardon, it is true, but he has not done it by that proclamation. The riot act, which passed in the reign of George I., was enacted in order to prevent tumultuous assemblies: if people refused to depart within one hour after it was read, they were guilty of felony, for which they were to suffer death, although the offence before was only a misdemeanour, yet the refusal to depart makes it felony; but it cannot be pretended that any such departure excused them from the riot, but, on the contrary, prosecution and conviction frequently take place for that crime, although they should disperse; and therefore it does not affect the merits of the case. The proclamation is as a blank paper before us, and therefore we must examine this case upon its own independent merits.

Gentlemen, in summing up this case on the part of the United States, the method most natural to adopt is, First, to consider the law as relating to this subject; secondly, what was the amount of the offences perpetrated at Bethlehem: and, thirdly, inquire whether the facts produced in evidence are such as to convict the prisoner, and make him guilty of the charge in the indictment as applying to his particular case.

First, with respect to the law on treason. I should have expected it was so well understood that there would have been no difference amongst us, however we might differ on its application to the prisoner; yet unfortunately there is, and we must endeavour to meet those objections. The statement which was made to you at the opening by myself, and a statement by the attorney of the district, I believe to be correct: I am confirmed in that opinion, and have no doubt it will be given to you by the court in the charge as correct. We are not at this day to distract ourselves with theory: The law of Edward III. of England, called by some "the sacred statute," and by others the parliament who enacted it

is called "The Blessed Parliament," that law and our constitution have adopted the same words. The judges in England, as eminent for their patriotism, as eminent for their tenderness, and as eminent for their ability as any ever were in this country, have solemnly settled this particular in a variety of instances, and unfortunately, young as this country is, there has been the necessity for a court of the United States for this district to settle the principle likewise. The adjudications under this statute were made by men all well known for their love of liberty. We have no need to conjure up a different exposition, or different form of construction, than what has already been admitted in both countries: indeed, it is what cannot be shaken at this day. It is, that all insurrections by a multitude of people with intention to usurp by violence or intimidation the lawful authority of the government in matters of a general and public concern, in which the insurgents have no interests distinct from the rest of the community, is treason. From the best consideration I have been able to give the subject, I have formed this definition, which I believe comprises the whole that can be said about it, and I believe no more: I think this assertion will appear to be justified by the best authorities. If this description is just, the offence is clearly settled, and amounts to "levying war against the United States." In the most essential parts, I think this rule has been settled by the counsel for the prisoner.

The intention, which constitutes the gist of the offence, is proved to have been to some general object; if the intention was to gratify some private concern or interest, even if there be all the apparatus of war, as guns, fifes, drums, &c., whatever violence should be committed under it, it cannot amount to treason, because the intention is not to a public matter, whatever other crime it may amount to, and whatever enormities may be committed. This may be the case, in order to gratify some particular passion, or some particular interest. It is the intention, which distinguishes treason from other crimes: Riot is generally much like it, but not being of a public nature, is only a misdemeanour: Treason, on the contrary, is the greatest crime known to the laws of any country. Lord Mansfield, at the trial of Lord George Gordon, expresses the same opinion. If this is a true position, it is certainly an irresistible inference, that insurrection for the purpose of suppressing and preventing the execution of a public law, is to prevent or obtain a public object, and of course must be high treason within the rule of our constitution. Yet this has been repeatedly denied by the gentleman to be high treason; nay, he even went on so far as to say, that in England no such thing had taken place; he says it must be a combination to oppose all the laws; or, at least, to force the repeal of a law. Gentlemen, I think I have stated enough to convince you that this is erroneous: If treason

is the unlawful pursuit of an object of a public nature, then the suppression of a public law is treason. But I would not have you rest on my definition, if I cannot bring you full proof in favour of it. See 1 Hawk. P. C. c. 17, § 25; 1 Hale, P. C. 133. And this position is confirmed still further by a precedent of our own. U. S. v. Vigol [Case No. 16,621], &c. I consider this settles the question beyond all doubt, and it ought to rest so forever, the decision was so serious and solemn in both countries. I shall assume this as an acknowledged point throughout the whole of my inquiry. I should have added the opinion of Mr. Erskine, in Lord George Gordon's trial. Speaking on the treason statute, he says— None of them have said more than this, that war may be levied, not only by destroying the constitution, or the government itself, but by assuming the appearance of war, to endeavour to suppress a law which it has enacted. It is certain that British cases go much farther, and if it was necessary, and the case required it, it could be justified by decisions in England upon points infinitely less strong than those I have quoted: points which were settled at a very early period, which neither the parliaments nor the courts have ever interposed to change. Cases of public grievances, whether real or pretended, whether they grow out of law or out of practice, as pulling down all enclosures, &c., which are the invasions of private right, from its universality—is high treason. Again, usurping the powers of the government by pulling down all bawdy houses, is high treason. The case referred to by Mr. Bradford, in Mifflin county, was, that a particular judge was driven from the bench: they did not oppose the sitting of the court, but they had a resentment against the individual, and therefore the prosecution was for riot. This will assist us in our farther inquiries upon the present occasion. This crime is said not to be treason, but a rescue and bare obstruction of process, and within the sedition law, or within a clause of the penal code, and therefore not treason. But whatever nature an offence may be of itself, if it is accompanied with this particular act of treason, the act becomes treason: I willingly admit that a rescue of prisoners may be without treason: a person may be willing to risk the law rather than his friend should suffer, and may therefore rescue him; this would be but misdemeanour: If ten men in arms go to an officer and rescue his prisoner, if it be done in a private manner, it is no more than a misdemeanour; but if these same ten men in arms go from motives of a public nature, then it becomes treason. The intention, therefore, makes the crime to differ. It is said farther, that the legislature of the United States have passed a solemn opinion upon it, and that they have called it no more than a combination of certain facts; a rescue, &c., against which it has provided; and therefore it cannot now be called treason. I think this received a good answer by Judge Wilson,

—U. S. v. Mitchell, [Case No. 15,788],—and the objection was solemnly overruled by the court. The sedition act was not made at that time, to be sure; but if it had, there can be no doubt but it would receive the same answer, and meet the same fate by this judge if read in objection. But the first section of the sedition act describes a different sort of combination, and is not levying of war. There must be of necessity a conspiracy in levying war, but there may not be one in an unlawful combination.

(Judge PETERS. — Whatever the crime would have been without a treasonable intention, with a treasonable intention it would constitute the overt act.)

Mr. Sitgreaves.—The cases in the books are strongly demonstrative of this particular. In Benstead's Case, Fost. Cr. Law, 212, "certain unpopular measures having passed in the council, the odium was thrown on the Archbishop of Canterbury. A paper was pasted up in London, exhorting the apprentices to rise and sack the archbishop's house at Lambeth, and accordingly some thousands went with a declaration that they would tear the archbishop in pieces." It was not attacking the individual, but the officer, that became high treason. The same with respect to the attack on General Neville's house during the Western insurrection; the attack on him was, because he was an officer, and therefore being upon the office and not the man, it was upon the government, and high treason.

Such is the general opinion of treason: the great inquiry will now be, what was the intention with which the offence at Bethlehem was perpetrated? It is allowed to be a rescue; it is conceded also that there was an obstruction of process: If it was so, it was a part of the general system which, being of this public nature, obtains the magnitude and operation of treason. Before I go into the examination of this, I will make an observation on what has been said: that the overt act must be proved in the county where it is laid. I heard this position, but I did not discover any application of it, and therefore I am at a loss to know how to treat it. There exists in England, and in the state of Pennsylvania, a form in the direction to the grand jury, which deserves notice; they are sworn to inquire for the body of the county. This causes considerable difficulty, particularly where something done out of the county is required as an ingredient in the charge, and if the beginning of a crime was in one county, and its completion in another, the difficulty would be greater; but even those difficulties are remedied. The idea of his honour, Judge PETERS, the other day, appears to be sound. That a district is the same as it respects the United States, as a county is to a state, and, therefore, the grand jury are drawn, not from the body of the county, but from the body of the district, and the whole extent of the district is equally connected with the venue, if it be laid there. As to the evidence,

therefore, I consider the crime may be laid in one county and proved in another. 2 Hawk. P. C. c. 46, § 182. I consider whatever rule applies in England, or in our state governments relative to counties, is the same respecting districts under the general government of the United States; likewise, if the overt act be proved in the county where it is laid, you may go out of the county for evidence to show the intention with which it was committed. This, I think, cannot be denied. In Fost. Cr. Law, 9, we see that an overt act not laid, may be brought as evidence to support one that is laid, in order to show the intention.

With respect to hearsay evidence, the rule of law is, that the circumstance of the oral testimony is regarded, as it may tend to establish other evidence, though of itself it be no proof. There are a variety of instances in which it is necessary to be admitted, though there is a rule against it in others. In all cases where proof is to be made by evidence of general reputation, it is useful; so, upon this occasion, it is competent to us to prove the general state of the country; if proper to show the general state of a country where insurrection prevails, it is as proper in order to show the general combination, the design and intention, because it may be the only effectual way of coming at that knowledge. For instance; this information, which was received by the commissioner in the discharge of his official duty, is proper evidence to show why the law was not carried into effect, and, consequently, the criminal spirit of the country. Poph. 152.

Mr. Sitgreaves then went into the case of Lord George Gordon, which had not been represented to the jury by Mr. Dallas to his satisfaction. He related the circumstances of that riot at length. He said the acquittal of that gentleman was not a certain proof of his innocence; doubts might have arisen on the minds of the jury as to the sufficiency or character of the evidence, or there may have been a contradiction of testimony, by which all the credit of it would be taken away. Besides, it did not appear to him that the act of high treason was committed; the multitude who accompanied Lord George to the parliament house, did not go to compel a repeal of the law, or to overawe the parliament, but from a report that the numerous signatures were not rightly obtained, they went to stamp truth on the instrument, and convince parliament of the respectability of the signers. Besides, the main point of evidence of what a person heard Lord Gordon say in the lobby, was received doubtfully by the jury. Many things went to make the testimony not so unambiguous as it ought to be on a trial for life or death, and on that account, perhaps, the learned judge charged them, if a doubt hung upon their minds, to acquit the prisoner. Upon the whole, no inference can be drawn from that case.

Gentlemen, another extraordinary position was taken, by both the counsel, in defence of the prisoner. It was said, that it could be no offence to rescue prisoners who were taken up for acts committed against men who acted without authority, nor to oppose men who had not authority to assess under this law. It was attempted to be shown you that some of the assessors had not received their warrants agreeably to the act of congress, and, thence, all the outrages were tolerated! I do not suppose that the gentlemen, engaged for the prisoner, mean to go beyond the case in which they are engaged, but I must say that their zeal on this occasion, has introduced a dangerous principle. If the apostle of any insurrection had come reeking from the gore of Europe, and had preached up to you this doctrine, he could not have done it more completely than those gentlemen; agreeably to this, the whole country may raise themselves into array against those who, de facto, exercise the authority of the government and the laws, yet, if called to account, the court must be informed, if the ingenuity of the counsel can find a fault in the appointment of the persons engaged in the execution of the laws, that they have not transgressed the laws, and upon that account! Is not this at once sapping the foundation of society, and by a kind of encouragement of insurrection, striking hard at the root of all government? This is an opposition, in my opinion, upon a dangerous and destructive ground. I am not disposed, at this time, to enter into any argument whether it is necessary to prove the appointment of the officers, but, admitting it is true, that upon the indictment of persons for obstruction of process, or obstruction of a public officer in his duty, it is no offence without he prove his due appointment, yet it does not follow that facts given in evidence to prove an outrage, should require all that strictness of examination. You will observe that the prisoner does not stand charged with anything but the rescue at Bethlehem; he is not now charged with the offences he committed in Bucks, or anywhere else, much less with anything where he was not present. These previous transactions are given you to show the intention with which the last outrage was committed; it is only to show the tendency of the design. These gentlemen exercised the offices, and it does not appear that there was the least doubt expressed in those counties of their authority, neither by the prisoner nor any person whatever, who associated with him, at any time or on any occasion; their opposition was not founded on any such pretext, but it grew merely out of the law, and, therefore, it must appear that the outrage was an unequivocal fact, conducted with the intention, so far as we can collect, to defeat the law. On these grounds there is no necessity for proof of due appointment. But what are the objections, or what proof do they require? There is no pretensions to a doubt respecting the

legal appointment of any officer but the two assessors at Penn in Northampton, and Milford in Bucks; Mr. Eyerly himself tells you, that all the rest were appointed by the board of commissioners, and that at Penn, the assessor refused, and Mr. Balliott had the blank to fill up. Respecting the other, Mr. Foulke supplied the place of Clark, who held his appointment, and Mr. Foulke was appointed to assist him. How, then, gentlemen, from those two cases, could a general inference be warranted that the appointments were irregular, and upon that ground, these outrages be justified? We have heard much about the danger of following English precedents, and about the words "high treason." There is a species of treason in England which cannot exist here; that is, conspiring against the life of the king, and speaking of mere words, which have frequently been construed into that crime. It has been a question of great doubt whether words can be called treason, but in that country or this, it is necessary to prove the intention with which a crime was committed; and, therefore, mere words, though it is true cannot convict, yet if a man has done a lawless act, we may exemplify the design by words, even of the prisoner himself. With respect to an action done publicly and notoriously, that is a matter capable of positive and absolute evidence, plain to the senses; those who see it can tell of it, but there can be no way of diving into the heart. If the party himself, from that recess, should develop his designs, these declarations made, either by himself or others who heard him, can prove the intention of his actions, and for that purpose is good evidence.

Gentlemen, I have now said all, which I think necessary, with respect to the law on treason. I am confident I have not done justice to it; but what I have omitted will be amply supplied by the attorney of the district, and their honours upon the bench. I shall now proceed to investigate the facts as they have appeared in evidence, and apply the law to those facts, in order to show you what share of guilt the prisoner transacted. In doing which I shall only select the most prominent features of the testimony which may go to prove my position.

First, with respect to levying war. I think it will require but few words to show that there has been an insurrection in the three counties; that at Bethlehem there was a multitude of people in arms, amounting to the full sense of the words of "levying war with arms;" the insurgents had all the apparatus and accoutrements of a regular military force, and they went there in military array. This is proved by fifteen witnesses, not by two, merely. It is farther certain that this multitude of people perpetrated atrocious and lawless offences, and in contempt of all legal authority, after solemn, reiterated, and repeated warning; that the marshal, con-

formably to that humanity which characterized him, sent a deputation to them, requiring them to go home and to abandon their purpose; that he selected persons who were most likely, from their political opinions, to procure the object: but, nothing would do for them short of what they set out upon, and the mission failed.

We will next consider for what purpose this outrage was committed. It was said to be simply for the purpose of releasing the prisoners; this was the abstract and naked design. If such is the fact, the prisoner must be acquitted: but if he had an object beyond that; if it should appear that this was one link in the chain of opposition to the laws, then it mounts higher, it mounts to treason. It is my purpose to show you that their object was higher than a mere rescue, and that it did not flow from any particular regard to the prisoners in custody, but it was a public opposition, and one means used with a view to prevent the execution of a law of the United States. Gentlemen, the mere recital of one or two facts will be sufficient to bring this home to the mind of any man who is not determined to shut his eyes against plain testimony.

It is in full and complete proof before you, that, in the counties of Northampton and Bucks, the opposition was almost general, and that in the township of Milford, all along the river Lehigh, and both sides of the mountain, there was a union in opposition to the law, uniformly conducted with system, menace, and threats; that the persons who thought proper to assist in the execution of that law, were previously intimidated not to accept of it, and after they had accepted, they were prevented from executing it, and in many places until the march of the army, the law did actually remain unexecuted. I shall not state to you the particulars of this evidence, but remark that the system was general, and that it was accompanied with threats and menace, and that the friends of the law, and those who were peaceably inclined, were prevented, under the influence of this terror, from speaking their minds on the occasion; and even the magistrates of the country were so impressed, or so intimidated, as not to perform the duties of their office: that the law was completely prostrate, and persons who would have given testimony against them for these proceedings, were afraid to do it. In the course of this proceeding, it was repeatedly declared, that if any person should be arrested for opposition to the law, they should be supported. This system of menace was general; it was not an opposition grounded particularly upon the obnoxious characters of persons who were employed in the execution of the law, but upon the law itself. There was an offer of a particular commissioner to use his influence, that they might choose their own officer, but that would not satisfy their object; no, they said

if they accepted that offer, it would be approving the law, and that they would not do. Mr. Eyerly, the commissioner, had been for many years the representative of this district in the legislature. Mr. Balliott had been in the legislature, in the council, and in the state convention, which proves they were men of confidence in their district, and that the particular dislike now exemplified was not to them as men, but as officers under the law. One of the counsel for the prisoner went minutely into all their views, and the veins through which they acted, and endeavoured to palliate or excuse the conduct of these insurgents; while, at the same time, he appears to know what were the views of government in prosecuting the delinquents; but there is no necessity to answer that, because the prisoner is not on his trial for obstruction of process. I most solemnly disavow that political party spirit enters at all into this prosecution, and beg the jury will dismiss all party spirit and prejudice from their minds. However we may differ on points of law, we must agree with them that the people had a right to examine and explain the law, and express their dislike to this or any other law. Their opposition to this law might have been right or wrong; it does not alter the case; and God forbid that any motive of the kind should influence us to revenge. These are natural rights under a free government, which every citizen has a right to exercise. We are not now inquiring into the nature or grades of any or all those particular offences; whether this particular outrage is a riot or that a misdemeanour, or whether it amounts to treason; we are simply showing to you, from the evidence collected, the weight and force of those facts; to wit, that there was opposition to this law, and that universally, and that these people did their utmost to endeavour to stop the execution of the law; and that these acts were in strict union with the last act at Bethlehem, of the intention of which the previous acts collectively are plain proof; for, certain it is, that an act illegal in its nature, may receive color and complexion from one that is strictly legal. Suppose a man had reduced his thoughts on the subject to writing, without any intention of communicating it to any person; suppose, in that writing, his intentions are fully declared with which such writing was drawn; then this act, though innocent in itself, would be competent evidence to show the intention with which a subsequent outrage was perpetrated, and it would be in full proof to show that a violent opposition to the laws in that county, particularly to the act for the valuation of houses, and that it was not from a personal or private motive, but generally an aversion to the law itself, so that a long time after the period fixed for its execution, the law actually remained unfulfilled. In several parts, the people returned to a sense of their duty and submitted to the laws, and happy would it have been for the government as well as themselves if they had all done it; for, then, this investigation would have been prevented. But, in some parts, the marshal, and those who were with him, who were not volunteers as has been insinuated, but acted in conformity to their duty as public officers—these were insulted, arrested, and obstructed as officers. The marshal was abused by numbers of people at Millar's town, and he was not able, though he touched Shankwyler, to execute process on him. Gentlemen, all I ask of you is to connect the circumstances in your minds,—the general course of events which gave rise to what afterwards was consummated at Bethlehem. The prisoners who were rescued were desirous of accompanying the marshal to Philadelphia; they would rather not be liberated; they were taken from various parts of the country, unknown to each other, and more so to the persons who rescued them; there was no private attachment, regard, or resentment; what, therefore, could be the motive of the insurgents? Could it be interest? No! it would be bad policy to spend dollars to oppose a tax law rather than cents to support it. Was it a private, distinct interest they had, which did not concern the community? If not, agreeably to Judge Foster, it was treason. I have said that these prisoners were not known to the insurgents; I would make the exception of Shankwyler; but you will observe that he never did surrender himself to the custody of the marshal, and though some said they were come to see him as a neighbour, others to see his partner (accuser), &c., yet he was not de facto in custody. It could not be to rescue him that this large armed body met, because he could have been safe by keeping at home. But one solemn fact respecting the others demands a solemn inference. The Lehigh prisoners had cordially submitted to the law, and thus desired to recommend themselves to the mercy of the government by penitence, and actually at last gave the marshal their individual assurances to meet him at Philadelphia. I ask, then, by way of inference, what becomes of all the private object or the neighbourhood esteem necessary to vindicate these insurgents? It was not for the prisoners' sakes, but through opposition to the law, that they did this act, for it is plain that the persons in custody of the marshal were afraid as much to trust themselves in the hands of the mob, as Mr. Eyerly or Mr. Balliott were. They doubtless had a treasonable, a rebellious determination to oppose the government; the previous declaration of the party was, that "if any persons were there in confinement who were opposed to the law, they should be rescued." was a plain indication of their opposition to the law, and that this rescue was a part of the general opposition. Mr. Sitgreaves then went into a review of the evidence re-

specting the meetings at Upper Milford, and at Schymer's where, he said, opposition to the law marked the conduct of the people, but at Lower Milford, the prisoner at the bar by his own confession, eminently displayed his intention; and, after recapitulating the evidence, proceeded. Gentlemen, when these facts are taken into view, so immediately preceding and so directly pointing to what took place at Bethlehem, can you hesitate, as honest men desiring to do justice, and speak impartially between the prisoner at the bar and his country, that he went there, not merely to rescue prisoners, but to execute a part of the general opposition to that law of the United States? If he has done so, he is guilty of treason. Let us now attend to the evidence which grows out of the avowal of the parties themselves at Bethlehem, at the time of the outrage. These are previous indications, which certainly point as truly to the intention as the needle points to the pole.

After a full consideration of the testimony, Mr. Sitgreaves proceeded.—

Here, then, gentlemen, the evidence closes. We find this man is not of a yielding texture; he still continued in his opposition, even at the time there was a recommendation to submit to the laws: at a meeting at Marks', it was determined to recommend submission to the officers, and all the laws of the United States, and to desist from opposition to the laws. This is proof that there had been opposition to the laws in the three counties. When these things were done, Mitchel asked Fries if he ever did intend to oppose the laws. "Yes, I did," was his answer. In the testimony of Mr. Roberts, we have proved the general state of opposition, as well as the guilt of the prisoner: this witness was called by the prisoner's counsel. To be sure he proved the prisoner's penitence and submission. If he had not been guilty, he could not have been penitent. He said he had not slept for several nights: an acknowledgment so much the more pertinent to prove that he had been doing what he knew was wrong.

Gentlemen of the jury, I have endeavoured to show you this subject in all the points of view I am able, so as to give you a right understanding of the facts; and permit me to declare to you that I have not wilfully perverted either the law or the facts, to the best of my knowledge; yet it is possible I may have done it; if so, you will be undeceived in those particulars by the court. Gentlemen, you have a solemn duty to perform: we have all had a disagreeable and tedious undertaking: I pray you to do it in such a way as may do justice to the prisoner at the bar; and at the same time consider how much the happiness, the peace, and tranquility of your country depend upon a fair, impartial and conscientious verdict, which there is no doubt but you will deliver.

Mr. Lewis.—It is now become my duty to address you on behalf of the prisoner at the bar, who is arraigned before you on the important issue of life or death: I do it with the more confidence, because I have not been able to learn from the counsel for the prosecution, a single instance of English law that comes up to the present case, in good times or in bad times, so as to denominate it treason, except in a determination during the bloody reign of Henry VIII., and that is mentioned among the evils of the time: I have not been able to find it under any existing circumstances whatever, and yet any person who is the least acquainted with English history or law, must know that the excise law and the shop-tax, as well as some others, have led to riot and insurrections, and a variety of trials have been held upon them. It may be right to make the experiment upon the present case; but, unless this prosecution is warranted, established in good times, and upon solid grounds, I am sorry to say, but truth compels me to declare, that it is a burning torch in the hand of a madman; it is a flaming sword in the hand of a tyrant, and has done immense injury in England. I know there is no intention in the attorney, in this case, to do anything that is wrong; yet I wish more reflection had been used, before the prosecution had gone on. Thus it was in England respecting Hardy, Tooke, Thelwel, and others; those who most understood the whole of the charges were not satisfied to call their crime a misdemeanour, though there was no direct point, in ancient or modern law, warranting any other indictment, yet the experiment was tried; but an English jury appreciated it in its proper light, and they resolved to do nothing which their ancestors had not done, not even in the application of constructive treason; and, therefore, after a mature discussion, they returned a verdict of not guilty. When, on the present occasion, the causes and proceedings are duly considered, I am satisfied you will feel it a duty you owe to the prisoner now before you, and to your country, to pronounce a like verdict. It is not because a circumstance any way similar to this has once taken place, and been argued upon the same grounds, that therefore it is right it should take place upon the present occasion; adopting a principle of this kind has often made courts. in arbitrary times, take gigantic strides over the statute of Edward III., so that a man could not know how to look, act, speak, or even think, without difficulty and danger. I have said that I am not able, except during the mandatory reign of Henry VIII., to find the trace of a single instance where rescue, under any circumstances whatever, has been found to amount to treason, and if succeeding ages did not consider themselves bound by that practice, I trust you will not sit here to establish a law, but to give it such a construction as justice demands of you. I have undertaken this cause the more readily, because I do not undertake to justify, to palliate, nor

to excuse; but I censure the transactions which have given rise to this trial as much as the counsel for the prosecution does: I am as sensible as they are, that those people violated the law without cause; and I came not here to set up a mock excuse for them: No, it is my opinion that they merit exemplary punishment, but that punishment must be comfortable to law, or, when once the law is overturned, the consequences will be incalculable; offences higher than the present may be committed with impunity by some, while those of less grade will be severely punished in others. It is not for me to say that the prisoner is entirely innocent: To me, to the court, and to you, it is totally immaterial whether he has acted wisely or foolishly, guilty or innocently, if not guilty of the offence upon which he now stands upon his deliverance. I may be asked here, how I came to defend a man who, I had admitted, had violated the law, and in some degree set the government at defiance? My reasons are these: It is the privilege of every man to have a fair trial, and not to be condemned without being heard, especially in affairs of a highly criminal nature; few men are capable of defending themselves before a court, and in a capital case, from the perturbations of their minds, still less so than in any other: And woe betide that country, where a man so charged should not be entitled to every assistance that he can procure! By the statute of William III., which is the first that ever allowed counsel at all, the court were directed to assign counsel, who were obliged to render all the assistance in their power; the same is allowed by our act of congress (page 112, § 29); for without that, he may be considered as condemned unheard, and the public mind would be left unsatisfied as to the innocence or guilt of the accused. Those who have entertained the surprise I have hinted at, at my being thus engaged, have doubtless acted from the best of motives; but, not satisfied with this, and wishing to spill the blood of a man before he is proved guilty, some calumniating scoundrel has, in a public print, had the hardihood, during the present trial, to impute to the unhappy prisoner's counsel, the base influence of gold, when all concerned know very well that the prisoner has not a farthing to give, and not a farthing, nor even a promise of any, was ever given to those who have undertaken his defence. I will say no more respecting this vile attempt, but that the law says no publication shall take place which may tend to influence a court or jury, while a trial is pending, and therefore it is a high contempt thrown upon the court, and upon you, and the probability is that either the author or the publisher will be brought to answer for his conduct.

There is one thing, gentlemen, I would wish to caution you against. There are many citizens who suppose that the troops will never turn out again unless a conviction takes place on the present occasion, and that an insurrection will soon appear again: but this is paying a poor compliment to our volunteer troops, to suppose they would not be satisfied without shedding blood: Gentlemen, let no arguments or considerations have weight with you but what are supported by law, and then decide, regardless of the consequences. Another matter I would caution you against, is one with which I found very considerable difficulty to cope; but at length I divested myself of it, and I pray you to do the same: I mean all kinds of prejudice as to the party tried and trying. Our constitution and our laws are wisely calculated to preserve the happiness and interest of ourselves and posterity: our government is composed of tried patriotic characters, and our political bark, with such men at the helm, need not fear a storm; but notwithstanding this, it is vilified and abused. These are grounds for prejudice to work upon, and it is difficult, I can say by experience, to avoid its influence; but when we come to the sacred temple of justice, even if to decide between A and B, on a matter of trifling property, we are sworn to an impartial and unprejudiced decision; and how much more it is demanded of us in a case of life and death? It is necessary to enter that temple divested of opinion or bias, otherwise there is not a fair scope for our reasonable faculties to act, nor can our consciences be acquitted of guilt. I will take the liberty of reminding you that your oath is "that you will well and truly try, according to evidence;" this obliges you to expel everything from your minds which you might have heard out of doors respecting the whole business of the insurrection, excepting such only as proved by the evidence. Your present situation, gentlemen, imposes upon you a duty which is highly important; important as it concerns your country, the prisoner, and likewise yourselves: it concerns him, because his life or death is, in some measure, placed in your hands; it is upon your verdict it depends whether he shall continue with industry to spend the remainder of his life with his family and friends, or whether he must leave them all, and be suspended between heaven and earth to a gazing multitude. Your decision is of importance to your country, because we are now treading upon the dangerous and, I had almost said, unbeaten ground of constructive treason, and because it may and will operate as a precedent to future proceedings. Nor is it less important to yourselves, because, if, owing to honest intention and mistaken views, you should go farther than a reflecting moment would dictate, in some circumstance of a public nature which might possibly occur, the work would be irretrievably done, the reflection would come too late, and pardon would be out of the question.

I will now proceed to consider the particular offence imputed in the indictment to

John Fries, the prisoner at the bar, by which he must be convicted, if at all. (Mr. Lewis here read the indictment.) To this indictment he has pleaded not guilty, and you are sworn to decide upon the issue. The question is not whether he has, or has not, been guilty of a riot or rescue: he may have been guilty of a high misdemeanour, of this or the other description; but the question is, has he ordered, prepared, and levied war against the United States? That is the language of our constitution, and the act of congress formed thereupon. In order to insure the conviction of this man at all events, it has been stated to you, and that with no small degree of confidence, that, as the framers of our constitution have adopted the words of the English statute, the courts are bound to admit the expositions which have taken place upon it from time to time in the English courts: though we have laws of our own, yet in order to know the true meaning of our constitution, we are to go back into the remotest and most dark ages of English history, to understand its meaning! The English statute, or the opinions of the courts of justice, are equally become part of the Code in that country, it is true, and it was as possible for the framers of our constitution to have extended the one as the other to this country, had they chosen so to do, but their not doing it, is a presumptive proof that it was not acceptable. To me it appears strange, that while the English statute is not in force here, the English construction of that statute should! That is a position I never mean to subscribe, but controvert it from the beginning to the end of this case. As we have enacted laws of our own, and have not extended the laws of England to this country, we must put our own construction upon them, and not the determination of an English court. Neither the English laws nor the opinions of English judges are to be regarded any farther than is consistent with our good, to appreciate which, the situation of the times when those opinions were given, and whether the judges were dependent or independent, are important considerations. I do not mean to find fault with English decisions in general: I believe that with regard to property, since the judges have been rendered independent of the crown, it is as wisely administered as the laws of any part of the globe are: but they were not always in a situation to give impartial opinions, when they held their station at the will of an arbitrary monarch, who could hasten or delay causes at his pleasure, to which the judges were the most obsequious tools. Such has been the decisions of some periods respecting treason. But it is not true that the very words of the English statute are adopted in our constitution: they very materially differ: the statute of Edward III. does not provide that confession must be made in open court if received at all; it does not specify that two witnesses shall be necessary to establish the fact, but it was left to the court upon principles of common law; nor does it say a single word about an overt act. Since, then, the two statutes are so dissimilar in important points, it would be very wrong to admit of the same construction in both. So careful was our government of the lives of our citizens, viewing the injuries other countries had sustained by indefinite laws, they provided that the crime should be put in the indictment, and supported by the testimony of two witnesses. In England there might be one witness to one overt act, and another to another.

But I shall now proceed to show what does, or what does not amount to levying war: in doing this, we are not to go back to corrupt times, under corrupt judges, nor do I think the observation of those judges are in the least obligatory upon our courts; but how far they will be respected, is another question; we may rest assured they will be regarded no farther than reason will suggest. This I consider of importance, not only at present, but to posterity. Most of our laws, it must be remembered, are from England, and were brought with our ancestors as their birth-right: this was the case wherever British subjects emigrated; but as soon as we became independent states, we enacted laws of our own, although in a great degree copied from British States, but they became new under our constitution. I think, gentlemen, I shall be able to show you, upon the opinions of men sound in law knowledge in England, that the definition of treason in our constitution will not bear the construction that has been put upon theirs at an early period. We have an express and distinct meaning of this crime in our own acts of congress; in the act passed 1790,—volume 1, p. 100 [1 Stat. 112],—section 1 shows what treason is, and particularizes wherein it shall consist. Section 5 defines the punishment which should be inflicted on a rescue of persons committed to custody, or in the hands of the officer. But there was another act passed defining the precise circumstances attending this case—this was passed after the declaration of the judges on the Case of the Western Insurrection—and from its being enacted subsequent to all others upon this species of crime, appears to me to be binding upon our courts: I mean the sedition act. It appears to reach the present case in the fullest extent; the language of that act is, whoever shall combine or conspire, &c., shall be guilty of a high misdemeanour; this act does not specify the number: a township, a county, or twelve counties equally are within the law. Combining to prevent the execution of the law: this reaches the action, whatever may be the number of force used: it is a misdemeanour, and shall be punished with fine and imprisonment, not death. Whether the object shall or shall not be effected, the law says the punishment shall be

the same. Here, then, is a solemn declaration made by the legislature itself, the same body that enacted the punishment of death to what they termed treason by a prior law, and surely that authority had the greatest right to put a construction on, or make an alteration in their own law. If there is a legal definition of the crime committed by the prisoner at the bar, this act contains it: every case is here provided for by the punishment of fine and imprisonment, and had a prosecution taken place under this act, a conviction would have been certain, and the punishment would have been rigorous and exemplary.

Under this head of English construction, I would ask how it can apply to us, when we consider that before the act of William III., no person charged with high treason was allowed counsel to plead for him, unless he stated some objection in point of law which made an argument necessary, and even then he could not do it without first admitting the truth of the fact charged against him, and yet all the decisions of English courts alluded to were formed before that period! Further. Not only was the accused not allowed counsel, but if he had hundreds of the most respectable witnesses to prove the falsity of the allegations, he never had a right to bring them forward until the reign of William III. These decisions, gentlemen, of the English courts, which are called up as precedents for us to regard, were formed under these arbitrary circumstances. No counsel allowed, even though the prisoner was deaf and dumb, nor witnesses, if he could even prove he was hundreds of miles distant at the time. Further, to show what dependence can be placed on the sayings of these men, you will observe that, until the time of William III., all the judges held their commissions during royal pleasure only, and even until the first of George III., the judges were never completely independent, and of course were obliged to study the royal pleasure; their opinions being extorted before the trial commenced. The consequence of all this is plain, that no impartial opinion could be given. It was common before trial first to closet these dependent judges and bring them to submission, if their opinions ran counter. Bacon, the greatest, wisest, but meanest of mankind, thus stooped to become the tool of his master. Those who could not thus be brought over were deposed, and more obsequious persons placed in their room, and it was not till they could have a decision thus formed that persons were brought on their trial for high treason. And yet we are referred to these persons to tell us what is the meaning of our own statute on treason! Thus it was that many of the best citizens of England fell a sacrifice, and for no other purpose, many of them, than because they possessed exalted virtue. During the existence of this state of things, the judges would sit silent on their bench during a trial for life, and hear the crown officers, instead of acts and expressions of humanity to the unhappy prisoner, abuse him with the most opprobrious and insulting language. Influenced by this meanness, Sir Edward Coke, while attorney-general, descended to abuse the great and good Sir Walter Raleigh with the vile epithets of "traitor," "viper," and "spider of hell," &c., turning away from him with the greatest scorn: and this was the manner in which trials were commonly managed. See Fost. Cr. Law, 234.

It was well known that the statute of Edward III. made no provision whatever respecting the charging of an overt act in the indictment, nor does it say anything about proof: but a statute enacted in the reign of Edward VI. made two witnesses necessary in cases of high treason; but Foster says no great regard was paid to this better statute till near a century after, and the reason assigned was that it was not for the safety of the crown, or to the common well known rules of legal evidence. It was common to admit one witness of his own knowledge, and another by hearsay, if it was even from the mouth of that one, and at the third or fourth hand, and frequently the depositions were taken out of court to be read, rather than bring them into open court. This must appear an uncommon representation of the administration of justice, but it is a fair picture of the times under which the decisions took place which are brought against us. At the period in which the seven bishops were tried, Lord Camden declares that Justice Powel was the only honest man that sat on the bench. Blessed justice! I know that since the judges have become independent men in England, there has been as much independence in their conduct as in any country; but then, as Hale tells us, these decisions had already taken place, and therefore they must be abode by; but he takes care to caution future judges how they introduce new cases by putting new constructions. The question now is, whether this court and jury are prepared to be bound by judges thus principled and thus circumstanced, to form a decision upon our own law. I contend that these decisions are by no means binding upon us. We have the sedition law, which comprehends the whole case. In 1 Hale, P. C. 132, and 1 Bl. Comm. 69, it appears to be lamented that the independent judges of later days have no power to alter the rules of law established in the dark ages of English jurisprudence; otherwise, we have reason to believe, they would not be in existence at this day. Lord Kenyon, when counsel for Lord George Gordon, declared, that he did not think the parliament of Edward III. ever had any design that constructive treason should exist at all, or any wish to leave room for it to be introduced. We are certainly, therefore, untrammelled by every foreign rule; otherwise the

question would be, what rules we should adopt, and what not. It is a rule in law that statutes affecting life, should never extend beyond the letter of the law, so as to leave the possibility of a doubt. If that is a rule respecting penal statutes in general, abundant more so is it necessary respecting the high crime of treason. Above all things, if bad times should ever happen in this country—and bad times may come here as well as they have in all other countries—it will be of vast importance that the law should be known precisely; it will be of consequence to a citizen to know on what law he is to be tried, if he becomes the devoted object of any one's resentment, or commits a crime: it is of consequence that the flood-gates of usurpation and tyranny should never be left open, and the liberties of our citizens be thrown away ad libitum on the uncertain ground of construction. 1 Bl. Comm. 88; Fost. Cr. Law, 58, we read that it ought to be "clearer than life itself."

We now come to examine the true, full, just and reasonable meaning of our own treason statute; for I do not admit that constructive treason ought to exist at all. A line is drawn, and if we ever cross it, where are we to stop? Treason against the United States, we find, consists in "levying war against them," &c. The question is, what is levying war? Levying war may fairly extend to the three following things: First. Where a body of men take up arms, and array themselves in a martial manner against the government, with a view to put an end to its existence. This is its plain natural meaning, but cannot be said to have been transacted by the prisoner at the bar, and therefore requires no farther definition. Secondly. It is expressly levying war, if a part of the Union throw off all allegiance and authority of the United States, totally disregarding its laws and institutions, and act as a divided people as though they did not belong to them. Thirdly. Where laws have been enacted by the Union, pursuant to the constitution of the United States, and a number of people, being dissatisfied, should, of their own authority, by numbers, or force of arms, take possession of the legislative or executive authority, and by this force of arms or numbers should undertake to compel either of the departments of government to act as they dictate, thus robbing the government of its legitimate power, by assuming it themselves.

No doubt the good of posterity was intended in the constitutional definition of treason, and we are to touch it with a trembling hand indeed, lest it moulder, and grow into God knows what. Now, as this is an act which was deliberately formed, if we go upon the dangerous ground of construction, that cannot be done so deliberately: No; I say it was to be handed down pure to posterity, and we ought not even to depart from a letter of it. If liberty of construction is to take place in any degree, by so much it tends to render the constitution vague and uncertain, and we know not where it will end. If the constitution only intended the three definitions of levying war which I have laid down, it is clear that a man cannot overstep those constitutional limits without intending to do it. Go beyond this, and you leave jurors and judges to make the constitution anything or nothing—a mere nose of wax, to be moulded into any form at their will; and they may be excused, because left to exercise their own judgment upon it; but Lord Hale has charged you not to do this, even though encouraged by a parity of reasoning: agreeably to his apprehension, it is deducible that if ever we have a bad president, presidential encroachment may wrest the constitution to everything that may serve any particular purpose. But God forbid either should ever happen.

(Mr. Lewis then went into a full examination of the English law, after which he said): I shall now proceed more particularly to state my reasons for alleging that the crimes with which the prisoner is charged are fully comprehended, and punishment provided for them, in the sedition law. This I shall consider first, as it relates to the rescue independently; secondly, I shall make some observations on the law, independent of the rescue; and thirdly, both together.

It is admitted, that the mere rescue of the persons from the custody of the marshal at Bethlehem, would not amount to treason; and it would not be necessary for me to say a word about that, were it not for the following reasons. Speaking of pulling down meeting-houses, brothels, prisons, &c., the crime is defined (4 Bl. Comm. 129): "Offences against public justice, is obstructing the execution of lawful process." This, there can be no doubt, is an offence at common law, and persons found guilty of a rescue of a person convicted of a crime, are adjudged guilty of the same crime, and would be punishable accordingly, had it not been for our act of congress (the sedition act); but that act reduces a rescue, generally, to misdemeanour. But agreeably to law, persons rescuing others not committed for treason, are not guilty of treason. A case in 4 Bl. Comm. 86, the party himself was guilty of felony at common law by making escape, but I believe it to be an entire new doctrine to make the offence of the accessories or assistants higher than those who are rescued: Rescue of persons for felony has been always felony, for treasons, &c. I think, therefore, it is clear to prove that every exertion has been used to attempt to make treason of this crime, by the gentlemen, but it is as clear that they have searched and tried in vain.

But it is farther said, that this business assumed a generality, and that the object was to defeat a law of the United States, for which purpose a number combined and conspired together, and more effectually to accomplish this, they rescued the prisoners, and therefore committed treason. Were I to admit this, I

might call upon the gentleman to support his conclusions by authority, to show that preventing the execution of process, or releasing prisoners before they were carried to jail, is treason. I repeat, that the only case mentioned, is in the disgraceful days of Henry VIII., which I think is inadmissible. But I deny the fact: I deny that there was any combination or conspiracy between the people of Lower Milford, in Northampton county, and those of Bucks county, at all upon the business. First, the people of both counties were alike averse to this law, and for similar reasons. I believe there are many unprincipled men who wish to injure their country, and go about preaching up sedition to the people, which, communicated in different directions, catch fire in the same manner, and perhaps at nearly one period; hence it is that their prejudices and opposition may appear from the same cause, without parties holding the least correspondence. I ask you whether there is a tittle of evidence to prove that ever the prisoner went into Northampton county till this circumstance occurred? was there any communication by writing, or any other way? No, not at all. Upon what foundation can a conjecture arise, then, that there was a combination? You are not to try by conjecture, or wild supposition: no, you are sworn to "well and truly try according to evidence." Does it appear, I ask you to recollect, gentlemen of the jury, that this conduct was instigated by any intercourse in any way held with Northampton county? No, it does not; but there is a strong presumption that the discontents took root and grew to that state without any combination at all. But whether or not treason was committed in Milford township, is not for you at present to say; the overt act is laid at Bethlehem, and there it must be proved, that he levied war upon the United States with a number, or by force sufficient for the purpose, and that with them he combined and conspired, &c. If he did this at all, he did it on the 7th of March, for it does not appear that he ever was there before in his life; now if there was a conspiracy, it must appear that he acted previously, and in concert with others, and the act would have been alike chargeable to all; but this does not appear. It is true Fries was heard to say "we will oppose you, and all the people of Northampton will join us;" but this could easily arise from his having heard that the people of Northampton were dissatisfied with the law, but it does not follow that, because there were discontents in Northampton county, he should be responsible for their actions, particularly since it all, at least, depends upon conjecture. Kelyng, 19, has a case to answer this, where rebellion existed in two parts at one time, but it was determined that this might happen without correspondence, since no such evidence appeared, and therefore no notice was taken of it. Then, gentlemen, if I were for a moment to admit that John Fries had committed treason in Bucks county,

which I deny, it would be immaterial upon the present occasion, because upon every indictment for treason, the overt act must be proved in the county. But it is said that doctrine does not apply, each state being to the whole United States as a county to the state, because the grand jury have the district at large to inquire for; and therefore it is immaterial whether laid in one county or the other. If this be sound law, dreadful indeed must be the situation of the people of the United States, if the government should ever fall into different hands from those in which it is now happily placed, because an attorney may, at any time, keep a person, arraigned for a capital offence, in ignorance, till he comes to the place of trial, and of course not prepared to repel it at a very distant place from where the act is laid. But this, I will be bold to say, cannot be law. My reasons for thinking so are, first, the law of congress, called the judiciary act (section 29, vol. 1, p. 67), says, that in cases punishable with death, the trial shall be had in the county where the offence was committed: here I would remark that the law takes notice, not of a state or a district, but of a county, and therefore the analogy drawn by Mr. Sitgreaves, that a district to the United States is the same as a county to a state, is not in point. The trial is to be had in the county unless the judges shall determine that it cannot be had there without great inconvenience. See Fost. Cr. Law, 194. But let the offence be where it may, twelve jurors must be summoned from the county. See page 237 of the same book. If we examine these authorities, they will appear different from what they were represented. 2 Hawk. P. C. c. 46, § 34, is an authority to prove that upon a plea of not guilty to a specific charge as to place, &c., in an indictment, if the least variance appears from that place, it is sufficient to acquit the party, and is fatal to the prosecution. It is not necessary for me again to say that you are totally to exclude from your views whatever the prisoner did in Bucks county, since the charge is laid in Northampton, and since an acquittal from that charge will not prevent a prosecution in Bucks county. If it appears that no treason was committed by him on the 7th of March at Bethlehem, you must pronounce him not guilty.

Mr. Lewis then reviewed the testimony of Dellinger on the circumstances which led to the expedition to Bethlehem, which, he contended, had nothing to do with it, save the quo animo. It appeared that they heard Shankwyler was to be there; but it is not pretended that going there upon that account would be treason, and particularly as Shankwyler was not in custody; and it does not appear that the prisoner knew of any others being there at that time. Then the object particularly was to see Shankwyler. When they came to the bridge, it appeared to them that two men were detained at Bethlehem, and it seems they went forward to

rescue them. In this they were justifiable; for if the law was violated, it was by Major Nichols, in making an arrest which the law did not authorize him to do. They were illegally detained, and it was lawful for anybody to go and rescue them. 2 Ld. Raym. 1301. I am not disposed to blame the marshal; but I cannot justify him in point of law: his situation, no doubt, rendered it a prudent measure; but it was detaining men by false imprisonment, and was enough to alarm all the people of the state. I mention the circumstance only to prove that there can be no rescue, unless the persons liberated are legally confined. Instead of Fries being guilty for that action, a very worthy man (the marshal) was guilty of assault and battery in the act of detention. If this is fact, how does the affair stand afterwards respecting universality and design? I have justified Fries and the others in leaving the bridge to go up to Bethlehem, and the laws of their country will justify them, because it does not appear that they knew these people were discharged. When they got to Bethlehem, it appeared there were a number of persons under arrest; for, it does not at all appear in evidence that they ever heard before that Fox, Ireman, or the Lehigh prisoners, were there: the gentlemen on the other side only presume it; but you, gentlemen, must not go upon presumption. "You must well and truly try, and true deliverance make, according to evidence." It does not appear they knew of it; they came from a great distance, and from quite another part of the country than where the Bucks county people came from; Fox and Ireman had been just brought in, and none of them knew they were there; however, when they were got there, upon a lawful occasion, hearing of a number of persons being confined there, and that they were to be taken to Philadelphia for what they considered to be no crime, they generally waxed warm; but Fries was cool; he endeavoured to pacify them: he had brought his sword with him, but when he was appointed an ambassador of peace to treat with the marshal he left it behind him.

The whole of the transaction must be viewed as a sudden affray, like numerous cases mentioned in Hale, Foster, &c., where great and sudden riots arose. Where is the proof, I ask, of combination, of association, or of correspondence? None at all: they came there to a man without the least treasonable views, for it was merely by chance they came there at all. There was much rage among the people upon the first impression the knowledge of the prisoners in custody made, and had it not been for the cool conduct of the prisoner at the bar, blood and massacre would have been the immediate consequence, for, no doubt, liquor was operating pretty much in their brains. An altercation took place: they insisted on the prisoners; and in the prosecution of his delega-

tion, from the peremptory demands of the people, he made use of language which I admit was unjustifiable, and violating the law, for which he ought to be punished, but not with death. 1 Hale, P. C. 153. But further: the persons were not in prison, they were only in custody of the marshal. These are materially distinct; the releasing of persons taken to prison, is only a misdemeanour, while releasing them after they are in prison, which is in some measure the sanctuary of the law, is felony. 4 Bl. Comm. 130. The breaking open of prisons generally is treason, but in no case is the releasing prisoners before they are taken there. J. Kelyng, 75, 63; Lord Gordon's Case, Demmaree's Case, 15 State Tr. 544, 600. It would not have been treason, therefore, if a number of persons had actually conspired to rescue these prisoners from the marshal, nor even if they had been confined in a jail, instead of a room, because it was not a general design to break open all prisons, but one only. But, on the contrary, they were not in prison; they were only in custody of the officer who served the process; how, then, in the name of reason and common sense, will it be made to amount to treason when it would not if they had been in jail. But, say the gentlemen, we will not call it rescuing of prisoners, but a general obstruction of the execution of the law, and the means here used were to support that general object. The rescue is of itself a specific offence, and of itself admitted by Mr. Sitgreaves to be only a misdemeanour. If it is so, how it it possible to convert a misdemeanour into a treason, and thus to take away the life of a man when imprisonment only is his desert! But what ground is there alleged for this position? It is said that the arming and arraying a number of men was with this intent. I deny the fact, and it has by no means been proved. The cases referred to in England are treason to a demonstration. Enhancing servant wages could not be done by force but by surrounding the parliament house, and this was justly denominated waging war against the king. Any rising to alter religion must be affected the same way. Religion is established by law in England, and that law must be altered by the parliament; therefore it could not be forcibly altered but by levying war. 4 Bl. Comm. 81. Reforming the laws must be done the same way, if at all. 1 Hawk. P. C. c. 17, § 25; see Erskine in Gordon's Case, 592. Not only open rebellion, but resisting the laws as enacted is treason. The laws are a proof of the authority of the commonwealth, and resisting those laws is making the parties independent of the commonwealth, and therefore a defiance of the authority of the state. Lord Mansfield, in the charge on the same trial, says, among other enumerations, that combinations, &c., to arrest the execution of militia laws, is treason. This strongly merits observation. Why does the learned and ex-

perienced Lord Mansfield particularly specify militia laws and no other? Why does he not say to arrest the execution of any law? Why the militia law? For the best of all reasons—the same reason as the taking or attacking a fort or a castle belonging to the king, because that is the place where he keeps his military forces, and because the military is the strength of the kingdom, and this is resisting the military authority. Therefore, it must be allowed, that a resistance of militia laws is upon a very different footing than any others, and, in time of danger, resisting this law would prevent the militia being drawn into the field when there is occasion for them. Now, gentlemen, these things all considered, plainly show, that what is now attempted is a novel experiment, like modern philosophy, an entire new thing, saving the solitary instance in the reign of Henry VIII., and it is clear that the resistance of no law is treason, but the militia law. I agree also with the doctrine Lord Mansfield lays down, that any attempt to oppose the laws, by intimidation and violence, is levying war, and treason.

It is unnecessary for me to turn to the books to prove that confession of the party, or words spoken by him, taken perhaps in the time of fear, are not to be regarded by you. This was so plainly improper, that the law of William III., making two witnesses necessary, or confession in open court, was enacted; I need only turn to our own laws (judiciary act). There must be one of two kinds of proof: the party in open court must confess, for confession out of court cannot avail, even if made before ten thousand witnesses; or else two witnesses must prove the same overt act, and he must be convicted upon that indictment, if any. If you are to go to all parts of the country for heated words, heard by anybody, in any circumstances, I must consider it as a very scandalous abuse of the statute of Edward III. I think it impossible to hesitate at what was the meaning of congress when they made this act, and, therefore, shall barely recur to the evidence. Here is a proof that the prisoner came up to Bethlehem, where he acted in a certain manner; but the gentlemen concerned for the prosecution, think that does not sufficiently indicate his design, and therefore they travel to Jacob Fries', to Kline's, and a number of other places: now suppose you convict him, I entreat you to inquire from what evidence you do convict him? Is it from the overt act committed at Bethlehem, or from that and other circumstances together? If this is the broad ground upon which you go, do you convict him upon the evidence of two witnesses, to the same overt act, transacted at the same place? No, you do it upon the evidence of two, and a number of other evidence besides, on a variety of circumstances. Let me suppose for a moment, that two witnesses had come forward, and given an account of his conduct at Bethlehem; but that evidence was not sufficient to answer the indictment: you hear of such and such conduct at Quaker town, at Kline's, &c. &c. I ask, would he have been convicted upon the evidence of those two, independent of any other? No, he would not. This is by no means agreeable to the statutes of William III., or Edward VI., and in my view totally inadmissible. What is the consequence of such a verdict? Why, a man charged with murder, assault or what not, may know who the witnesses against him are, while one charged with treason, the highest possible crime, may not know, if you can travel from town to town, and from county to county for the evidence, if you can bring correspondence, &c., from every part, of which the prisoner knew nothing until brought before the court. No man would be safe in the admission of such things, but you must form your opinion alone from the evidence of two witnesses relating to the act committed at Bethlehem agreeably to the indictment. The statutes, and our act of congress mean and intend to prevent this kind of rambling over the whole state for evidence; or, indeed, upon the doctrine of the gentlemen, notwithstanding the act says otherwise, they can with equal propriety go throughout the United States to collect evidence to support the prosecution, which was never seen nor heard of before.

I now contend, gentlemen, that the case of the prisoner at the bar does not come within the statute of treason; and I also contend that it does come within one of two other acts, for the judiciary act,—volume 1, §§ 22, 23, p. 109, [1 Stat. 117],—speaking of resistance of process and rescue, completely extends to the prisoner. No, say the gentlemen, it is not a mere rescue, but a rescue for certain intentions and designs. Have the congress distinguished any particular design, or have they not, in this law? No, they have not: then permit me to say, where congress have not distinguished it, nor the books, it is not for judges nor juries to distinguish: it belongs to congress to make or except such cases as they thought proper; they have not thought proper; and you have no right whatever to do it. But lest any objection should appear of weight to except it from the judiciary act, there is a very good law, but which has been shamefully vilified and abused, called the sedition bill, providing fine and imprisonment for any high misdemeanour, under which, as I observed before, the very actions of the prisoner are defined. This act has passed since the trials of the Western insurgents in 1794, so that the opinions of the judges respecting treason at that time, are most clearly and fairly superseded by this act, which has pointed out whatever has heretofore caused doubts about the meaning of treason in the statute, and thus put an end to any judicial construction. That act provides, that if any

persons should combine and conspire together, to impede the operation of any law of the United States, or to intimidate any persons holding places or offices under the United States, (this last is one of the many little things collected together, in order that, when brought into a mass, they may amount to treason.) and that, if they should advise, attempt, or procure any insurrection, riot, or unlawful assembly or combination. he or they shall be deemed guilty of a high misdemeanour, whether it be carried into effect or not. The very crimes which are here enumerated are charged upon John Fries, the prisoner at the bar. Now, if any act or description can be more just than this, I should wonder; it answers precisely every part of the crime charged, and every concomitant circumstance. Now the question is, whether or not, as the constitution did not define the punishment of treason, and as a misdemeanour is described here to be what some have thought used to be levying war, and as the punishment is less than what the other law respecting treason enacts— whether this should not operate as a repeal of the former law, so far as related to these points. As to the cases of Vigol and Mitchell, Western insurgents, I should doubt whether it would affect them at all, even if the law had then existed, because the circumstances very much differed from the insurrection in Northampton county. Wells and Neville were inspectors. and their offices were strictly belonging to the United States, and were deposits of the United States, and equally under the protection of the law with castles or citadels: in addition to this. the officers of government were driven from their own homes, and upon pain of death, they dared not approach their homes. Their offices were burnt by the insurgents. and there was no law that touched their case but the constitutional act defining treason; on which account, they were tried and convicted under it. I would introduce these ideas. to show you, that the decisions then formed by the court. are inapplicable at this time. since the sedition act is since passed, and agreeable to these circumstances, which materially differ from those of 1794.

It is now time to close. Gentlemen, the task which you have to perform is very serious, and very important; but I will not insult your understandings, by saying more than my indispensable duty claims from me, in behalf of the prisoner. You will, I have no doubt, consider the case calmly. wisely, and deliberately. You know the law. under the direction of the court: and I have no doubt you will decide according to the impulse of your consciences. I will only add. that the prisoner received, and has held his life from the authority of Him who is allwise, great and good, and by Him only can it be destroyed, except he has violated those equitable laws made by his country for the preservation of peace and order in society:

he is. therefore, entitled to an equitable verdict: if he has done the acts named in the indictment, I have no doubt you will pronounce him guilty: if he has forfeited his life, go he must, and if he is to go, it is not in the power of men to prevent it. I shall, therefore, rest assured, that you will give a conscientious verdict, upon which you are bound to answer.

Mr. Rawle after his exordium, in which he expressed the importance of his situation as public accuser—hoped that while his duty peremptorily imposed upon him the necessity of doing justice to the United States, he should not be divested of candour towards the unfortunate prisoner at the bar, to whom he hoped full justice would be done.

He proposed, in the first place, to collect the detail of transactions, in the clear and unequivocal train they had been testified by the several witnesses, not only called to support the prosecution, but unhappily for the prisoner, corroborated by the witnesses called by himself. In the second place he should apply these facts to the laws and constitution of the United States: from both of which he thought it would evidently appear to the jury that the prisoner was guilty of treason in levying war against the United States. The prisoner stood indicted for opposing, in a warlike manner, two laws of the United States, the one entitled "An act providing for the valuation of lands and dwelling-houses," &c., passed July 9, 1798 [1 Stat. 580], and the other entitled "An act for levying a direct tax within the United States," passed July 14, 1798 [Id. 597]. Agreeably to these acts, certain commissions and assessors were to be appointed to carry the provisions thereof into execution. It appeared in evidence that Mr. Eyerly, one of the witnesses produced, had received a commission conformable thereto in a part of Pennsylvania, which he received in August, 1798, together with a request from the secretary of the treasury, that he would find suitable characters to serve as assessors to act in the division assigned to him. In the execution of this request, Mr. Eyerly found very great difficulties. although there was a perfect acquiescence in all other parts of the Union. Many whom he nominated declined on account of the unpopularity of those laws, although Mr. Eyerly very industriously, and in a praiseworthy manner. endeavoured to remove those objections.

In order to show the general difficulties there was in the execution of these officers' duty, Mr. Rawle recited the testimony of Mr. Eyerly, and its confirmation by Mr. Chapman. Mr. Henry and others, and went into an examination of the testimony demonstrative of the difficulties the assessors found in the execution of their duty and the insult they frequently met with, when engaged in their pacific efforts to explain the laws to the misled rabble. But sorry was he to say. that these commendable efforts were outweighed by the influence of certain leaders, among

whom he found several captains of militia, and Fries with the rest: he throughout the whole scene appeared the most prominent, and instead of attending to the good advice given him by his best friends, flew into a rage and renewed his opposition. A part of the effects of their hostility was accomplished in preventing Mr. Clark from fulfilling the office which he had undertaken, and the general reluctance there was in others, and indeed finally the abandonment of the assessments; for it appeared that, not only those who were unwilling to give their rates refused, but those who were willing were intimidated from doing it. To such a pitch was intimidation and disaffection arrived, that he was sorry to say, the very magistrates of the peace had so far neglected their duty as to join the opposition, and nearly all of them, from one or other of these motives, refused to issue process for the apprehension of delinquents, or examine persons who opposed the laws: and those who did attend to their duty, found the greatest difficulties to procure the attendance of evidences, who were prevented by the impulse of fear from coming forward. Many attempts were made to pacify these deluded people, who were under the most baneful advice, and the attempts accordingly miscarried, even though propositions were made in some townships to indulge them with the choice of their own assessors.

After a full and thorough consideration of the evidence, Mr. Rawle said:

These are facts; not founded on the testimony of a single witness, which is sufficient to convict a man in common cases; nor are they confined to the testimony of two witnesses, which is all the constitution requires; but they are corroborated by numerous witnesses, produced in order to remove every doubt from your minds as to the material facts of the crime. There is no case in our books more clear than the present; the evidence is so uniform that even the ingenuity and talents of the prisoner's counsel have not been able to contest one fact that has been related; indeed the whole is so fair, that the most incredulous must be satisfied of the accuracy of the charge, independent of the confession of the prisoner, which confirms the whole: it proves to a demonstration that his main object was nothing less than to prevent the execution of the laws which all men are bound to obey. Gentlemen, the counsel for the prisoner have endeavoured to diminish the force of that voluntary confession by telling you that no man can be convicted upon his own confession out of court, nor without the testimony of two witnesses; the same arguments have been used to nullify the expressions which we have produced proof that the prisoner frequently made use of, from which we evidently discover his intention. I allow that no man should be convicted for treason unless upon the testimony of two witnesses, or confession in open court; but when all the facts necessary to substantiate the crime are proved by two witnesses, the declarations of the prisoner, as well as his confession, may be produced as good evidence as to his intention, and this is not necessary to be proved by two witnesses; this tends to show the designs of his heart, which can only be known to his Creator and himself. These declarations should be known to the court in order to discover the intention with which the crime was perpetrated. In the Case of Lord Gordon, the words said to have been used by him in the lobby of the house were not rejected by the jury because it required two witnesses, but on account of the improbability of a declaration having been publicly used which no more than one individual could be produced to prove. We have proved by two witnesses that the overt act was committed by the prisoner, and have produced much corroborative testimony, in which we have not been confined to two, having heard it from twelve respectable witnesses. If we have succeeded to prove the intention, it is sufficient for the law, and if you believe the testimony, it indubitably substantiates the fact.

I shall now proceed to consider what is the law arising upon these facts, in going into the examination of which, I shall put out of the question two objections; one of them only has been produced, the other having barely been alluded to, rather than held up. A proclamation was issued by the president, on which Fries did then go to his home, whereupon it has been argued that no instance can be produced to prove a prosecution being commenced for acts committed prior to the reading of the riot act in England, if the mob thereupon dispersed, because they had complied with the proclamation. It is right in part: if the people do not disperse, the remaining mob are guilty of felony; but I ask the gentleman has the defence been at all set up on the ground of compliance with the proclamation? In the riot at Drury Lane Theatre by the footmen, and that which was held up in which the Earl of Essex and others were engaged, many of the rioters did disperse in consequence of the riot act being read, and yet were afterward punished for the enormities they committed while they were there. Alike trivial is the objection respecting the undue appointment of assessors. It is sufficient that such a person acts as commissioner or assessor; if he usurps that power, the law has provided a remedy by other means than the dangerous one of an insurrection to know merely whether A, B or C is regularly appointed to office. There are legal modes of application to ascertain the fact; there is the whole board of commissioners, or even a higher power may be applied to, to ascertain the authority, and no virtuous, honest citizen would think of opposition on that account. We do not think it necessary to trouble the court, since it was fully in the power of the prisoner's counsel to have brought the commissioners under this

act before them; but not having availed themselves of it, nor pressed it home to your notice, gentlemen, why was such a scarecrow insinuated, but to mislead you? There can be no doubt of the legality of those commissioners; if there was, it would not alleviate the crime of rebellion. But that was never used, neither by the prisoner himself, nor any of the insurgents, as a ground for the rebellion; it was not even a colour for it, nor does it appear that the insurgents ever doubted in the smallest degree, the legality of the appointments; their declarations were repeatedly, "No assessors shall act in the township, nor shall any assessments be made." No doubt was ever made of the powers used by the officers, and therefore the opposition to the law is alone to be considered.

Having disposed of those two points, I wish now to impress upon your minds a most solemn conviction, to wit: That the law under which the prisoner at the bar stands indicted, without being in the least doubtful, ambiguous, obscure, or perplexing, is well defined in, and composes a part of, the constitution of the United States (article 3, § 3). It is certainly momentous that you should be fully satisfied of the true meaning of that part under which the present crime is placed, to wit: levying war against the United States. I would premise that the indictment is worded precisely in the usual form, and that the only question now is, what is that levying war with which the prisoner is charged? To ascertain what is levying war, it is necessary for us only to consider what is the nature of civil and political society in the United States. The government is the organ which the people collectively have thought it their duty and interest to establish for their mutual safety—their will, publicly expressed in the laws, is the legitimate will of the majority of the people; all our laws are the acts of this majority; and it is a radical principle which will not be controverted, that the will of the majority is always binding upon the minority, and should be acquiesced in quietly by them, whether the administration of that government be in the hands of one person, or of many; those, therefore, who do not choose to continue in that society, ought to withdraw quietly from it, rather than disturb the quiet of the whole. Allegiance is a quiet submission and acquiescence to the supreme power. In monarchical governments it is placed in the king; but the citizens of America know of no allegiance but to the laws, for they alone are the binding principle by which society at large is kept in domestic peace and security. If, therefore, deviating from this allegiance to the laws, measures are taken to disturb the public peace by a resistance of the laws, accompanied by force of arms, or by the intimidation of numbers sufficient for the purpose, and it be applicable only to a grievance of a public or general, and not of a particular or private interest, such resistance then becomes the crime of treason, and particularly so if the views are to bring about the suspension or repeal of any of the laws; for there is no particular kind of law liable to exception; it is treason, because it is an attempt to overturn the fundamental principles of society, by endeavouring to impose into the system the will of a minority which has no right to be there; it is creating a new agency, a new species of legislature, and eventually dissolving the powers legally ordained. This definition may apply as well to any one law as to all the laws, for each is equally stamped with public approbation, and to none particularly is sanctity attached, all proceeding from one power, those who undertake to resist any one, may with equal propriety resist the whole, and treason appears to me to be the inevitable inference; otherwise it would be impossible to ascertain the limits at which this dangerous licentious conduct must stop, we should be at once thrown back into a state of natural society, which God prevent. I ask the gentlemen who argued for this distinction, to point out to me which law may be resisted with impunity! If one may be, the evil principle will go on to another and another, and where will it stop?

I have no occasion again to recur to the authorities we have produced, which the gentlemen pass over as the acts of bad times, corrupt judges, a profligate court, &c. The counsel, with all their learning and industry, seem to be satisfied with this general discharge of our authorities; but whatever might have been the baseness of the attorney-generals of those times, the meanness of the judges, the profligacy of the court, or the merits of the prisoner, we stand upon broad, established and general ground, which is not pretended to be obligatory upon us merely because it has heretofore been decided, nor is it obligatory in England upon that account, although you have been so told, but we go upon it, because it is right. That Sir Walter Raleigh was grossly abused by Sir Edward Coke, is notorious; it was the bad practices of those times; but this reference more regards the proceedings on trials, than the decisions; the decisions uniformly were, that usurpation of public authority in a certain manner amounted to treason. What! shall a man be permitted to attack the government by piecemeal? to take out a plank here and a plank there, till our political ship sinks, and such conduct not be called a treasonable division of the government! With respect to the authorities wherein it was stated to be necessary that the design should be to pull down meeting-houses, brothels, &c., generally, in order to constitute high treason, it must be observable that it was the assumption of the legal powers which constituted the crime; to pull down meeting-houses as such, was interfering with the toleration granted by government, and therefore treasonable. With respect to bawdy-houses, government, and not individuals, have a right to correct them, and

if individuals pretended to correct the evil, they were attainted of high treason.

We are told that no case is to be found in which a mere rescue is called treason. Hale, P. C. 133, in my opinion, is an authority in point. Bethlehem was the prison of the United States under the marshal; there the marshal held several persons in custody; and levying war, or attempting by force or intimidation to deliver those prisoners out of his custody, is certainly treason. Here we stand upon settled ground, we say, and I appeal, gentlemen, to your recollection, that there was no particular view to relieve any particular person, but that the words were "Shankwyler and others;" the claim was general, and the object was general—the repeal of the law was that object, and these were the means used to obtain it. This is declared to be treason even by that great and virtuous man who is held up to your notice as guarding us to beware of introducing more constructive treasons: Sir Matthew Hale, whose very name carried authority at the period of 1668, and with him all the judges, upon mature deliberation, have declared this to be sound law. As burglary, arson and murder may be made the means of treason, so may rescue; treason must have some means; sometimes the most atrocious, sometimes the means may be newly invented; but because newly invented, it cannot lessen the crime. With respect to the murder of Sir Theodosius Boughton by Captain Donnelan, in England, which was merely by a draught of laurel water, (which in that country is poison,)—a new invention for murder—the counsel might have argued against the conviction, because no former case had occurred, as well as that the innocence of this rescue should be held up, because new. But there was no such thing. A strong and important part of the combination was actually carried into effect, and it was not absolutely necessary to prove the rescue in order to prove the treason; it has been evidently shown to you in the transactions at Quaker town, that the rescue was only a part, and the termination of the general plan so far as it proceeded. I have no need to take up more authorities to prove that this is treason; it was so before the birth of our constitution; this principle was coeval with the reign of Edward III. in 1340. I take it to be a true and incontrovertible principle, that when we find an act on which previous decisions have been made, those decisions have been acted upon, and we should think proper to pass that act by ingrafting it into, and making it a part of our constitution, those decisions are of course adopted as our direction, whereby we are to understand the applications of that act. I would barely observe, that while those gentlemen are telling us that we are not to have recourse to those volumes of laws, (which we ought all to be acquainted with, as volumes of science, explanatory of the code by which we are bound,) they themselves resort to the same species of authority,

to endeavour to prove that treason under the act of Edward III. is not treason in America. We have heard much about constructive and interpretative treason, and constructive levying of war. Agreeably to the form of government in England, the king is recognized as king in two capacities, one in his natural, as king, and one in his political, as sovereign: now, when that part of treason called compassing the king's death is mentioned, it refers to his natural capacity; but when of levying war against the king, it refers to his political capacity, and it was therefore necessary to show the distinction between different species of treason; this latter is termed constructive treason; but from the variety of its modes of introduction, cannot be so well defined; but its existence is necessary, in order to support society and preserve it secure: this is what is termed levying of war; it may consist in opposition to the king's forces, or by threats or force attempting to compel the king to remove his ministers or alter established laws. If you expunge what is direct levying of war, there can no such thing as treason be found; either the law is wrong, or the arguments used on the other side. Gentlemen, the law is established, but the arguments vanish like vapour before the morning sun; what, then, in England is called constructive levying of war, in this country must be called direct levying of war. The framers of our constitution were as learned and as wise as any gentleman now at the bar; they certainly saw that this was the only kind of direct levying of war that could exist in this country, and therefore if they had not intended that what was called constructive in England should constitute what they called "levying of war against the United States," they would not have introduced the crime at all: this is an absurdity they never would have been guilty of.

The learned gentleman admits that resistance against one particular law may be termed constructive treason, and may be the crime of treason here: he says that resistance to the militia law would be a restraint upon the principal dependence of the government, and therefore treason; gentlemen try our arguments by this test, and see whether resistance on the present occasion is not equally so. I ask you what is to become of the militia, the standing army, the eventual army, or the civil power itself, if you are unable to raise revenue? Who will fight, who will transact your civil concerns, if they are not paid? If by opposing revenue laws the government itself as well as the army is fundamentally undermined, is it not at least as much treason as though the militia law alone were more openly (but not more effectually) attacked? Nothing is so much entitled to respect and submission as laws which are the direct means of keeping society together. At the present time, when the feudal system is no more, but from necessity subsistence must be obtained

from employment and labour. the defence and preservation of the country must come from the revenue, and to destroy that is to give a mortal wound to the government itself.

Mr. Rawle then went into a review of some of the circumstances, alluded to by the opposite counsel, which characterize the insurrection, and the trials thereupon in 1795, which he insisted, though those gentlemen would not allow it, were very similar in circumstances to the unhappy affair now before the court, in which he drew the following parity between the cases: In 1794, the disturbance was to prevent the execution of one law—the excise law: In 1799, the house and land-tax laws. In 1794, four counties were engaged in opposition. In 1799, but three: Northampton, Bucks, and Montgomery. In 1794, the excise officers were attacked and prevented executing their duty. In 1799, the assessors were the same. In 1794, the insurgents collected into an army, in battle array, displaying their ensigns of triumph, with numbers sufficient to procure their object; say, 6000 men in Braddock's field. The object of 1799 was to do it in a similar manner, and they actually did, by their military appearance and boasts of much larger increase, impress a general opinion of their power sufficient to accomplish their purpose. In 1794, the insurgents made public declarations that the excise law should never be executed. In 1799, were not declarations of the same nature made by these insurgents? —that other counties, and even other states, would support them, and that it should never be done? The object of 1794 was to obtain a repeal of a law—the excise law. In 1799, it was the same, so far as related to them —the house and direct tax. In 1794, the excise officers were compelled to promise that they would not execute the law in that part of the country. In 1799, the same promise is exacted, and obtained respecting Lower Milford and other parts. There was some difference, it is true, as the gentleman stated, some of the officers at that time being banished from their houses, on pain of death. It was farther argued, that there was this striking distinction—that General Neville's house might be considered as a castle of the United States, because it was an office of excise; but the analogy still holds good; it was General Neville's dwelling-house, however, that was attacked; the attack was made only because he was an officer employed in the superintendence of a tax they disliked: Mr. Levering's tavern at Bethlehem was made the prison of the United States, and there was an executive officer of the United States; it was as much so as any other prison in the Union: this was the castle, the fortress of the United States, to protect which the marshal had assembled his posse comitatus, provided with weapons of defence. I consider this, therefore, a more violent breach of the law than the attack upon General Neville's house, so far as it went—admitting that

no guns were fired, nor lives lost, nor was any house burnt, otherwise, so far as it went, the case was rather stronger than the former. Happy is it for the prisoners that the scene of riot was not farther from the seat of government! if it had been more remote from the power of government, we cannot calculate upon the consequences, or increase of revolt and excess which would have been evinced. I will not pretend to anticipate them, for I wish not to inflame my own mind by the sad calculation, nor the minds of the jury; I only wish the facts to appear in their native colours.

Why, then, can we entertain a doubt, viewing all these circumstances, that the prisoner is guilty of treason? There can be none. We are told that the legislature have passed a law, entitled the sedition act, which shows the offence of the prisoner; and that the opinion of the legislature was to bring under this law the constitutional definition of treason, making it a misdemeanour! To me, of all the weak arguments which have been brought in behalf of the prisoner, this is the weakest. This law, which has been cried up from one end of the continent to the other by some persons as unconstitutional, is now to be brought into court to explain away what the constitution positively defines to be treason. If this ever had been the intention of the legislature, there certainly would have been something like treason, something like levying of war, introduced into that bill, but we find no such thing; the words do not at all occur in it, and that it is not intended, I think is clear. Sedition and treason are two distinct crimes, and two distinct punishments are enacted to meet them. The description of crime in the sedition act, is— those who combine with intent to impede the operation of the law, and those who intend to raise an insurrection: these are to be considered as guilty of a high misdemeanour. Now, those who conspire to commit treason are not considered guilty of treason; the treason must have been carried into effect. It cannot be treason for a man to counsel, advise, or attempt to procure insurrection, with intent to impede the operation of any law of the United States; but this is declared to be a misdemeanour, whether executed or not. Besides, the word "treasonable" is not inserted in the sedition law: thus, if a man be indicted for taking the property of another, unless the word "feloniously" is introduced, he is not liable to the charge. So in this case, the act must be traitorously done, or it is not treason. To show the absurdity of this doctrine, we need only for a minute suppose, that in the commission of any of the crimes specified in the sedition act, lives should be lost, houses burnt, &c. The laws of the United States have previously declared, that such offenders should be punished with death, and surely it ought to be carried into execution—not be mitigated by a future law to the mere penalty of five

thousand dollars, and five years imprisonment. If this was the intention of the legislature, might it not, at least, be expected that they would have declared so in the act; but they have manifested no such intention in that, nor in the present instance, with respect to which, had they done it, they would have overleaped their constitutional powers; for the constitution is an ark, into which the legislature itself dare not place its feet; if they were to do it, the judiciary have the power, and it is their duty to bring them back again, and say, "You have gone too far." They can as much restrain an unconstitutional act, as congress can make a constitutional act. This constitution gave congress the power to declare the punishment that should be inflicted on what it had defined to be treason. Congress had nothing to do with the crime, and if they have declared it, as the gentleman supposes, they have done it without authority, and it can be of no avail whatever. But no—they have rather, in the act alluded to, declared what should not be considered treason, or removed doubts upon that head. This being the case, the same opinion which operated on the judges in 1795, is still in force; because no legislative act has intervened to change it. Certain it is, that congress did not intend to enact an unconstitutional punishment for treason; but if they had intended it, they have not a right to do it, nor have they done it.

Now, gentlemen, whether these things are as we have represented, or not, is for you to judge, and decide upon your information; if you are satisfied that the prisoner at the bar was engaged in the affair at Bethlehem, and that affair was connected with your previous arrangements, you must convict him: otherwise, you must not. We consider, and think the evidence must prove to you, that all are parts of the same whole, were begun long before the 7th of March; and that they partly existed in Northampton and partly in Bucks counties. It must be upon a full conviction in your minds that the treason was committed by him in Northampton county, that you can convict the prisoner; and if you have not that full conviction, I firmly hope you will acquit him; if you have, you are bound to pronounce him guilty.

PETERS, District Judge (charging jury). Gentlemen of the Jury—As this case is important, both in its principles and consequences, I think it my duty to give my opinion, formed with as much deliberation as the intervals of this lengthy trial would permit, on the most prominent points of law which have been made in this cause. I have condensed my sentiments into as short a compass as possible. I shall leave remarks on the evidence, and more enlarged observations on the law, to the presiding judge, who will deliver to you the charge of the court. At his request, I state my individual opinion, though I do not always deem it necessary, when there is a unanimity of sentiment in the court.

1. It is treason "in levying war against the United States" for persons who have none but a common interest with their fellow-citizens. to oppose or prevent, by force, numbers or intimidation, a public and general law of the United States, with intent to prevent its operation, or compel its repeal. Force is necessary to complete the crime; but the quantum of force is immaterial. This point was determined by this court on a former occasion, which was, though not in all circumstances. yet in principle and object, very analogous to the subject of our present inquiries. I hold myself bound by that decision, which, on due consideration, I think legal and sound. I do not conceive it to be overshadowed, or rendered null, by any legislative construction contained in any subsequent act of congress. The law, though established by legislative acts, or settled by judicial decisions, may be altered by congress, by express words, in laws consistent with the constitution. But a mere legislative construction, drawn from any act by intendment, ought not to repeal positive laws, or annul judicial decisions. The judiciary have the duty assigned to them of interpreting. declaring and explaining—the legislature that of making, or altering, or repealing laws. But the decision of a question on the constitutionality of a law is vested in the judiciary department. I consider the decisions in the cases of Vigol [Case No. 16,621] and Mitchell [Id. 15,788] in full force, and founded on true principles of law. The authorities from British precedents and adjudications are used as guides in our decisions. I will not enter into a discussion whether we are bound to follow them; because they are precedents,—or because we think them reasonable and just. If numbers and force can render one law ineffectual, which is tantamount to its repeal, the whole system of laws may be destroyed in detail. All laws will at last yield to the violence of the seditious and discontented. Although but one law be immediately assailed, yet the treasonable design is completed, and the generality of intent designated, by a part assuming the government of the whole. And thus, by trampling on the legal powers of the constituted authorities, the rights of all are invaded by the force and violence of a few. In this case, too, there is a direct outrage on the judiciary act, with intent to defeat, by force and intimidation. the execution of a revenue law, enacted under clear and express constitutional authority. A deadly blow is aimed at the government, when its fiscal arrangements are forcibly destroyed, distracted and impeded; for on its revenues its very existence depends.

2. Though punishments are designated, by particular laws. for certain inferior crimes. which. if prosecuted as substantive offences, and the sole object of the prosecution, are exclusively liable to the penalties directed by those laws, yet, when committed with trea-

sonable ingredients. these crimes become only circumstances or overt acts. The intent is the gist of the inquiry in a charge of treason; and is the great and leading object in trials for this crime. The description of crimes, contained in the act commonly called the sedition act [1 Stat. 596], lose their character, and become but component parts of the greater crime, or evidences of treason, when the treasonable intent and overt act are proved. So it is with rescue of prisoners; which, in the present case, was not an independent offence, but an overt act of the treason. These were crimes—misdemeanours—at common law; and might have been punished by fine and imprisonment when substantive independent offences. But, when committed with treasonable intent, they are merged in the treason, of which sedition, conspiracy and combination are always the harbingers. I do not think that the acts relating either to sedition or rescue have altered the principle, though they have defined and bounded the punishments. The law, as to treason, is the same now as if those offences were still punishable at common law. The sedition act cannot constitutionally alter the description or the crime of treason, to which the combination and conspiracy to perpetrate this offence, with force and numbers, are essential attributes. Numbers must combine and conspire to levy war. But if these indispensable qualities of the crime are, by the legislature, declared only misdemeanours, and separated from the treasonable act, the legislature nullify the description of treason contained in the constitution; and so indirectly alter and destroy, or make inefficient, this part of that instrument. The congress neither possess, nor did they intend to exercise, any such power. They could not (nor did they so intend) place the crime declared in the constitution to be treason, among the inferior class of offences, by describing some of its essential qualities in the sedition act, and prescribing punishments, when they solely constitute substantive and independent offences. Congress can only (as they have done) prescribe the punishment for treason, regulate the trial, and direct the mode in which that punishment is to be executed.

3. However indisputably requisite it may be to prove, by two witnesses, the overt act for which the prisoner at the bar stands indicted, yet evidence may be given of other circumstances, or even of other overt acts, connected with that on which the indictment is grounded, and occurring or committed in any other part of the district than the place mentioned. Although the prisoner be not on his trial, nor is he now punishable, for any other than the overt act laid, other overt acts and other circumstances, parts of the general design, may nevertheless be proved, to show the quo animo—the intent—with which the act laid was committed. Indeed, the treason would be complete, by the conspiracy, in any part of the district, to commit the treasonable act at Bethlehem, if any had, in consequence of the conspiracy, marched or committed any overt act for the purpose, though the actual rescue had not taken place. So we thought in the Cases of the Western Insurgents, that the treason, concocted at Couche's Fort, would have been complete, if any had only marched to commit the crime; though the design had not arrived to the disgraceful catastrophe it finally attained. Indisputable authorities might be produced to support this position.

4. The confession of the prisoner may be given in evidence as corroboratory proof of the intent, or quo animo. But, although proved by two witnesses, being made out of court, it is not of itself sufficient to convict. Two witnesses are necessary to prove the overt act. But the intent may be proved by one witness, collected from circumstances, or even by a single fact.

5. The doctrine of constructive treason has produced much real mischief in another country; and it has been, for an age, the subject of discussions, among lawyers, other public speakers, and political writers. The greater part of the objections to it are totally irrelevant here.—The subject of them is unknown, and may it ever remain so, in this country. I mean the compassing the death of the king. It will be found that the British judges, since the days of political darkness and bigotry have passed away, are to be found among the most able and decided opposers of the abuses of this doctrine. They do not follow decisions and precedents rooted in bad times, because they find them in their law books. On the contrary, on a fair investigation, it will be proved, that those contrary to justice, reason, and law are rejected. It is not fair and sound reasoning to argue against the necessary and indispensable use of construction, from the abuses it has produced. What is there among the best of human (and I wish I could not add divine) systems which has not been perverted and abused? That there must be some defined sense and interpretative exposition made of the terms "levying war," and when, and in what circumstances, it is levied "against the United States," cannot be denied. The able counsel, in this case, who has said the most on this subject, and traveled the farthest into the gloomy, dark, and tyrannical periods of the British history and jurisprudence, for melancholy and disgusting proofs of atrocious abuses, and even crimes, committed under colour of law, has, unavoidably, himself furnished also proofs of the necessity we are under of some constructive or interpretative expositions. He, at first, confined these expositions to three cases. Now, if there is a necessity of one, it shows that, without supplementary interpretation, the law would be a mere dead letter. Aware of the dangerous lengths to which the abuses of construction have been carried, courts and juries should be cautious

in their decisions; but not so much alarmed about abuses as to restrain from the proper and necessary use of interpretation. I do not then hesitate to say, that the position we have found established, to wit, that opposition, by force and numbers, or intimidation with intent to defeat, delay, or prevent the execution of a general law of the United States, or to procure, or with a hope of procuring, by force and numbers, or intimidation, its repeal or new execution, is treason by levying war against the United States. And it does not appear to me to be what is commonly called constructive, but open and direct treason, in levying war against the United States, within the plain and evident meaning and intent of the constitution. • 6. As to the objections, founded on want of proof of regular appointments under, and of the proper execution of the law called the house-tax law, I do not see that they apply. If the prosecution was definitely for opposing one or more officer or officers of this tax law, the proof might be more rigidly required. But, as all the necessary use made of these collateral and subordinate circumstances, relative to the tax law officers, is for the purpose of showing the quo animo or intent with which the treason alleged was committed, I consider them as not relevant in this cause. It is even enough in criminal prosecutions, more directly aimed at the specific offence of opposing an officer, that he was an officer de facto.

7. As to the disarming and confining the two videttes, or advance of the armed insurgents, by the marshal at Bethlehem, I think him legally as well as prudentially justified in his conduct. Even a constable has a right to restrain and confine, under strong circumstances of suspicion, persons whose conduct or appearance evidence an intention to commit illegal and violent acts. Much more so was the marshal (having notice of an intended rescue of his prisoners), justifiable in seizing and disarming two of the armed body, against whom existing circumstances raised strong and evident suspicion. But I think this has been made more important than it really is. Because the release of these men was not the object of, or even known to, the prisoner at the bar and his party, when they commenced their treasonable march for the release of the prisoners in the marshal's custody at Bethlehem.

8. The president's proclamation should have been pleaded as a pardon, if it was intended to be relied on as such. This not having been done, it is not legally before us. But, since it has been mentioned, I think it necessary to declare it as my opinion, that it does not operate as a pardon to precedent offences. It is directed by law as a step, preparatory to applying an armed force against those supposed to have committed crimes, and embodied for unlawful purposes. It is a humane warning, calculated to prevent the effusion of blood. Its allegations of facts, or its injunctions, have no operation in the trial of the prisoner at the bar. Whether the prisoner is or is not guilty of the treason laid in the indictment, in the manner and form therein set forth, it is your province to determine. It is the duty of the court to declare the law; though both facts and law, which, I fear, are too plain to admit a reasonable doubt, are subjects for your consideration. We must all obey our public duty, whatever may be our private feelings. Mercy is not deposited in our hands. It is entirely within the constitutional authority of another department.

IREDELL, Circuit Justice. Gentlemen of the Jury: I am persuaded that every person who has attended to the present very awful and important case upon which you are now called to decide, must be impressed with a just respect for the patience and attention you have shown, through the long period which unfortunately has been taken up; but this, though much personal inconvenience must have been experienced, not only by you, but by all concerned, is unavoidable; none of us can repent that, in a case of such moment as the present, the time which is absolutely necessary for a complete investigation has been employed. Gentlemen, it is with great satisfaction to me, on the present occasion, that my ideas on the points of law directing our conclusions, upon which it is the duty of the court to give opinion, absolutely coincide with that of the respectable judge with whom I have the honour to sit. Before I state to you any observation with regard to the facts which have appeared from the evidence, I shall previously deliver my opinion upon some points of law, so far as they are unconnected with the evidence; those which are, I shall speak to in their proper place.

This, gentlemen of the jury, is an indictment against the prisoner at the bar, for levying war against the United States; the first inquiry, therefore, is, what is meant by these words of our constitution—"Treason against the United States shall consist only in levying war against them," &c. These words are repeated verbatim, I believe, in an act of congress, called the judiciary act, defining the punishment of the crime of treason, pursuant to constitutional authority. This crime being defined in the constitution of our country, becomes the supreme law, and can only be altered by the means therein pointed out, and not by any act of the legislature; and, therefore, the repetition of the words of the constitution in the judiciary act is quite unnecessary, as the only power left to congress over this crime was, to describe the punishment: the same act, in another part, makes provision for the method of trial. Agreeably to their power, congress have described the punishment, and thereby declared the crime to be capital. It is clear, therefore, that, as the constitution

has defined the crime, the congress, drawing its sole authority from that constitution, cannot change it in any manner, particularly as it is so declared; yet the counsel for the prisoner say, that the legislature have given it a legislative interpretation, and that their interpretation is binding on this court. They say that congress did not mean to include the offence charged upon the prisoner at the bar, under the definition of levying war; because the sedition act describes a similar offence, and because a rescue is provided for in another act, the punishment extending no further than fine and imprisonment. Several answers may be given to remove these objections:

First, if congress had intended to interpret these words of the constitution by any subsequent act, they had no kind of authority so to do. The whole judicial power of the government is vested in the judges of the United States, in the manner the constitution describes; to them alone it belongs to explain the law and constitution; and congress have no more right nor authority over the judicial expositions of those acts, than this court has to make a law to bind them. If this was not an article of the constitution, but a mere act of congress, they could not interpret the meaning of that act while it was in force, but they may alter, amend, or introduce explanatory sections to it. In this we differ from the practice of England, from whence we received our jurisprudential system in general; for they having no constitution to bind them, the parliament have an unlimited power to pass any act of whatever nature they please; and they, consequently, cannot infringe upon the constitution. The very treason statute of Edward III. itself contains a provision giving parliament an authority to enact laws thereupon, in these words: "Because other like cases of treason may happen in time to come, which cannot be thought or declared at present, it is thought that, if any such does happen, the judges should not try them without first going to the king and parliament, where it ought to be judged treason, or otherwise felony." On this point, Sir Matthew Hale was very careful, lest constructive treason should be introduced. This gentlemen, you will observe, only relates to any case not specified in that act. But, on the occasion now before you, it is not attempted, by any construction or interpretation, that anything should be denominated treason, that is not precisely and plainly within the constitution. No treason can be committed except war has actually been levied against the United States. But farther, nothing is more clear to me than that congress did not intend, in any manner whatever, to innovate on the constitutional definition of treason, because they have repeated the words, I think, verbatim in their own act; with regard to the rescue and obstruction of process, which are mentioned in the act alluded to, it will not be pretended, by any man, that every rescue, or every obstruction of an officer in serving process, or even both together, amounts to high treason, or else to no crime at all: No; the crimes are differently specified, and rescue or obstruction of process may be committed without that high charge. This, I think, was sufficiently explained by the counsel for the United States. Suppose one thousand men rise in arms, avowedly to destroy the government, and in the execution of their design commit murder, burn houses, purloin property, &c., does it make the design less evident, because they committed other atrocious crimes in order to obtain their main views? No; it was to destroy the government, and that crime would be charged upon them, being the higher crime, which the concomitant ones only tended to aggravate, as they were committed, not for the purpose of committing murder, but to intimidate the government, and accelerate their object. With regard to what is stated in the sedition act, combinations and conspiracies to raise an insurrection—these, gentlemen, may be committed without the parties being guilty of treason: men may combine and conspire for a private purpose; possibly to injure an individual, merely to gratify some private motive: if so, they come within that act, and that only. It is only when they carry their projects farther; when they aim at the destruction of the government, that the nature of the offence attains the aspect of, and essentially becomes, treason; and, therefore, it is necessary to prove the intention; otherwise there can be no treason. There can be no levying war without a number of persons unite, and that number cannot levy war without some previous intention; and, therefore, under this law, there being no previous intention defined, but merely an unlawful combination, the act termed treason in the constitution, it is plain, is not intended, nor is it of the nature of treason.

With regard to the authority from which the opinion of this court is founded, and of which you have heard much already, I shall trouble you with a very few observations. When this constitution was made, it was in the power of those who formed it either to define treason or not, or, if they thought proper to do so, to do it in what manner they chose, in which they might have followed the example of the country whence their ancestors came, to which they were accustomed, and in which they were most experienced in their own several states, where the crime of levying war was denominated treason. I believe this has been generally followed through the states: in some I know it has. This term of levying war is an English expression, borrowed from the statute of Edward III.; but, notwithstanding this, the principal provisions respecting treason are taken from an act of the British parliament in the reign of Wil-

liam III., which is principally calculated to guard the independence of the court against the power of the crown, and the prisoner against his prosecutors. Now, I must confess, as these able and learned framers of our constitution borrowed the act, in terms, from the British statute alone, an authority with which they were familiar, that they certainly at least meant that the English authorities and definition of those terms should be much respected. Those gentlemen knew as well as any counsel at the bar, the danger of constructive treasons: they knew how to guard themselves against the bad times of English history, and were equally acquainted with the better and more modern decisions. Would it not have been natural for men so able, so wise, so cautious, of their liberties, had they entertained a doubt of their insufficiency, to have introduced some new guards, some new interpretations, and not to have left us in later times in the dark, exposed to so much danger as the gentlemen of the bar apprehend? Gentlemen who know anything of that country, know that arbitrary times have existed, and also that a number of decisions have taken place since that period. I do not believe that any judge since the revolution in England has ever considered that he was bound to follow every arbitrary example of the English courts, or the crown laws which had taken place in dark ages. Can any man suppose that, if a man was to be prosecuted for either of the crimes referred to by one gentleman (Mr. Lewis), so absurd a prosecution would be for a moment indulged by the judges of this age? No, they would highly resent such an insult offered to an enlightened court. Such instances have ever been reprobated as much by the courts, as by the gentleman who quoted them.

With respect to this doctrine of precedent, I will take the liberty of submitting to you a case of a civil nature; suppose it a case of great moment; suppose in this court, or any other from which an appeal could not be had, a solemn decision had been had respecting a title to a piece of land; upon this adjudication a gentleman wishes to purchase this land; taking this title to a lawyer, he is confirmed in the opinion that the title is good, and that he is safe because of the decision of the court. On the faith of this decision alone the man lays his money out, and therefore it must be important how precedents are formed. If precedent is so important in a civil case, how much more so must it be in one like the present. If a case is new altogether, and no precedent can be found, it ought to be much in favour of the prisoner, but if a solemn declaration has once been made that such and such facts constitute a certain crime, that declaration ought to be abode by, and for this plain reason; every man ought to have an opportunity to know the laws of his country (if he will take pains to inform himself) lest he should involve himself in guilt ignorantly. The propriety

and necessity of this must be manifest, and if so, it is as necessary that the proceedings of our courts should be uniform, otherwise there can be no dependence upon their judgment. If, therefore, a point has been settled in a certain way, it is enough to direct any court to settle a future case of a similar kind in the same way, because nothing can be more unfortunate than when courts of justice deviate in decisions on the same evidence.

This leads me, gentlemen, to point out to you a consideration of great magnitude: this is not the first time, as I have been informed, that these questions have been discussed in the court. During the trials of the persons concerned in the Western insurrection, they were discussed, and I have no doubt with great ability on both sides. Judges Paterson and Peters were then on the bench, and after all the display of splendid talent used in argument on both sides, and all the authorities produced that men were capable of, from the best judgment that could be formed, the court, without hesitation, declared itself in favour of the prosecution. As I do not differ from that decision, my opinion is, that the same declaration ought to be made on the points of law at this time. Vide U. S. v. Mitchell [Case No. 15,788].

It is, however, objected, that after this solemn decision had taken place, the legislature, by the sedition act, settled the matter differently, and that we are bound by that act. This has been answered, so as to remove it beyond all doubt, and concessions were made at the bar sufficient to remove the seriousness of this objection out of the way. It was acknowledged that, if it had been an opposition to the militia act, then the crime would have been treason; or if it had been done to compel the repeal of an act, it would have been treason. For my part, I cannot perceive what kind of sanctity there is in the militia act more than any other, that should make my opposition to that act particularly serious: all the acts of congress flow from the same authority, and all tend to the same end, to wit, the happiness and security of the community: individuals may differ in their views of the magnitude of them; some may think the militia law, some the revenue law, some another, but the legislature have thought all these laws equally necessary, and they having thought so, it is our duty to obey them all alike. But, if the opposition to the militia law, by force of arms, is to have this extraordinary sanctity, because it strikes immediately at the existence of the government, then I should be glad to know what can be said about a revenue law? Government cannot exist a day without revenue to support it! Farther: opposition by force to one law, is of the same nature as opposition to all the laws: the offence is levying war against the government: opposing, by force of arms, an act of congress, with a view of defeating

its efficacy, and thus defying the authority of the government, is equally the same in principle, if done in one instance, as it could be in many. In monarchical governments it will sometimes happen that a rebellion breaks out in an endeavour to destroy one monarch, and set another on the throne: in such a case the treason plainly and unequivocally displays itself, and there can be no doubt about it; but this cannot occur in a republican form of government: men are seldom found who will be guilty of such open treason, as to come forward, in the face of day, and declare their design to destroy the constitution or all the laws. No, if men of sense go to promote insurrection, whether they mean to destroy the government or not, they must be wicked; they go about their design by more insidious means; art will be used, and pains taken to promote a dislike to a certain law; this evil prejudice is encouraged until it becomes general among the people, and they become as ripe for insurrection as in the present case. Nor would the evil cease with the destruction of one law: they may declare they mean to stop at that one act, but having destroyed 't, and finding their power above that of the government, is it not to be apprehended that they would destroy another and another, and so on to any number they disapprove of? If they would not be particular in one case, they would not in another. During the Western insurrection, the excise law was unpopular: in this case it is the house tax act; and if this is permited, it will be impossible to know where we can rest secure, nor how soon the government itself will fall a prey. This reason may account for the introduction into the English statute book, and our constitution, with the determination of the courts in both countries, of the principle that an attempt by force and violence to impede the operation of a single act, shall be treason, and under the description of levying war, as much as what shall at first appear more dangerous, since the effect may be the same.

There is another preliminary point, meriting a few observations, that is, with respect to the proclamation of the president. It was contended that, because that proclamation required the people to disperse, and commit no more crimes, it amounted to a pardon of all they did before. It is sufficient to observe here, that, had this objection been seriously made, a plea of pardon upon the ground of that proclamation must have been preferred, or it could not have been admitted. But the plea was not made, nor if it had, would it have been effectual, because, if this did amount to a pardon, it did so only on certain conditions; the attorney of the United States and the party are both allowed to show whether or not the prisoner has complied with the conditions of the pardon. It is possible, also, that the pardon has not been offered in such a manner as the consti-

tution permits, in which case the attorney must be permitted to put in a demurrer. Of the force of these objections the court are to decide, and of course the plea must be referred to them. Again, this pardon might have been pleaded in due season. Of this the counsel for the prisoner were informed, and had time to consider, but they did not choose to avail themselves of it. But if it had been proposed, nothing is more clear to me than its insufficiency; for in my view, the proclamation contained no pardon at all. The circumstances which gave rise to, and the nature of the proclamation, ran thus: Certain information was received by the government of a disturbance having broken out in that part of the country, which baffled the power of civil authority, but as it is necessary to prevent any insurrection with as little trouble as possible, after inferior means have failed, the law provides that the president shall make proclamation, inviting and commanding such disturbers of the public peace to disperse in quietness to their homes by a certain time; this must be done before the military can be ordered out against them. This is in order to prevent more people joining the standard of rebellion afterwards, and to admonish others not to commit farther crimes; but there is not a word in the proclamation implying an offer of pardon for anything committed before. The riot act of England was cited in support of this doctrine, but there is no similarity in the two cases: that act says, a magistrate shall go to the mob, and endeavour to prevail upon them to disperse. If he cannot do it, he reads the act, and if they still continue combined, they are guilty of felony, but then this felony is a crime created merely by that act, but even that act does not intimate that they should be pardoned for crimes committed before the magistrate came, even if they do disperse. Instances to the contrary might be cited.

Having now, gentlemen of the jury, stated my opinion in the best manner in my power on the law, independent of the facts, or the particular application of that law to the prisoner at the bar, I shall, agreeably to my duty, state to you in the best manner I am capable of, the nature of the issue which you are now called upon to determine. It is an issue of an aspect the most awful and important that any juror can ever be called upon to determine. It is your duty to divest yourselves of all manner of prejudice and partiality one way or the other. Dismiss from your minds, as much as you can, all which you might have heard or thought on this case before you came into this court, and confine your opinions merely to the evidence which has been produced. No extraneous circumstances whatever ought to have the least weight with you in giving your verdict: you ought not, and I hope you will not, take into your consideration at all whether the safety of the United States re-

quires that the prisoner should suffer, on the one hand, or whether, on the other, it may be more agreeable to your feelings that he should be acquitted. It is solely your duty to say whether he is guilty of the crime charged to him or not. No man can conceive that the interest of any government can possibly make it requisite to sacrifice any innocent man, and I can rest perfectly satisfied, which I have no doubt you also are, that this government will not, and God forbid any considerations whatever should ever influence such an action. I do not think it necessary to go into a minute detail of all the evidence which has been produced; it would be only misspending time. The general scenes which passed at Bethlehem must be fully in your mind; these scenes are supported upon the evidence of twelve witnesses. But I think it my particular duty to bring to your recollection those parts of that transaction in which the prisoner at the bar was concerned, leaving the rest as much as possible out of view. On this occasion I must request the gentlemen of the bar, if in any instance I should err in stating the evidence, that they will correct me; but I shall endeavour to be accurate. (The judge here stated the prominent features of the evidence given by Messrs. Henry, John Barnet, William Barnet, Winters, Col. Nichols, Schlaugh, Horsefield, Eyerly, Toon and Mitchel, so far as related to the conduct of the prisoner at Bethlehem, which, he said, he thought proper to state first, because the offense charged in the indictment was said to have been committed at Bethlehem. Gentlemen, he continued, if you are not well satisfied that the overt act of treason was committed at Bethlehem, and that that overt act is supported by the evidence of two witnesses at least, you will not find the prisoner guilty.)

Now, gentlemen, is the proper time for me to state one or two points concerning the law of evidence, of which you have heard much from the bar. As I observed, there must be two at least to prove that the act of treason was committed at Bethlehem. It is the opinion of the counsel for the prisoner that you must be convinced, not only of the fact by two witnesses; not only that he was concerned in a certain act; but that you must have the evidence of two witnesses, at least, by evidence drawn from the same place, that it was done with a treasonable intention, before you can pay any attention to any other evidence whatever. The fact is that, when the overt act is proved by two witnesses, it is proper to go into evidence to show the course of the prisoner's conduct at other places, and the purpose for which he went to that place where the treason is laid, and if he went with a treasonable design, then the act of treason is conclusive. In this I am supported by a very respectable authority on crown law, Foster, in the Case of Deacon [Fost. Cr. Law, 246], from which it appears that it is enough, to prove that a re-

bellious assembly of armed men were there, and that the prisoner joined them. In order to prove to you fully the design with which the prisoner went to Bethlehem and joined in this great outrage, I shall select some of the evidence respecting those previous transactions; it is not necessary to state the whole. (The judge here read the evidence of James Chapman, John Rodrick, Cephas Childs, and William Thomas, respecting the conduct of Jacob Fries on the 5th of March, and respecting the meeting with Foulke and Rodrick near Singmaster's; and also the transactions of the 6th, at Quaker Town, which evidence, he said, so confirmed each other, that no doubt could be entertained.)

We now come to the confession of the prisoner, voluntarily made on his examination before Judge PETERS. Here is a point of law relied on by the prisoner's counsel—that no man should be convicted of treason but on the evidence of two witnesses, or upon confession in open court. This is the provision in England as well as here, and the meaning is, that no confession of the prisoner, independent of two witnesses, or without the facts have been established by two witnesses, should be sufficient to convict him: but if two witnesses have proved a fact, the confession of the party may be received by way of confirmation of what has before been sworn to. In former days in England, it was allowed that confession out of court, and the proof of the witnesses, should be sufficient to warrant a conviction; but happily our constitution would not admit it, if a hundred would swear to it: that danger is wisely avoided. Instances enough are in the recollection of the court, of a civil and criminal nature, where confessions have been received; but the jury are to judge from other evidence how far that is to be regarded. Evidence may sometimes be given which may be doubtful, and wants corroboration; you will judge whether that is or is not the case at present. But if the confession of the prisoner should go to confirm the evidence, if sworn to by two witnesses at least, it may be received, but unless it does go to corroborate other testimony, I do not think it admissible. You will consider whether any part of this confession has not before been proved by two witnesses: if it has, it goes to corroborate what they say; if it has not, you are to disregard it. I think there ought to be great caution in receiving, as evidence, a confession which any man makes himself, because it possibly might be obtained from him by artifice or intimidation: with respect to this confession, you have the testimony of my honourable colleague, Judge PETERS, that he gave the prisoner deliberate warning that he was not bound to convict himself, and that no intimidation was used. Whatever objections, then, there may be as to confession in general, it does not apply in this case, because it was

voluntarily given. The prisoner on his part introduced some witnesses, thinking they would be favourable to him: one of them appeared to be so in his testimony, which I shall endeavour to relate; the other three did not answer his expectation. (The judge related the evidence of John Jamieson.)

With regard to the point of law stated respecting the sufficiency of the warrants, the evidence to this fact shows the general disposition of that part of the country to resist the execution of the law, and prevent it by force or intimidation; our means of showing that, is their conduct towards the assessors. Those who were appointed to that office, so far as they had it in their power, showed a disposition to act as such. It is contended that their warrant ought to have been produced. With respect to the blank commission, which there was a suspicion was unlawfully filled up, there ought to have been the books produced; but it was not material. This indictment, it will be observed, is not for any resistance to the assessors, or obstruction of them in the discharge of their duty. I suppose it is not necessary to show that these officers were de facto engaged in the execution of the law; that they were considered as assessors; and that no doubt ever was entertained that they were properly authorized to be assessors. This doubt, if there was any, could be removed by reference to a very respectable authority. It was sufficient if the warrants, given under the seal of the commissioner, were produced to the court.

The honourable judge entered pretty largely into the examination of the objection respecting Mr. Foulke's appointment in the place of Mr. Clarke, which, he contended, was not material, since the warrant was filled and he acted under it.

With respect to another point of objection stated at the bar, that the marshal, in detaining the two men at Bethlehem, was liable to an action, he said that, under the circumstances of that period, he could not, because, under certain circumstances, he was warranted to call out the posse comitatus, i. e. the power of the county, to assist him, if he was likely to be overpowered: it could not be presumed that the circumstance did not empower and warrant him to call them out, and therefore we may conclude that danger was really to be apprehended, and those apprehensions must be heightened by the arrival of those two men in arms. In the opinion of Judge Henry, who was present, the danger was such as to justify the act of detention of those two men. Was it with a view of depriving these men of their liberty? No; but supposing them to have come with intent to assist in the rescue which they acknowledged they had heard was contemplated. Gentlemen, in looking to the law on this point, I do not think it is encroaching at all upon the liberty of any man to take him in custody. An officer in

such an action must be at his peril, and could only be justified on the exigency of the circumstance: if he did it unnecessarily, a jury would teach him to take care how he sported with the liberties of his fellow-citizens; but supposing, from good evidence, that he was in danger of assault, if he waited the united force of the assailants, shall it be contended as unreasonable, that the marshal should take measures of self-defence while it was in his power, and detain what he might reasonably suppose a part of them? He surely acted the part of a prudent man, and was justifiable in the act. Before I dismiss this general subject, I think it an indispensable duty which I owe, to declare that, excepting the single instance, wherein I do perceive some impropriety of conduct, in the filling up the blank commission, what has been disclosed in the course of this examination of the conduct of the commissioners or assessors, has reflected on those officers the greatest honour: at the same time they acted with industry, fidelity, and firmness, in the discharge of that duty, they did all in their power to make it easy to the people, accommodating themselves to endeavour to give full satisfaction, undeceiving the deluded, and removing the errors which the people had fallen into. If the people still continued in ignorance and opposition, those gentlemen acquitted themselves of blame, and their conduct merited high praise.

As to the plea of ignorance, the law says ignorance shall excuse no man; otherwise, how could it be possible to prove whether a person knew the law or not? If ignorance could excuse a man for crimes, no crime would be brought to justice, or there must be, what is not to be expected, some self-evident proof of the guilt. A complete knowledge of the laws cannot be expected in every corner of our country; but thus much we may say, to remove this kind of excuse. If a man does not know when a law is passed, he knows how to obtain that information, and the law itself; for if he cannot come to Philadelphia, or some other town where they may be purchased by himself, he has opportunity of sending from time to time. But in the present case, any doubt could have been removed by application to the assessors, who were ever ready and willing to show the law, and therefore no plea of ignorance can possibly be set up.

Having spoken in commendation of the conduct of the commissioners and assessors, perhaps it is also my duty to say that the conduct of the marshal has been equally exemplary: he did everything in his power, by fair and honourable means, to avoid going to extremity, and as long as he had a hope of retaining his prisoners, he displayed a degree of courage which few men would do. He even offered to expose his life to this armed mob, by proceeding with the prisoners to Philadelphia, which he would have done but for the advice of three or four gen-

tlemen with him, who thought it madness to proceed. He accordingly desisted, and in the event delivered up the prisoners.

This trial has lasted so many days, that we must be all very much fatigued; and I declare, gentlemen, I have scarce had power to examine the various points with minute attention, much less to prepare so proper a statement of them as I intended to have done. The fatigue I have felt many nights at going out of this court has prevented me doing it. Under these circumstances, I have no doubt of your excuse, which I shall the more readily meet, since your fatigue must also be very great.

Gentlemen of the Jury:—The occasion is undoubtedly the most awful and important that ever could arise in any country whatever: the great question for you to decide is, whether the prisoner has been guilty of levying war against the United States at Bethlehem, in the county of Northampton, as charged in the indictment, or not. In order to discover the nature of his conduct, you must examine into the motive with which he went to Bethlehem: it is necessary for you to examine the whole of his previous actions relating thereto: if it should appear to you that the prisoner formed a scheme, either on the way or at Bethlehem, by any kind of force, to obtain this object, then, in my opinion, you ought to declare him guilty of the charge laid in the indictment. On the contrary, if you think he had no public and evil motive in view, he is not guilty of the crime. Before I dismiss you, gentlemen, I would remind you of one consideration which must impress your minds. A great and important end of bringing persons guilty of public crimes to justice is to preserve inviolate the laws of our country. Men who commit crimes ought to be punished; otherwise no safety or security can be had. On the other hand, it is of consequence that no man's life shall be taken away unjustly. If a man is not guilty of a crime, he ought not to be punished for it; and it cannot be for the interest of the country to put a man to death for what he has not committed: therefore you are not to regard the consequences, but determine merely by the facts in a manner for which you will be answerable at a future day, as well as myself, for all the conduct of our lives, as well as for the verdict you now give.

Mr. Lewis stated a question to the court, whether the overt act laid in the indictment in a certain county, must not be proved to the satisfaction of the jury, both as to fact and intention, in the same county, or whether the overt act did not include both fact and intention. To which Judge Iredell replied, that he considered Foster's crown law as settling that point. When two witnesses are produced, which proves the overt act laid in the indictment, there might be then evidence drawn from other counties respecting the intention: this is the opinion of Judge Foster, and it is my opinion. But there is another thing: it goes to a point which is inadmissible; it is not for the court to say whether there was a treasonable intention or act as charged in the indictment; that is for the jury to determine; we have only to state the law—we therefore should have no right to give our opinion upon it. Again, if no evidence could regularly be admitted out of the county until both the fact and intention were established where the crime is laid, the consequence would be, that there ought to be some way of taking the opinion of the jury, whether they believed that the crime was committed at Bethlehem, before the court could proceed to extraneous testimony! This cannot be done; a jury must give verdict upon all the evidence collectively; if the evidence is admitted, then the jury is bound to respect the weight of it: the competency of that evidence is for the court to decide, but the jury must estimate its weight. The question for you to decide at this time, gentlemen of the jury, is, whether, upon the testimony of two witnesses, there is ground to believe the act was committed; and whether, from the prisoner's conduct at Bethlehem or elsewhere, it is proved to be with a treasonable intention.

Judge PETERS.—I think the overt act and the intention constitute the treason; for without the intention the treason is not complete. If a man goes for a private purpose, to gratify a private revenge, and not with a public or general view, it differs materially. The intention may possibly be gathered at the place where the act was committed, or it may not; if not, evidence is admissible to prove it elsewhere.

The jury then withdrew, and the court adjourned for about three hours, when they returned with the verdict guilty.[10]

Motion for a new trial of John Fries, for treason.

May 14.—Mr. Lewis informed the court that, the other day, in coming into court, he received a slight information, which he thought it his duty, as advocate for the prisoner, to make further inquiries into; but it was not till this morning that he had been able to procure the depositions of witnesses to prove a fact, on which he meant to ground a motion. He read the depositions to the court, which imported that John Rhoad, one of the jurymen on the trial of John Fries, had declared a prejudice against the prisoner after he was summoned as a juror on the trial. He now found that he could procure other affidavits to the same fact, on the ground of which he "moved a rule to show

---

[10] "This trial," says the reporter, "occupied the unremitted attention of the court and jury from April 30 until May 9, inclusive (nine days), during which time the jury never separated."

cause why there ought not to be a new trial." [11] He expressed himself aware of the lateness of the period, verdict having been given, but the impossibility of proving the fact earlier was a sufficient apology. He should forbear to enter into the merits of the motion at present. Rule was granted, and made returnable to-morrow morning.

Wednesday, May 15.—Mr. Dallas said it became his duty, as advocate for the prisoner, to lay before their honours the grounds on which they had moved for a new trial in the case of their unfortunate client, in which he was sensible some little violence must he offered to his feelings in whose behalf it was made, and particularly if judgment should at last be pronounced upon him: but whatever the event, it became their duty to prefer it; and he was certain that, upon examination into the facts, they must be justified in producing them, as the event must alter the decision which had taken place. He was satisfied that the court, without direct reference to authorities, would be inclined to listen to anything that could be offered upon good grounds in favour of life, or the chance of life. With this confidence, he relied on the favourable attention which would be paid by the court, and that the intervention of any trifling error in the proceeding, may not expose the defendant to the danger of an unfavourable decision. In making the motion, Mr. Lewis had laid before the court some affidavits in order to prove that one of the jurors, after he had been summoned to attend the trial, did declare that the man should be convicted: in addition to that circumstance, the following reasons should have been assigned in favour of the motion: First, that the marshal has, without any order or direction from the court or judges for that purpose, returned a greater number of jurors than he was by law authorized to do. Secondly, that he returned them from such parts of the district as he thought proper, and without the direction of the court or judges. Thirdly, that the trial ought to have been held in the county where the offence was committed, except manifest inconvenience should appear; and it does not appear from any part of the record of the court that any inconvenience did prevent it, for whatever were the acts of the court, they ought to have been placed on the record, which, not being done, is good ground for a motion.

Judge IREDELL did not think that the court were bound to assign a reason for their judgment on the record of their proceedings; besides, it was a high contempt at this time to call for the renewal of an argument whereon a solemn decisive opinion was delivered: he asked what part of the law required it: if it was at that time omitted, it was not in the power of the court to order it now; or if they did not order the reasons to be inserted, the mere decision on the face of the record was enough to make it authoritative.

Mr. Dallas then addressed the court in an argument of great length on the questions submitted by Mr. Lewis, protesting at the outset that there was no intention of offering a contempt to the court; and if the court would attend, they would be convinced there was not. He next made a few observations on the conduct of the juror, which, he said, was not merely an expression of opinion, but a previous determination, and an expression of fear that the prisoner should be acquitted, so that it was impossible to doubt that, if this was true, the juror did not give verdict upon evidence, but was influenced by a previous bias, and prejudiced determination; his going into the box with this partial mind, deprived the prisoner of that chance which the law determines he shall have. It is necessary that every jury should enter this box free from malice; but it was not so: this juror laboured under particular impressions, unfavourable to John Fries, because he conceived he had been the leader of, and brought on this disturbance, and therefore ought to be hung: this will be proved to have been more than once the language of the juror, and that he indulged himself in those expressions. After running from place to place, influenced by a vindictive spirit of prejudice, to express his desires, can it be contended that he was capable of deciding on the guilt or innocence of the prisoner, by the weight of the testimony only? There cannot be found a stronger case in the books. It is not necessary or right to go into the testimony, or any of the circumstances of the crime of the prisoner, to see whether the verdict was right or wrong; but it is necessary to view the determination of this juror, who wished them all hanged, and particularized Fries. First, his words were, "We will hang them all;" then he said, "I myself shall be in danger, unles we do hang them all." This is not merely an opinion generally expressed, but the language of design to convict at all events. If eleven out of twelve jurors had been of opinion that an acquittal should take place, and this individual, supposing he was in danger, had declared this opinion, and pointed out his view of the probable consequences, would not the voice of the eleven be changed to guard against this danger? 4 Hawk. P. C. c. 43, § 28, p. 399, supports the doctrine generally, that if a juror has declared his opinions beforehand, that the party is guilty, or will be hanged, or the like, it is good cause of challenge: but if from his knowledge of the case, and not from ill-will to the party, he has only declared his opinion, it is no cause of challenge. But even resentment has not the influence

---

[11] "The prisoner." says the reporter, "had been brought into court in order to receive sentence of death, but on Mr. Lewis' motion for a rule to show cause, judgment was suspended, and he was remanded back to prison."

upon a man's conduct which self-preservation has: ill-will is not the only ground of challenge; interest is as much so: if a man had laid a wager another would be hung, this is not ill-will, but would vitiate the juror. Therefore we must conclude that "ill-will," in the above authority, is put merely as an instance. Whether these words were spoken in warmth or not, is immaterial, for it would be no alleviation; it is impossible that they should have been expressed without ill-will; and therefore the man is not impartially qualified to pass upon the life or death of the prisoner. Salk. 645; 11 Mod. 118. Upon the general ground of what could be with propriety called misconduct in the person summoned to discharge the duty of a juror with impartiality, he observed there could be no doubt upon the propriety of their asking a new trial, nor upon the justice of one being granted.

Mr. Lewis mentioned 5 Bac. Abr. (Old Ed.) 251, 252, and 4 Bl. Comm. 354, 355, in order to show, that in criminal cases there should be no new trial, unless it should appear that the former trial had been attended with fraud, &c., and that a new trial in those cases might be granted after conviction. 11 Mod. 119; 5 Bac. Abr. 243; and 3 Bac. Abr. (Old Ed.) 258. If he has declared his will touching the matter, it shall be cause. 4 Bl. Comm. (Old Ed.) 346. The direction respecting the venire, he said, was entrusted to the law, and not to the marshal; and by that direction was exercised by the judges in 1795; and if that was neglected, it was not legally executed. The court could, as then, order the jury to be called from all parts of the state, and not to be left to the marshal. 5 Bac. Abr. 242, is an instance in which a son was sworn into the jury, (being the same name of John Pierce,) instead of the father, who was the person summoned to attend, whereupon a new trial was granted, because the trial was held by only eleven qualified persons as jurors. If the sheriff did not follow the direction of the law in respect to the venire, it was good cause for new trial.

Mr. Sitgreaves, in replying to Mr. Lewis and Mr. Dallas, first doubted the power of the court to give a new trial in criminal cases, upon which.

Judge IREDELL said, he had not discovered any dictum which distinguished civil from criminal causes, so that equal justice ought not to be administered; but if either, surely a criminal case called most strongly for justice: it would never do to apply cases so far, as to say that, if one man upon a jury was discovered not to be fully impartial, a new trial should not be granted, when a man's life was at stake.

Judge PETERS said he always understood, that the power of granting a new trial was in the discretion of the court; and that its opinion ought not to be turned by any vagaries which should be presented, but he governed by a reference to legal discretion; but at the same time, he could not say that the court ought to throw entirely out of their view all the evidence which had been given in the trial and everything that had been done. If, in the scale of justice, there should appear to be any error, and the case is any way doubtful, then the court will take advantage of a trifle, in order to grant a new trial; but where the court has been fully convinced that the verdict is right, then the evidence ought to have some weight, as well as the law.

Mr. Dallas observed, that the motion was not in any regard to evidence; if so, the weight of evidence must be considered; but it was alone on the point of law, totally independent of evidence.

After Mr. Sitgreaves and Mr. Rawle had replied, it was agreed by counsel, and ordered by the court, that the deponents should give testimony, and be cross-examined in court, on each side; and also that the witnesses should be examined separately, and kept out of the court, so as not to hear the evidence given by each other. Five witnesses were then produced, who testified that John Rhoad, one of the jurors who sat on the case, had declared, at two separate occasions, after his being summoned on the jury, but before the trial, that Fries, the prisoner, "ought to be hung;" "that it would not be safe at home unless they hung them all;" &c. Rhoad himself was afterward called by the district attorney, and denied under oath that he had made use of the expressions imputed to him, or any other of a similar character. Some testimony, also, was produced for the purpose of showing his veracity and general good character.

Mr. Lewis then mentioned the grounds upon which the rule to show cause had been granted; whether either or all the grounds had weight in them, he would not undertake to assert; but certain it was that it was the duty of the prisoner's counsel to lay them before the court and wait the event, which, if favourable, would cause a new trial; if not, they should be satisfied with having discharged their duty; in either case they should cheerfully submit to the opinion of the court; and he was sorry to see that the last question, to wit, that the trial ought to have been held in the proper county, had given any discomposure to the court. He then explained the reason, to show the court that it was not agitated out of any disrespect to their former decision, which was that "manifest inconvenience" did prevent the trial being held there, but this did not appear on the record. In criminal prosecutions, and especially capital cases, it was usual for the prisoner's counsel to avail themselves of every slip and inaccuracy, and therefore he was excusable in the present objection. 4 Burrows, 252. It was common to the court to err, and in such a case he considered himself in duty bound to point it out to them; and he was satisfied,

if that error was of consequence enough, the court would grant a rule thereupon, and thus retract from their former opinions, which they were fully authorized to do. 3 Bl. Comm. 391; 1 Burrows, 393. Mr. Lewis then went on to point out the propriety of granting a new trial in criminal as well as civil cases, although the prosecuting counsel had enforced the want of precedent as a reason against it; indeed, he said, it was evidently of more consequence, and therefore he supposed it had been the more strongly opposed; a man's life and his fame were of more value than a part of his property, and he had no doubt that whatever might have been the verdict, the court would go as far in granting it. It was admitted that the court had the power; if it had the power, there was no doubt but the honourable judges would exercise it according to their conviction. Mr. Lewis said the counsel for the prisoner did not come forward to prove that the verdict was given against evidence, but to insist that the prisoner had been tried by eleven jurors only, for the other stood indifferent as he stood unsworn; they went further—they went to prove that there was an essential error in the panel, and thus the prisoner was bereft of those benefits to which the law entitled him. If we prove this, said he, we do not address ourselves to the discretion of your honours; it is not a matter of will; it is a matter of justice to which we are entitled. As it respects the evidence, you are not at all to consider its weight; the evidence may be clear, and yet the verdict may be wrongly given, because of the incompetency of the jurors. The gentlemen have said the period of application is past—it is too late; but with all their talents and industrious researches, those learned gentlemen have not been able to produce a single authority to support the doctrine that it is too late; after conviction, or even after condemnation, the court have authority to order a new trial; no time is specified to limit the discretion, if the reasons are good. If the law has not distinguished the period, those gentlemen are certainly unwarranted in saying it is too late. In 2 Strange, 968, is a case where an argument was held on a plea for a new trial; but not a single argument is used, that a new trial could not be held on capital cases; that seems to be taken for granted.

It was argued against a new trial, in capital cases, that the court proceeded more deliberately, and more cautiously, and because the prisoner was allowed a challenge of his jury. The argument amounts to this: because the law requires more caution, and gives the prisoner more advantages where his life is at stake, for that reason he should have less advantage and less indulgence; or, in other words, because the benignity of the law allowed more benefits in the awful event of life or death, therefore in another point essential to the prisoner, he should be bereft of an advantage enjoyed by one indicted for an assault, or in a common civil cause. It may be argued, that the benevolence of the executive may extend mercy to the prisoner, because of any irregularity in evidence or proceeding; but this will not satisfy the law; it is a hazard at best, while the law gives him the certain advantage of a new trial The power and right of granting a new trial in some cases, are admitted; now, if any of the witnesses or jurors could be proved to have perjured themselves, the evidence being first given, and the verdict pronounced, this, it will be allowed, would have weight to grant a new trial; but the case before the court goes as far, if not farther; and if there should appear an extreme error in summoning the jury, or that one of the jurors had disqualified himself from wearing the characteristics of an unbiassed man, then it must equally appear that there has been an infringement of a legal right, sufficient to lay the foundation of a second hearing. Another doctrine that was insisted on was, that it was discretionary in the court; that, where they were satisfied with a verdict, although against evidence, no new trial ought to be granted. There may be instances of a civil nature in which that doctrine will be allowable; but they differ materially from the one now before the court, and therefore will not apply. That application may go to the favour of the court, where they see the evidence strong; but no favour can be exercised, nor is any asked in this case; we only appeal to the justice of the case.

It was said by one of the gentlemen, that this juror's declaring his sentiments was only cause of challenge to the favour, for which triers ought to have been appointed, and the qualification or disqualification of the juror been determined by them, but for which it was now too late. Mr. Lewis denied the position. He had already proved, both on his own declaration, and by the evidence, that it did not come to their knowledge until after the verdict was given, and therefore they came forward as soon as they were obliged: this was allowed a sufficient excuse in Salk. 645, and 11 Mod. 119, and therefore the objection was unimportant. The witnesses could not inform John Fries, for he was in jail; he could not know it until yesterday morning, when the motion was made in court, for the witnesses had no knowledge of each other, so as to be able to communicate it. 3 Bac. Abr. 258, 259, says: "It is particular cause of challenge, if a juror has declared his opinion touching the matter." In causes of particular challenge, the court is to inquire into the truth of the fact, and no triers are to be called: if they find the cause a true one, they are not to judge, nor to be left to discretion, but, they must try the issue again. This is the doctrine of ancient law and usage. Bac. Abr. 266. Then, all the argument about triers is out of the question; the question is, whether the juror stood indifferent, or whether he was under the influence of bias, and a prejudiced

mind: the law compels the issue to steer clear of friends or enemies: no partiality whatever is to predominate: but can any man in the world say that Rhoad's mind was free from prejudice when he took opportunities to make such declarations?

Mr. Lewis then went into an examination of the evidence and depositions. Now suppose the court to believe the fact nearly as stated by the evidence, Mr. L. asked, whether it was possible, consistent with law or justice, to believe that a just verdict was given, or that any man ought to suffer under such a verdict? Suppose the whole twelve to have made similar declarations; it would require no argument to convince the unbiassed, that the consequence must be fatal. It has been attempted to be proved that even such a declaration was no ground of challenge, if it was not made from malice; but what is the meaning of an independent man? It means a man who stands on the high ground of justice and impartiality, and is not warped by prejudice nor warmed by resentment, quite free from interest in the issue; also, a man whose judgment has not been made up in favour of either the one party or the other; for, if it has, though he may be an honest and well meaning man, it is not likely that his mind would be freely given according to evidence. Without he is free from these entanglements upon his mind, he will, he must err. Now, it appears by the evidence of even Mr. Rhoad himself, that he was warm, and might have forgotten the expressions, and nothing can be shown but that Mayer, the witness, who has lived in this country, is a man of good character; however, he must be supposed so, until he can be proved otherwise. Mr. Lewis remarked, that the witnesses spoke of different conversations; Mayer of one, when Rhoad came first to town; the others, of two afterwards, in the room where they were sitting, and in the bed-room. He contended that no material, although a verbal, difference did exist; but the testimony of Rhoad differed materially from them all; his verbal testimony and deposition were also different, as might be seen. But, Mr. Lewis said, he doubted whether the testimony of Rhoad in this matter was legal evidence or not, because it was a matter in which he was materially concerned; however, they had not much objected, as there was a considerable difference in evidence going to a court, and to a jury; he had no doubt their honours would make the necessary allowance. Although Rhoad was not sworn at the time he used these expressions, he was summoned on this trial, and it was a high misdemeanor—whether it was indictable or not, he would not say—but it was a very imprudent disposition to encourage or even suffer. In Cooke's Case, Salk. 153, Chief Justice Holt holds, that if a man ought not to be compelled to prove that he is a party, neither should he be allowed to prove that he is not a party, by his own evidence. This applies to Rhoad giving evidence, in which his character is concerned. 15 State. Tr. 547, 548, the case appears more fully; such conduct is here declared to be scandalous, a misdemeanor, and the man ought not to be on any jury. By four witnesses, neither inconsistent with themselves, nor with each other, Mr. Lewis said this fact was clearly proved, and he thought incontrovertibly so; of the respectability of those witnesses he knew nothing; but nothing disrespectful had been proved, and, consequently, not their incompetency.

Judge PETERS said that he did not know about their swearing falsely, nor could he say anything about Mayer; but of the others, he well knew that one was extremely stupid, and the others deeply prejudiced, on which account, their evidence should be carefully scrutinized, and carefully received.

The necessity of great precaution and care, Mr. Lewis was willing to admit; but this stupidity was a good apology for their not revealing the fact until it was drawn from them. Their ignorance, indeed, was deducible from the whole of their conduct, and the opposition they made to the government, but it did not strike at their credibility; uninformed and misinformed as they were, their verity might be good. They were under indictments, and therefore perhaps afraid to speak; besides, coming from different parts of the country, they knew not John Fries; but let their offence or situation be what it may, they may be honest men, and men of truth and integrity, and, therefore, they must stand upon as good a footing as witnesses could stand. We must take it for granted, then, said Mr. Lewis, that the juror made these declarations; and if so, according to the law of England and of the United States, he is disqualified from the ouuce; otherwise that most invaluable right, trial by jury, would be eminently impaired.

Mr. Lewis then examined some authorities which had been quoted by the prosecuting counsel, some of which were irrelevant, and some he thought not at all applicable. With respect to the Case of Ann Clifton, as quoted from the Pennsylvania Practices, the juror declared that "he did not know how anybody could do otherwise than bring her in guilty, but he did not speak as a juryman." The court were of opinion, it was not sufficient to grant a new trial. The objection of the court was, not because it was a capital case, but they gave as a reason, that these words were not sufficient to vitiate a juror; his mind as a juror, he declared, was still open to conviction.

It was stated that the application ought not to be listened to, because the prisoner had the challenge of sixty-eight in effect out of the whole panel; how this was meant to be applied he could not discover, but one fact was plain, that the smaller number there were summoned above thirty-five, the better choice there was for the prisoner, and there-

fore the whole number cannot be made to exceed sixty, agreeably to common law. Mr. Lewis then observed, that one remark of Mr. Rawle, that Mr. Rhoad was the last they could challenge, but they would rather have him than trust to the next, was a plain implication that they were ignorant of the fact, instead of militating against the motion. In order to remove every suspicion of inaccuracy from the former testimony, he said, he had happily been able to procure one whose respectability could not be questioned, and which he should now introduce to the court.

Here, an additional witness was introduced, to sustain the facts already sworn to on the part of the prisoner.

Mr. Lewis resumed his argument in favour of the evidence, which, he said, had not the last witness come forward, the others being suspected, would have been a question, whether the negative testimony of Mr. Rhoad, in which he was a party, or the positive testimony of four others who were not concerned, had the most weight. But now, taking it for granted that Rhoad is mistaken, it can be only accounted for in two ways: First, that his memory failed him; or secondly, that he was extremely prejudiced. Imputing nothing corrupt to him, still we cannot allow him to be less so than any one of the five witnesses we have brought to controvert his assertions; allowing him not to be free from prejudice, he cannot be supposed to be capable of judging for himself. Mr. Lewis concluded by examining at great length the other reasons submitted on the motion for a new trial.

After some aditional evidence had been introduced of the same nature as that already noticed:

Judge PETERS observed, that the opinion of Lord Chief Justice Trevy, in 15 State Tr. was much to the point; but that question was not determined by the court. In a question of so much national importance as the present, Judge PETERS thought it his duty to give an opinion. When a man lives in the county where insurrection has happened, his impressions of injury from the repetitions of such scenes will be stronger than might be expected in other men, and, therefore, all that Rhoad said about it being unsafe for the friends of the government to live there, is accounted for, and no way improper for him to speak. I think Rhoad an honest man, and do not think he had any malice against Fries more than any of the rest; but I think he must have forgotten. That which appeared to strike Mr. Lewis with such force does not appear to me important. I think the proceedings might have been more regular, but yet I think they were regular enough to stamp the event with a sufficient sanction. The proceedings were much the same as the court of oyer and terminer, when the sheriff summons a number more than is wanted, in order to have them ready, and when twelve are wanted they are taken out

of that number. This venire issued by the same course as all others do, perhaps not knowing the offences would be capital, but it appearing otherwise afterwards, agreeably to act of congress some were summoned from the proper counties. The venire says the number is not to exceed sixty, yet these words do not designate more than those in the practice of England which directs twelve, but twenty-four is generally returned. To be sure the court might have given the order, but I do not see how this could be done without the defendant lying in jail, or a special court being held. There is some weight, to be sure, in the arguments on that point, but they are not so important as they were held up to be. The marshal having ready a certain number, when the issue was joined, then, and not before, was the number who did appear made to appear in court. The panel was returned, and furnished to Fries, on which the trial was suffered to proceed, and on that account I think it appears it was approved of by the court, which is a sufficient designation.

Judge IREDELL.—The question which the court have now to decide is certainly as important a one as ever was before a court. With regard to any interest the government could be supposed to have in the event, or the feelings of private humanity or compassion as men, for the very unhappy situation of the prisoner—these must both be sacrificed to that impartial justice which our duty peremptorily commands us to exercise according to the best of our capacities. Sure I am that it is always my disposition so to be influenced, as I am convinced it is also of the judge with whom I have the honor to sit on the bench. It is admitted, I believe, on both sides, that it is in the power of the court in criminal cases to grant a new trial in favor of the prisoner, though they cannot to his prejudice, and it must be readily admitted that it must be the most obvious considerations, which could possibly render it the duty of the court, lest they too readily grant a new trial: for if the power is placed in a court, it is proof that it must, or might be sometimes exercised, and if ever proper occasion arise for the exercise of it, it must depend on some particular, strikingly applicable circumstances. With regard to the particular circumstance now brought forward, that one of the jurymen made certain declarations unfavorable to the justice a prisoner has a right to expect, I must confess that until the evidence yesterday given by Mr. Yohe, I was not satisfied that he had said any such thing which could give the court full ground to believe him improperly biassed, so as to admit just cause for a new trial; but that testimony corroborating the testimony of those before given on which, independently, we could place but little dependence, strikes me with great force, otherwise I should have entertained some doubt, owing to their different relations of apparently the same event.

This caution was invigorated by the very excellent character which the juror had borne. From this I have every reason to believe that he has not wilfully done anything wrong, nor sworn to anything which he does not believe to be true. From the relation, it was difficult to arrange the particular parts of the conversation, so as to make it accord at any interval of time, on which account I was extremely desirous that Mr. Rhoad and Mr. Yohe should be confronted, and questions put to remind each other of the facts, so as both might accord; but it does appear that Mr. Rhoad's memory is extremely defective in some material points, and, therefore, without any impeachment, we may presume it was a gross mistake. It is the clear opinion of the court in 15 State Tr. that if a juryman, not out of particular malice against the individual, but from any other cause, appears to have formed a predetermined opinion, he was not fit to be a juryman, and it was, therefore, good cause of challenge. In that case the expressions used were much similar to the present case: that opinion appears to be grounded upon the supposition that where a man, from any ill motives, or otherwise, forms an opinion strongly on his mind, an improper bias is extremely difficult to get clear of, and will influence an honest man unwarily to give a wrong verdict, and to these circumstances every man is liable. It is impossible for me to resist the impression, from the number of depositions produced, that Mr. Rhoad must, at different times, have used expressions similar to those related by Mr. Yohe, but I can readily conceive that such expressions were used with an innocent intention, and without meaning to prejudice himself from afterwards serving as an honest juryman; yet I cannot be certain but it might originate from a predisposed opinion of the guilt of the man, and, therefore, it must render him less able to discriminate facts; but if no such idea of guilt did exist, according to the authority stated, it would be good cause of challenge, if known, but if not known until after verdict is given, it would then be sufficient time, for what is good cause of challenge previous to trial, is good ground for a motion after verdict. It is very much to be regretted that the witnesses who heard these declarations did none of them communicate it to the counsel or the prisoner before the jury were sworn, because he might have been set aside, and much unnecessary public expense and distress to the unfortunate man, besides delay of the execution of justice, in this particular case, been prevented. It being admitted that the court may grant a new trial in criminal cases upon sufficient cause to show, and it following that they ought to do it if shown, I further think that if there is cause of challenge before, there is equal cause, if it is proved that the juror was biassed, to order it, after verdict is pronounced, whatever delay or inconvenience may result therefrom; for that can be no reason to withhold a privilege to which a prisoner is entitled. From these views, I think it my duty to vote for a new trial in the present case, as the fact appears too clear to be controverted. In this event, there will be still an opportunity for the prisoner to be freed, and justice be done between himself and his country.

With regard to the point of law, if my mind had not been clear on the evidence respecting the juror, I should have been decidedly against a new trial, and accordingly should have taken the trouble more fully to have delivered my sentiments; it being so, I shall now make but a few general remarks. As to the point, that the record should evince the proceedings of the court, otherwise they are invalid, with reasons why trial could not be held in the county, I think there is no necessity of the reasons appearing on the record of court. If the question had stood simply upon this ground, it would have been immaterial; but it did not. Application was made to this court, after several indictments were found, alleging that the trials ought to be held in the county, whereupon the court declared its opinion, that "great inconvenience" prevented a compliance with the motion; but further it appeared to be gone out of the power of the court, because the indictment had been found in this court, which must be considered a part of the trial; and the law means the whole proceeding shall be in one place, so that the indictment must have been found in that county, otherwise the trial by jury could not be held there. These were the reasons which operated to influence the court to refuse the application. In this dilemma, it was impossible for the court to say the trial should not proceed here; and, had it been removed, a new indictment could not have been found; if it had, the trial could not proceed upon two indictments. The only time for considering this question, I believe, was, when this man was charged with the offence, before he was committed, or even after the court sat, and before the indictment was brought into court. If it had been the opinion of the judge who committed him, that the trial could be held there, then it could have been referred to the supreme court, who, if they had been of the same opinion, would have ordered a special court. But from the state of that county, no one can believe that a trial could have been held therein any way conducive to justice, or so as to make the proceedings of the court such as they ought to be, because the president has declared, by proclamation, that the law could not be executed without military assistance, which I never wish to see guard a court of justice as matter of choice, though unavoidable necessity may sometimes make it prudent.

With regard to the summoning the jury, it is to be observed, that the practice now used, was an established usage of this court for many years past, which is a sanction suffi-

cient, if no positive law nullifies it. The venire, issued in this form, in my opinion, did issue with the sanction of the court, and had the same effect as though the express order of the court had been annexed. It appears that it was not known, at the time the venire issued, that any cases were punishable with death, and of course not necessary to include a special provision for twelve to come from the county. Mr. Lewis made a concession, which, if right, did away the whole of this objection; he said, that upon the marshal's receiving information (whether it came from the judge or not) that a case punishable with death had occurred, he had a right, without any order from the court, written or verbal, to summon a greater number of men than in other cases: the words of the law are, not that he should summon twelve, but twelve at least; but he observed that this should not exceed, but be included in the number sixty. I do not know what authority he had to limit the number to sixty, in this or any other case. The law intends that a prisoner shall have a chance of men from his own neighbourhood; certainly then the greater the number which comes from it, his chance is proportionably increased; therefore it can never prejudice the prisoner. I think that if the marshal should extend the discretion given to him to an unnecessary number, it would operate to the vexation of the persons summoned, and they alone would have cause to complain. Formerly, by law, a sheriff was directed to summon twelve, but, by usage, he actually did summon twenty-four, yet all above the twelve appeared to acquiesce, and it could not be of disadvantage; so in the grand-jury for twenty-four, forty-eight were summoned; the power was assumed, and not complained of. I presume that if the marshal had authority to return that number, without a venire or precept, he was not limited as to number; and that when they came here, they formed the jury attending court. I am further of opinion, that when the panel was presented to the prisoner, that panel contained the full sanction of the court, as much as though they had given the order.

So far as to substance. With respect to form, the words are, after joining the issue, "let the jury come." That is a direction given by the court to the marshal to summon the jury; but as it would be inconvenient for him to summon the jury after this order, which is for him to do it without delay, those jurors already summoned appear in court, so that if it was entered upon record, it would appear that, after the prisoner was arraigned, and issue joined, the marshal had directed these men to come, and they had come. It appears to me that, whether the marshal summoned the jurors of his own accord, or whether they were summoned under the express order of the court after issue was joined,

in substance and in form the law is so far complied with as to do perfect justice. Though I am not certain that my opinion on these points of law is right, not having had much time to examine, yet I am strongly of that opinion at present; however, I have thought less and said less upon them than if the main object of the motion rested on it.

Sensible of the importance of the question, and that if life is once lost, it can never be recovered; leaving aside the question which involves doubt, and resting on the facts which have appeared before the court, I deem it my duty to say that a new trial ought to be granted.

Judge PETERS then said: Although I am not perfectly satisfied with the testimony, which is contradicted by the juror on his oath, I will allow it to be taken for granted, and meet the question on principle. I am in sentiment against granting the motion for a new trial. Because, 1. The juror said no more than all friends to the laws and the government were warranted in thinking and saying as the facts appeared then to the public. Fries being generally alleged to be the most prominent character, it was on this account, and not with special or particular malice, that Rhond's declaration was made. 2. If a juror was rejected on account of such declarations, trials, where the community at large are intimately affected by crimes of such general importance and public notoriety, must be had, in all probability, by those who only openly or secretly approved of the conduct of criminals. This would be unjust and improper, as it affects the government in its public prosecutions. Little success could be expected from proceedings against the most atrocious offenders, if great multitudes were implicated in their delusions or guilt. 3. It is natural for all good citizens, when atrocious crimes, of a public nature, are known to have been committed, to express their abhorrence and disapprobation both of the offenses and the perpetrators. It is their duty so to express themselves. This is not like the case of murder, or any offence against an individual, or where several are charged, and none remarkably prominent. In this latter case, selecting one out of the mass might evince particular malice. 4. I have no doubt that declarations of an opposite complexion could be proved; and yet the jurors were unanimous in their verdict. The defendant has had a fair, and I think an impartial trial. But as a division in the court might lessen the weight of the judgment if finally pronounced, and the great end of the law in punishments being example, I, with some reluctance, yield to the opinion of Judge IREDELL. Although justice may be delayed, yet it will not fail either as it respects the United States or the prisoner.